James Albert Hodges CDCR#V41134
Name and Prisoner/Booking Number

California healthcare facility
Place of Confinement

P.O. Box 32116 OR 7707 Austin RD
Mailing Address

Stockton, CA 95213
City, State, Zip Code

**(Failure to notify the Court of your change of address may result in dismissal of this action.)**

# FILED

MAY 0 1 2020

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

James Albert Hodges ,
(Full Name of Plaintiff)          Plaintiff,

v.

(1) Correctional officer, J. seibert ,
(Full Name of Defendant)

(2) Correctional officer, A. Brewer ,

(3) correctional officer, A. monroy ,

(4) Correctional officer, P. Bevens ,
                        Defendant(s).

☐ Check if there are additional Defendants and attach page 1-A listing them.

All Defendants Acted under the color
of State law

CASE NO. 2:20cv-896 CKD PC
(To be supplied by the Clerk)

**CIVIL RIGHTS COMPLAINT
BY A PRISONER**

☑ Original Complaint
☐ First Amended Complaint
☐ Second Amended Complaint

Notice: First copy
For Clerk

## A. JURISDICTION

1.  This Court has jurisdiction over this action pursuant to:
    ☑ 28 U.S.C. § 1343(a); 42 U.S.C. § 1983
    ☐ 28 U.S.C. § 1331; Bivens v. Six Unknown Federal Narcotics Agents, 403 U.S. 388 (1971).
    ☐ Other: _____.

2.  Institution/city where violation occurred: California state prison - Sacramento .

Revised 3/11/2016

## B. DEFENDANTS

1. Name of first Defendant: J. Seibert. The first Defendant is employed as: Correctional officer at California State prison- Sacramento.
   (Position and Title)                    (Institution)

2. Name of second Defendant: A. Brewer. The second Defendant is employed as: Correctional officer at California State prison- Sacramento.
   (Position and Title)                    (Institution)

3. Name of third Defendant: A monson. The third Defendant is employed as: Correctional officer at California State prison - Sacramento.
   (Position and Title)                    (Institution)

4. Name of fourth Defendant: p. Bevens. The fourth Defendant is employed as: Correctional officer at California state prison- Sacramento.
   (Position and Title)                    (Institution)

**If you name more than four Defendants, answer the questions listed above for each additional Defendant on a separate page.**

## C. PREVIOUS LAWSUITS

1. Have you filed any other lawsuits while you were a prisoner?  ☑ Yes  ☐ No

2. If yes, how many lawsuits have you filed? 1 . Describe the previous lawsuits:

   a. First prior lawsuit:
      1. Parties: James Hodges v. R. Kitschner
      2. Court and case number: 2:15-CV-00599-AC .
      3. Result: (Was the case dismissed? Was it appealed? Is it still pending?) Settled - Reached Settlement of court .

   b. Second prior lawsuit:
      1. Parties: _____ v. _____
      2. Court and case number: _____ .
      3. Result: (Was the case dismissed? Was it appealed? Is it still pending?)_____ .

   c. Third prior lawsuit:
      1. Parties: _____ v. _____
      2. Court and case number: _____ .
      3. Result: (Was the case dismissed? Was it appealed? Is it still pending?)_____ .

**If you filed more than three lawsuits, answer the questions listed above for each additional lawsuit on a separate page.**



## D. CAUSE OF ACTION

### CLAIM I

1. State the constitutional or other federal civil right that was violated: __8th Amendment__
   ~~Jail~~ __deliberate indifference__.

2. **Claim I.** Identify the issue involved. Check **only one**. State additional issues in separate claims.
   - [ ] Basic necessities
   - [ ] Mail
   - [ ] Access to the court
   - [ ] Medical care
   - [ ] Disciplinary proceedings
   - [ ] Property
   - [ ] Exercise of religion
   - [ ] Retaliation
   - [ ] Excessive force by an officer
   - [x] Threat to safety
   - [ ] Other: _____

3. **Supporting Facts.** State as briefly as possible the FACTS supporting Claim I. Describe exactly what **each Defendant** did or did not do that violated your rights. State the facts clearly in your own words without citing legal authority or arguments.

On September 5th 2016 while house in psychiatric service unit (lockup for mental health ill inmates. I spoke with my psychologist Dr. Costa he came to my cell and caught me slipping up Bedsheet he ask what I was doing. I told him I was suicidal and was going to hang myself, Costa told officers to put me in holding cage I was handcuffed behind my back and leg irons and I was to be wadaphi - J. Seibert was keeping Safety Checken A TIH A detentia SexgeardionCuffs - legitonisurtch All polici to prevent Self-harms. officer, Seibert began talking tcash About Another officer that was not present. I told him to shut up. he then started threatening me. next thing I remember is waking up in the U.C. Davis medical center I.C.U on A ventilator, when they took out the tube, the doctor asked How I was feeling. I was confused. I asked what happen? the doctor said you hung yourself and you Are lucky you came very close to dying, I told the doctor I couldn't remember, doc said Because you lost consciousness and oxygen to the brain it effected your memory. doctor said someone from the police will becoming to seem. I have filed countless appeals trying to get them to get C3751 IIH But they CDCR are deliberately covering up. (please note none of defendants try to prevent hanging). none intervene) none try to stop me All defendants All equally guilty

4. **Injury.** State how you were injured by the actions or inactions of the Defendant(s).

Anoxic Brain injury - loss of memory exposed to dangerous life - threatening situation. severe migraines Blurred vision I.Cu - Ventilator Back of ears enlarged

5. **Administrative Remedies:**
   a. Are there any administrative remedies (grievance procedures or administrative appeals) available at your institution?   [x] Yes   [ ] No
   b. Did you submit a request for administrative relief on Claim I?   [x] Yes   [ ] No
   c. Did you appeal your request for relief on Claim I to the highest level?   [x] Yes   [ ] No
   d. If you did not submit or appeal a request for administrative relief at any level, briefly explain why you did not. _____

**3**

## CLAIM II

1. State the constitutional or other federal civil right that was violated: 8th Amendment
Cruel and unusual punishment with Sadistic intent/deliberate indifference.

2. **Claim II.** Identify the issue involved. Check **only one**. State additional issues in separate claims.

   ☐ Basic necessities     ☐ Mail     ☐ Access to the court     ☐ Medical care

   ☐ Disciplinary proceedings     ☐ Property     ☐ Exercise of religion     ☐ Retaliation

   ☐ Excessive force by an officer     ☐ Threat to safety   ☑ Other: Cruel and unsual punishment.

3. **Supporting Facts.** State as briefly as possible the FACTS supporting Claim II. Describe exactly what **each Defendant** did or did not do that violated your rights. State the facts clearly in your own words without citing legal authority or arguments.

Not long After A Sergeant Kevin Steel of Isu investigative services unit came to interview me eh Camera n Asked me what whapppe? I told him I couldnot remember but the last thing I told him was Arguing with J. Sebez, he Said So you dont remember telling All 4 officers R fall gonna have to explain this)
that I then S flipped out handcuff Stop took off to -Shirt, Sipped it up made A noose then tied to top of Holding Cage, Put Around my neck and Hang my Self on till I lost consciousness? I said no, why didht they Stop me? Sergeant Steele Said they have no Answers excuses As to why didnt intervene that's why I am here? I Said their Action where Cruel and unsual punishment they where deliberately Indifferent to my Mental health and medical, Sergeant yes, (note) sergeant steele told me I died At the prison
none of the defendants try to stop me from hanging my self thay all Are guilty in All Claims.
they all Are guilty on All Claims.

4. **Injury.** State how you were injured by the actions or inactions of the Defendant(s).
Anoxic Brain injury -loss of memory exposed to dangerous life-threatening situation severe migraines Blurted vision I cin ventilator Back of efg enlarged

5. **Administrative Remedies.**

   a. Are there any administrative remedies (grievance procedures or administrative appeals) available at your institution?    ☑ Yes   ☐ No

   b. Did you submit a request for administrative relief on Claim II?    ☑ Yes   ☐ No

   c. Did you appeal your request for relief on Claim II to the highest level?    ☑ Yes   ☐ No

   d. If you did not submit or appeal a request for administrative relief at any level, briefly explain why you did not. _____

4

**CLAIM III**

1. State the constitutional or other federal civil right that was violated: _____
_____.

2. **Claim III.** Identify the issue involved. Check **only one.** State additional issues in separate claims.
   - ☐ Basic necessities
   - ☐ Mail
   - ☐ Access to the court
   - ☑ Medical care
   - ☐ Disciplinary proceedings
   - ☐ Property
   - ☐ Exercise of religion
   - ☐ Retaliation
   - ☐ Excessive force by an officer
   - ☐ Threat to safety
   - ☐ Other: _____.

3. **Supporting Facts.** State as briefly as possible the FACTS supporting Claim III. Describe exactly what **each Defendant** did or did not do that violated your rights. State the facts clearly in your own words without citing legal authority or arguments.

I was Allowed and deliberately, knowingly willingly, defendants Acted with malicious and sadistic intent to watch me suffer by hanging fact finder if defendant Acted with urgency and stopped me from Attempting suicide I would not need medical But Furthermore defendants watched me until lost consciousness defendants put me in a life – threatening situation No regard for my health or safety there was no Action put me in the hospital in Icu on a ventilator and could ive cost me my life and cause me to lose Brian Cells due to lack of oxygen to the Brian – loss of memory exposed me and suffered Anoxic Brain injury – severe migraines black of eyes _____ _____ to _____ eye-glasses cant see

4. **Injury.** State how you were injured by the actions or inactions of the Defendant(s).

Anoxic Brain injury – loss of memory exposed to dangerous life threatening situation severe migraines Blured vision Icu-ventilator Back of eyes enlarged I have A hard time when it comes to concentration _____ _____ – loss of _____ _____ cells – _____ – _____ _____ _____

5. **Administrative Remedies.**
   a. Are there any administrative remedies (grievance procedures or administrative appeals) available at your institution?  ☑ Yes  ☐ No
   b. Did you submit a request for administrative relief on Claim III?  ☑ Yes  ☐ No
   c. Did you appeal your request for relief on Claim III to the highest level?  ☑ Yes  ☐ No
   d. If you did not submit or appeal a request for administrative relief at any level, briefly explain why you did not. _____
   _____

**If you assert more than three Claims, answer the questions listed above for each additional Claim on a separate page.**

5

# Claim 4

## Criminal Reckless Endangerment

Defendants willingly, knowingly deliberately exhibited
A culpable disregard of the foreseeable
consequences to my health - life - safety from the
Act - Omission involved their demeanor - nature
Put me in imminently dangerous life - threatening
situation with no regard of the consequences.

# Claim 5

## Criminal negligence

Defendants had to Know their inActions - Action
would cause the unnecessary and wanton
infliction of pain and know it could've cause Death
or result to me becoming - A Vegetalbee
its appropriate to Say
Defendant Actions were (Malicious and sadistic)

6

## E. REQUEST FOR RELIEF

State the relief you are seeking:

wherefore, plaintiff respectfully requests that this court enter an order issuing declaratory relief declaring that the Act's and provisions of the defendant's have violated plaintiff rights of eighth Amendment Award Compensation damages for the pain it cause in near Death in Amount of 100,000 each in defendant's individual and official Capacity, and 200,000 punitive damages individual official Capacity under Color of state law And Seek Trial - @ 100.000 pain and suffering individual and official Capacity And All defendants take lie detector test

I declare under penalty of perjury that the foregoing is true and correct.

Executed on   5-3- 2020
_____
DATE

James Hodges
_____
SIGNATURE OF PLAINTIFF

_____
(Name and title of paralegal, legal assistant, or other person who helped prepare this complaint)

_____
(Signature of attorney, if any)

_____
_____
(Attorney's address & telephone number)

## ADDITIONAL PAGES

All questions must be answered concisely in the proper space on the form. If you need more space you may attach more pages, but you are strongly encouraged to limit your complaint to twenty-five pages. If you attach additional pages, be sure to identify which section of the complaint is being continued and number all pages. Remember, there is no need to attach exhibits to your complaint.

7

California Department of Correction and Rehabilitation

# grievance / 602

## Both Sides

### Back and Front

EXhibit #1

EXhibit # 1

they deliberately dodged, ignored, Avoided
MY grevance But sent to
office office Internal Affairs
which said defendants didn't violate policy
which is all in All A cover up
in greivance I even told them Dont Just
give to Affairs Because they have A
history of Covering up correctional officers
wrongdoings total Corruption - Cover up
CDCR - officials - Isu - All are guilty

STATE OF CALIFORNIA
**INMATE/PAROLEE APPEAL**
CDCR 602 (REV. 08/09)
DEPARTMENT OF CORRECTIONS AND REHABILITATION
Side 1

1900223

V41134

IAB USE ONLY

*(handwritten)* SAC P.18 04313

You may appeal any California Department of Corrections and Rehabilitation (CDCR) decision, action, condition, policy or regulation that has a material adverse effect upon your welfare and for which there is no other prescribed method of departmental review/remedy available. See California Code of Regulations, Title 15, Section (CCR) 3084.1. You must send this appeal and any supporting documents to the Appeals Coordinator (AC) within 30 calendar days of the event that lead to the filing of this appeal. If additional space is needed, *only* one CDCR Form 602-A will be accepted. Refer to CCR 3084 for further guidance with the appeal process. No reprisals will be taken for using the appeal process.

**Appeal is subject to rejection if one row of text per line is exceeded.** WRITE, PRINT, or TYPE CLEARLY in black or blue ink.

| Name (Last, First): Hodges James | CDC Number: V41134 | Unit/Cell Number: Q-216 | Assignment: |

State briefly the subject of your appeal (Example: damaged TV, job removal, etc.):
Cruelty indifference to mental health/violation policy, procedure

A. Explain your issue (If you need more space, use Section A of the CDCR 602-A) On 9-5-18 in prison CSP-Sac in psu B-7 in holding cage waiting to go to cell Bed inside Block infront of c/o office is holding cage located around 2:10pm I, and c/o seabert 1 not sure on spelling name

B. Action requested (If you need more space, use Section B of the CDCR 602-A): I am requesting the First names and last names of All 5 c/o the 4 on the Floor and the tier control I need the Statements/reports that c/o gave

**Supporting Documents: Refer to CCR 3084.3.**
☑ Yes, I have attached supporting documents.
List supporting documents attached (e.g., CDC 1083, Inmate Property Inventory; CDC 128-G, Classification Chrono):
Second Level Response    22 request for interview
602 return to me    that I want to Answer questions and return to me

☐ No, I have not attached any supporting documents. Reason: _____

Inmate/Parolee Signature: Hodges James    Date Submitted: 10-4-18

☐ By placing my initials in this box, I waive my right to receive an interview.

*(stamp)* REC BY OOA FEB 25 2019
*(stamp)* REC BY OOA MAR 25 2019
*(stamp)* INMATE APPEALS RECEIVED OCT 30 2018
*(stamp)* BYPASS

**C. First Level - Staff Use Only**
This appeal has been:    Staff – Check One: Is CDCR 602-A Attached? ☐ Yes ☐ No
☐ Bypassed at the First Level of Review. Go to Section E.
☐ Rejected (See attached letter) for instruction) Date: _____ Date: _____ Date: _____ Date: _____
☐ Cancelled (See attached letter) Date: _____
☐ Accepted at the First Level of Review.

Assigned to: _____ Title: _____ Date Assigned: _____ Date Due: _____

First Level Responder: Complete a First Level response. Include Interviewer's name, title, interview date, location, and complete the section below.
Date of Interview: _____ Interview Location: _____
Your appeal issue is: ☐ Granted ☐ Granted in Part ☐ Denied ☐ Other: _____
See attached letter. If dissatisfied with First Level response, complete Section D.

Interviewer _____ (Print Name) Title: _____ Signature: _____ Date completed: _____
Reviewer _____ (Print Name) Title: _____ Signature: _____
Date received by AC: _____

Sent to HA 7

| AC Use Only |
| Date mailed/delivered to appellant _____ / _____ / _____ |

**D. If you are dissatisfied with the First Level response,** explain the reason below, attach supporting documents and submit to the Appeals Coordinator for processing within 30 calendar days of receipt of response. If you need more space, use Section D of the CDCR 602-A.

BYPASS

Inmate/Parolee Signature: _____     Date Submitted : _____

**E. Second Level - Staff Use Only**                    Staff – Check One: Is CDCR 602-A Attached?  ☑ Yes  ☐ No

This appeal has been:
☐ By-passed at Second Level of Review. Go to Section G.
☐ Rejected (See attached letter for instruction) Date: _____  Date: _____  Date: _____  Date: _____
☐ Cancelled (See attached letter)
☑ Accepted at the Second Level of Review

Assigned to: K. Largent   Title: CCII   Date Assigned: 11/9/18  Date Due: 02-04-19

Second Level Responder: Complete a Second Level response. If an interview at the Second Level is necessary, include interviewer's name and title, interview date and location, and complete the section below.

Date of Interview: N/A     Interview Location: Referred to OIA

Your appeal issue is: ☐ Granted  ☑ Granted in Part  ☐ Denied  ☐ Other: _____
See attached letter. If dissatisfied with Second Level response, complete Section F below.

Interviewer: N/A (Print Name)   Title: CCII   Signature: K. Largent   Date completed : 1/29/19

Reviewer: J. Lynch (Print Name)   Title: C/(a)   Signature: _____

Date received by AC: 01-30-19

**AC Use Only**
Date mailed/delivered to appellant 01/30/19

**F. If you are dissatisfied with the Second Level response,** explain reason below; attach supporting documents and submit by mail for Third Level Review. It must be received within 30 calendar days of receipt of prior response. Mail to: Chief, Inmate Appeals Branch, Department of Corrections and Rehabilitation, P.O. Box 942883, Sacramento, CA 94283-0001. If you need more space, use Section F of the CDCR 602-A.

Ask correctional officers what did why Dont to stop my
Suicide Attempt? _____ See Section F
and why they didnt stop me when I slipped out of handcuffs!
Please Asked them investigate 602 Fully Please Dont be Bias!
Dont deliberately Dodge Avoid or ignore my Request Ask them

Inmate/Parolee Signature: Hodges James   Date Submitted: 2-18-19

**G. Third Level - Staff Use Only**             MAD 1 3 2019
This appeal has been:
☐ Rejected (See attached letter for instruction) Date MAR 1 3 2019  Date: _____  Date: _____  Date: _____  Date: _____
☑ Cancelled (See attached letter)   Date: _____
☐ Accepted at the Third Level of Review. Your appeal issue is ☐ Granted  ☐ Granted in Part  ☐ Denied  ☐ Other: _____
   See attached Third Level response.

**Third Level Use Only**
Date mailed/delivered to appellant ___/___/___

**Request to Withdraw Appeal:** I request that this appeal be withdrawn from further review because; State reason. (If withdrawal is conditional, list conditions.)

_____
_____
_____

Inmate/Parolee Signature: _____   Date: _____

Print Staff Name: _____  Title: _____  Signature: _____  Date: _____

return to me

STATE OF CALIFORNIA
**INMATE/PAROLEE APPEAL FORM ATTACHMENT**
CDCR 602-A (08/09)

Cmf 71/18-074468 #7 Side 1

| IAB USE ONLY | Institution/Parole Region: | Log #: | Category: |
|---|---|---|---|
| | SAC-P-18-04343 | | 7 |

1900223

*FOR STAFF USE ONLY*

Attach this form to the CDCR 602, only if more space is needed. Only one CDCR 602-A may be used.

**Appeal is subject to rejection if one row of text per line is exceeded.**       **WRITE, PRINT, or TYPE CLEARLY in black or blue ink.**

| Name (Last, First): Hodges James | CDC Number: V41134 | Unit/Cell Number: R-216 | Assignment: |
|---|---|---|---|

**A. Continuation of CDCR 602, Section A only (Explain your issue)** began Arguing with each other verbally disrespecting each stating that I would get him and he get I. this went on for 2 hours, At Around 6:00pm I was wondering what was taken so long next I remember is waking up in U.C Davis hospital in icu I Dont remember what led me there, where I was there I sp sgt. stell came to interview on the event that led me there I told him I Dont remember he stated while in holding cage I slipped handcuffs took off tee-shirt rip it made noose tied it to the top of the cage and right before I hung myself so-called I stated y'all gon have to explain this and then I hung myself is what sgt stell says that the report states from All 4 c/o infront of cage. now seabert was in Bad Feelings with me now policy and procedure c/o Are suppose to "stop" intervene "stop" inmates that Are trying to commit Suicide "not" watch them with cruel evil intent they All c/o violated policy prosedure, thier Oath As correctional officers and my 8th Amendment right

Inmate/Parolee Signature: Hodges James       Date Submitted: **Flip over**
10-4-18       **CONTINUED BACK SIDE**

**B. Continuation of CDCR 602, Section B only (Action requested):** About the event and the ISn report of the end of the investigation "Please" N/

Flip over

Inmate/Parolee Signature: Hodges James       Date Submitted: 10-4-18

INMATE APPEALS RECEIVED OCT 3 0 2018 CMF

REUSE OF SACRAMENTO NOV -7 2018

REC BY OOA MAR 25 2019

REC BY OOA FEB 25 2019

*Return to me review entire 602 Admit truth Don't Dodge Side 2*

*director of CDCR is responsible for his employees, As well As warden this is coverup*

D. Continuation of CDCR 602, Section D only (Dissatisfied with First Level response): _____

_____.

_____

*BYPASS*

Inmate/Parolee Signature: _____     Date Submitted: _____

F. Continuation of CDCR 602, Section F only (Dissatisfied with Second Level response): Facts L.Agent deliberately chose to ignore Fact

Fact 1, I name c/o that verbally disrepecting each other name "Seabert" Again not sure on correct spelling name

Fact 2 the staff that told me what happen to me is not just Any staff its Sergeant Steele from Isu reliable source that was told what happen to by All 4 c/o themselves told from this on months Fact 3) Admitting their wrong of saying y'all gonna have to explain this they set back and watch me Attempt suicide and did not stop me Fact 4 Sergeant Steele is the evidence that supports the explaination on How I got hospitalization) Facts steele is going on what the was told by the c/o's Again on their on mouths Admission they Admitted to steele what happened why would Sergeant Steele Lie?. they also violated policy, proce dure, of Suicide prevention and my 8th Amendment I want CDCR to Admit to the truth its clear and obvious I want you to contact Sergeant Steele from Isu interview on what the c/o's told him and what he told me) Also L.Agent said unrelated issue not cover in response or c/o's name wont be exhausted First of All this is 1 issue 1 event what the c/o's did and didnt do sent me to the hospital Icu its 1 issue So Acknowledge that it's 1 event and their Actions Led me in Icu Almost death 1st for the other 3 John Does names c/o I clearly Asked for their names But L.Agent did deliberately chose not to give them to me so I am Asking you to give me All c/o First and last names that worked 9-5-18 'SN B Yard 7-Block 3rd watch check Log in Book Finally We All know internal Affairs work for c/o cover up nd Always takes sides with c/o they Are not gonna expose truth this All is a covering up want director, cdcr to invest to the 602

Inmate/Parolee Signature: Hodges JAmes     Date Submitted: 2-18-19

*returntome*

CMF17-8024468 #7

| IAB USE ONLY | Institution/Parole Region: | Log #: | Category: |
|---|---|---|---|
| | SAC-P-18-04343 | | |

**FOR STAFF USE ONLY**

Attach this form to the CDCR 602, only if more space is needed.  Only one CDCR 602-A may be used.

**Appeal is subject to rejection if one row of text per line is exceeded.**      **WRITE, PRINT, or TYPE CLEARLY in black or blue ink.**

| Name (Last, First): Hodges James | CDC Number: V41134 | Unit/Cell Number: Q-216 | Assignment: |
|---|---|---|---|

**A.  Continuation of CDCR 602, Section A only (Explain your issue):** Do I believe I nnng myself? No there were no masks, bruises around my neck nor did it bust, But I had marks around my wrists from handCUFF As if I Been in A struggle, I believe that one point I was taken out of cage and A throated out I dont Know why I Dont remember the doctors Stated I was 2 minutes from dying I lost conscious ness For 24 hours couldve been in coma or died my family wouldve never Know the truth since then I have been having nightmares, headaches and blurry vision

the reason why I am writing 602 so late in pip-Acnt8 First time being Able CC pullot mre out cant have pen in cell

Please For to CSP-Sac Appeals coordinator

REC BY OOA
FEB 25 2019

INMATE APPEALS RECEIVED OCT 3 0 2018 CMF

CSP-SAC APPEAL RECEIVED 2018 NOV-7 AM 11:4

| Inmate/Parolee Signature: Hodges James | Date Submitted: |
|---|---|
| 10-4-18 | |

"continued Back Side→

Flipover

**B.  Continuation of CDCR 602, Section B only (Action requested):**

REC BY OOA
MAR 25 2019

| Inmate/Parolee Signature: | Date Submitted: |
|---|---|

**D. Continuation of CDCR 602, Section D only (Dissatisfied with First Level response):** _____

BYPASS

**Inmate/Parolee Signature:** _____  **Date Submitted:** _____

**F. Continuation of CDCR 602, Section F only (Dissatisfied with Second Level response):** 602 states if needed Additional space only 1 CDCR Form 602-A will be Accepted this is only 1 want director of CDCR to investigate my 602 head the warden is responsible for their employees conduct and care of inmates welfare, I want All correctional officers questioned About their Actions and conduct of my Suicide Attempt and why they did Attempt to stop me? and why they Allowed me to slipped out handcuffs and they Just watched? Ask why they didn't follow policy, procedure, protocol of Suicide prevention? PLEASE ASK them this is part of 602 process procedure (Don't Dodge or Avoid) do your Job) ASK why they didn't follow procedure by doing A 128-B Suicide Attempt Report? I want All correctional officers First and last name that was involved on Duty 9-5-18 B-Yard B-7 PSU 3rd watch And when it comes to internal Affairs we All know they have Long history of not protecting inmates civil Rights and covering up for correctional officers no secret look At the facts "To Allow me to Attempt Suicide period" that's true fact they Violated All policies and my 8th Amendment Don't Avoid the truth (I want CDCR to question c/o's and Sergeant Steele on All their Roles in regards to my Suicide Attempt) that's what I want and their names (this whole thing has mentally shaken me up) by malice Acts I am losing sleep, Stressed out (Acknowledge the truth) Address All issues in my Appeal PLEASE because I Feel this is Acoverup I Almost died by hand that suppose to c Alive

**Inmate/Parolee Signature:** _____  **Date Submitted:** 2-18-19

# Memorandum

Date : January 29, 2019

To : HODGES, (V41134)
CHCF, Facility B

Subject: **STAFF COMPLAINT RESPONSE - APPEAL # SAC-P-18-04343 SECOND LEVEL RESPONSE**

**APPEAL ISSUE**: Your appeal states that on September 5, 2018, while in a B7 unit holding cell, you and an unidentified officer were verbally disrespecting each other for about two hours and next thing you know, you woke up at UC Davis Hospital. You claim staff told you the events of what led up to your hospitalization, but the evidence does not support the explanation of your hospitalization.

All issues unrelated to the allegation of staff misconduct must be appealed separately and will not be addressed in this response. You do not exhaust administrative remedies on any unrelated issue not covered in this response or concerning any staff member not identified by you in this complaint. If you are unable to name all involved staff you may request assistance in establishing their identity.

**DETERMINATION OF ISSUE**: A review of the allegations of staff misconduct presented in the written complaint has been completed. Based upon this review your appeal is being referred to Office of Internal Affairs. You will be interviewed during the process of your inquiry/investigation.

**Your appeal is PARTIALLY GRANTED in that:**
This matter has been referred to the Office of Internal Affairs for follow-up and a possible investigation. If investigated, upon completion of that investigation, you will be notified as to whether the allegations were SUSTAINED, NOT SUSTAINED, UNFOUNDED, EXONERATED or there was NO FINDING. In the event the matter is not investigated, but returned by OIA to the institution or region to conduct an Appeal Inquiry, you will be notified upon the completion of the inquiry whether it was determined staff did, or did not, violate policy.

**ALL STAFF PERSONNEL MATTERS ARE CONFIDENTIAL IN NATURE.**
As such, the details of any inquiry will not be shared with staff, members of the public, or offender appellants. Although you have the right to submit a staff complaint, a request for administrative action regarding staff or the placement of documentation in a staff member's personnel file is beyond the scope of the staff

complaint process.    A variety of personnel actions may be initiated by the Department based upon the content of your complaint and the outcome of any investigation or inquiry conducted as a result of your complaint. Allegations of staff misconduct do not limit or restrict the availability of further relief via the inmate appeals process.

If you wish to appeal the decision and/or exhaust administrative remedies, you must submit your staff complaint appeal through all levels of appeal review up to, and including, the Secretary's/Third Level of Review. Once a decision has been rendered at the Third Level, administrative remedies will be considered exhausted.

Print: _R. Largent, CCI_ Sign: _R. Largent_ Date: _1/29/19_
Interviewer

Print: _J. Peterson_ Sign: _____ Date: _1/29/19_
Reviewing Authority

Appeal Log No: <u>SAC-P-18-04343</u>

# RIGHTS AND RESPONSIBILITY STATEMENT

*The California Department of Corrections and Rehabilitation has added departmental language (shown inside brackets, in non-boldface type) for clarification purposes.*

***Pursuant to Penal Code 148.6, anyone wishing to file an allegation of misconduct by a departmental peace officer must read, sign and submit the following statement:***

**YOU HAVE THE RIGHT TO MAKE A COMPLAINT AGAINST A POLICE OFFICER** [this includes a departmental peace officer] **FOR ANY IMPROPER POLICE** [or peace] **OFFICER CONDUCT. CALIFORNIA LAW REQUIRES THIS AGENCY TO HAVE A PROCEDURE TO INVESTIGATE CITIZENS'** [or inmates'/parolees'] **COMPLAINTS. YOU HAVE A RIGHT TO A WRITTEN DESCRIPTION OF THIS PROCEDURE. THIS AGENCY MAY FIND AFTER INVESTIGATION THAT THERE IS NOT ENOUGH EVIDENCE TO WARRANT ACTION ON YOUR COMPLAINT; EVEN IF THAT IS THE CASE, YOU HAVE THE RIGHT TO MAKE THE COMPLAINT AND HAVE IT INVESTIGATED IF YOU BELIEVE AN OFFICER BEHAVED IMPROPERLY. CITIZEN** [or inmate/parolee] **COMPLAINTS AND ANY REPORTS OR FINDINGS RELATING TO COMPLAINTS MUST BE RETAINED BY THIS AGENCY FOR AT LEAST FIVE YEARS.**

| COMPLAINANT'S PRINTED NAME | COMPLAINANT'S SIGNATURE | DATE SIGNED | |
|---|---|---|---|
| Hodges James | | | |
| INMATE/PAROLEE PRINTED NAME | INMATE/PAROLEE'S SIGNATURE | CDC NUMBER | DATE SIGNED |
| Hodges James | Hodger gan | VH113H | 3-19-14 |
| RECEIVING STAFF'S PRINTED NAME | RECEIVING STAFF'S SIGNATURE | DATE SIGNED | |

DISTRIBUTION:
ORIGINAL -
Public - Institution Head/Parole Administrator
Inmate/Parolee - Attach to CDC form 602
Employee - Institution Head/Parole Administrator
COPY - Complainant



## THIRD LEVEL APPEAL DECISION

Date: JUN 0 7 2019

In re: James Hodges, V41134
California Health Care Facility - Stockton
7707 Austin Road
Stockton, CA 95213

TLR Case No.: 1900223          Local Log Nos.: CMF-18-03468 and SAC-18-04343

This matter was reviewed on behalf of the Director of the California Department of Corrections and Rehabilitation (CDCR) by Appeals Examiner H. Liu, Captain. All submitted documentation and supporting arguments of the parties have been considered.

**I   APPELLANT'S ARGUMENT:** It is the appellant's position that staff are indifferent to his mental health. The appellant claims that while in the holding cell on September 5, 2018, at 1410 hours, he and an unidentified Correctional Officer (CO) were verbally disrespecting each other for approximately two hours by stating, "I would get him and he get I." The appellant claims when he woke up in the UC Davis Hospital, he did not remember why he was in the hospital. The appellant claims that Correctional Sergeant Stell informed him of the events that led to his hospitalization; however, the appellant feels that the evidence did not support the explanation he was provided. The appellant further asserts that pursuant to departmental policy and procedures, staff should have stopped and intervened his suicide attempt.

The appellant requests the names of all five COs involved in the matter. The appellant further requests the statements/reports provided by the involved COs.

**II   SECOND LEVEL'S DECISION:** This matter has been referred to the Office of Internal Affairs (Office of Internal Affairs (OIA)) for follow-up and a possible investigation. If investigated, upon completion of the investigation the appellant will be notified as to whether the allegations were sustained, not sustained, unfounded, exonerated, or no findings possible. In the event the matter is not investigated, but returned by OIA to the institution to conduct a Confidential Inquiry, the appellant will be notified upon completion of the inquiry as whether it was determined staff violated or did not violate policy. The appeal was partially granted at the Second Level of Review in that the matter was referred to the OIA.

**III   THIRD LEVEL DECISION:** Appeal is denied.

**A.   FINDINGS:** Upon review of the documentation submitted, it is determined that the appellant's allegations have been reviewed and evaluated by the Hiring Authority and referred to the OIA for further investigation. In the event that staff misconduct was substantiated, the institution would take the appropriate course of action. All staff personnel matters are confidential in nature and not privy to inquires of other staff, the general public or the inmate population. Although the appellant has the right to submit an appeal as a staff complaint, the request for administrative action regarding staff, the placement of documents in a staff member's personnel file, and requests for monetary compensation are beyond the scope of the staff complaint appeals process. However, the appellant has the right to be notified whether or not staff violated CDCR policy. In this case the OIA has notified the SAC of the decision and the appellant will be informed of the findings by SAC staff.

**B.   BASIS FOR THE DECISION:**
California Code of Regulations, Title 15, Section: 3001, 3004, 3005, 3084.1, 3270, 3380, 3391

**C.   ORDER:** No changes or modifications are required by the Institution.

This decision exhausts the administrative remedy available to the appellant within CDCR.

H. LIU, Appeals Examiner
Office of Appeals

T. RAMOS, Chief (A)
Office of Appeals

cc:    Warden, CHCF
Appeals Coordinator, CHCF
Appeals Coordinator, CMF
Appeals Coordinator, SAC

State of California                                        Department of Corrections and
Rehabilitation

# Memorandum



Date    :   August 20, 2019

To      :   Hodges, V41134
            B 306A1-116001L

Subject:   **STAFF COMPLAINT RESPONSE-APPEAL # SAC-P-18-04343**

Allegations raised in your complaint dated October 4, 2018, have been evaluated. Our review indicates that there was no violation of California Department of Corrections and Rehabilitation policy. Accordingly, no further action will be taken with regard to your complaint.

**This response does not limit or restrict the availability of further relief via the inmate appeals process.** If you have not already done so, and you wish to further appeal the decision, you must submit your staff complaint appeal through all levels of appeal review up to, and including, the Secretary's Level of Review.

With the rendering of a decision at the Third Level of Review your administrative remedies will be exhausted.

Print:   D. Matthews , ᒪᒋ ·    Sign:                          Date:  August 20, 2019
            Appeals Coordinator

Appeal : SAC-P-18-04343

State of California
Rehabilitation

Department of Corrections and

APPEALS

# Memorandum

Date : August 20, 2019

To : Hodges, V41134
B 306A1-116001L

This was
OIA's
destomatin
and
you have
already
exhausted
the appeal
to 3rd
level

Subject: **STAFF COMPLAINT RESPONSE-APPEAL # SAC-P-18-04343**

Allegations raised in your complaint dated October 4, 2018, have been evaluated. Our review indicates that there was no violation of California Department of Corrections and Rehabilitation policy. Accordingly, no further action will be taken with regard to your complaint.

**This response does not limit or restrict the availability of further relief via the inmate appeals process.** If you have not already done so, and you wish to further appeal the decision, you must submit your staff complaint appeal through all levels of appeal review up to, and including, the Secretary's Level of Review.

With the rendering of a decision at the Third Level of Review your administrative remedies will be exhausted.

Print: D. Matthews , LT.    Sign:                    Date: August 20, 2019
Appeals Coordinator



IAB USE ONLY

SICOTT DIGY                    10
CHCF B-9-0474G

You may appeal any California Department of Corrections and Rehabilitation (CDCR) decision, action, condition, policy or regulation that has a material adverse effect upon your welfare and for which there is no other prescribed method of departmental review/remedy available.  See California Code of Regulations (CCR), Title 15, Section 3084.1.  You must send this appeal and any supporting documents to the Appeals Coordinator (AC) within 30 calendar days of the event that led to the filing of this appeal. If additional space is needed, only one CDCR Form 602-A will be accepted. Refer to CCR 3084 for further guidance with the appeal process.  No reprisals will be taken for using the appeal process.

**Appeal is subject to rejection if one row of text per line is exceeded.**          **WRITE, PRINT, or TYPE CLEARLY in black or blue ink.**

| Name (Last, First) | CDC Number: | Unit/Cell Number: | Assignment: |
|---|---|---|---|
| Hodges   James | V41134 | B3B-130  Stockton P.P | |

State briefly the subject of your appeal (Example: damaged TV, job removal, etc.):

deliberately withholding OIA/ISU Findings of investigation of my 9-5-18 suicide attempt

A.  **Explain your issue** (If you need more space, use Section A of the CDCR 602-A): On 9-5-18 I Attempted suicide at CSP-SAC-PSU holding cage Awaiting to put seen to crisis Bed's was Allowed Knowingly willingly Aiding, Assisting my suicide Attempt while watching and not At All Stopping me

B.  **Action requested** (If you need more space, use Section B of the CDCR 602-A): provide ISU Findings All reports of Sergeant Kevin steele OIA Your Findings, All reports All officer's statements and witness P. LCTS ASAP

**Supporting Documents:** Refer to CCR 3084.3.

☐ Yes, I have attached supporting documents.

List supporting documents attached (e.g., CDC 1083, Inmate Property Inventory; CDC 128-G, Classification Chrono):

_____   _____

_____   _____

☐ No, I have not attached any supporting documents. Reason :_____

_____

_____

_____

Inmate/Parolee Signature: _Hodges James_     Date Submitted: _10-7-19_

☐ **By placing my initials in this box, I waive my right to receive an interview.**

RECEIVED
OCT 14 2019
By _____
APPEALS

2019 NOV 13 PM 2:00
RECEIVED CHCF

CSP-SAC APPEALS
NOV 21 '19 AM 11:22

STAFF USE ONLY

---

**C.  First Level - Staff Use Only**                    Staff – Check One:  Is CDCR 602-A Attached?  ☑ Yes   ☐ No

This appeal has been:

☐ Bypassed at the First Level of Review. Go to Section E.   AC

☑ Rejected (See attached letter for instruction)  Date: _11-14-19_   Date: _____   Date: _____   Date: _____

☒ Cancelled (See attached letter) Date: _12-5-19-CZ_

☐ Accepted at the First Level of Review.

Assigned to: _____   Title: _____   Date Assigned: _____   Date Due: _____

First Level Responder: Complete a First Level response. Include Interviewer's name, title, interview date, location, and complete the section below.

Date of Interview: _____   Interview Location: _____

Your appeal issue is:  ☐ Granted   ☐ Granted in Part   ☐ Denied   ☐ Other: _____

See attached letter.  If dissatisfied with First Level response, complete Section D.

Interviewer: _____ (Print Name)   Title: _____   Signature: _____   Date completed: _____

Reviewer: _____ (Print Name)   Title: _____   Signature: _____

Date received by AC: _____

| AC Use Only |
|---|
| Date mailed/delivered to appellant ____ / ____ / ____ |

**D. If you are dissatisfied with the First Level response**, explain the reason below, attach supporting documents and submit to the Appeals Coordinator for processing within 30 calendar days of receipt of response. If you need more space, use Section D of the CDCR 602-A.

_____
_____
_____
_____
_____
_____
_____

Inmate/Parolee Signature: _____ Date Submitted : _____

---

**E. Second Level - Staff Use Only**                    Staff – Check One:  Is CDCR 602-A Attached?  ☐ Yes   ☐ No

This appeal has been:

☐ By-passed at Second Level of Review.  Go to Section G.
☐ Rejected (See attached letter for instruction) Date: _____  Date: _____  Date: _____  Date: _____
☐ Cancelled (See attached letter)
☐ Accepted at the Second Level of Review

Assigned to: _____  Title: _____  Date Assigned: _____  Date Due: _____

Second Level Responder:  Complete a Second Level response.  If an interview at the Second Level is necessary, include interviewer's name and title, interview date and location, and complete the section below.

Date of Interview: _____  Interview Location: _____

Your appeal issue is:  ☐ Granted    ☐ Granted in Part    ☐ Denied    ☐ Other: _____

See attached letter.  If dissatisfied with Second Level response, complete Section F below.

Interviewer: _____  Title: _____  Signature: _____  Date completed : _____
           (Print Name)

Reviewer: _____  Title: _____  Signature: _____
           (Print Name)

Date received by AC: _____

| AC Use Only |
| Date mailed/delivered to appellant ____ /____ /____ |

---

**F. If you are dissatisfied with the Second Level response**, explain reason below; attach supporting documents and submit by mail for Third Level Review.  It must be received within 30 calendar days of receipt of prior response.  Mail to: Chief, Inmate Appeals Branch, Department of Corrections and Rehabilitation,  P.O. Box 942883, Sacramento, CA 94283-0001.  If you need more space, use Section F of the CDCR 602-A.

_____
_____
_____
_____
_____

Inmate/Parolee Signature: _____ Date Submitted: _____

---

**G. Third Level - Staff Use Only**
This appeal has been:
☐ Rejected (See attached letter for instruction) Date: _____  Date: _____  Date: _____  Date: _____  Date: _____
☐ Cancelled (See attached letter)   Date: _____
☐ Accepted at the Third Level of Review.  Your appeal issue is  ☐ Granted   ☐ Granted in Part   ☐ Denied   ☐ Other: _____
     See attached Third Level response.

| Third Level Use Only |
| Date mailed/delivered to appellant ____ /____ /____ |

---

**H. Request to Withdraw Appeal:**  I request that this appeal be withdrawn from further review because; State reason. (If withdrawal is conditional, list conditions.)

_____
_____
_____
_____

_____  Inmate/Parolee Signature: _____  Date: _____

Print Staff Name: _____  Title: _____  Signature: _____  Date: _____

IAB USE ONLY



CHCF-B-19-04746
SAC-19-05104
FOR STAFF USE ONLY

Attach this form to the CDCR 602, only if more space is needed. Only one CDCR 602-A may be used.

**Appeal is subject to rejection if one row of text per line is exceeded.** **WRITE, PRINT, or TYPE CLEARLY in black or blue ink.**

Name (Last, First): Hodges James

CDC Number: V41134

Unit/Cell Number: B3D-13d

Assignment:

**A. Continuation of CDCR 602, Section A only (Explain your issue) :** it was stated that officers R. Bevens, A. Brewer, A. monca, J. Seibert didnt violate CDCR policy, thats all, "obviously" I am entitled to the officers statements Sergeant Kaven Steely of ISU findings and full reports As well As internal Affairs I am entitled to know what happened to me and the statements that was made (it's my legal right.) if they didnt violate R. DCR policy (provide it). give me the reports All statements made tell me why I cant have them, the 602 # of m'.s conduct SAC-P-19-03048

Inmate/Parolee Signature: Hodges James     Date Submitted: 10-7-19

2019 NOV 13 PM 12:08    RECEIVED CHCF
APPEALS

CSP-SAC APPEALS
NOV 21 '19 AM 11:22

**B. Continuation of CDCR 602, Section B only (Action requested):** _____

Inmate/Parolee Signature: _____     Date Submitted: _____

**D. Continuation of CDCR 602, Section D only (Dissatisfied with First Level response):** _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

**Inmate/Parolee Signature:** _____  **Date Submitted:** _____

**F. Continuation of CDCR 602, Section F only (Dissatisfied with Second Level response):** _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

**Inmate/Parolee Signature:** _____  **Date Submitted:** _____

RE: Screening at the FIRST Level

*Thursday, December 5, 2019*

*HODGES, V41134*
***CHCF** B 303B1130001L*

LEGAL, Copies, 11/21/2019
Log Number: SAC-O-19-05104
**(Note: <u>Log numbers are assigned to all appeals for tracking purposes. Your appeal is subject to cancellation for failure to correct noted deficiencies.</u>)**

The enclosed documents are being returned to you for the following reasons:

*Your appeal has been cancelled pursuant to the California Code of Regulations, Title 15, Section (CCR) 3084.6(c)(2). The appeal duplicates a previous appeal upon which a decision has been rendered or is pending.*

**Appeal is a duplicate to previous appeal #SAC-P-19-03048 and appeal #SAC-P-18-04343 which was exhausted at the Third Level of Review.**

☑ K. Daly, CCII
☐ D. Matthews, SC Lieutenant
☐ S. Boxall, CCII
☐ J. Hess, Office Technician
☐ L. O'Brian, CCII(A)
☐ A. Winston, AGPA(A)
Appeals Coordinator
SAC

**NOTE:** If you are required to respond/explain to this CDCR Form 695, use <u>only</u> the lines provided below.

_____

_____

_____

Be advised that you cannot appeal a rejected appeal, but should take the corrective action necessary and resubmit the appeal within the timeframes specified in CCR 3084.6(a) and CCR 3084.8(b). Pursuant to CCR 3084.6(e), once an appeal has been cancelled, that appeal may not be resubmitted. However, a separate appeal can be filed on the cancellation decision. The original appeal may only be resubmitted if the appeal on the cancellation is granted.
**NOTE THIS CDCR 695 IS A PERMANENT APPEAL ATTACHMENT AND IS NOT TO BE REMOVED**



STATE OF CALIFORNIA
**INMATE/PAROLEE APPEAL**
CDCR 602 (REV. 03/12)

Provide me with A log # Forward to CSP-SAC Appeals coordinator

DEPARTMENT OF CORRECTIONS AND REHABILITATION
Side 1

**IAB USE ONLY**

CHCF-B-19-04853
MC-PH-05105

10

You may appeal any California Department of Corrections and Rehabilitation (CDCR) decision, action, condition, policy or regulation that has a material adverse effect upon your welfare and for which there is no other prescribed method of departmental review/remedy available. See California Code of Regulations (CCR), Title 15, Section 3084.1. You must send this appeal and any supporting documents to the Appeals Coordinator (AC) within 30 calendar days of the event that led to the filing of this appeal. If additional space is needed, only one CDCR Form 602-A will be accepted. Refer to CCR 3084 for further guidance with the appeal process. No reprisals will be taken for using the appeal process.

**Appeal is subject to rejection if one row of text per line is exceeded.**  **WRITE, PRINT, or TYPE CLEARLY in black or blue ink.**

| Name (Last, First): Hodges James | CDC Number: VU1134 | Unit/Cell Number: CHCF B30 pip | Assignment: |
|---|---|---|---|

State briefly the subject of your appeal (Example: damaged TV, job removal, etc.): 114A Detention Segregation Record
deliberately destroying and withholding 837's Suicide Attempt report

**A. Explain your issue** (If you need more space, use Section A of the CDCR 602-A): This is in regards to my September 5th 2018 Suicide Attempt, CDCR, J Sw Sargent Kevin Steele, J. Lyons, AGPA, CCIR Largent, H. Lih Appeals Examiner, T. Ramos, Ralph Diaz, Are deliberately

**B. Action requested** (If you need more space, use Section B of the CDCR 602-A): I am requesting All 837's Suicide Attempt reports of All Correctional officers statements involved in my Suicide Attempt September 5th 2018 PSN-B7, 3rd Watch and the

**Supporting Documents: Refer to CCR 3084.3.**
☑ Yes, I have attached supporting documents.
List supporting documents attached (e.g., CDC 1083, Inmate Property Inventory; CDC 128-G, Classification Chrono):
22 Form C/o T.LoR Stating he     22 Form As proof that I am
wrote 837's                       Sending 602

☐ No, I have not attached any supporting documents. Reason : _____

Inmate/Parolee Signature: Hodges James     Date Submitted: 11-17-19

☐ **By placing my initials in this box, I waive my right to receive an interview.**

2019 NOV 20 PM 12:00
RECEIVED CHCF
APPEALS
STAFF USE ONLY

CSP-SAC APPEALS
DEC 3 '18 AM 9:57

**C. First Level - Staff Use Only**     Staff – Check One: Is CDCR 602-A Attached? ☑ Yes ☐ No
This appeal has been:
☐ Bypassed at the First Level of Review. Go to Section E.
☑ Rejected (See attached letter for instruction). Date: 11-20-19     Date: _____ Date: _____ Date: _____
☑ Cancelled (See attached letter) Date: 12.10.19
☐ Accepted at the First Level of Review.
Assigned to: _____ Title: _____ Date Assigned: _____ Date Due: _____

First Level Responder: Complete a First Level response. Include Interviewer's name, title, interview date, location, and complete the section below.
Date of Interview: _____ Interview Location: _____
Your appeal issue is: ☐ Granted ☐ Granted in Part ☐ Denied ☐ Other: _____
See attached letter. If dissatisfied with First Level response, complete Section D.

Interviewer: _____ (Print Name) Title: _____ Signature: _____ Date completed: _____

Reviewer: _____ (Print Name) Title: _____ Signature: _____

Date received by AC: _____

| AC Use Only |
|---|
| Date mailed/delivered to appellant ____ / ____ / ____ |

**D. If you are dissatisfied with the First Level response**, explain the reason below, attach supporting documents and submit to the Appeals Coordinator for processing within 30 calendar days of receipt of response. If you need more space, use Section D of the CDCR 602-A.

_____

_____

_____

_____

_____

_____

Inmate/Parolee Signature: _____ Date Submitted : _____

---

**E. Second Level - Staff Use Only**                    Staff – Check One: Is CDCR 602-A Attached?  ☐ Yes    ☐ No

This appeal has been:

☐ By-passed at Second Level of Review. Go to Section G.
☐ Rejected (See attached letter for instruction) Date: _____ Date: _____ Date: _____ Date: _____
☐ Cancelled (See attached letter)
☐ Accepted at the Second Level of Review

Assigned to: _____ Title: _____ Date Assigned: _____ Date Due: _____

Second Level Responder: Complete a Second Level response. If an interview at the Second Level is necessary, include interviewer's name and title, interview date and location, and complete the section below.

Date of Interview: _____ Interview Location: _____

Your appeal issue is:  ☐ Granted    ☐ Granted in Part    ☐ Denied    ☐ Other: _____

See attached letter. If dissatisfied with Second Level response, complete Section F below.

Interviewer: _____ Title: _____ Signature: _____ Date completed :_____
            (Print Name)

Reviewer: _____ Title: _____ Signature: _____
          (Print Name)

Date received by AC: _____

| | AC Use Only |
| | Date mailed/delivered to appellant ____ /____ /____ |

---

**F. If you are dissatisfied with the Second Level response**, explain reason below; attach supporting documents and submit by mail for Third Level Review. It must be received within 30 calendar days of receipt of prior response. Mail to: Chief, Inmate Appeals Branch, Department of Corrections and Rehabilitation, P.O. Box 942883, Sacramento, CA 94283-0001. If you need more space, use Section F of the CDCR 602-A.

_____

_____

_____

_____

_____

Inmate/Parolee Signature: _____ Date Submitted: _____

---

**G. Third Level - Staff Use Only**

This appeal has been:
☐ Rejected (See attached letter for instruction) Date: _____ Date: _____ Date: _____ Date: _____ Date: _____
☐ Cancelled (See attached letter)  Date: _____
☐ Accepted at the Third Level of Review. Your appeal issue is ☐ Granted    ☐ Granted in Part    ☐ Denied    ☐ Other: _____
      See attached Third Level response.

| | Third Level Use Only |
| | Date mailed/delivered to appellant ____ /____ /____ |

---

**H. Request to Withdraw Appeal:** I request that this appeal be withdrawn from further review because; State reason. (If withdrawal is conditional, list conditions.)

_____

_____

_____

_____

Inmate/Parolee Signature: _____ Date:_____

Print Staff Name: _____ Title: _____ Signature:_____ Date:_____

IAB USE ONLY



CHCF B-19-04853   10
SAC-P-19-05165

Attach this form to the CDCR 602, only if more space is needed. Only one CDCR 602-A may be used.

**Appeal is subject to rejection if one row of text per line is exceeded.**   WRITE, PRINT, or TYPE CLEARLY in black or blue ink.

Name (Last, First): Hodges James
CDC Number: V41134
Unit/Cell Number: CHCF B30-B-P/P
Assignment:

**A. Continuation of CDCR 602, Section A only (Explain your issue):** inter ferring and covering up correctional officers, J. Seibert A. Monroy, A Brewer, P. Bevens evil-malice - sadistic wrongdoing by watching me Attempt suicide and not stopping me 602 H (sac-18-04343 or sac-p-18-04343) staff misconduct they watch me suffer and I am. Since I am Being denied findings and correctional officers statements and C/o witness T.Lor which now works At CHCF-pip and told me that he and s.i.A 837's with All correctional officers involved in my Suicide Attempt 837's Suicide Attempt Report and All provided Statements and he wrote A S 22 request form Stating that which I am sending with this 602 so stop destroying evidence its policy for Serious Suicide Attempt to be reports on 837 and statements given thats (CDCR policy protocol) and since I was in holding cage being watched by correctional officers J. Sebat and other name in 602 is (policy protocol) Detention/Segregation 114/A Record log Sheet "Safety Check"

Inmate/Parolee Signature: Hodges James
Date Submitted: 11-17-19

**B. Continuation of CDCR 602, Section B only (Action requested):** 114/A Detention/Segregation Record log Sheet for Safety Checks statements while in holding cage awaiting crisis Bed and I am Asking you to defined the purpose of the 837's what is it used for? I am Asking you to defined the purpose of 114/A detention/Segregation log Sheet what Are they used for? I am Asking for you Not to ignore delay Avoid my Action requests or not to ignore delay Avoid defining purpose of 837's and 114/A no excuses Are (my Action Requested)

Inmate/Parolee Signature: Hodges James
Date Submitted: 11-17-19

2019 NOV 20 PM 2:00   RECEIVED CHCF APPEALS

STAFF USE ONLY

CSP-SAC APPEALS
DEC 3 '19 AM 9:57

**D. Continuation of CDCR 602, Section D only (Dissatisfied with First Level response):** _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

**Inmate/Parolee Signature:** _____  **Date Submitted:** _____

**F. Continuation of CDCR 602, Section F only (Dissatisfied with Second Level response):** _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

**Inmate/Parolee Signature:** _____  **Date Submitted:** _____

RE: Screening at the FIRST Level

*Tuesday, December 10, 2019*

*HODGES, V41134*
**CHCF - B** *304B1127001L*

LEGAL, Copies, 12/03/2019
Log Number: SAC-P-19-05165
**(Note: <u>Log numbers are assigned to all appeals for tracking purposes. Your appeal is subject to cancellation for failure to correct noted deficiencies.</u>)**

The enclosed documents are being returned to you for the following reasons:

*Your appeal has been cancelled pursuant to the California Code of Regulations, Title 15, Section (CCR) 3084.6(c)(2). The appeal duplicates a previous appeal upon which a decision has been rendered or is pending.*

*This appeal is a duplicate to previous appeals SAC-P-19-03048 and SAC-O-19-05104.*

☐  K. Daly, CCII
☐  D. Matthews, SC Lieutenant
☐  S. Boxall, CCII
☐  J. Hess, Office Technician
☐  L. O"Brian, CCII(A)
☑  A. Winston, AGPA(A)
Appeals Coordinator
SAC

**NOTE:** If you are required to respond/explain to this CDCR Form 695, use <u>only</u> the lines provided below.

_____

_____

_____

Be advised that you cannot appeal a rejected appeal, but should take the corrective action necessary and resubmit the appeal within the timeframes specified in CCR 3084.6(a) and CCR 3084.8(b). Pursuant to CCR 3084.6(e), once an appeal has been cancelled, that appeal may not be resubmitted. However, a separate appeal can be filed on the cancellation decision. The original appeal may only be resubmitted if the appeal on the cancellation is granted.
**NOTE THIS CDCR 695 IS A PERMANENT APPEAL ATTACHMENT AND IS NOT TO BE REMOVED**

State of California
CDC FORM 695
Screening For:
CDC 602 Inmate/Parolee Appeals
CDC 1824 Reasonable Modification or Accommodation Request

RE: Screening at the FIRST Level

*Wednesday, September 25, 2019*

*HODGES, V41134*
*B 303B1130001L*

LEGAL, Processing of Appeals, 09/17/2019
Log Number: SAC-P-19-04049
**(Note: <u>Log numbers are assigned to all appeals for tracking purposes. Your appeal is subject to cancellation for failure to correct noted deficiencies.</u>)**

The enclosed documents are being returned to you for the following reasons:

*Be advised that pursuant to 3084.1(b) your appeal administrative remedies are deemed exhausted. Administrative remedies shall not be considered exhausted relative to any new issue, information, or person later named by the appellant that was not included in the originally submitted CDCR Form 602 and addressed through all required levels of administrative review up to and including the third level.*

*As stated on your previous Form 695 8/21/19 (SAC-P-19-03488) on this issue, SAC has no authority over OIA investigations, any investigation paperwork involved, or when they are completed. However, the determination of the OIA investigation was received in appeals office on 8/20/19 and the determination was mailed to you (E-4 dated 8/20/19 copy attached), Wednesday 8/21/19 and according to the attached EEC form you received it on 8/29/19. PLEASE NOTE: SAC only recevies the determination and has no access to the investigation itself. The E-4 states 'Our review…"In this case "Our" refers to the department which includes OIA, who made the determination and determined there was no violation of policy, if you have an issue with OIA you may appeal to them directly. You are responsible for maintaining copies for your records of your appeals and paperwork. You may request future documents from your C-file from your counselor. You have already appealed this issue to the 3rd Level. This appeal is being returned to you with no further action.*

☐ J. Lyons, AGPA

**NOTE:** If you are required to respond/explain to this CDCR Form 695, use <u>only</u> the lines provided below.

_____
_____
_____

Be advised that you cannot appeal a rejected appeal, but should take the corrective action necessary and resubmit the appeal within the timeframes specified in CCR 3084.6(a) and CCR 3084.8(b). Pursuant to CCR 3084.6(e), once an appeal has been cancelled, that appeal may not be resubmitted. However, a separate appeal can be filed on the cancellation decision. The original appeal may only be resubmitted if the appeal on the cancellation is granted.
**NOTE THIS CDCR 695 IS A PERMANENT APPEAL ATTACHMENT AND IS NOT TO BE REMOVED**

**State of California**
**CDC FORM 695**
**Screening For:**
CDC 602 Inmate/Parolee Appeals
CDC 1824 Reasonable Modification or Accommodation Request

☐   K. Daly, CCII
☐   D. Matthews, Appeals Lt.
☐   S. Boxall, CCII
☐   J. Hess, Office Technician
☐   L. O"Brian, CCII(A)
Appeals Coordinator
SAC

**NOTE:** If you are required to respond/explain to this CDCR Form 695, use <u>only</u> the lines provided below.

_____

_____

_____

Be advised that you cannot appeal a rejected appeal, but should take the corrective action necessary and resubmit the appeal within the timeframes specified in CCR 3084.6(a) and CCR 3084.8(b). Pursuant to CCR 3084.6(e), once an appeal has been cancelled, that appeal may not be resubmitted. However, a separate appeal can be filed on the cancellation decision. The original appeal may only be resubmitted if the appeal on the cancellation is granted.

**NOTE THIS CDCR 695 IS A PERMANENT APPEAL ATTACHMENT AND IS NOT TO BE REMOVED**

*coordinator*
Provide Log # and Forward to CSP-Sac Appeals

**IAB USE ONLY**

CHCF-B-19-03778   10
SAC-P-A-04444 ©

RECEIVED CHCF
2019 SEP 11 AM 10:00
CSP-SAC APPEAL

You may appeal any California Department of Corrections and Rehabilitation (CDCR) decision, action, condition, policy or regulation that has a material adverse effect upon your welfare and for which there is no other prescribed method of departmental review/remedy available. See California Code of Regulations (CCR), Title 15, Section 3084.1. You must send this appeal and any supporting documents to the Appeals Coordinator (AC) within 30 calendar days of the event that led to the filing of this appeal. If additional space is needed, only one CDCR Form 602-A will be accepted. Refer to CCR 3084 for further guidance with the appeal process. No reprisals will be taken for using the appeal process.

**Appeal is subject to rejection if one row of text per line is exceeded.**          **WRITE, PRINT, or TYPE CLEARLY in black or blue ink.**

| Name (Last, First): Hodges    James | CDC Number: V41134 | Unit/Cell Number: Stockton, P.i.P CHCF-B3B-130 | Assignment: |
|---|---|---|---|

Class Statement

State briefly the subject of your appeal (Example: damaged TV, job removal, etc.):
Deliberate Failure to provide me with D.I.A Findings/reports

A. Explain your issue (If you need more space, use Section A of the CDCR 602-A): this is in regards to internal Affairs, I.S.U, investigations of staff misconduct As to 602's SAC-P-04343 in regards to my September 5th 2018 suicide Attempt and c/o willingly Allowed me to carry it out

B. Action requested (If you need more space, use Section B of the CDCR 602-A): I am Asking For the sergeant Kevin steele of I.S.U reports, findings, internal Affairs findings/reports All officers statements given and witnesses statements send me them ASAP"

Supporting Documents: Refer to CCR 3084.3.
☑ Yes, I have attached supporting documents.

List supporting documents attached (e.g., CDC 1083, Inmate Property Inventory; CDC 128-G, Classification Chrono):
CDC form 695

☐ No, I have not attached any supporting documents. Reason :

Inmate/Parolee Signature: Hodges James          Date Submitted: 9-10-19

☐ By placing my initials in this box, I waive my right to receive an interview.

**C. First Level - Staff Use Only**          Staff – Check One: Is CDCR 602-A Attached? ☑ Yes ☐ No
This appeal has been:
A6
☐ Bypassed at the First Level of Review. Go to Section E 9-11-19
☑ Rejected (See attached letter for instruction) Date: 9-11-19    Date: 9/25/19    Date: _____    Date: _____
☐ Cancelled (See attached letter) Date: _____
☐ Accepted at the First Level of Review.
Assigned to: _____ Title: _____ Date Assigned: _____ Date Due: _____

First Level Responder: Complete a First Level response. Include Interviewer's name, title, interview date, location, and complete the section below.
Date of Interview: _____ Interview Location: _____

Your appeal issue is: ☐ Granted ☐ Granted in Part ☐ Denied ☐ Other: _____
See attached letter. If dissatisfied with First Level response, complete Section D.

Interviewer: _____ (Print Name) Title: _____ Signature: _____ Date completed: _____

Reviewer: _____ (Print Name) Title: _____ Signature: _____

Date received by AC: _____

| AC Use Only |
|---|
| Date mailed/delivered to appellant ___ / ___ / ___ |

STAFF USE
2019 SEP 11 AM 10:00
RECEIVED CHCF
APPEALS
RECEIVED
CSP-SAC APPEAL

**D. If you are dissatisfied with the First Level response**, explain the reason below, attach supporting documents and submit to the Appeals Coordinator for processing within 30 calendar days of receipt of response.  If you need more space, use Section D of the CDCR 602-A.

_____
_____
_____
_____
_____
_____

Inmate/Parolee Signature: _____  Date Submitted : _____

---

**E.  Second Level - Staff Use Only**                    Staff – Check One:  Is CDCR 602-A Attached?  ☐ Yes    ☐ No

This appeal has been:

☐ By-passed at Second Level of Review.  Go to Section G.
☐ Rejected (See attached letter for instruction) Date: _____  Date: _____  Date: _____  Date: _____
☐ Cancelled (See attached letter)
☐ Accepted at the Second Level of Review

Assigned to: _____  Title: _____  Date Assigned: _____  Date Due: _____

Second Level Responder:  Complete a Second Level response.  If an interview at the Second Level is necessary, include interviewer's name and title, interview date and location, and complete the section below.

Date of Interview: _____  Interview Location: _____

Your appeal issue is:  ☐ Granted    ☐ Granted in Part    ☐ Denied    ☐ Other: _____

See attached letter.  If dissatisfied with Second Level response, complete Section F below.

Interviewer: _____  Title: _____  Signature: _____  Date completed : _____
                   (Print Name)

Reviewer: _____  Title: _____  Signature: _____
                (Print Name)

Date received by AC: _____

| | |
|---|---|
| | **AC Use Only**<br>**Date mailed/delivered to appellant ____ /____ /____** |

---

**F.  If you are dissatisfied with the Second Level response**, explain reason below; attach supporting documents and submit by mail for Third Level Review.  It must be received within 30 calendar days of receipt of prior response.  Mail to: Chief, Inmate Appeals Branch, Department of Corrections and Rehabilitation,  P.O. Box 942883, Sacramento, CA 94283-0001.  If you need more space, use Section F of the CDCR 602-A.

_____
_____
_____
_____
_____

Inmate/Parolee Signature: _____  Date Submitted: _____

---

**G.  Third Level - Staff Use Only**

This appeal has been:
☐ Rejected (See attached letter for instruction) Date: _____  Date: _____  Date: _____  Date: _____  Date: _____
☐ Cancelled (See attached letter)   Date: _____
☐ Accepted at the Third Level of Review.  Your appeal issue is  ☐ Granted    ☐ Granted in Part    ☐ Denied    ☐ Other: _____
      See attached Third Level response.

| | |
|---|---|
| | **Third Level Use Only**<br>**Date mailed/delivered to appellant ____ /____ /____** |

**H. Request to Withdraw Appeal:**  I request that this appeal be withdrawn from further review because; State reason. (If withdrawal is conditional, list conditions.)

_____
_____
_____
_____

_____  Inmate/Parolee Signature: _____  Date: _____
Print Staff Name: _____  Title: _____  Signature: _____  Date: _____


Provide Log#
Forward to CSP-Sac
Appeals Coordinator

IAB USE ONLY

CHCF B-19 03798
SACP-19-04049

Attach this form to the CDCR 602, only if more space is needed. Only one CDCR 602-A may be used.

Appeal is subject to rejection if one row of text per line is exceeded.    WRITE, PRINT, or TYPE CLEARLY in black or blue ink.

| Name (Last, First): | CDC Number: | Unit/Cell Number: | Assignment: |
|---|---|---|---|
| Hodges James | V41134 | Stockton P.P CHCF B30-130 | |

**A. Continuation of CDCR 602, Section A only (Explain your issue):** I received notice, CDC
Form 695 stating that the office of internal affairs
sent it's findings to SAC Appeals and they sent it to me
wednesday 8-21-19 I never received the findings
"period" I Don't Know what games Are being made/played
I am entitled to the findings of ISU, internal Affairs
findings, reports, and correctional officers
statements they gave. this whole process has
been stressful and depressing CDCR does not want
to Admit that officers Violated suicide prevention
policy and my 8th Amendment right and Knowing
did, they will do the same eventhough its soo
obvious Again I never received
findings "period"
(They never sent it)

Inmate/Parolee Signature: Hodges James    Date Submitted: 9-10-19

**B. Continuation of CDCR 602, Section B only (Action requested):** _____

Inmate/Parolee Signature: _____    Date Submitted: _____

2019 SEP 17 AM 11:00
APPEALS
STAFF USE
RECEIVED CHCF
SP-SAC APPEAL
RECEIVED

**D. Continuation of CDCR 602, Section D only (Dissatisfied with First Level response):** _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

**Inmate/Parolee Signature:** _____ **Date Submitted:** _____

**F. Continuation of CDCR 602, Section F only (Dissatisfied with Second Level response):** _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

**Inmate/Parolee Signature:** _____ **Date Submitted:** _____

RE: Screening at the FIRST Level

*Monday, July 29, 2019*

*HODGES, V41134*
*B 306A1116001L*

LEGAL, Processing of Appeals, 07/22/2019
Log Number: SAC-P-19-03048
**(Note: <u>Log numbers are assigned to all appeals for tracking purposes. Your appeal is subject to cancellation for failure to correct noted deficiencies.</u>)**

The enclosed documents are being returned to you for the following reasons:

*Be advised that pursuant to 3084.1(b) your appeal administrative remedies are deemed exhausted. Administrative remedies shall not be considered exhausted relative to any new issue, information, or person later named by the appellant that was not included in the originally submitted CDCR Form 602 and addressed through all required levels of administrative review up to and including the third level.*

*SAC-P-19-04343 was already completed at the 3rd level on 6/7/19, and the appeals unit at SAC has not authority over OIA investigations or when they are completed. This appeal is being returned to you with no further action.*

☒ J. Lyons, AGPA
☐ K. Daly, CCII
☐ D. Matthews, Appeals Lt.
☐ S. Boxall, CCII
☐ J. Hess, Office Technician
☐ L. O"Brian, CCII(A)
Appeals Coordinator
SAC

**NOTE:** If you are required to respond/explain to this CDCR Form 695, use <u>only</u> the lines provided below.

_____

_____

_____

Be advised that you cannot appeal a rejected appeal, but should take the corrective action necessary and resubmit the appeal within the timeframes specified in CCR 3084.6(a) and CCR 3084.8(b). Pursuant to CCR 3084.6(e), once an appeal has been cancelled, that appeal may not be resubmitted. However, a separate appeal can be filed on the cancellation decision. The original appeal may only be resubmitted if the appeal on the cancellation is granted.
NOTE THIS CDCR 695 IS A PERMANENT APPEAL ATTACHMENT AND IS NOT TO BE REMOVED

STATE OF CALIFORNIA
**INMATE/PAROLEE APPEAL**
CDCR.602 (REV. 03/12)

DEPARTMENT OF CORRECTIONS AND REHABILITATION

| IAB USE ONLY | | |
|---|---|---|

CHCF-B-19-02850
SAC-P-19-03040

10

You may appeal any California Department of Corrections and Rehabilitation (CDCR) decision, action, condition, policy or regulation that has a material adverse effect upon your welfare and for which there is no other prescribed method of departmental review/remedy available. See California Code of Regulations (CCR), Title 15, Section 3084.1. You must send this appeal and any supporting documents to the Appeals Coordinator (AC) within 30 calendar days of the event that led to the filing of this appeal. If additional space is needed, only one CDCR Form 602-A will be accepted. Refer to CCR 3084 for further guidance with the appeal process. No reprisals will be taken for using the appeal process.

**Appeal is subject to rejection if one row of text per line is exceeded.**          **WRITE, PRINT, or TYPE CLEARLY in black or blue ink.**

| Name (Last, First): Hodges     James | CDC Number: V41134 | Unit/Cell Number: 86A-116 | Assignment: |
|---|---|---|---|

State briefly the subject of your appeal (Example: damaged TV, job removal, etc.):
delay on in ongoing Isu investigation

**A. Explain your issue** (if you need more space, use Section A of the CDCR 602-A): it saddens me that I have to file this 602 But this is ridiculous on 9-5-18 while in psu B-7 holding cage waiting to be sent to crisis Bad I was being watch by U B-7 c/s while in cage

**B. Action requested** (if you need more space, use Section B of the CDCR 602-A): I want the investigation report/Finding and statements made by c/s regards to my suicide Attempt and thier Actions I want Isu report ASAp

**Supporting Documents: Refer to CCR 3084.3.**
☑ Yes, I have attached supporting documents.

List supporting documents attached (e.g., CDC 1083, Inmate Property Inventry; CDC 128-G, Classification Chrono):
memorandum
From Isu Sgt K. Steele

☐ No, I have not attached any supporting documents. Reason : _____

_____
_____
_____
_____

Inmate/Parolee Signature: Hodges James          Date Submitted: 7-11-19

☐ **By placing my initials in this box, I waive my right to receive an interview.**

RECEIVED CHCF
2019 JUL 15 PM 12:55
APPEALS

RECEIVED
CSP-SAC APPEAL
2019 JUL 29 AM 11:18
STAFF USE

**C. First Level - Staff Use Only**          **Staff – Check One: Is CDCR 602-A Attached?** ☑ Yes ☐ No
This appeal has been:
☐ Bypassed at the First Level of Review. Go to Section E.          AC
☐ Rejected (See attached letter for instruction) Date: 7-15-19 Date: 7/29/19 Date: _____ Date: _____
☐ Cancelled (See attached letter) Date: _____
☐ Accepted at the First Level of Review.
    Assigned to: _____ Title: _____ Date Assigned: _____ Date Due: _____

First Level Responder: Complete a First Level response. Include Interviewer's name, title, interview date, location, and complete the section below.

Date of Interview: _____ Interview Location: _____

Your appeal issue is: ☐ Granted ☐ Granted in Part ☐ Denied ☐ Other: _____
    See attached letter. If dissatisfied with First Level response, complete Section D.

Interviewer: _____ Title: _____ Signature: _____ Date completed: _____
                    (Print Name)

Reviewer: _____ Title: _____ Signature: _____
                    (Print Name)

Date received by AC: _____

| AC Use Only |
|---|
| Date mailed/delivered to appellant ____ / ____ / ____ |

**D. If you are dissatisfied with the First Level response,** explain the reason below, attach supporting documents and submit to the Appeals Coordinator for processing within 30 calendar days of receipt of response. If you need more space, use Section D of the CDCR 602-A.

_____
_____
_____
_____
_____
_____
_____

Inmate/Parolee Signature: _____ Date Submitted : _____

**E. Second Level - Staff Use Only**                    Staff – Check One: Is CDCR 602-A Attached?  ☐ Yes  ☐ No

This appeal has been:

☐ By-passed at Second Level of Review. Go to Section G.  
☐ Rejected (See attached letter for instruction) Date: _____ Date: _____ Date: _____ Date: _____  
☐ Cancelled (See attached letter)  
☐ Accepted at the Second Level of Review

Assigned to: _____ Title: _____ Date Assigned: _____ Date Due: _____

Second Level Responder: Complete a Second Level response. If an interview at the Second Level is necessary, include interviewer's name and title, interview date and location, and complete the section below.

Date of Interview: _____ Interview Location: _____

Your appeal issue is: ☐ Granted  ☐ Granted in Part  ☐ Denied  ☐ Other: _____

See attached letter. If dissatisfied with Second Level response, complete Section F below.

Interviewer: _____ Title: _____ Signature: _____ Date completed : _____
           (Print Name)

Reviewer: _____ Title: _____ Signature: _____
         (Print Name)

Date received by AC: _____

| AC Use Only |
| Date mailed/delivered to appellant ____/____/____ |

**F. If you are dissatisfied with the Second Level response,** explain reason below; attach supporting documents and submit by mail for Third Level Review. It must be received within 30 calendar days of receipt of prior response. Mail to: Chief, Inmate Appeals Branch, Department of Corrections and Rehabilitation, P.O. Box 942883, Sacramento, CA 94283-0001. If you need more space, use Section F of the CDCR 602-A.

_____
_____
_____
_____
_____
_____

Inmate/Parolee Signature: _____ Date Submitted: _____

**G. Third Level - Staff Use Only**

This appeal has been:

☐ Rejected (See attached letter for instruction) Date: _____ Date: _____ Date: _____ Date: _____ Date: _____  
☐ Cancelled (See attached letter)    Date: _____  
☐ Accepted at the Third Level of Review. Your appeal issue is ☐ Granted  ☐ Granted in Part  ☐ Denied  ☐ Other: _____

See attached Third Level response.

| Third Level Use Only |
| Date mailed/delivered to appellant ____/____/____ |

**H. Request to Withdraw Appeal:** I request that this appeal be withdrawn from further review because; State reason. (If withdrawal is conditional, list conditions.)

_____
_____
_____
_____

Inmate/Parolee Signature: _____ Date: _____

Print Staff Name: _____ Title: _____ Signature: _____ Date: _____



IAB USE ONLY

CHCF-B-19-02830
SAC-P-19-03048

Attach this form to the CDCR 602, only if more space is needed. Only one CDCR 602-A may be used.

**Appeal is subject to rejection if one row of text per line is exceeded.** **WRITE, PRINT, or TYPE CLEARLY in black or blue ink.**

| Name (Last, First): Hodges James | CDC Number: VH1134 | Unit/Cell Number: B6A-116 | Assignment: |

**A. Continuation of CDCR 602, Section A only (Explain your issue)** I was Allowed to Attempt Suicide I endedup in U.C Davis I C.U. I File 602 Log # sac-18-04343 while in Icu Sergeat K. Steele of I SU came to Interview me About what happen Long story short he told me it was going to be investigation it's now been 11 months since I Keep sending 220 and Sgt steele to be patient he Keep telling me I can't understand why the investigation is taken soo long? when the facts Are clear As day c/o violated Suicide prevention and my 8th Amendment Iam starting to think it's no investigation and it's A cover up happening Iam depressed and stressing out why is it taken soo ~~way~~ long? it's taken it's toll on me

Inmate/Parolee Signature: Hodges James     Date Submitted: 7-11-19

**B. Continuation of CDCR 602, Section B only (Action requested):** _____

Inmate/Parolee Signature: _____     Date Submitted: _____

RECEIVED CHCF
2019 JUL 15 AM 7:5
APPEALS

RECEIVED
CSP-SAC APPEALS
2019 JUL 22 PM 1:10

**D. Continuation of CDCR 602, Section D only (Dissatisfied with First Level response):** _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Inmate/Parolee Signature: _____ Date Submitted: _____

**F. Continuation of CDCR 602, Section F only (Dissatisfied with Second Level response):** _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Inmate/Parolee Signature: _____ Date Submitted: _____

RE: Screening at the FIRST Level

*Wednesday, August 21, 2019*

*HODGES, V41134*
*B 306A1116001L*

LEGAL, Processing of Appeals, 08/05/2019
Log Number: SAC-P-19-03488
(Note: <u>Log numbers are assigned to all appeals for tracking purposes. Your appeal is subject to cancellation for failure to correct noted deficiencies.</u>)

The enclosed documents are being returned to you for the following reasons:

*Your appeal has been cancelled pursuant to the California Code of Regulations, Title 15, Section (CCR) 3084.6(c)(2). The appeal duplicates a previous appeal upon which a decision has been rendered or is pending.*

*This is a duplicate appeal of SAC-P-19-03048. As stated on that 695, SAC has not authority over OIA investigations or when they are completed. However, the findings of the OIA investigation were received in appeals office on 8/20/19 and the original response was mailed to you today, Wednesday 8/21/19. Attached is a copy of the memo mailed to you. You are responsible for maintaining copies for your records of your appeals and paperwork, including staff names involved in your incident. You may request documents from your C-file from your counselor. This appeal is being returned to you with no further action.*

☐ J. Lyons, AGPA
☐ K. Daly, CCII
☐ D. Matthews, Appeals Lt.
☐ S. Boxall, CCII
☐ J. Hess, Office Technician
☐ L. O"Brian, CCII(A)
Appeals Coordinator
SAC

**NOTE:** If you are required to respond/explain to this CDCR Form 695, use <u>only</u> the lines provided below.

_____

_____

_____

Be advised that you cannot appeal a rejected appeal, but should take the corrective action necessary and resubmit the appeal within the timeframes specified in CCR 3084.6(a) and CCR 3084.8(b). Pursuant to CCR 3084.6(e), once an appeal has been cancelled, that appeal may not be resubmitted. However, a separate appeal can be filed on the cancellation decision. The original appeal may only be resubmitted if the appeal on the cancellation is granted.
NOTE THIS CDCR 695 IS A PERMANENT APPEAL ATTACHMENT AND IS NOT TO BE REMOVED

STATE OF CALIFORNIA
**INMATE/PAROLEE APPEAL FORM ATTACHMENT**
CDCR 602-A (REV. 03/12)

DEPARTMENT OF CORRECTIONS AND REHABILITATION

**Side 1**

IAB USE ONLY 

Category

Attach this form to the CDCR 602, only if more space is needed. Only one CDCR 602-A may be used.
**Appeal is subject to rejection if one row of text per line is exceeded.     WRITE, PRINT, or TYPE CLEARLY in black or blue ink.**

| Name (Last, First): | CDC Number: | Unit/Cell Number: | Assignment: |
|---|---|---|---|
| Hodges    James | V41134 | BGA-116 | |

A. Continuation of CDCR 602, Section A only (Explain your issue): The 3rd level Decision
said that the office of internal Affairs has
notified CSP-SAC of their decision Finding
so I contacted CSP-SAC Appeals coordinator which they replied
that internal Affairs never sent them their decision,
Findings. I am starting to think its some cover nps and
stalling on All investigations with internal Affairs
and ISU its Been 1 Year since Suicide Attempt
its Clear As Day officers violated Suicide
prevention policy, procodures and my 8th Amendment

Inmate/Parolee Signature: Hodges     Date Submitted: 7-29-19

B. Continuation of CDCR 602, Section B only (Action requested): internal Affairs immediately
and All First and last names of All c/o's that were involved,
4 c/o's that worked 3rd watch B-7 psu September 8th
2018 and witness

Inmate/Parolee Signature: Hodges James     Date Submitted: 7-29-19

**D. Continuation of CDCR 602, Section D only (Dissatisfied with First Level response):** _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

**Inmate/Parolee Signature:** _____  **Date Submitted:** _____

**F. Continuation of CDCR 602, Section F only (Dissatisfied with Second Level response):** _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

**Inmate/Parolee Signature:** _____  **Date Submitted:** _____

Provide log# and Forward to CSP-SAC, Appeals coordinator Side 1

IAB USE ONLY

SAC-P-19-03488

You may appeal any California Department of Corrections and Rehabilitation (CDCR) decision, action, condition, policy or regulation that has a material adverse effect upon your welfare and for which there is no other prescribed method of departmental review/remedy available. See California Code of Regulations (CCR), Title 15, Section 3084.1. You must send this appeal and any supporting documents to the Appeals Coordinator (AC) within 30 calendar days of the event that led to the filing of this appeal. If additional space is needed, only one CDCR Form 602-A will be accepted. Refer to CCR 3084 for further guidance with the appeal process. No reprisals will be taken for using the appeal process.

**Appeal is subject to rejection if one row of text per line is exceeded.**                    **WRITE, PRINT, or TYPE CLEARLY in black or blue ink.**

| Name (Last, First) | CDC Number: | Unit/Cell Number: | Assignment: |
|---|---|---|---|
| Hodges James | V41134 | B6A-116 | |

State briefly the subject of your appeal (Example: damaged TV, job removal, etc.): Staff misconduct
Findings/report of internal Affairs on my suicide Attempt 9-5-18

A. Explain your issue (If you need more space, use Section A of the CDCR 602-A): Around June 18th 2019 I receive Third Level Appeals Decision in regards to 602 staff misconduct on my suicide Attempt 9-5-18/ Log# SAC-18-04343 & TLR Case No. 1900223

B. Action requested (If you need more space, use Section B of the CDCR 602-A): I am requesting internal Affairs decision Findings All correctional officers that were involved in my suicide Attempt statements they Gave to ISN sergeant Steele and

Supporting Documents: Refer to CCR 3084.3.
☑ Yes, I have attached supporting documents.
List supporting documents attached (e.g., CDC 1083, Inmate Property Inventory; CDC 128-G, Classification Chrono):
response Form 22 for SAC

☐ No, I have not attached any supporting documents. Reason : _____

Inmate/Parolee Signature: Hodges James          Date Submitted: 7-29-19

☐ By placing my initials in this box, I waive my right to receive an interview.

RECEIVED - SAC P&A APPEAL STAFF USE ONLY

---

**C. First Level - Staff Use Only**                    Staff – Check One: Is CDCR 602-A Attached?  ☑ Yes  ☐ No

This appeal has been:
☐ Bypassed at the First Level of Review. Go to Section E.
☐ Rejected (See attached letter for instructions) Date: _____ Date: _____ Date: _____ Date: _____
☐ Cancelled (See attached letter) Date: 8/14/19
☐ Accepted at the First Level of Review.

Assigned to: _____ Title: _____ Date Assigned: _____ Date Due: _____

First Level Responder: Complete a First Level response. Include Interviewer's name, title, interview date, location, and complete the section below.

Date of Interview: _____ Interview Location: _____

Your appeal issue is: ☐ Granted  ☐ Granted in Part  ☐ Denied  ☐ Other: _____
See attached letter. If dissatisfied with First Level response, complete Section D.

Interviewer: _____ (Print Name)  Title: _____ Signature: _____ Date completed: _____

Reviewer: _____ (Print Name)  Title: _____ Signature: _____

Date received by AC: _____

| AC Use Only |
|---|
| Date mailed/delivered to appellant ____ / ____ / ____ |

**D. If you are dissatisfied with the First Level response**, explain the reason below, attach supporting documents and submit to the Appeals Coordinator for processing within 30 calendar days of receipt of response.  If you need more space, use Section D of the CDCR 602-A.

_____
_____
_____
_____
_____
_____

Inmate/Parolee Signature: _____     Date Submitted : _____

---

**E.  Second Level - Staff Use Only**                    Staff – Check One:  Is CDCR 602-A Attached?   ☐ Yes   ☐ No

This appeal has been:

☐ By-passed at Second Level of Review.  Go to Section G.
☐ Rejected (See attached letter for instruction) Date: _____   Date: _____   Date: _____   Date: _____
☐ Cancelled (See attached letter)
☐ Accepted at the Second Level of Review

Assigned to: _____ Title: _____ Date Assigned: _____ Date Due: _____

Second Level Responder:  Complete a Second Level response.  If an interview at the Second Level is necessary, include interviewer's name and title, interview date and location, and complete the section below.

Date of Interview: _____     Interview Location: _____

Your appeal issue is:   ☐ Granted   ☐ Granted in Part   ☐ Denied   ☐ Other: _____

See attached letter.  If dissatisfied with Second Level response, complete Section F below.

Interviewer: _____ Title: _____ Signature: _____ Date completed : _____
(Print Name)

Reviewer: _____ Title: _____ Signature: _____
(Print Name)

Date received by AC: _____

| AC Use Only |
| Date mailed/delivered to appellant ____ /____ /____ |

---

**F.  If you are dissatisfied with the Second Level response**, explain reason below; attach supporting documents and submit by mail for Third Level Review.  It must be received within 30 calendar days of receipt of prior response.  Mail to: Chief, Inmate Appeals Branch, Department of Corrections and Rehabilitation,  P.O. Box 942883, Sacramento, CA 94283-0001.  If you need more space, use Section F of the CDCR 602-A.

_____
_____
_____
_____
_____

Inmate/Parolee Signature: _____     Date Submitted: _____

---

**G.  Third Level - Staff Use Only**

This appeal has been:
☐ Rejected (See attached letter for instruction) Date: _____   Date: _____   Date: _____   Date: _____   Date: _____
☐ Cancelled (See attached letter)   Date: _____
☐ Accepted at the Third Level of Review.  Your appeal issue is ☐ Granted   ☐ Granted in Part   ☐ Denied   ☐ Other: _____
     See attached Third Level response.

| Third Level Use Only |
| Date mailed/delivered to appellant ____ /____ /____ |

**H. Request to Withdraw Appeal:**  I request that this appeal be withdrawn from further review because; State reason. (If withdrawal is conditional, list conditions.)

_____
_____
_____

_____ Inmate/Parolee Signature: _____     Date: _____

Print Staff Name: _____ Title: _____ Signature: _____     Date: _____

— 🌀 eXhibit A-A

CDCR 22 Form

From correctional officer T. LOR

he stated in 22 there was 837's
Suicide Attempt Reports were written

Other 22

From Correctional counselor H. Gutierrez
stating that there was no documentation
Found.

CDCR officials deliberatley removed/destroyed
the reports which makes them
(look more guilty.)

I would like the courts to ask where are
the 837's Suicide Attempt reports?
CDCR-official are trying to keep the truth
From coming out



STATE OF CALIFORNIA
**INMATE/PAROLEE REQUEST FOR INTERVIEW, ITEM OR SERVICE**
CDCR 22 (10/09)

DEPARTMENT OF CORRECTIONS AND REHABILITATION

### SECTION A: INMATE/PAROLEE REQUEST

| NAME (Print): (LAST NAME) | (FIRST NAME) | CDC NUMBER: | SIGNATURE: |
|---|---|---|---|
| Hodges | James | V41134 | Hodges |

| HOUSING/BED NUMBER: | ASSIGNMENT: | HOURS FROM _____ TO _____ | TOPIC (I.E. MAIL, CONDITION OF CONFINEMENT/PAROLE, ETC.): |
|---|---|---|---|
| B3B-130 | | | |

CLEARLY STATE THE SERVICE OR ITEM REQUESTED OR REASON FOR INTERVIEW:

This is inregards to my Centermber 5th 2018 Suicide Attempt which you were witness to At CSP-SAC/PBSn-B-7 3rd watch. today is 11-12-19 At CHCF-pip which you knew work today You told me you wrote it in "Suicide Attempt Report" statement of everything you witnessed and turn it in. So I would like to know is that true and the title and name of officers you turned it into and do you Admit to telling me today 11-12-19 you did Report and did Suicde Attempt report and did you tell ISU Sergeant Kevin Steele what happen

METHOD OF DELIVERY (CHECK APPROPRIATE BOX ) **NO RECEIPT WILL BE PROVIDED IF REQUEST IS MAILED **

☐ SENT THROUGH MAIL: ADDRESSED TO: C/o T. LOR        DATE MAILED: 11/12/19

☑ DELIVERED TO STAFF (STAFF TO COMPLETE BOX BELOW AND GIVE GOLDENROD COPY TO INMATE/PAROLEE):

| RECEIVED BY: PRINT STAFF NAME: | DATE: | SIGNATURE: | FORWARDED TO ANOTHER STAFF? (CIRCLE ONE) YES NO |
|---|---|---|---|
| C/o T. Lor | 11/12/19 | | |

| IF FORWARDED – TO WHOM: | DATE DELIVERED/MAILED: | METHOD OF DELIVERY: (CIRCLE ONE) IN PERSON BY US MAIL |
|---|---|---|

### SECTION B: STAFF RESPONSE

| RESPONDING STAFF NAME: | DATE: | SIGNATURE: | DATE RETURNED: |
|---|---|---|---|
| C/o T. Lor | 11/12/19 | | 11/12/19 |

I submitted a written report 837's to my unit supervisor. I can't recalled the supervisor name. On 11/12/19 I were assigned to B3B FLR #2; you ask me if I were the officer present on the day of the incident you attempted to commit suicide in the holding cell; I did confirmed that I was present. During the course of time periods after the incident, I have never made any verbal or written contact with Sgt. Steele.

### SECTION C: REQUEST FOR SUPERVISOR REVIEW

PROVIDE REASON WHY YOU DISAGREE WITH STAFF RESPONSE AND FORWARD TO RESPONDENT'S SUPERVISOR IN PERSON OR BY US MAIL. KEEP FINAL CANARY COPY.

_____
_____
_____
_____
_____

| SIGNATURE: | DATE SUBMITTED: |
|---|---|
| | |

### SECTION D: SUPERVISOR'S REVIEW

| RECEIVED BY SUPERVISOR (NAME): | DATE: | SIGNATURE: | DATE RETURNED: |
|---|---|---|---|
| | | | |

_____
_____
_____
_____
_____
_____

STATE OF CALIFORNIA

DEPARTMENT OF CORRECTIONS AND REHABILITATION

**INMATE/PAROLEE REQUEST FOR INTERVIEW, ITEM OR SERVICE**
CDCR 22 (10/09)

## SECTION A: INMATE/PAROLEE REQUEST

| NAME (Print): (LAST NAME) | (FIRST NAME) | | CDC NUMBER: | SIGNATURE: |
|---|---|---|---|---|
| Hodges | James | | V41134 | Hodges James |

| HOUSING/BED NUMBER: | ASSIGNMENT: | HOURS FROM_____ TO_____ | TOPIC (I.E. MAIL CONDITION OF CONFINEMENT/PAROLE, ETC.): |
|---|---|---|---|
| B3B-120 | | | |

CLEARLY STATE THE SERVICE OR ITEM REQUESTED OR REASON FOR INTERVIEW:

Asked you to into File in All other places where 637's Suicide Attempt Report s are Filed you told me it was no such report ever Filed or 114A Detention/ Segregation Record For the Date of the Suicide Attempt on September 5th 2018 So is Both requests and your Answer to requests true. Also is Fit policy for 837's to be Filed Attempted suicides? is it policy or 114A Detention/ Segregation Record which is A log Sheet of Safety Checks on inmates

METHOD OF DELIVERY (CHECK APPROPRIATE BOX ) **NO RECEIPT WILL BE PROVIDED IF REQUEST IS MAILED** Awaiting
☑ SENT THROUGH MAIL: ADDRESSED TO: CCA Gutierrez                  DATE MAILED: __/__/__
☑ DELIVERED TO STAFF (STAFF TO COMPLETE BOX BELOW AND GIVE GOLDENROD COPY TO INMATE/PAROLEE): holding

| RECEIVED BY: PRINT STAFF NAME: | DATE: | SIGNATURE: | FORWARDED TO ANOTHER STAFF? (CIRCLE ONE)   YES   NO | cage |
|---|---|---|---|---|
| IF FORWARDED – TO WHOM: | | DATE DELIVERED/MAILED: | METHOD OF DELIVERY: (CIRCLE ONE) IN PERSON   BY US MAIL | To be Sent to crisis Bed? |

## SECTION B: STAFF RESPONSE

| RESPONDING STAFF NAME: | DATE: | SIGNATURE: | DATE RETURNED: |
|---|---|---|---|
| Cc1 H. Gutierrez | 12/02/19 | | 12/02/19 |

AFTER A COMPLETE FILE REVIEW NO DOCUMENTATION WAS FOUND PERTAINING TO YOUR REQUEST.

## SECTION C: REQUEST FOR SUPERVISOR REVIEW

PROVIDE REASON WHY YOU DISAGREE WITH STAFF RESPONSE AND FORWARD TO RESPONDENT'S SUPERVISOR IN PERSON OR BY US MAIL. KEEP FINAL CANARY COPY.

| SIGNATURE: | DATE SUBMITTED: |
|---|---|
| | |

## SECTION D: SUPERVISOR'S REVIEW

| RECEIVED BY SUPERVISOR (NAME): | DATE: | SIGNATURE: | DATE RETURNED: |
|---|---|---|---|
| | | | |

eXhibit A

First Responder
R.N.
Progress Note-Nurse
and

(GCS) Glasgow Coma scale

I want the court's to Acknowledge to Fact Finders
When R.N. telled stop you cant do that! Dont move him
Officers disregard R.N advisement More So
R.N. Asked Frantialy Did anyone See Anything?
No respose was given.

Patient:        **HODGES, JAMES ALBERT**
DOB/Age/Sex:  7/16/1984  / 34 years   / Male        CDCR: V41134

---

### *Perioperative Record*

No data exists for this section

---

### *Physician Orders*

No data exists for this section

---

### *Procedures/Interventions*

No data exists for this section

---

### *Public Health*

No data exists for this section

---

### *Progress Notes*

Document Type:                      Progress Note-Nurse
Document Subject:                   Hanging: late entry
Service Date/Time:                  9/7/2018 14:45 PDT
Result-Status:                      Auth (Verified)
Perform Information:                Ames,Kristi RN (9/7/2018 14:53 PDT)
Sign Information:                   Ames,Kristi RN (9/7/2018 14:53 PDT)
Authentication Information:         Ames,Kristi RN (9/7/2018 14:53 PDT)

On 9/5/2018 at approximately 1815 a code 1 response to the block was called regarding an inmate hanging. RN Rover responded to the block, coming into B7, seeing numerous custody officers, no medical staff present. Custody had inmate HODGES (V41134) held by the side of his blue jump suite, head parallel to an orange gurney on the ground, with his head slumping to the side unsupported, with no visibly attempt to support IP neck or head during transfer, or log roll method. HODGES had a c-collar already applied by unknown staff. RN Rover saw this and yelled "Stop! You can't do that! Don't move him without a backboard!" Custody officers continued to move IP and put HODGES onto an orange gurney disregarding RN advisement. RN Rover asked franticly "Did anyone see anything?", without response from a single officer. Custody then put the orange gurney onto a rolling gurney and proceeded to building 56, TTA. RN Rover grabbed some tape from the red bag and attempted to secure HODGES' head to the orange gurney for additional support and stability, following custody. During rolling transport to TTA RN attempted to communicate with IP, without response from IP and provided quick visual assessment. IP eyes were open and fixated, no motor response, no verbal response, but breathing irregularly with gurgling, Cheyne-stroke pattern, GCS of 4. Further assessment showed IP was biting down on his tongue, locked jaw, causing salivation and blood loss. IP arrived to TTA where oral suction was applied with some effect, VS taken, and IV access established Rt arm, 1LNS. Breathing was still irregular displaying cheyne-stroke pattern, gurgling present, pupils were fixated and non-responsive to light, approx. 5mm in size. Code 3 BLS ambulance was called.

---

Legend: c=Corrected, @=Abnormal, C=Critical, L=Low, H=High, f=Result Comment, i=Interp Data, *=Performing Lab

---

Report Request ID:  14534457                                Print Date/Time:  1/24/2019 12:47 PST

**WARNING:** This report contains confidential, proprietary, and/or legally privileged
information intended for the recipient only.



**brainline**

All about brain injury and PTSD

# What Is the Glasgow Coma Scale?

*BrainLine*



Related Content:

Brain Injury: Common Tests and Procedures (/article/brain-injury-common-tests-and-procedures)

What Imaging Techniques Are Used to Diagnose Traumatic Brain Injury?
(/video/what-imaging-techniques-are-used-diagnose-traumatic-brain-injury)

What Are the Symptoms of Concussion? (/video/what-are-symptoms-concussion)

Why Is Mild Traumatic Brain Injury Hard to Diagnose? (/video/why-mild-traumatic-brain-injury-hard-diagnose)

What is the Difference Between a Subdural and Epidural Hematoma? (/video/what-difference-between-subdural-and-epidural-hematoma)

The Glasgow Coma Scale (GCS) is the most common scoring system used to describe the level of consciousness
(/landing_pages/categories/coma.html) in a person following a traumatic brain injury
(/landing_pages/categories/abouttbi.html). Basically, it is used to help gauge the severity of an acute brain injury. The test is
simple, reliable, and correlates well with outcome following severe brain injury.

The GCS is a reliable and objective way of recording the initial and subsequent level of consciousness in a person after a brain
injury. It is used by trained staff at the site of an injury like a car crash or sports injury
(/landing_pages/categories/sportsinjuries.html), for example, and in the emergency department and intensive care units.

The GCS measures the following functions:

**Eye Opening (E)**

4 = spontaneous

3 = to sound

2 = to pressure

1 = none

NT = not testable

**Verbal Response (V)**

5 = orientated

4 = confused

3 = words, but not coherent

2 = sounds, but no words

1 = none

NT = not testable

**Motor Response (M)**

6 = obeys command

5 = localizing

4 = normal flexion

3 = abnormal flexion

2 = extension

1 = none

NT = not testable

Clinicians use this scale to rate the best eye opening response, the best verbal response, and the best motor response an individual makes. The final GCS score or grade is the sum of these numbers.

## Using the Glasgow Coma Scale

A patient's Glasgow Coma Score (GCS) should be documented on a coma scale chart. This allows for improvement or deterioration in a patient's condition to be quickly and clearly communicated.

Individual elements, as well as the sum of the score, are important. The individual elements of a patient's GCS can be documented numerically (e.g. E2V4M6) as well as added together to give a total Coma Score (e.g E2V4M6 = 12). For example, a score may be expressed as GCS 12 = E2 V4 M6 at 4:32.

Every brain injury is different, but generally, brain injury is classified as:

**Severe:** GCS 8 or less

**Moderate:** GCS 9-12

**Mild:** GCS 13-15

Mild brain injuries can result in temporary or permanent neurological symptoms and neuroimaging tests (/content/2008/11/brain-injury-common-tests-and-procedures.html) such as CT scan or MRI (/content/multimedia.php?id=3214) may or may not show evidence of any damage.

Moderate and severe brain injuries often result in long-term impairments in cognition (/landing pages/categories/cognitivesymptoms.html) (thinking skills), physical (/landing pages/categories/physicalsymptoms.html) skills, and/or emotional/behavioral (/landing pages/categories/behavioralsymptoms.html) functioning.

## Limitations of the Glasgow Coma Scale

Factors like drug use, alcohol intoxication (/webcasts/4-TBI and Substance Abuse/), shock, or low blood oxygen can alter a patient's level of consciousness. These factors could lead to an inaccurate score on the GCS.

## Children and the Glasgow Coma Scale

The GCS is usually not used with children (/landing pages/features/blkids.html), especially those too young to have reliable language skills. The Pediatric Glasgow Coma Scale, or PGCS, a modification of the scale used on adults, is used instead. The

PGCS still uses the three tests — eye, verbal, and motor responses — and the three values are considered separately as well as together.

Here is the slightly altered grading scale for the PGCS:

# Eye Opening (E)

4 = spontaneous

3 = to voice

2 = to pressure

1 = none

NT = not testable

# Verbal Response (V)

5 = smiles, oriented to sounds, follows objects, interacts

4 = cries but consolable, inappropriate interactions

3 = inconsistently inconsolable, moaning

2 = inconsolable, agitated

1 = none

NT = not testable

# Motor Response (M)

6 = moves spontaneously or purposefully

5 = localizing (withdraws from touch)

4 = normal flexion (withdraws to pain)

3 = abnormal flexion (decorticate response)

2 = extension (decerebrate response)

1 = none

NT = not testable

Pediatric brain injuries are classified by severity using the same scoring levels as adults, i.e. 8 or lower reflecting the most severe, 9-12 being a moderate injury and 13-15 indicating a mild TBI. As in adults, moderate and severe injuries often result in significant long-term impairments.

*Posted on BrainLine February 13, 2018. Reviewed July 25, 2018.*

## References

Teasdale G, Allen D, Brennan P, McElhinney E, Mackinnon L. *The Glasgow Coma Scale: an update after 40 years (https://www.nursingtimes.net/Journals/2014/10/10/n/p/l/141015Forty-years-on-updating-the-Glasgow-coma-scale.pdf)*. Nursing Times 2014; 110: 12-16

Teasdale G, Jennett B. *Assessment of coma and impaired consciousness. A practical scale.* Lancet 1974,2:81-84. PMID 4136544 (http://www.ncbi.nlm.nih.gov/pubmed/4136544).

The Glasgow Structured Approach to Assessment of the Glasgow Coma Scale. (n.d.). Retrieved February 13, 2018, from www.glasgowcomascale.org (http://www.glasgowcomascale.org/).

# exhibit ~B
## Anoxic and Hypoxic Brain injury

Due to hanging I suffered Anoxic injury
killing brain cells — Meamory loss
difficulty with concentration and losing train of thought
severe migraines
Blurry vision, Back of eyes Are enlarged,
Have to wear seeing glasses


defendants exposed me to the Above and Death



**:pherd** | **Patient Programs** | About | Admissions | **For Healthcare Professionals** | Su Us

Spinal Cord Injury Rehabilitation

Brain Injury Rehabilitation Program

Learn About Brain Injury

Types of Brain Injuries

Anoxic and Hypoxic Brain Injuries

Traumatic Brain Injury

Brain Injury Prevention

Brain Injury Causes

Tips For Caregivers

About Shepherd Center's Brain Injury Program

Choosing a Rehabilitation Program

Brain Injury Programs at Shepherd Center

Level 1 Rehabilitation Research

Inpatient Rehabilitation

Home / Patient Programs / Brain Injury Rehabilitation Program / Learn About...

# Anoxic and Hypoxic Brain Injury



## What are Anoxic or Hypoxic Brain Injuries?

Unlike traumatic brain injuries, in which brain damage is induced by direct physical trauma, anoxic and hypoxic brain injuries are brain injuries characterized by a lack of oxygen being provided to the brain. Anoxic and hypoxic brain injuries are commonly associated with strokes, although strokes are not the only causes of these type of brain injury.

› **Anoxic brain injuries** are caused by a complete lack of oxygen being provided to the brain, which results in the death of brain cells after approximately four minutes of oxygen deprivation.

›

Disorders of Consciousness Program

Adolescent Program

Day Program

Residential Program

Brain Injury Rehabilitation Doctors

Stroke Rehabilitation

Brain Injury Care for U.S. Service Members

Multiple Sclerosis

Outpatient Programs

Spine and Pain

Beyond Therapy

Guillain Barré Syndrome

Research

Specialty Programs

Sports and Recreation Therapy

Seating Clinic

**Hypoxic brain injuries** are brain injuries that form due to a restriction on the oxygen being supplied to the brain. The restricted flow of oxygen causes the gradual death and impairment of brain cells.

### Causes of Anoxic and Hypoxic Brain Injuries

›   **Hypoxicischemic injury,** also known as stagnant anoxia, may:
  ›   Occur when oxygen-carrying blood cannot reach the brain, resulting in oxygen deprivation.
  ›   Be caused by strokes, but can also be caused by other pulmonary conditions, such as cardiac arrest or cardiac arrhythmia.
›   **Anemic anoxia:** Anemic anoxia occurs when the blood cannot properly carry enough oxygen or if there is not enough blood in the body itself to support the oxygen needs of the brain.
›   **Toxic anoxia:** Toxic anoxia occurs when chemicals or poisons hinder the ability of the brain to receive oxygen from blood cells.
›   **Anoxic anoxia:** Anoxic anoxia is caused by the lack of oxygen in the air, resulting in suffocation.

# Symptoms of Anoxic and Hypoxic Brain Injuries

Anoxic and hypoxic brain injuries often cause an initial loss of consciousness, which can be short-term or long-term depending on severity and length of oxygen deprivation. Initial loss of consciousness may result in a comatose state. Other symptoms of an occurring anoxic or hypoxic brain injury occurring may include slurring and difficulties with speech, confusion and disorientation or facial drooping.

Upon regaining consciousness, the effects and symptoms are often similar to that of a traumatic brain injury, depending on severity of the injury. More severe anoxic or hypoxic brain injuries may leave the patient in a vegetative state. **The effects of an anoxic brain injury may include:**

›   headache
›   difficulty coordinating balance
›   blurred vision in one or both eyes

›   difficulty forming s
›   confusion
›   trouble communica

- › milder vision problems
- › seizures
- › changes in sensory perception
- › trouble speaking and swallowing
- › changes in sleep pattern
- › lack of bowel and bladder control
- › changes in sexual function
- › motor impairment
- › personality changes

- › difficulty with reas
- › memory impairme
- › depression
- › poor concentratior
- › mood swings
- › limited attention sp
- › disorientation
- › forgetfulness
- › acting inappropriat

## Prognosis of Anoxic or Hypoxic Brain Injuries

Projecting the recovery and care for anoxic or hypoxic brain injuries is difficult because each case is unique. A full recovery from severe anoxic or hypoxic brain injury is rare, but many patients with mild anoxic or hypoxic brain injuries are capable of making a full or partial recovery. Furthermore, symptoms and effects of the injury are dependent on the area(s) of the brain that was affected by the lack of oxygen.

## Learn More from Shepherd Center

**Need help identifying the right brain injury rehabilitation center?
Discover if Shepherd Center is right for you or your loved one.**

**Click for more information now**

Please contact us at 404-352-2020 if you have additional questions about traumatic brain injuries, concussions, or anoxic injuries.

REFER A PATIENT          DON

exhibit - C

U.C. Davis medical center
Patient information Record

Note too thick
For staple

UC DAVIS HEALTH

# Interfacility Transfer Summary Report

## UNIVERSITY OF CALIFORNIA, DAVIS
## PATIENT INFORMATION RECORD

*V41134*

| Patient Name: James 9Bm Hodges#* | MRN: 7509175 |
|---|---|
| Financial Class: G | |
| Dept: 1. T2 SURGICAL ICU I | |
| CSN # 200026785256 | Account # 950018308197 |

| PCP | Admission Info |
|---|---|
| No Pcp Per Patient | Admit Date/Time: 9/5/2018 1926 |
| None | Attending: 1033198742 [Travis Gerlach, Md] |
| Office Ph: None | Referring Facility: |
| | Patient Class: Inpatient |

### Patient Information

| | |
|---|---|
| 300 Prison Road | Pt. DOB: 7/16/1984 (34 yrs) |
| Represa CA 95671 | |
| Mobile Ph: Telephone Information: | Sex: Male |
| Mobile    916-985-2561 | |
| Home Ph: 916-985-2561 | Marital Status: Single |
| Work Ph: | Alias: DOE,JERSEY BM |
| Employment Status: NOT EMPLOYED | Ethnicity: Not Hispanic Or Latino |
| Occupation: | Race: Other |
| UCD Employee Ind: | Employer: |
| Pt. SSN: xxx-xx-0001 | Language: English |
| Advanced Directive: N | |

### Guarantor and Coverage Information

| | | | |
|---|---|---|---|
| Guarantor: | HODGES#*,JAMES 9BM | | |
| Address: | 300 prison road | Sex: | Male |
| | REPRESA, CA, 95671 | | |
| Relation to Pt. | Sponsoring Agency | Home Phone | 916-985-2561 |
| Guarantor ID: | 3389047 | Work Phone: | |
| Guarantor Employer | | | |
| Employer: | | Status: | NOT EMPLO* |

### Emergency Contact

| Contact Name | Legal Guardian? | Relationship to Patient | Home Phone | Work Phone |
|---|---|---|---|---|
| CONTACTS,NONE | | NONE | 999-999-9999 | |

### Coverage

Primary Insurance

| | | | |
|---|---|---|---|
| Payor: | STATE OF CALIFORNIA | | |
| Attn/Insurance Co. | | Plan: | CALIFORNIA DEPT OF CORRE* |
| Group Number: | | Insurance Type: | INDEMNITY |
| Subscriber Name: | HODGES#*,JAMES 9BM | Subscriber DOB: | 07/16/1984 |
| Subscriber ID | V41134 | Auth Phone: | 916-294-3166 |
| Pt. Rel. to Subscriber | Ward | | |

| Secondary Insurance | | | |
|---|---|---|---|
| Payor: | | Plan: | |
| Group Number: | | Insurance Type: | |
| Subscriber Name: | | Subscriber DOB: | |
| Subscriber ID | | Auth Phone: | 916-294-3166 |
| Pt. Rel. to Subscriber | | | |

Printed Date & Time: September 7, 2018 4:02 PM by 640643599

## ED Initial Note - ED Initial Provider Note

ED Initial Note by Mary Lai Bing, MD at 09/05/18 1954

## ED Initial Note - ED Initial Provider Note (continued)

**ED Initial Note by Mary Lai Bing, MD at 09/05/18 1954 (continued)**

| | | |
|---|---|---|
| Author: Mary Lai Bing, MD | Service: Emergency Medicine | Author Type: *PHYSICIAN: FACULTY |
| Date of Service: 09/05/18 | Filed: 09/06/18 0037 | Status: Signed |
| Editor: Mary Lai Bing, MD (*PHYSICIAN: FACULTY) | | |

## EMERGENCY DEPARTMENT PHYSICIAN NOTE - James 9Bm Hodges#*

| | | | |
|---|---|---|---|
| Date of Service: | 9/5/2018 7:26 PM | Patient's PCP: | No Pcp Per Patient |
| Note Started: | 9/5/2018 19:54 | DOB: | 7/16/1984 |

### History
**Chief Complaint**
Patient presents with
- *911:Blunt/Critical Trauma Level I

The history provided by the EMS personnel.
Interpreter used: No

James 9Bm Hodges#* is a 34yr old male, who has no significant past medical history, presenting to the ED with a chief complaint of hanging that began 50 minutes ago. Pt was found in his cell handing with noose around his neck. Has been GCS 6 since he was cut down. Was initially combative. He was intubated for airway protection on arrival. Mildly hypotensive in the field.[JW1.1]

Further history limited due to unresponsiveness.[MB1.1]

A full history, including past medical, social, and family history, and review of systems was unobtainable due to acuity of condition. We attempted to obtain history from the above source(s), but this history was limited.

### HISTORY:
No past medical history on file.          Allergies not on file
No past surgical history on file.          No current outpatient prescriptions on file.
Social History                             No family history on file.
  Marital status: SINGLE        Spouse
name:
  Years of education:           Number
of children:

Occupational History
  None on file

Social History Main Topics
  Smoking status: Not on file
    Smokeless status: Not on file
  Alcohol use: Not on file
  Drug use: Not on file

**ED Initial Note - ED Initial Provider Note (continued)**

ED Initial Note by Mary Lai Bing, MD at 09/05/18 1954 (continued)
Sexual activity: Not on file

Other Topics       Concern
None on file

Social History Narrative
None on file

**Review of Systems**
Review of Systems
Unable to perform ROS: Acuity of condition

**Physical Exam**
**TRIAGE VITAL SIGNS:**
Temp: 37.1 °C (98.8 °F) (09/05/18 1947)
Temp src: Oral (09/05/18 1947)
Pulse: 133 (09/05/18 1932)
BP: 121/71 (09/05/18 1932)
Resp: 28 (09/05/18 1932)
SpO2: 98 % (09/05/18 1932)
Weight: 83.2 kg (183 lb 6.8 oz) (09/05/18 1947)

Physical Exam
Constitutional: He appears distressed.
HENT:
Head: Normocephalic.
Right Ear: External ear normal.
Left Ear: External ear normal.
**Abrasion and ecchymosis to anterior neck**
**Inner lip laceration**
Eyes: Conjunctivae are normal. Pupils are equal, round, and reactive to light.
**Pupils 5 mm slugish**
Neck: No JVD present. No tracheal deviation present.
**Collar in place**
Cardiovascular: Intact distal pulses.
**Tachycardic**
Pulmonary/Chest: Effort normal and breath sounds normal.
Abdominal: Soft. Bowel sounds are normal.
Musculoskeletal:[JW1.1]
**No step-offs to CTL spine.**
**No extremity trauma**[MB1.1]

Neurological: GCS eye subscore is 4. GCS verbal subscore is[JW1.1] 1[MB1.1]. GCS motor subscore is 3.
Skin: Skin is warm and dry.
Nursing note and vitals reviewed.


**INITIAL ASSESSMENT & PLAN, MEDICAL DECISION MAKING, ED COURSE**

## ED Initial Note - ED Initial Provider Note (continued)

### ED Initial Note by Mary Lai Bing, MD at 09/05/18 1954 (continued)

James 9Bm Hodges#* is a 34yr male who presents with a chief complaint of[JW1.1] neck trauma after hanging[JW1.2] [JW1.1]

This patient's differential diagnosis is broad and complex and includes but is not limited to intracranial injury, cervical spine injury, pulmonary injury, intra-abdominal injury, orthopedic injury.[JW1.2]

## Amount/ Complexity of Data Reviewed

The results of the ED evaluation were notable for the following:[JW1.1]

## Pertinent lab results:[JW1.2]

I reviewed these laboratory results.

**Results for orders placed or performed during the hospital encounter of 09/05/18**

**CBC NO DIFFERENTIAL    Status: Abnormal**

| Result | Value | Status |
|---|---|---|
| White Blood Cell Count | 19.3 (H) | Final |
| Red Blood Cell Count | 3.84 (L) | Final |
| Hemoglobin | 10.9 (L) | Final |
| Hematocrit | 35.2 (L) | Final |
| MCV | 91.6 | Final |
| MCH | 28.4 | Final |
| MCHC | 31.0 (L) | Final |
| RDW | 15.5 (H) | Final |
| MPV | 9.4 | Final |
| Platelet Count | 395 | Final |

**CBC NO DIFFERENTIAL    Status: Abnormal (Preliminary result)**

| Result | Value | Status |
|---|---|---|
| White Blood Cell Count | 18.2 (H) | Preliminary |
| Red Blood Cell Count | 3.38 (L) | Preliminary |
| Hemoglobin | 9.8 (L) | Preliminary |
| Hematocrit | 28.9 (L) | Preliminary |
| MCV | 85.6 | Preliminary |
| MCH | 29.0 | Preliminary |
| MCHC | 33.8 | Preliminary |
| RDW | 14.6 | Preliminary |

**BASIC METABOLIC PANEL    Status: Abnormal**

| Result | Value | Status |
|---|---|---|
| Sodium | 144 | Final |
| Potassium | 4.1 | Final |
| Chloride | 105 | Final |
| Carbon Dioxide Total | 10 (Crtl) | Final |
| Urea Nitrogen, Blood (BUN) | 15 | Final |
| Glucose | 183 (H) | Final |
| Calcium | 8.8 | Final |
| Creatinine Serum | 2.10 (H) | Final |
| E-GFR, African American | 46 | Final |
| E-GFR, Non-African American | 40 | Final |

**HEPATIC FUNCTION PANEL    Status: Abnormal**

| Result | Value | Status |
|---|---|---|

## ED Initial Note - ED Initial Provider Note (continued)

**ED Initial Note by Mary Lai Bing, MD at 09/05/18 1954 (continued)**

| | | |
|---|---|---|
| Protein | 7.0 | Final |
| Alkaline Phosphatase (ALP) | 66 | Final |
| Aspartate Transaminase (AST) | 46 (H) | Final |
| Bilirubin Total | 0.7 | Final |
| Alanine Transferase (ALT) | 24 | Final |
| Bilirubin Direct | 0.1 | Final |
| Albumin | 4.0 | Final |

**LIPASE    Status: Normal**

| Result | Value | Status |
|---|---|---|
| Lipase | 30 | Final |

**INR    Status: Normal**

| Result | Value | Status |
|---|---|---|
| INR | 0.99 | Final |

**APTT STUDIES    Status: Normal**

| Result | Value | Status |
|---|---|---|
| aPTT | 27.7 | Final |

**ETHANOL, PLASMA    Status: None**

| Result | Value | Status |
|---|---|---|
| ETHANOL, PLASMA | Negative | Final |

**URINALYSIS-COMPLETE    Status: Abnormal**

| Result | Value | Status |
|---|---|---|
| COLLECTION | CLEAN CATCH | Final |
| COLOR | Yellow | Final |
| CLARITY | Clear | Final |
| SPECIFIC GRAVITY, URINE | 1.016 | Final |
| pH URINE | 5.0 | Final |
| OCCULT BLOOD URINE | Small (Abnl) | Final |
| BILIRUBIN URINE | Negative | Final |
| KETONES | Trace (Abnl) | Final |
| GLUCOSE URINE | Negative | Final |
| PROTEIN URINE | 30 (Abnl) | Final |
| UROBILINOGEN | Negative | Final |
| NITRITE URINE | Negative | Final |
| LEUK ESTERASE | Negative | Final |
| MICROSCOPIC | Indicated | Final |
| WBC, URINE | <1 | Final |
| RBC | 1 | Final |
| BACTERIA/HPF | Moderate (Abnl) | Final |
| MUCOUS/LPF | Moderate (Abnl) | Final |
| HYALINE CASTS | 26-100 (Abnl) | Final |

**UR DRUGS OF ABUSE SCREEN    Status: Normal**

| Result | Value | Status |
|---|---|---|
| Barbiturates Screen, Urine | NEGATIVE | Final |
| Benzodiazepines Screen, Urine | NEGATIVE | Final |
| Cocaine Metabolite Scrn, Urine | NEGATIVE | Final |
| Opiates Screen, Urine | NEGATIVE | Final |
| Amphetamine Screen, Urine | NEGATIVE | Final |

**TROPONIN T    Status: Abnormal**

| Result | Value | Status |
|---|---|---|
| TROPONIN T | 27 (H) | Final |

2018 SEP 10 AM 11 59

## ED Initial Note - ED Initial Provider Note (continued)

ED Initial Note by Mary Lai Bing, MD at 09/05/18 1954 (continued)

**ACETAMINOPHEN    Status: Normal**

| Result | Value | Status |
|---|---|---|
| Acetaminophen | <10 | Final |

**SALICYLATE,BLOOD    Status: None**

| Result | Value | Status |
|---|---|---|
| SALICYLATE,BLOOD | Negative | Final |

**VALPROATE    Status: Abnormal**

| Result | Value | Status |
|---|---|---|
| Valproate | 26 (L) | Final |

**AMMONIA    Status: Normal**

| Result | Value | Status |
|---|---|---|
| Ammonia | 25 | Final |

**BLD GAS VENOUS    Status: Abnormal**

| Result | Value | Status |
|---|---|---|
| PATIENT TEMP, VEN |  | Final |
| PO2, VEN | 147 (H) | Final |
| O2 SAT, VEN | 98 | Final |
| PCO2, VEN | 32 (L) | Final |
| pH, VEN | 7.10 (Crtl) | Final |
| HCO3, VEN | 10 (L) | Final |
| BASE EXCESS, VEN | -19 (L) | Final |

**BLD GAS ARTERIAL    Status: Abnormal**

| Result | Value | Status |
|---|---|---|
| PATIENT TEMP, ART | 37.1 | Final |
| PO2, ART | 261 (H) | Final |
| O2 SAT, ART | 100 | Final |
| PCO2, ART | 34 (L) | Final |
| pH, ART | 7.23 (L) | Final |
| HCO3, ART | 14 (L) | Final |
| BASE EXCESS, ART | -12 (L) | Final |
| FiO2(%), ART | 60 | Final |
| PO2/FIO2 RATIO | 435 | Final |

**CALCIUM ION WHOLE BLOOD    Status: Abnormal**

| Result | Value | Status |
|---|---|---|
| CALCIUM ION WHOLE BLOOD | 0.95 (L) | Final[JW1.3] |

**Pertinent imaging results** (reviewed and interpreted independently by me):[JW1.2]
Head CT: no ICH[JW1.3]

**Radiology reads:**[JW1.2]
Ct Chest W Contrast

Result Date: 9/5/2018
CT CHEST W CONTRAST EXAM DATE: 9/5/2018 8:36 PM COMPARISON: Chest radiograph performed earlier same day INDICATION: Pain, hypotensive, tachycardic TECHNIQUE: Contrast-enhanced CT scan of the chest was performed following the uneventful intravenous administration of 125 mL of Omnipaque 350. Coronal, sagittal, and maximum intensity projection images were reformatted. DOSE REPORT: This study involved (2) CT acquisition(s). The CTDIvol and DLP values are included below as required by state law: 1;

**ED Initial Note - ED Initial Provider Note (continued)**

**ED Initial Note by Mary Lai Bing, MD at 09/05/18 1954 (continued)**

Series: 2; Chest/Abdomen/Pelvis; 32 cm; CTDIvol=8.9 mGy; DLP 312.2 mGy-cm 2; Series: 2; Chest/Abdomen/Pelvis; 32 cm; CTDIvol=9.1 mGy; DLP 540.7 mGy-cm For further information on CT radiation dose, see http://www.ucdmc.ucdavis.edu/radiology/RadiationDose.html FINDINGS: LOWER NECK AND CHEST WALL: Bilateral gynecomastia. MEDIASTINUM AND HILA: Normal. Esophageal catheter in place. CARDIOVASCULAR: Normal. LUNGS, AIRWAYS, AND PLEURA: Patent central airways. Endotracheal tube in place. No focal consolidation or pulmonary edema. Mild bibasilar dependent atelectasis. No pleural effusion or pneumothorax. UPPER ABDOMEN: Reported separately. BONES: No acute osseous abnormality. IMPRESSION: 1. No evidence of acute intrathoracic trauma. Preliminary Report Electronically Signed By: Jena K Fujimoto on 9/5/2018 8:38 PM I have personally reviewed the images of this study and agree with the above report. Final Report Electronically Signed By: Stephen Henrichon on 9/5/2018 9:40 PM

Ct Angio Neck

Result Date: 9/5/2018

CT ANGIO NECK EXAM DATE: 9/5/2018 8:40 PM. COMPARISON: Same-day head CT and chest CT INDICATION: Status post hanging. TECHNIQUE: Axial CT images of the neck, with sagittal and coronal reformations. Images were acquired during administration of 100 cc of Omnipaque intravenous contrast. No immediate complication. DOSE REPORT: This study involved (3) CT acquisition(s). The prevertebral soft tissues are within normal limits. And DLP values are included below as required by state law: 1; Series: 200; Neck; 32 cm; CTDIvol=4.9 mGy; DLP 2.4 mGy-cm 2; Series: 201; Neck; 32 cm; CTDIvol=29.2 mGy; DLP 14.6 mGy-cm 3; Series: 2; Neck; 32 cm; CTDIvol=18.6 mGy; DLP 544.8 mGy-cm For further information on CT radiation dose, see http://www.ucdmc.ucdavis.edu/radiology/RadiationDose.html FINDINGS: Lines and tubes: Endotracheal tube tip projects approximately 2.4 cm superior to the carina. Feeding tube coiled in the pharynx. Enteric tube is within the esophagus. The distal enteric tube is not included within the field-of-view. Visualized brain: Unremarkable. Aortic Arch: Normal 3 vessel arch. Left carotid: No occlusion, high-grade stenosis, or vascular injury. Right carotid: No occlusion, high-grade stenosis, or vascular injury. Vertebrobasilar: No occlusion, high-grade stenosis, or vascular injury. Dominant right and diminutive left vertebral arteries. Soft tissues: Secretions are noted within the posterior nasopharynx and oropharynx. Prevertebral soft tissues are within normal limits. No lymphadenopathy. Thyroid is unremarkable. Bones: There is normal alignment of the cervical spine. No acute fractures or destructive changes. There is no significant spinal canal stenosis. Lung apices: Clear. IMPRESSION: 1. No occlusion, high-grade stenosis, or vascular injury. Preliminary Report Electronically Signed By: Jonathan Muldermans on 9/5/2018 8:47 PM I have personally reviewed the images of this study and agree with the above report. Final Report Electronically Signed By: Matthew Bobinski, M.D. on 9/5/2018 9:03 PM

: 1. No occlusion, high-grade stenosis, or vascular injury. 2. No fracture, or traumatic malalignment of the cervical spine. *THIS STUDY HAS NOT BEEN REVIEWED BY AN ATTENDING RADIOLOGIST* Preliminary Report Electronically Signed By: Jonathan Muldermans on 9/5/2018 8:47 PM

Ct Head Without Contrast

Result Date: 9/5/2018

CT HEAD WITHOUT CONTRAST EXAM DATE: 9/5/2018 8:15 PM COMPARISON: None INDICATION: Multisystem trauma; TECHNIQUE: 2.5 mm axial images from skull base through vertex with sagittal and coronal reformatted images. DOSE REPORT: CTDIvol: 52.18 mGy DLP: 1049.69 mGy-cm FINDINGS: Brain: No evidence of hemorrhage, mass, shift, or extra axial fluid collection. The gray-white matter differentiation is maintained. The ventricles are normal in size and morphology. Bones and orbits: Normal. Soft tissues: Endotracheal tube in place. Enteric tube coils within the oropharynx, with tip projecting below the field of view. Soft tissues otherwise unremarkable. Paranasal sinuses and mastoid air cells: Clear. IMPRESSION: 1. No acute intracranial hemorrhage or mass effect. Preliminary Report Electronically Signed By: Jena K Fujimoto on

**ED Initial Note - ED Initial Provider Note (continued)**

ED Initial Note by Mary Lai Bing, MD at 09/05/18 1954 (continued)

9/5/2018 8:31 PM I have personally reviewed the images of this study and agree with the above report. Final Report Electronically Signed By: Matthew Bobinski, M.D. on 9/5/2018 8:55 PM


: 1. No acute intracranial hemorrhage or mass effect. *THIS STUDY HAS NOT BEEN REVIEWED BY AN ATTENDING RADIOLOGIST* Preliminary Report Electronically Signed By: Jena K Fujimoto on 9/5/2018 8:31 PM


Pelvis 1 Or 2 Views


Result Date: 9/5/2018
PELVIS 1 OR 2 VIEWS EXAM DATE: 9/5/2018 7:53 PM COMPARISON: None INDICATION: Pain status post trauma TECHNIQUE: 1 view(s) of the pelvis.   FINDINGS: There is no acute fracture. There is no substantial arthrosis. There is no focal soft tissue abnormality. IMPRESSION: 1. No acute osseous abnormality. Preliminary Report Electronically Signed By: Jena K Fujimoto on 9/5/2018 8:13 PM I have personally reviewed the images of this study and agree with the above report. Final Report Electronically Signed By: Stephen Henrichon on 9/5/2018 9:03 PM


Dx Chest 1 View


Result Date: 9/5/2018
DX CHEST 1 VIEW EXAM DATE: 9/5/2018 7:53 PM COMPARISON: None. INDICATION: Pain status post trauma FINDINGS: Endotracheal tube in place, with tip projecting 1.7 cm above the carina. Normal heart size. No focal consolidation or pulmonary edema. No pleural effusion or pneumothorax. The visualized upper abdomen is unremarkable. No acute osseous abnormality. IMPRESSION: 1. No evidence of acute traumatic injury. Preliminary Report Electronically Signed By: Jena K Fujimoto on 9/5/2018 8:12 PM I have personally reviewed the images of this study and agree with the above report. Final Report Electronically Signed By: Stephen Henrichon on 9/5/2018 9:02 PM


Us Focused Abdominal Sonography For Trauma


Result Date: 9/5/2018
US FOCUSED ABDOMINAL SONOGRAPHY FOR TRAUMA EXAM DATE: 9/5/2018 7:55 PM COMPARISON: None INDICATION: Trauma TECHNIQUE: Focused real-time ultrasound scanning of the four quadrants of the abdomen and midline pelvis performed by the sonographer. Representative static images and video clips are submitted for review. Substernal evaluation of the inferior pericardium was not performed. FINDINGS: No free fluid in the abdomen or pelvis. IMPRESSION: 1. No free fluid in the abdomen or pelvis. Preliminary Report Electronically Signed By: Jena K Fujimoto on 9/5/2018 8:17 PM I have personally reviewed the images of this study and agree with the above report. Final Report Electronically Signed By: Simran Sekhon, M.D. on 9/5/2018 10:16 PM


Ct Abdomen + Pelvis With Contrast


Result Date: 9/5/2018
CT ABDOMEN + CT PELVIS, WITH CONTRAST EXAM DATE: 9/5/2018 8:31 PM COMPARISON: None INDICATION: Pain status post trauma TECHNIQUE: Helically acquired contrast enhanced multidetector CT of the abdomen and pelvis acquired in the portal venous phase. Uneventful administration of 125 mL of Omnipaque 350 injected intravenously. No oral contrast was administered. Images were acquired in the axial plane and reformatted in coronal and sagittal planes. DOSE REPORT: CTDIvol:  18.03 mGy DLP:  852.88 mGy-cm FINDINGS: Lower Chest: Reported separately. Liver: Mild periportal edema. Otherwise unremarkable. Bile Ducts: Unremarkable. Gallbladder: Unremarkable. Pancreas: Unremarkable. Spleen:

## ED Initial Note - ED Initial Provider Note (continued)

### ED Initial Note by Mary Lai Bing, MD at 09/05/18 1954 (continued)

Unremarkable. Adrenal Glands: Unremarkable. Kidneys: Punctate nonobstructing left renal calculus. Right kidney is unremarkable. GI Tract: Enteric tube terminates within the stomach. GI tract is otherwise unremarkable. Peritoneal Cavity: No free fluid or free air. Bladder: Small amount of air within the bladder, likely secondary to Foley catheter placement. Prostate and Seminal Vesicles: Unremarkable. Lymph Nodes: No lymphadenopathy. Major Vascular Structures: Unremarkable. Soft Tissues: Bilateral gynecomastia. Musculoskeletal: Unremarkable. IMPRESSION: 1. No evidence of acute abdominal or pelvic traumatic injury. 2. Mild periportal edema, possibly secondary to fluid resuscitation. 1. Preliminary Report Electronically Signed By: Jena K Fujimoto on 9/5/2018 8:47 PM I have personally reviewed the images of this study and agree with the above report. Final Report Electronically Signed By: Simran Sekhon, M.D. on 9/5/2018 9:46 PM

Ct C-spine (2d Recons C-spine From Angio Or Soft Tissue Neck)

Result Date: 9/5/2018
2DRECON TRAUMA C-SPINE (ED/RAD ONLY) EXAM DATE: 9/5/2018 8:42 PM COMPARISON: Same-day CTA neck and chest CT INDICATION: Status post hanging TECHNIQUE: 1.25 mm axial CT images through the cervical spine with sagittal and coronal reformatted images. DOSE REPORT: Please see the dose report from the same-day CTA neck FINDINGS: Alignment: There is normal alignment of the spine. Vertebrae: No acute fractures or destructive changes. There is no significant spinal canal stenosis. Prevertebral and paraspinal soft tissues: Normal. Lung apices are clear. ET tube and feeding tube. Feeding tube is coiled in the pharynx. IMPRESSION: 1. There is no acute fracture or subluxation of the cervical spine. Preliminary Report Electronically Signed By: Jonathan Muldermans on 9/5/2018 8:48 PM I have personally reviewed the images of this study and agree with the above report. Final Report Electronically Signed By: Matthew Bobinski, M.D. on 9/5/2018 9:00 PM

: 1. There is no acute fracture or subluxation of the cervical spine. *THIS STUDY HAS NOT BEEN REVIEWED BY AN ATTENDING RADIOLOGIST* Preliminary Report Electronically Signed By: Jonathan Muldermans on 9/5/2018 8:48 PM

Ct L-spine (2d Recons L-spine From Abd/pelvis)

Result Date: 9/5/2018
CT L-SPINE (2D RECONS L-SPINE FROM ABD/PELVIS) EXAM DATE: 9/5/2018 8:36 PM COMPARISON: None INDICATION: Pain status post trauma TECHNIQUE: Helical data set acquired during CT abdomen and pelvis exam was retro-reconstructed in bone windows in the axial, sagittal and coronal planes. DOSE REPORT: Data set was acquired via reformat from CT abdomen/pelvis without additional radiation dose to the patient. FINDINGS: Alignment: There is normal alignment of the spine. Vertebrae: No acute fractures or destructive changes. There is no significant spinal canal stenosis. Prevertebral and paraspinal soft tissues: Normal. IMPRESSION: 1. No acute fracture or post-traumatic malalignment. Preliminary Report Electronically Signed By: Jena K Fujimoto on 9/5/2018 8:39 PM I have personally reviewed the images of this study and agree with the above report. Final Report Electronically Signed By: Simran Sekhon, M.D. on 9/5/2018 9:47 PM

Ct T-spine (2d Recons T-spine From Chest)

Result Date: 9/5/2018
CT T-SPINE (2D RECONS T-SPINE FROM CHEST) EXAM DATE: 9/5/2018 8:36 PM COMPARISON: None INDICATION: Pain status post trauma TECHNIQUE: 1.25 mm axial CT images through the thoracic spine with sagittal and coronal reformatted images. DOSE REPORT: Images reconstructed from chest CT. FINDINGS: Alignment: There is straightening of the normal thoracic kyphosis which could reflect muscle spasm or could be positional. Vertebrae: No acute fractures or destructive changes. There is no significant spinal canal stenosis. Prevertebral and paraspinal soft tissues: Normal. IMPRESSION: 1. There is no acute fracture or subluxation of

Hodges#*, James 9Bm (MRN 7509175)

ED Initial Note - ED Initial Provider Note (continued)

ED Initial Note by Mary Lai Bing, MD at 09/05/18 1954 (continued)
the thoracic spine. Preliminary Report Electronically Signed By: Jena K Fujimoto on 9/5/2018 8:40 PM I have personally reviewed the images of this study and agree with the above report. Final Report Electronically Signed By: Stephen Henrichon on 9/5/2018 9:36 PM[JW1.3]

**Consults**: Toxicology per Trauma service.

**ECG**: ST, no rSR' in aVR[MB1.2]

**PATIENT SUMMARY**[JW1.1]
James 9Bm Hodges#* is a 34yr old male presenting with Hanging injury with GCS of 6.
Pt initially hypotensive and acutely intubated for airway protection.
Was resuscitated with stabilization of vitals.
Imaging negative for acute traumatic injury.
Labs with significant acidosis. Med list obtained and several high risk meds.
Toxicology consulted and final recs are pending.

Will admit to TRM[JW1.3] ICU[MB1.2] for further evaluation and management.[JW1.3]

**LAST VITAL SIGNS:**
Temp: 37.1 °C (98.8 °F) (09/05/18 1947)
Temp src: Oral (09/05/18 1947)
Pulse: 135 (09/05/18 1940)
BP: (!) 141/117 (09/05/18 1940)
Resp: 22 (09/05/18 1947)
SpO2: 98 % (09/05/18 1947)
Weight: 83.2 kg (183 lb 6.8 oz) (09/05/18 1947)

**Clinical Impression:**[JW1.1]
Hanging injury
Anion gap acidosis[JW1.3]
AMS with low GCS s/p intubation[MB1.2]

**Disposition:**[JW1.1] Admit[JW1.3]

**PATIENT'S GENERAL CONDITION:**[JW1.1]
Critical: Vital signs are unstable and not within normal limits. Patient may be unconscious. Indicators are unfavorable[JW1.3]

Electronically signed by: John R Walter, MD, Resident[JW1.1]

COPY - Protected Health Information - 09/07/2018 16:02:02-
MHSP4037

2018 SEP 10 AM 11 59

## ED Initial Note - ED Initial Provider Note (continued)

### ED Initial Note by Mary Lai Bing, MD at 09/05/18 1954 (continued)

This patient was seen, evaluated, and care plan was developed with the resident. I agree with the findings and plan as outlined in our combined note. I personally independently visualized the images and tracings as noted above.[MB1.2]    Mary Lai Bing, MD[MB1.3]

Electronically signed by: Mary Lai Bing, MD, Attending Physician[MB1.2]

Electronically signed by Mary Lai Bing, MD at 09/06/18 0037
Revision History

| User Key | Date/Time | User | Provider Type | Action |
|---|---|---|---|---|
| > MB1.3 | 09/06/18 0037 | Mary Lai Bing, MD | *PHYSICIAN: FACULTY | Sign |
| MB1.2 | 09/06/18 0031 | Mary Lai Bing, MD | *PHYSICIAN: FACULTY | |
| MB1.1 | 09/05/18 2348 | Mary Lai Bing, MD | *PHYSICIAN: FACULTY | Share |
| JW1.3 | 09/05/18 2344 | John Walter, MD | *PHYSICIAN: RESIDENT | Share |
| JW1.2 | 09/05/18 2046 | John Walter, MD | *PHYSICIAN: RESIDENT | Share |
| JW1.1 | 09/05/18 2003 | John Walter, MD | *PHYSICIAN: RESIDENT | Share |

## Last History and Physical

### H&P by Ian Brown, MD at 09/05/18 1925

| | | |
|---|---|---|
| Author: Ian Brown, MD | Service: (A) Trauma Surgery | Author Type: *PHYSICIAN: FACULTY |
| Date of Service: 09/05/18 | Filed: 09/06/18 0226 | Status: Addendum |
| Editor: Ian Brown, MD (*PHYSICIAN: FACULTY) | | |

## TRAUMA ADMISSION HISTORY AND PHYSICAL

Age: 34yr

Note Date and Time: 9/5/2018    19:25

Date of Service: 9/5/2018

Trauma Type:[BC1.1] 911[BC1.2]

Date of Admission: No admission date for patient encounter.

Patient's PCP: No primary care provider

on file.


**CODE STATUS**:[BC1.1] Full/Not Filed[BC1.3]


**CHIEF COMPLAINT**
34yr-old[BC1.1] man[BC1.2] bib[BC1.1] EMS and law enforcement after he was found hanging in his jail cell.
Patient is obtunded with GCS 6 and further history was not obtainable.[BC1.2]


**HISTORY OF PRESENT ILLNESS**
Mechanism of injury:[BC1.1] hanging[BC1.2]
Location: body part injured:[BC1.1] presumed neck, however there is blood on face and patient is
hypotensive and tachycardic.[BC1.4]
Duration of symptoms (time):[BC1.1] prior to arrival[BC1.4]


*Context*
Seatbelted:[BC1.1] N/A[BC1.4]
Loss of consciousness:[BC1.1] patient was found hanging and is now GCS 6[BC1.4]
Hypotension prior to arrival:[BC1.1] Yes[BC1.4]
Helmeted:[BC1.1] N/A[BC1.4]


Mode of transport:[BC1.1] Ambulance[BC1.4]


**PAST MEDICAL HISTORY**
PMHx:
**Past Medical History:**
Diagnosis                                                        Date
- Borderline personality disorder
  *Added 9/5/2018*
- PTSD (post-traumatic stress disorder)
  *Added 9/5/2018*
- Schizoaffective disorder
  *Added 9/5/2018*
- Suicidal behavior
  *Added 9/5/2018*
- Suicidal overdose
  *Added 9/5/2018*


PSHx:[BC1.5] unknown[BC1.6]


Allergies: No Known Allergies[BC1.5]


Medications:
Cannot display prior to admission medications because the patient has not been admitted in this
contact.

**Last History and Physical (continued)**

<u>H&P by Ian Brown, MD at 09/05/18 1925 (continued)</u>

## FAMILY HISTORY[BC1.1] - not obtained as patient is GCS 6[BC1.6]

## SOCIAL HISTORY[BC1.1]
Social History

Social History
- Marital status:                                        SINGLE
      Spouse name:                                  N/A
- Number of children:                              N/A
- Years of education:                               N/A

Social History Main Topics
- Smoking status:                          Unknown If Ever Smoked
- Smokeless tobacco:                    None
- Alcohol use                                 None
       Comment: u/k
- Drug use:                                    None
       Comment: prior use
- Sexual activity:                           Not Asked

Other Topics                                                           Concern
- None

Social History Narrative
- None[BC1.3]

The patient's past medical, family, and social history was[BC1.1] partially obtained from deputies but patient was unable to obtain in history as he is obtunded GCS 6.[BC1.6]

## ROS[BC1.1] - not obtained d/t GCS 6[BC1.6]

## VITAL SIGNS
<u>Current:</u>[BC1.1]
Temp: 37.1 °C (98.8 °F)[BC1.3] |[BC1.1] BP: 115/45[BC1.3] |[BC1.1] Pulse: 110[BC1.3] |[BC1.1] Resp: 17[BC1.3] |[BC1.1]
SpO2: 100 %[BC1.3] |[BC1.1]
Weight: 83.2 kg (183 lb 6.8 oz)[BC1.3] |[BC1.1] There is no height or weight on file to calculate BSA.[BC1.3]
|[BC1.1] There is no height or weight on file to calculate BMI.[BC1.3]

<u>Last Recorded:</u>[BC1.1]
Temp: 37.1 °C (98.8 °F) (09/05/18 1947)
Temp src: Oral (09/05/18 1947)
Pulse: 110 (09/05/18 2040)

There is no height or weight on file to calculate BMI.
There is no height or weight on file to calculate BSA.[BC1.3]

## GLASGOW COMA SCALE

Hodges#*, James 9Bm (MRN 7509175)

## Last History and Physical (continued)

H&P by Ian Brown, MD at 09/05/18 1925 (continued)

Eye Opening:[BC1.1] Spontaneous - 4[BC1.6]
Verbal Response:[BC1.1] None - 1[BC1.6]
Motor Response:[BC1.1] None - 1[BC1.6]
Total:[BC1.1] 6[BC1.6]

## PHYSICAL EXAM

Head:[BC1.1]No evidence of trauma[BC1.6]
Eyes:[BC1.1] 5mm equal and reactive. **Not tracking.**[BC1.6]
Ear, Nose, Throat:[BC1.1] **Blood in oral cavity and on face. Small internal lip laceration.**[BC1.6]
Neck:[BC1.1] **no step offs in cervical spine, ecchymosis and abrasions anterior neck.**[BC1.6]
Respiratory:[BC1.1] Equal Breath Sounds, no crepitus or external signs of trauma on chest[BC1.6]
Cardiovascular:[BC1.1] Tachycardic[BC1.6]
Abdominal:[BC1.1] Soft without ecchymosis or external sign of trauma[BC1.6]
Pelvis:  Pubic symphysis stable
Genital Exam:[BC1.1] Genital Exam Normal[BC1.6]
Rectal Exam:[BC1.1] N/A[BC1.6]
Back:[BC1.1] No step offs, no blood or external sign of trauma[BC1.6]
Neurological:[BC1.1] GCS 6[BC1.6]
Extremities:[BC1.1] No obvious sign of trauma, **not moving extremities.**[BC1.6]
Pulses:[BC1.1] 1+[BC1.6] bilateral radial,[BC1.1] 1+[BC1.6] bilateral pedal,[BC1.1] 2+[BC1.6] bilateral femoral

## LAB RESULTS[BC1.1]

Recent labs for the past 72 hours

|  | 9/5/18 1941 |
| --- | --- |
| • HEMATOCRIT | 35.2* |

Recent labs for the past 24 hours

|  | 9/5/18 1941 |
| --- | --- |
| • WHITE BLOOD CELL COUNT | 19.3*[BC1.3] |

### PT/INR (24 hours):[BC1.1]

Recent labs for the past 24 hours

|  | 9/5/18 1941 |
| --- | --- |
| • PROTHROMBIN TIME | -- |
| • INR | 0.99[BC1.3] |

### BMP (24 hours):[BC1.1]

Recent labs for the past 24 hours

|  | 9/5/18 1941 |
| --- | --- |
| • SODIUM | 144 |
| • POTASSIUM | 4.1 |
| • CHLORIDE | 105 |
| • CARBON DIOXIDE TOTAL | 10* |
| • CREATININE BLOOD | 2.10* |
| • E-GFR, AFRICAN AMERICAN | 46 |
| • E-GFR, NON-AFRICAN AMERICAN | 40 |
| • UREA NITROGEN, BLOOD (BUN) | 15 |
| • GLUCOSE | 183* |
| • CALCIUM | 8.8 |

COPY - Protected Health Information - 09/07/2018 16:02:02-
MHSP4037

2018 SEP 10 PM 11 59

## Last History and Physical (continued)

### H&P by Ian Brown, MD at 09/05/18 1925 (continued)

Recent labs for the past 24 hours

|  | 9/5/18 1941 |
|---|---|
| • PROTEIN | 7.0 |
| • ALBUMIN | 4.0 |
| • BILIRUBIN TOTAL | 0.7 |
| • ALKALINE PHOSPHATASE (ALP) | 66 |
| • ASPARTATE TRANSAMINASE (AST) | 46* |
| • ALANINE TRANSFERASE (ALT) | — |
| • BILIRUBIN DIRECT | 0.1 |

Recent labs for the past 24 hours

|  | 9/5/18 1941 |
|---|---|
| • PO2, VEN | 147* |
| • O2 SAT, VEN | 98 |
| • PCO2, VEN | 32* |
| • PH, VEN | 7.10* |
| • HCO3, VEN | 10* |
| • BASE EXCESS, VEN | -19* |
| • FIO2(%), VEN | __[BC1.3] |

## TOX SCREEN
-Drugs of abuse[BC1.1]

Recent labs for the past 72 hours

|  | 9/5/18 2003 |
|---|---|
| • BARBITURATES SCREEN, URINE | NEGATIVE |
| • BENZODIAZEPINES SCREEN, URINE | NEGATIVE |
| • COCAINE METABOLITE SCRN, URINE | NEGATIVE |
| • OPIATES SCREEN, URINE | NEGATIVE |
| • UR DRUGS BY GC | __[BC1.3] |

-Serum blood alcohol - non forensic[BC1.1]

Lab Results

| Component | Value | Date |
|---|---|---|
| ETOH | Negative | 09/05/2018[BC1.3] |

## IMAGING
All studies preliminary unless noted.[BC1.1]

## DX CHEST 1 VIEW[BC1.6]
IMPRESSION:
1. No evidence of acute traumatic injury.[BC1.7]
## US FOCUSED ABDOMINAL SONOGRAPHY FOR TRAUMA[BC1.6]
IMPRESSION:
1. No free fluid in the abdomen or pelvis.[BC1.7]
## PELVIS 1 OR 2 VIEWS[BC1.6]
IMPRESSION:

**Last History and Physical (continued)**

H&P by Ian Brown, MD at 09/05/18 1925 (continued)

1. No acute osseous abnormality.[BC1.7]

**DX CHEST 1 VIEW**[BC1.6]

IMPRESSION:

1. No evidence of acute traumatic injury.[BC1.7]

**CT HEAD WITHOUT CONTRAST**[BC1.6]

IMPRESSION:

1. No acute intracranial hemorrhage or mass effect.[BC1.7]

**CT CHEST W CONTRAST**[BC1.6]

IMPRESSION:

1. No evidence of acute intrathoracic trauma.[BC1.7]

**CT ABDOMEN + PELVIS WITH CONTRAST**[BC1.6]

IMPRESSION:

1. No evidence of acute abdominal or pelvic traumatic injury.

2. Mild periportal edema, possibly secondary to fluid resuscitation.[BC1.8]

**CT L-SPINE (2D RECONS L-SPINE FROM ABD/PELVIS)**[BC1.6]

IMPRESSION:

1. No acute fracture or post-traumatic malalignment.[BC1.7]

**CT T-SPINE (2D RECONS T-SPINE FROM CHEST)**[BC1.6]

IMPRESSION:

1. There is no acute fracture or subluxation of the thoracic spine.[BC1.7]

**CT ANGIO NECK**[BC1.6]

IMPRESSION:

1. No occlusion, high-grade stenosis, or vascular injury.[BC1.7]

**CT C-SPINE (2D RECONS C-SPINE FROM ANGIO OR SOFT TISSUE NECK)**[BC1.6]

IMPRESSION:

1. There is no acute fracture or subluxation of the cervical spine.[BC1.7]


**LAB TESTS/STUDIES**

I personally reviewed the imaging, labs, and clinical course with the trauma service.


**ASSESSMENT AND PLAN**

|  | List of Injuries | Assessment & Plan |
|---|---|---|
| Head/Neuro[BC1.1] | Suspected anoxic brain injury from hanging[BC1.9] | CT head negative for ICH or skull fracture.[BC1.1] Patient was GCS 6 upon arrival and not moving extremities or speaking. The hypoxia also likely explained the initial lab abnormalities that are now resolving.[BC1.9] |
| EENT |  |  |
| Cervical Spine |  | CT C-spine negative for acute cervical fracture/malalignment.[BC1.1] C-Spine clearance pending - cannot currently be cleared d/t ALOC and intubation.[BC1.9] |

**Last History and Physical (continued)**

H&P by Ian Brown, MD at 09/05/18 1925 (continued)

| CV/HEME[BC1.1] | Tachycardia[BC1.9] | Serial CBC[BC1.1] stable[BC1.9]. Hypotensive[BC1.1] initially[BC1.9] [BC1.1] Patient given crystalloid, blood products, FFP, and TXA. After a thorough work-up there was no evidence of bleeding. His blood pressure resolved and stayed stable very shortly into his recussitation. His tachycardia began to resolve during his ED stay. These abormalities are most likely explained by hypoxic injury from the hanging. Toxicology was consulted and after thorough work-up they don't suspect a tox cause at this time. Patient admitted to ICU for ongoing management.[BC1.9] |
|---|---|---|
| Chest/Respiratory | | CXR[BC1.1] no acute pathology.[BC1.9] |
| Thoracic Spine | | CT imaging negative for acute thoracic fracture/malalignment. T spine cleared. |
| Abdomen/Pelvis | | Soft[BC1.1] on exam.[BC1.9] CT Abd/Pelvis[BC1.1]: mild periportal edema, otherwise no acute pathology, [[BC1.9] |
| Lumbar Spine | | CT imaging negative for acute lumbar fracture/malalignment. L spine cleared. |
| Musculoskeletal | | No bony deformity[BC1.1] or external sign of trauma.[BC1.9] |
| Integumentary/Wound [BC1.1] | Small internal lip laceration. | Wound care, monitor.[BC1.9] |

| Nutrition/PO Status | | |
|---|---|---|
| Endocrine | | |
| GU/Renal/Fluids | | |
| ID | None | |
| Anticoagulation | Per admitting team[BC1.9] | |
| ETOH | Alcohol intoxication - Serum BAL[BC1.1] negative[BC1.9]. | |
| Conditions of Chronic Disease | | |

## CONSULTS:

I consulted[BC1.1] toxicology[BC1.5] at[BC1.1] 2020[BC1.5] regarding[BC1.1] tachycardia, base deficits, and possible OD.[BC1.6]

**Last History and Physical (continued)**

**H&P by Ian Brown, MD at 09/05/18 1925 (continued)**

DISPO[BC1.1] ICU A with Trauma Blue[BC1.10]

Admitting team contacted for admission orders at[BC1.1] 2330[BC1.10].

## PRESENT ON ADMISSION:

Are any of the following five conditions present or suspected on admission: decubitus ulcer, infection from an intravascular device, infection due to an indwelling catheter, surgical site infection or pneumonia?[BC1.1] No.[BC1.10]

**Report Electronically Signed By:**
Bodhi Canfield, D.O.
PGY1, Emergency Medicine
PI#: 28130
Pager Number: 816-9182[BC1.1]

**I arrived within 10 minutes for the initial resuscitation of this patient after 911 activation. I have seen & examined the patient. I have reviewed the consultation note & physical examination performed by the Trauma and Emergency Surgery Resident as well as relevant laboratory & imaging studies. I verified the findings & together we developed the plan as presented above.**

**34M obtunded after attempted hanging. Intubated for GCS.**
**Tachycardic 140s-160s.**
**BP fluctuating. 2 L crystalloid given and transfused 1 unit PRBC. Arterial line placed.**
**BP improved. FAST negative.**

**CT scan with no apparent trauma requiring surgical intervention.**

**Initial base deficit 19 on VBG. Improved base excess of 4 with time and resuscitation. Acidosis significantly improved.**

**Tox screen negative.**

**Admitted to ICU for mental status, ventilation, and further resuscitation.**

**45 minutes of critical care time spent in resuscitating this patient, obtaining and evaluating labs and imaging. Additionally, arterial line was placed.**

Ian Brown, MD, PhD
Division of Acute Care Surgery, Trauma, and Surgical Critical Care
PI # 14778
Pager 816-9839[IB1.1]

## Last History and Physical (continued)

### H&P by Ian Brown, MD at 09/05/18 1925 (continued)

Electronically signed by Bodhi Canfield, DO at 09/06/18 0146
Electronically signed by Ian Brown, MD at 09/06/18 0226
Electronically signed by Ian Brown, MD at 09/06/18 0226
Revision History

| User Key | Date/Time | User | Provider Type | Action |
|---|---|---|---|---|
| > IB1.1 | 09/06/18 0226 | Ian Brown, MD | *PHYSICIAN: FACULTY | Addend |
| BC1.9 | 09/06/18 0146 | Bodhi Canfield, DO | *PHYSICIAN: INTERN | Sign |
| BC1.10 | 09/06/18 0007 | Bodhi Canfield, DO | *PHYSICIAN: INTERN | Share |
| BC1.7 | 09/05/18 2149 | Bodhi Canfield, DO | *PHYSICIAN: INTERN | Share |
| BC1.8 | 09/05/18 2129 | Bodhi Canfield, DO | *PHYSICIAN: INTERN | Share |
| BC1.3 | 09/05/18 2056 | Bodhi Canfield, DO | *PHYSICIAN: INTERN | Share |
| BC1.6 | 09/05/18 2042 | Bodhi Canfield, DO | *PHYSICIAN: INTERN | |
| [N/A] | 09/05/18 2039 | Bodhi Canfield, DO | *PHYSICIAN: INTERN | Share |
| BC1.5 | 09/05/18 2036 | Bodhi Canfield, DO | *PHYSICIAN: INTERN | Share |
| BC1.4 | 09/05/18 2018 | Bodhi Canfield, DO | *PHYSICIAN: INTERN | Share |
| BC1.2 | 09/05/18 2003 | Bodhi Canfield, DO | *PHYSICIAN: INTERN | Share |
| BC1.1 | 09/05/18 1925 | Bodhi Canfield, DO | *PHYSICIAN: INTERN | Share |

## Recent Vital Signs (3 days)

| | 09/04 0700 - 09/05 0659 | 09/05 0700 - 09/06 0659 | 09/06 0700 - 09/07 0659 | 09/07 0700 - 09/07 1602 | Most Recent | |
|---|---|---|---|---|---|---|
| Temp (°C) | 36.7 - 37.6 | 37 - 37.6 | 37 - 37.2 | | 37 (98.6) | 09/07 1215 |
| Pulse | 73 - 143 | 71 - 123 | 89 - 120 | | 98 | 09/07 1600 |
| Resp | 12 - 28 | 10 - 21 | 13 - 24 | | 16 | 09/07 1600 |
| BP | 97/5 - (!) 2 147/ 96 | 91/6 - 140/ 0 84 | 99/6 - 149/ 6 74 | | 107/67 | 09/07 1500 |
| SpO2 (%) | 98 - 100 | 94 - 100 | 94 - 98 | | 98 | 09/07 1600 |
| Weight (kg) | 83.2 | | | | 83.2 kg (183 lb 6.8 oz) | 09/05 1947 |

## Patient Lines, Drains, Airways, and Wounds

### Active LDAs

| Name: | Placement date: | Placement time: | Site: | Days: |
|---|---|---|---|---|
| Brace/Orthotic/Orthosis cervical collar | 09/05/18 | 2100 | | 2 |
| Peripheral IV 1 over-the-needle catheter R wrist 18 gauge | 09/05/18 | 1932 | | 2 |
| Peripheral IV 1 over-the-needle catheter L wrist 18 gauge | 09/05/18 | 1942 | | 2 |
| Peripheral IV 3 over-the-needle catheter L hand 22 gauge | 09/06/18 | 0130 | | 1 |

2018 SEP 10 AM 11 59

COPY - Protected Health Information - 09/07/2018 16:02:02-
MHSP4037

**Legend:**

| Given Time | Held Time | Not given (Time) | Due Time | Canceled Entry Time | Other Actions Time-Action |
|---|---|---|---|---|---|
| | Discontinued/ Completed | Future | | | |

| Medications | 09/05/18 | 09/06/18 |
|---|---|---|

### ALPHA-2 RECEPTOR ANTAGONIST ANTIDEPRESSANTS

| | | | |
|---|---|---|---|
| **Mirtazapine (REMERON) Tablet 15 mg**<br>Dose: 15 mg<br>Freq: DAILY AT BEDTIME Route: PO<br>Start: 09/06/18 2100<br>Admin. Amount: 1 tablet (1 × 15 mg tablet)<br>Last Admin: 09/06/18 2019 | | 2019 (15 mg) | [ ] 2100 |

### ANALGESIC/ANTIPYRETICS,NON-SALICYLATE

| | | | |
|---|---|---|---|
| **Acetaminophen (TYLENOL) Tablet 1,000 mg**<br>Dose: 1,000 mg<br>Freq: EVERY 8 HOURS (0600, 1400, 2200) Route: PO<br>Start: 09/06/18 1400<br>Admin. Amount: 2 tablet (2 × 500 mg tablet)<br>Last Admin: 09/07/18 0942 | | 1458 (1,000 mg) | 0041 (1,000 mg) [C]<br>0942 (1,000 mg)<br>[ ] 1700 |

### ANTICONVULSANTS

| | | | |
|---|---|---|---|
| **Valproic Acid (DEPAKENE) Capsule 500 mg**<br>Dose: 500 mg<br>Freq: DAILY MORNING Route: PO<br>Indications Comment: QAM<br>Start: 09/06/18 1215<br>Admin. Amount: 2 capsule (2 × 250 mg capsule)<br>Last Admin: 09/07/18 0942 | | 1458 (500 mg) [C] | 0942 (500 mg) |
| **Valproic Acid (DEPAKENE) Capsule 750 mg**<br>Dose: 750 mg<br>Freq: DAILY AT BEDTIME Route: PO<br>Indications Comment: QHS<br>Start: 09/06/18 2100<br>Admin. Amount: 3 capsule (3 × 250 mg capsule)<br>Last Admin: 09/06/18 2019 | | 2019 (750 mg) | [ ] 2100 |

### ANTIDIARRHEAL MICROORGANISMS AGENTS

| | | | |
|---|---|---|---|
| **Lactobacillus (CULTURELLE) Capsule 1 capsule**<br>Dose: 1 capsule<br>Freq: DAILY MORNING Route: PO<br>Start: 09/06/18 0900<br>Admin. Amount: 1 capsule<br>Last Admin: 09/07/18 0942 | | 0855 (1 capsule) | 0942 (1 capsule) |

### ANTIEMETIC/ANTIVERTIGO AGENTS

| | | | |
|---|---|---|---|
| **Ondansetron (ZOFRAN) Injection 4 mg**<br>Dose: 4 mg<br>Freq: EVERY 12 HOURS IF NEEDED Route: IV<br>PRN Reason: nausea/vomiting<br>Start: 09/05/18 2349<br>Admin. Amount: 2 mL = 4 mg of 2 mg/mL<br>Volume: 2 mL | | | |

### ANTIPSYCHOTIC,ATYPICAL,DOPAMINE,SEROTONIN ANTAGNST

| | | | |
|---|---|---|---|
| **Lurasidone (LATUDA) Tablet 40 mg**<br>Dose: 40 mg<br>Freq: DAILY AT BEDTIME Route: PO<br>Indications Comment: Qpm<br>Start: 09/06/18 2100<br>Order specific questions:<br>Does use meet restrictions? Yes, Continuation of home therapy<br><br>Admin. Amount: 1 tablet (1 × 40 mg tablet)<br>Last Admin: 09/06/18 2019 | | 2019 (40 mg) | [ ] 2100 |

2018 SEP 10 10:11:55

| Medications | 09/05/18 | 09/06/18 |
|---|---|---|
| **Lurasidone (LATUDA) Tablet 60 mg**<br>Dose: 60 mg<br>Freq: DAILY MORNING Route: PO<br>Indications Comment: QAM<br>Start: 09/06/18 1215<br>Order specific questions:<br>Does use meet restrictions? Yes, Continuation of home therapy<br><br>Admin. Amount: 1 tablet (1 × 60 mg tablet)<br>Last Admin: 09/07/18 0942 | | 1458 (60 mg) [C] | 0942 (60 mg) |

DENTAL AIDS AND PREPARATIONS

| | | |
|---|---|---|
| **Chlorhexidine (PERIDEX) 0.12 % Liquid 15 mL**<br>Dose: 15 mL<br>Freq: EVERY 4 HOURS Route: TOPI<br>Start: 09/06/18 0500<br>Admin. Amount: 15 mL<br>Volume: 15 mL<br>Last Admin: 09/07/18 0942 | 0637 (15 mL)<br>0818 (15 mL)<br>1221 (15 mL)<br>1752 (15 mL)<br>2019 (15 mL) | 0041 (15 mL)<br>(0500)<br>0942 (15 mL)<br>(1300)<br>[ ] 1700<br>[ ] 2100 |
| **Chlorhexidine (PERIDEX) 0.12 % Liquid 15 mL**<br>Dose: 15 mL<br>Freq: PRN Route: TOPI<br>PRN Comment: Prior to traveling to OR or procedural areas.<br>Start: 09/06/18 0403<br>Admin. Amount: 15 mL<br>Volume: 15 mL | | |

GENERAL ANESTHETICS,INJECTABLE-BENZODIAZEPINE TYPE

| | | |
|---|---|---|
| **Midazolam (VERSED) Injection 0.5-4 mg**<br>Dose: 0.5-4 mg<br>Freq: EVERY 1 HOUR IF NEEDED Route: IV<br>PRN Reason: agitation<br>Start: 09/05/18 2349<br>Admin. Amount: 0.5-4 mL = 0.5-4 mg of 2 mg/2 mL<br>Volume: 4 mL | | |
| **Midazolam (VERSED) Injection 1 mg**<br>Dose: 1 mg<br>Freq: PREMED Route: IV<br>Start: 09/06/18 1715<br>Admin. Amount: 1 mL = 1 mg of 2 mg/2 mL<br>Volume: 2 mL | | |

LAXATIVES AND CATHARTICS

| | | |
|---|---|---|
| **Docusate (COLACE) Capsule 100 mg**<br>Dose: 100 mg<br>Freq: TWO TIMES DAILY Route: PO<br>Start: 09/06/18 0900<br>Admin. Amount: 1 capsule (1 × 100 mg capsule)<br>Last Admin: 09/07/18 0942 | (0900) [C]<br>2019 (100 mg) | 0942 (100 mg)<br>[ ] 2100 |
| **Polyethylene Glycol 3350 (MIRALAX) Oral Powder Packet 17 g**<br>Dose: 17 g<br>Freq: DAILY MORNING Route: PO<br>Start: 09/06/18 0900<br>Admin. Amount: 1 packet (1 × 17 g packet)<br>Last Admin: 09/07/18 0942 | 0855 (17 g) | 0942 (17 g) |

LOCAL ANESTHETICS

2018 SEP 10 AM11 59

COPY - Protected Health Information - 09/07/2018 16:02:02-
MHSP4037

| Medications | 09/05/18 | 09/06/18 | |
|---|---|---|---|
| **Lidocaine (XYLOCAINE) 10 mg/mL (1%) Injection 0.5-20 mL** <br> Dose: 0.5-20 mL <br> Freq: PRN Route: INFI <br> PRN Comment: procedural use <br> Start: 09/05/18 2347 <br> Admin. Amount: 0.5-20 mL <br> Volume: 20 mL | | | |
| **MAGNESIUM SALTS REPLACEMENT** | | | |
| **Magnesium Sulfate 2 grams in Sterile Water 50 mL IVPB** <br> Dose: 2 g <br> Freq: PRN Route: IV <br> PRN Reason: hypomagnesemia <br> PRN Comment: Per Admin Instructions <br> Start: 09/05/18 2349 <br> Admin. Amount: 50 mL = 2 g of 2 g/50 mL <br> Volume: 50 mL <br> Infused Over: 60 Minutes | | | |
| **NSAIDS, CYCLOOXYGENASE INHIBITOR - TYPE ANALGESICS** | | | |
| **Ketorolac (TORADOL) Injection 15 mg** <br> Dose: 15 mg <br> Freq: EVERY 8 HOURS IF NEEDED Route: IV <br> PRN Reason: severe pain (pain score 7-10) or unable to tolerate PO meds <br> Start: 09/06/18 1118  End: 09/11/18 1117 <br> Admin. Amount: 1 mL = 15 mg of 15 mg/mL | | | |
| **POTASSIUM REPLACEMENT** | | | |
| **Potassium Chloride 10 mEq in Sterile Water 100 mL IVPB** <br> Dose: 10 mEq <br> Freq: PRN Route: IV <br> PRN Reason: hypokalemia <br> PRN Comment: Per Admin Instructions <br> Last Dose: 10 mEq (09/06/18 1640) <br> Start: 09/05/18 2349 <br> Admin. Amount: 10 mEq <br> Volume: 100 mL <br> Infused Over: 60 Minutes <br> Last Admin: 09/06/18 1640 | | 0637 (10 mEq) <br> 0855 (10 mEq) <br> 1002 (10 mEq) <br> 1157 (10 mEq) <br> 1525 (10 mEq) <br> 1640 (10 mEq) | 2018 SEP 10 AM 11 |
| **SEROTONIN-NOREPINEPHRINE REUPTAKE-INHIB (SNRIS)** | | | |
| **Venlafaxine (EFFEXOR) Tablet 75 mg** <br> Dose: 75 mg <br> Freq: DAILY MORNING Route: PO <br> Start: 09/06/18 1215 <br> Admin. Amount: 1 tablet (1 × 75 mg tablet) <br> Last Admin: 09/07/18 0942 | | 1752 (75 mg) [C] | 0942 (75 mg) [C] |
| **TOPICAL LOCAL ANESTHETICS** | | | |
| **Lidocaine (LIDODERM) 5 %(700 mg/patch) Patch 1 patch** <br> Dose: 1 patch <br> Freq: EVERY 24 HOURS NOW Route: TD <br> Start: 09/06/18 1215 <br> Admin. Amount: 1 patch <br> Last Admin: 09/07/18 1302 | | 1220 (1 patch) [C] | 1302 (1 patch) [C] |
| **Other** | | | |
| **Lidocaine patch REMOVAL** <br> Freq: EVERY 24 HOURS NOW Route: TD <br> Start: 09/07/18 0015 <br> Last Admin: 09/07/18 0041 | | | 0041 ( ) [C] |

## Future Medications

| Medications | 09/05/18 | 09/06/18 | |
|---|---|---|---|

| Medications | 09/05/18 | 09/06/18 | |
|---|---|---|---|
| **HEPARIN AND RELATED PREPARATIONS** | | | |
| Enoxaparin (LOVENOX) Injection 40 mg<br>Dose: 40 mg<br>Freq: DAILY AT 2100 Route: SC<br>Start: 09/07/18 2100<br>Admin. Amount: 0.4 mL = 40 mg of 40 mg/0.4 mL<br>Volume: 0.4 mL | | | [ ] 2100 |

## Discontinued/Completed Medications

| Medications | 09/05/18 | 09/06/18 | |
|---|---|---|---|
| **ANALGESICS NARCOTIC, ANESTHETIC ADJUNCT AGENTS** | | | |
| ~~FENTANYL (PF) 50 MCG/ML INJECTION SOLUTION~~<br>Start: 09/05/18 1950   End: 09/05/18 1950 | | | |
| ~~Fentanyl (SUBLIMAZE) Injection 100 mcg~~<br>Dose: 100 mcg<br>Freq: ONE TIME ONLY Route: IV<br>Start: 09/05/18 2045   End: 09/05/18 1953<br>Admin. Amount: 2 mL = 100 mcg of 100 mcg/2 mL<br>Volume: 2 mL<br>Last Admin: 09/05/18 1953 | 1953 (100 mcg) | | |
| ~~Fentanyl (SUBLIMAZE) Injection 100 mcg~~<br>Dose: 100 mcg<br>Freq: EVERY 1 HOUR IF NEEDED Route: IV<br>PRN Reason: severe pain (pain score 7-10)<br>Start: 09/05/18 1947   End: 09/05/18 2351<br>Admin. Amount: 2 mL = 100 mcg of 100 mcg/2 mL<br>Volume: 2 mL<br>Last Admin: 09/05/18 2317 | 2214 (100 mcg)<br>2317 (100 mcg) | | |
| **ANALGESICS, NARCOTICS** | | | |
| ~~Fentanyl (SUBLIMAZE) 1,000 mcg in NaCl 0.9% 100 mL Infusion~~<br>Rate: 0.5-10 mL/hr Dose: 5-100 mcg/hr<br>Freq: CONTINUOUS INFUSION Route: IV<br>Last Dose: Stopped (09/06/18 1300)<br>Start: 09/06/18 0045   End: 09/06/18 1256<br>Volume: 100 mL<br>Last Admin: 09/06/18 0800<br>Current Line:      Peripheral IV 1 over-the-needle<br>catheter L wrist 18 gauge (distal) | | 0049 (5 mcg/hr)<br>0100 (20 mcg/hr)<br>0110 (30 mcg/hr)<br>0200 (30 mcg/hr)<br>0305 (20 mcg/hr)<br>0320 (10 mcg/hr)<br>0437 (15 mcg/hr)<br>0508 (20 mcg/hr)<br>0600 (30 mcg/hr)<br>0800 (30 mcg/hr)<br>1300 | |
| **ANTIFIBRINOLYTIC AGENTS** | | | |
| ~~Tranexamic Acid (CYKLOKAPRON) 1,000 mg in NaCl 0.9% 110 mL Loading Dose IVPB~~<br>Dose: 1,000 mg<br>Freq: ONE TIME ONLY Route: IV<br>Last Dose: Stopped (09/05/18 1953)<br>Start: 09/05/18 2030   End: 09/05/18 1953<br>Admin. Amount: 1,000 mg<br>Volume: 110 mL<br>Infused Over: 10 Minutes<br>Last Admin: 09/05/18 1943 | 1943 (1,000 mg)<br>1953 | | |
| ~~Tranexamic Acid (CYKLOKAPRON) 1,000 mg in NaCl 0.9% 250 mL Infusion~~<br>Dose: 1,000 mg<br>Freq: ONE TIME ONLY Route: IV<br>Last Dose: 1,000 mg (09/06/18 0200)<br>Start: 09/05/18 2030   End: 09/06/18 0400<br>Admin. Amount: 1,000 mg<br>Volume: 250 mL<br>Infused Over: 8 Hours<br>Last Admin: 09/06/18 0200<br>Current Line:      Peripheral IV 1 over-the-needle<br>catheter R wrist 18 gauge (single) | 2000 (1,000 mg) | 0028 (1,000 mg)<br>0200 (1,000 mg) | |

COPY - Protected Health Information - 09/07/2018 16:02:02-
MHSP4037

| Medications | 09/05/18 | 09/06/18 | |
|---|---|---|---|
| **CALCIUM REPLACEMENT** | | | |
| ~~Calcium Chloride 1,000 mg in NaCl 0.9% 250 mL IVPB~~<br>Dose: 1,000 mg<br>Freq: ONE TIME ONLY Route: IV<br>Start: 09/05/18 2115 End: 09/05/18 2209<br>Admin. Amount: 1,000 mg<br>Volume: 250 mL<br>Infused Over: 1 Hours<br>Last Admin: 09/05/18 2109 | 2109 (1,000 mg) | | |
| ~~Calcium Chloride 1,000 mg in NaCl 0.9% 50 mL IVPB - CENTRAL Line Only~~<br>Dose: 1 g<br>Freq: ONE TIME ONLY Route: IV<br>Start: 09/05/18 2100 End: 09/05/18 2018<br>Admin. Amount: 1,000 mg<br>Volume: 50 mL<br>Infused Over: 1 Hours | | | |
| **CARDIOVASCULAR DIAGNOSTICS-RADIOPAQUE** | | | |
| ~~Iohexol (OMNIPAQUE) 350 mg/mL Injection 100 mL~~<br>Dose: 100 mL<br>Freq: IMAGING X 1 Route: IV<br>Start: 09/05/18 2040 End: 09/05/18 2040<br>Admin. Amount: 100 mL<br>Volume: 100 mL<br>Last Admin: 09/05/18 2040 | 2040 (100 mL) | | |
| ~~Iohexol (OMNIPAQUE) 350 mg/mL Injection 125 mL~~<br>Dose: 125 mL<br>Freq: IMAGING X 1 Route: IV<br>Start: 09/05/18 2036 End: 09/05/18 2037<br>Admin. Amount: 125 mL<br>Volume: 125 mL<br>Last Admin: 09/05/18 2037 | 2037 (125 mL) | | |
| **ELECTROLYTE MAINTENANCE** | | | |
| ~~Electrolyte Solution A (PLASMA-LYTE A) Bolus 1,000 mL~~<br>Dose: 1,000 mL<br>Freq: ONE TIME ONLY Route: IV<br>Last Dose: Stopped (09/05/18 2031)<br>Start: 09/05/18 2030 End: 09/05/18 2031<br>Admin. Amount: 1,000 mL<br>Volume: 1,000 mL<br>Last Admin: 09/05/18 2030 | 2030 (1,000 mL)<br>2031 | | |
| ~~Electrolyte Solution A (PLASMA-LYTE A) Bolus 1,000 mL~~<br>Dose: 1,000 mL<br>Freq: ONE TIME ONLY Route: IV<br>Last Dose: Stopped (09/06/18 0010)<br>Start: 09/05/18 2030 End: 09/06/18 0010<br>Admin. Amount: 1,000 mL<br>Volume: 1,000 mL<br>Last Admin: 09/05/18 2109 | 2109 (1,000 mL) | 0010 | |
| ~~Electrolyte Solution A (PLASMA-LYTE A) Bolus 1,000 mL~~<br>Dose: 1,000 mL<br>Freq: ONE TIME ONLY Route: IV<br>Last Dose: Stopped (09/05/18 2031)<br>Start: 09/05/18 2030 End: 09/05/18 2031<br>Admin. Amount: 1,000 mL<br>Volume: 1,000 mL<br>Last Admin: 09/05/18 2030 | 2030 (1,000 mL)<br>2031 | | |

Hodges#*, James 9Bm (MRN 7509175)

## Medication Administration Report (continued) for Hodges#*, James 9Bm as of 09/07/18 1602

| Medications | 09/05/18 | 09/06/18 | |
|---|---|---|---|
| **Electrolyte Solution A (PLASMA-LYTE A) Infusion**<br>Rate: 100 mL/hr<br>Freq: CONTINUOUS INFUSION Route: IV<br>Last Dose: Stopped (09/06/18 1800)<br>Start: 09/06/18 0045 End: 09/06/18 1733<br>Volume: 1,000 mL<br>Last Admin: 09/06/18 1525 | | 0133 ( )<br>0200 ( )<br>0500 ( )<br>0600 ( )<br>0800 ( )<br>1525 ( )<br>1800 | |
| **GENERAL ANESTHETICS,INJECTABLE** | | | |
| **Etomidate (AMIDATE) Injection**<br>Freq: Code/Trauma/Sedation PRN<br>Start: 09/05/18 1936 End: 09/05/18 1936<br>Last Admin: 09/05/18 1936 | 1936 (30 mg) | | |
| **Propofol (DIPRIVAN) 10 mg/mL Continuous Infusion**<br>Rate: 2.5-25 mL/hr Dose: 5-50 mcg/kg/min<br>Weight Dosing Info: 83.2 kg<br>Freq: CONTINUOUS INFUSION Route: IV<br>Last Dose: Stopped (09/06/18 0524)<br>Start: 09/06/18 0030 End: 09/06/18 1256<br>Admin. Amount: 416-4,160 mcg/min<br>Volume: 100 mL<br>Last Admin: 09/06/18 0508<br>Current Line: Peripheral IV 1 over-the-needle catheter L wrist 18 gauge (single) | | 0000 (50 mcg/kg/min)<br>0050 (50 mcg/kg/min)<br>0200 (50 mcg/kg/min)<br>0250 (50 mcg/kg/min)<br>0305 (40 mcg/kg/min)<br>0320 (30 mcg/kg/min)<br>0508 (20 mcg/kg/min)<br>0524 | |
| **PROPOFOL 10 MG/ML INTRAVENOUS EMULSION**<br>Start: 09/05/18 2340 End: 09/05/18 2340 | | | |
| **GENERAL ANESTHETICS,INJECTABLE-BENZODIAZEPINE TYPE** | | | |
| **Midazolam (VERSED) Injection 2 mg**<br>Dose: 2 mg<br>Freq: ONE TIME ONLY Route: IV<br>Start: 09/05/18 2045 End: 09/05/18 2136<br>Admin. Amount: 2 mL = 2 mg of 2 mg/2 mL<br>Volume: 2 mL<br>Last Admin: 09/05/18 2136 | 2136 (2 mg) | | |
| **GENERAL INHALATION AGENTS** | | | |
| **Sodium Chloride 3 % Solution for Nebulization 3 mL**<br>Dose: 3 mL<br>Freq: EVERY 4 HOURS Route: NEB<br>Start: 09/06/18 0145 End: 09/06/18 0106<br>Admin. Amount: 3 mL<br>Volume: 4 mL | | | |
| **NEUROMUSCULAR BLOCKING AGENTS** | | | |
| **Rocuronium (ZEMURON) Injection**<br>Freq: Code/Trauma/Sedation PRN<br>Start: 09/05/18 1936 End: 09/05/18 1936<br>Last Admin: 09/05/18 1936 | 1936 (100 mg) | | |

2018 SEP 10 PM 11:59

**ED Procedure Note - Emergency Department: Progress, Procedure and Other Notes**

**ED Procedure Note by Mary Lai Bing, MD at 09/05/18 2354**

| | | |
|---|---|---|
| Author: Mary Lai Bing, MD | Service: Emergency Medicine | Author Type: *PHYSICIAN: FACULTY |
| Date of Service: 09/05/18 | Filed: 09/06/18 0037 | Status: Addendum |
| Editor: Mary Lai Bing, MD (*PHYSICIAN: FACULTY) | | |


## _Orotracheal Intubation_

**Indication:** Failure to protect airway

**Consent:** Informed Consent was not obtained because of emergent nature of the procedure. Appropriate procedural pause was taken

**Pre-Procedure:**
  ID verified by two sources (select any two from list): MRN and DOB
  Site: Orotracheal
  Procedure: Orotracheal Intubation
  Surgical/Procedure pause: N/A

  Site(s) marked: N/A
  Position: N/A
  Consent: See consent documentation above
  History and Physical: Available; reviewed by MD
  Other relevant documentation:  N/A
  Relevant images: Not applicable
  Implants: N/A
  Special Equipment: Difficult airway cart available
  Blood products matched:  N/A
  Other pre-procedural information:  N/A
  Patient concurs: See consent documentation above
  Team present and concurs:  Yes

**Technique:** Cardiopulmonary monitoring, pulse oximetry, and end tidal CO2 monitors were applied to the patient. The patient was pre-oxygenated with high-flow oxygen.  Premedication was not administered.. Sedation was achieved with 30 mg of Etomidate and muscular relaxation with 100 mg of Rocuronium. Cervical spine immobilization was maintained throughout the procedure. Cricoid pressure was not maintained throughout laryngoscopy.  Upon adequate sedation and muscular relaxation a  Video-Mac  laryngoscope size 4 was used to visualize the glottis.  A full view was obtained.  A cuffed, size 7.5 endotracheal tube was placed with  Bougie on the first attempt to a depth of 25 cm and secured with bite block. End tidal C02 was used to confirm endotracheal tube placement in addition to chest auscultation. A post procedure chest x ray was used to confirm depth of endotracheal tube placement.  During the procedure the patient's vital signs remained stable and there were no significant episodes of hypoxia.

**Complications:** none

Procedure performed by John R Walter, MD Resident

## ED Procedure Note - Emergency Department: Progress, Procedure and Other Notes (continued)

### ED Procedure Note by Mary Lai Bing, MD at 09/05/18 2354 (continued)

Electronically signed by: John R Walter, MD, Resident[JW1.1]

I was present for the entire procedure performed by the resident. No complications occurred and it was well tolerated by the patient.

Report electronically signed by: Mary Lai Bing, MD, MPH
Attending physician.[MB1.1]

Electronically signed by John Walter, MD at 09/05/18 2355
Electronically signed by Mary Lai Bing, MD at 09/06/18 0037
Electronically signed by Mary Lai Bing, MD at 09/06/18 0037

Revision History

| User Key | Date/Time | User | Provider Type | Action |
|----------|-----------|------|---------------|--------|
| > MB1.1 | 09/06/18 0037 | Mary Lai Bing, MD | *PHYSICIAN: FACULTY | Addend |
| JW1.1 | 09/05/18 2355 | John Walter, MD | *PHYSICIAN: RESIDENT | Sign |

## Recent Progress Notes (Notes from 09/04/18 through 09/07/18)

### Progress Notes by Erik S Desoucy, DO at 09/07/18 1021

| | |
|---|---|
| Author: Erik S Desoucy, DO | Service: (A) Trauma Surgery |
| Date of Service: 09/07/18 | Filed: 09/07/18 1023 |
| Editor: Erik S Desoucy, DO (*PHYSICIAN: RESIDENT) | |

Author Type: *PHYSICIAN: RESIDENT
Status: Signed
Cosigner: Travis Gerlach, MD at 09/07/18 1353

**TRAUMA BLUE SENIOR ICU PROGRESS NOTE**
9/7/2018 10:21

Length of stay: 2 Days

**ID:** James Hodges is 34-year-old man found hanging in jail cell, was obtunded, GCS 6 and intubated on arrival in the ED. BP was liable, tachycardiac and concern for possible drug overdose.

**Injuries:**
Internal lip laceration
Possible anoxic brain injury
No traumatic injuries

**Procedures:**
None

**Interval Events:**
- Extubated

Progress Notes by Erik S Desoucy, DO at 09/07/18 1021 (continued)

**A/P:** Hanging in jail cell with obtunded on arrival, GCS 6 and intubated
- Awaiting transfer out to ward
- Follow up C-spine MRI
- Follow up psych recs

Will continue to follow while patient in ICU status in anticipation of transfer to the ward team.


Erik DeSoucy, DO
General Surgery Chief Resident
Pager# 0687  PI# 12725[ED1.1]


Electronically signed by Erik S Desoucy, DO at 09/07/18 1023
Electronically signed by Travis Gerlach, MD at 09/07/18 1353

Revision History

| User Key | Date/Time | User | Provider Type | Action |
|---|---|---|---|---|
| > ED1.1 | 09/07/18 1023 | Erik S Desoucy, DO | *PHYSICIAN: RESIDENT | Sign |

---

Progress Notes by James Alan Chenoweth, MD at 09/06/18 0915

Author: James Alan Chenoweth, MD      Service: Toxicology      Author Type: *PHYSICIAN: FACULTY

Date of Service: 09/06/18      Filed: 09/06/18 1903      Status: Addendum

Editor: James Alan Chenoweth, MD (*PHYSICIAN: FACULTY)

2018 SEP 10 AM 11 59

## TOXICOLOGY PROGRESS NOTE
Date: 9/6/2018          Time: 09:15
Date of Service: 9/6/2018
Patient Name: James 9Bm Hodges#*
Medical Record Number: 7509175


**SUMMARY:**
34M incarcerated hanging victi. Intubated in the ed and admitted to trauma. Tox called for suspicious med list[MH1.1], acidosis, AKI,[JC1.1] and[MH1.1] AMS[JC1.1].

**INTERVAL HISTORY:**
Remains intubated but now awake and alert, interactive.[MH1.1]
Toxic alcohols negative
Creatinine and acidosis improved[JC1.1]

**SUBJECTIVE:**
Non verbal due to ETT but shakes his head no when asked if he ingested anything. Points to ETT indicating he wants it out.

**OBJECTIVE:**

COPY - Protected Health Information - 09/07/2018 16:02:02-
MHSP4037

Progress Notes by James Alan Chenoweth, MD at 09/06/18 0915 (continued)

## Medications

### Scheduled Medications
Chlorhexidine (PERIDEX) 0.12 % Liquid 15 mL, TOPICAL, Q4H
Docusate (COLACE) Capsule 100 mg, ORAL, BID
Lactobacillus (CULTURELLE) Capsule 1 capsule, ORAL, QAM
Polyethylene Glycol 3350 (MIRALAX) Oral Powder Packet 17 g, ORAL, QAM

### IV Medications
Electrolyte Solution A, , IV, CONTINUOUS, Last Rate: 100 mL/hr at 09/06/18 0800
Fentanyl, 5-100 mcg/hr, IV, CONTINUOUS, Last Rate: 30 mcg/hr (09/06/18 0800)
Propofol, 5-50 mcg/kg/min, IV, CONTINUOUS, Last Rate: Stopped (09/06/18 0524)

### PRN Medications
Chlorhexidine (PERIDEX) 0.12 % Liquid 15 mL, TOPICAL, PRN
Lidocaine (XYLOCAINE) 10 mg/mL (1%) Injection 0.5-20 mL, INFILTRATION, PRN
Magnesium Sulfate 2 grams in Sterile Water 50 mL IVPB, IV, PRN
Midazolam (VERSED) Injection 0.5-4 mg, IV, Q1H PRN
Ondansetron (ZOFRAN) Injection 4 mg, IV, Q12H PRN
Potassium Chloride 10 mEq in Sterile Water 100 mL IVPB, IV, PRN, Last Rate: 10 mEq (09/06/18 0855)

## Vital Signs Summary
Temp src: Bladder Temp (09/06 0900)
Temp: [36.7 °C (98.1 °F)-37.6 °C (99.7 °F)]
Pulse: [73-143]
BP: (97-147)/(45-117)
Resp: [12-28]
SpO2: [98 %-100 %]

## Current Vitals
Temp: 37.5 °C (99.5 °F) (09/06/18 0900)
Temp src: Bladder Temp (09/06/18 0900)
Pulse: 74 (09/06/18 0900)
BP: 140/84 (09/06/18 0900)
Resp: 20 (09/06/18 0900)
SpO2: 99 % (09/06/18 0900)
Weight: 83.2 kg (183 lb 6.8 oz) (09/05/18 1947)

## PHYSICAL EXAM:
**General Appearance:** skin warm, dry, and pink, cooperative.
**Eyes:** conjunctivae and corneas clear. PERRL, EOM's intact. sclerae normal.
**Ears:** external inspection of ears show no abnormality.
**Nose:** normal.

COPY - Protected Health Information - 09/07/2018 16:02:02-
MHSP4037

Progress Notes by James Alan Chenoweth, MD at 09/06/18 0915 (continued)

V41134

**Mouth:** SMall dried blood, ETT in place.
**Neck:** Ligature mark, no stridor.
**Heart:** normal rate and regular rhythm, no murmurs, clicks, or gallops.
**Lungs:** clear to auscultation.
**Abdomen:** BS normal. Abdomen soft, non-tender. No masses or organomegaly.
**Extremities:** no cyanosis, clubbing, or edema.
**Skin:** Skin color, texture, turgor normal. No rashes or lesions.
**Neuro:** no clonus, no rigidity.
**Mental Status:** Appearance/Cooperation: well developed and well nourished and non-toxic.
**Musculoskeletal:** Normal tone/bulk, moves all extremities.


LAB RESULTS - 24 HOURS (excluding micro)
**Lab Results - 24 hours (excluding micro and POC)**
**CBC NO DIFFERENTIAL    Status: Abnormal**

| Result | Value | Status |
|---|---|---|
| White Blood Cell Count | 19.3 (H) | Final |
| Red Blood Cell Count | 3.84 (L) | Final |
| Hemoglobin | 10.9 (L) | Final |
| Hematocrit | 35.2 (L) | Final |
| MCV | 91.6 | Final |
| MCH | 28.4 | Final |
| MCHC | 31.0 (L) | Final |
| RDW | 15.5 (H) | Final |
| MPV | 9.4 | Final |
| Platelet Count | 395 | Final |

**BASIC METABOLIC PANEL    Status: Abnormal**

| Result | Value | Status |
|---|---|---|
| Sodium | 144 | Final |
| Potassium | 4.1 | Final |
| Chloride | 105 | Final |
| Carbon Dioxide Total | 10 (Crtl) | Final |
| Urea Nitrogen, Blood (BUN) | 15 | Final |
| Glucose | 183 (H) | Final |
| Calcium | 8.8 | Final |
| Creatinine Serum | 2.10 (H) | Final |
| E-GFR, African American | 46 | Final |
| E-GFR, Non-African American | 40 | Final |

**HEPATIC FUNCTION PANEL    Status: Abnormal**

| Result | Value | Status |
|---|---|---|
| Protein | 7.0 | Final |
| Alkaline Phosphatase (ALP) | 66 | Final |
| Aspartate Transaminase (AST) | 46 (H) | Final |
| Bilirubin Total | 0.7 | Final |
| Alanine Transferase (ALT) | 24 | Final |
| Bilirubin Direct | 0.1 | Final |
| Albumin | 4.0 | Final |

2018 SEP 10   PM 11 59

Progress Notes by James Alan Chenoweth, MD at 09/06/18 0915 (continued)

**LIPASE    Status: Normal**

| Result | Value | Status |
|--------|-------|--------|
| Lipase | 30 | Final |

**INR    Status: Normal**

| Result | Value | Status |
|--------|-------|--------|
| INR | 0.99 | Final |

**APTT STUDIES    Status: Normal**

| Result | Value | Status |
|--------|-------|--------|
| aPTT | 27.7 | Final |

**ETHANOL, PLASMA    Status: None**

| Result | Value | Status |
|--------|-------|--------|
| ETHANOL, PLASMA | Negative | Final |

**BLD GAS VENOUS    Status: Abnormal**

| Result | Value | Status |
|--------|-------|--------|
| PATIENT TEMP, VEN | | Final |
| PO2, VEN | 147 (H) | Final |
| O2 SAT, VEN | 98 | Final |
| PCO2, VEN | 32 (L) | Final |
| pH, VEN | 7.10 (Crtl) | Final |
| HCO3, VEN | 10 (L) | Final |
| BASE EXCESS, VEN | -19 (L) | Final |

**SALICYLATE,BLOOD    Status: None**

| Result | Value | Status |
|--------|-------|--------|
| SALICYLATE,BLOOD | Negative | Final |

**TROPONIN T    Status: Abnormal**

| Result | Value | Status |
|--------|-------|--------|
| TROPONIN T | 27 (H) | Final |

**BLD GAS ARTERIAL    Status: Abnormal**

| Result | Value | Status |
|--------|-------|--------|
| PATIENT TEMP, ART | 37.1 | Final |
| PO2, ART | 261 (H) | Final |
| O2 SAT, ART | 100 | Final |
| PCO2, ART | 34 (L) | Final |
| pH, ART | 7.23 (L) | Final |
| HCO3, ART | 14 (L) | Final |
| BASE EXCESS, ART | -12 (L) | Final |
| FiO2(%), ART | 60 | Final |
| PO2/FIO2 RATIO | 435 | Final |

**CALCIUM ION WHOLE BLOOD    Status: Abnormal**

| Result | Value | Status |
|--------|-------|--------|
| CALCIUM ION WHOLE BLOOD | 0.95 (L) | Final |

**URINALYSIS-COMPLETE    Status: Abnormal**

| Result | Value | Status |
|--------|-------|--------|
| COLLECTION | CLEAN CATCH | Final |
| COLOR | Yellow | Final |
| CLARITY | Clear | Final |

2018 SEP 10 PM 11 59

COPY - Protected Health Information - 09/07/2018 16:02:02-
MHSP4037

Progress Notes by James Alan Chenoweth, MD at 09/06/18 0915 (continued)

| | | |
|---|---|---|
| SPECIFIC GRAVITY, URINE | 1.016 | Final |
| pH URINE | 5.0 | Final |
| OCCULT BLOOD URINE | Small (Abnl) | Final |
| BILIRUBIN URINE | Negative | Final |
| KETONES | Trace (Abnl) | Final |
| GLUCOSE URINE | Negative | Final |
| PROTEIN URINE | 30 (Abnl) | Final |
| UROBILINOGEN | Negative | Final |
| NITRITE URINE | Negative | Final |
| LEUK ESTERASE | Negative | Final |
| MICROSCOPIC | Indicated | Final |
| WBC, URINE | <1 | Final |
| RBC | 1 | Final |
| BACTERIA/HPF | Moderate (Abnl) | Final |
| MUCOUS/LPF | Moderate (Abnl) | Final |
| HYALINE CASTS | 26-100 (Abnl) | Final |

**UR DRUGS OF ABUSE SCREEN   Status: Normal**

| Result | Value | Status |
|---|---|---|
| Barbiturates Screen, Urine | NEGATIVE | Final |
| Benzodiazepines Screen, Urine | NEGATIVE | Final |
| Cocaine Metabolite Scrn, Urine | NEGATIVE | Final |
| Opiates Screen, Urine | NEGATIVE | Final |
| Amphetamine Screen, Urine | NEGATIVE | Final |

**CBC NO DIFFERENTIAL   Status: Abnormal**

| Result | Value | Status |
|---|---|---|
| White Blood Cell Count | 18.2 (H) | Final |
| Red Blood Cell Count | 3.38 (L) | Final |
| Hemoglobin | 9.8 (L) | Final |
| Hematocrit | 28.9 (L) | Final |
| MCV | 85.6 | Final |
| MCH | 29.0 | Final |
| MCHC | 33.8 | Final |
| RDW | 14.6 | Final |
| MPV | 8.7 | Final |
| Platelet Count | 259 | Final |
| Platelet Estimate, Smear | Adequate | Final |

**ACETAMINOPHEN   Status: Normal**

| Result | Value | Status |
|---|---|---|
| Acetaminophen | <10 | Final |

**VALPROATE   Status: Abnormal**

| Result | Value | Status |
|---|---|---|
| Valproate | 26 (L) | Final |

**AMMONIA   Status: Normal**

| Result | Value | Status |
|---|---|---|
| Ammonia | 25 | Final |

**VOLATILE GC SCREEN   Status: Normal**

COPY - Protected Health Information - 09/07/2018 16:02:02-
MHSP4037

## Recent Progress Notes (Notes from 09/04/18 through 09/07/18) (continued)

**Progress Notes by James Alan Chenoweth, MD at 09/06/18 0915 (continued)**

| Result | Value | Status |
|---|---|---|
| METHANOL | <5 | Final |
| ETHANOL | <5 | Final |
| ISOPROPANOL | <5 | Final |
| ACETONE | <5 | Final |

**ETHYLENE GLYCOL    Status: Normal**

| Result | Value | Status |
|---|---|---|
| ETHYLENE GLYCOL | <5 | Final |

**BASIC METABOLIC PANEL    Status: Abnormal**

| Result | Value | Status |
|---|---|---|
| Sodium | 138 | Final |
| Potassium | 3.8 | Final |
| Chloride | 104 | Final |
| Carbon Dioxide Total | 24 | Final |
| Urea Nitrogen, Blood (BUN) | 11 | Final |
| Glucose | 120 (H) | Final |
| Calcium | 8.5 (L) | Final |
| Creatinine Serum | 1.42 (H) | Final |
| E-GFR, African American | >60 | Final |
| E-GFR, Non-African American | >60 | Final |

**VALPROATE    Status: Abnormal**

| Result | Value | Status |
|---|---|---|
| Valproate | 30 (L) | Final |

**LACTIC ACID    Status: Normal**

| Result | Value | Status |
|---|---|---|
| Lactic Acid | 1.3 | Final |

**CREATINE KINASE    Status: Abnormal**

| Result | Value | Status |
|---|---|---|
| Creatine Kinase | 464 (H) | Final |

**BLD GAS ARTERIAL    Status: Abnormal**

| Result | Value | Status |
|---|---|---|
| PATIENT TEMP, ART | 37.1 | Final |
| PO2, ART | 196 (H) | Final |
| O2 SAT, ART | 99 | Final |
| PCO2, ART | 33 (L) | Final |
| pH, ART | 7.50 (H) | Final |
| HCO3, ART | 26 | Final |
| BASE EXCESS, ART | 4 (H) | Final |
| FiO2(%), ART | 40 | Final |
| PO2/FIO2 RATIO | 490 | Final |

**CBC NO DIFFERENTIAL    Status: Abnormal**

| Result | Value | Status |
|---|---|---|
| White Blood Cell Count | 12.4 (H) | Final |
| Red Blood Cell Count | 3.62 (L) | Final |
| Hemoglobin | 10.2 (L) | Final |
| Hematocrit | 30.8 (L) | Final |

COPY - Protected Health Information - 09/07/2018 16:02:02-
MHSP4037

## Recent Progress Notes (Notes from 09/04/18 through 09/07/18) (continued)

### Progress Notes by James Alan Chenoweth, MD at 09/06/18 0915 (continued)

| | | |
|---|---|---|
| MCV | 85.1 | Final |
| MCH | 28.3 | Final |
| MCHC | 33.2 | Final |
| RDW | 14.8 (H) | Final |
| MPV | 8.8 | Final |
| Platelet Count | 267 | Final |

**BLD GAS ARTERIAL    Status: Abnormal**

| Result | Value | Status |
|---|---|---|
| PATIENT TEMP, ART | 37.3 | Final |
| PO2, ART | 181 (H) | Final |
| O2 SAT, ART | 99 | Final |
| PCO2, ART | 33 (L) | Final |
| pH, ART | 7.50 (H) | Final |
| HCO3, ART | 26 | Final |
| BASE EXCESS, ART | 4 (H) | Final |
| FiO2(%), ART | 30 | Final |
| PO2/FIO2 RATIO | 603 | Final |

**BLD GAS ARTERIAL    Status: Abnormal**

| Result | Value | Status |
|---|---|---|
| PATIENT TEMP, ART | 37.1 | Final |
| PO2, ART | 177 (H) | Final |
| O2 SAT, ART | 99 | Final |
| PCO2, ART | 36 | Final |
| pH, ART | 7.48 (H) | Final |
| HCO3, ART | 27 | Final |
| BASE EXCESS, ART | 4 (H) | Final |
| FiO2(%), ART | 30 | Final |
| PO2/FIO2 RATIO | 590 | Final |

**CBC NO DIFFERENTIAL    Status: Abnormal**

| Result | Value | Status |
|---|---|---|
| White Blood Cell Count | 10.0 | Final |
| Red Blood Cell Count | 3.71 (L) | Final |
| Hemoglobin | 10.5 (L) | Final |
| Hematocrit | 31.6 (L) | Final |
| MCV | 85.2 | Final |
| MCH | 28.3 | Final |
| MCHC | 33.2 | Final |
| RDW | 15.2 (H) | Final |
| MPV | 8.9 | Final |
| Platelet Count | 274 | Final |

**BASIC METABOLIC PANEL    Status: Abnormal**

| Result | Value | Status |
|---|---|---|
| Sodium | 136 | Final |
| Potassium | 3.5 | Final |
| Chloride | 101 | Final |
| Carbon Dioxide Total | 25 | Final |

2018 SEP 10 AM 11 59

Recent Progress Notes (Notes from 09/04/18 through 09/07/18) (continued)

Progress Notes by James Alan Chenoweth, MD at 09/06/18 0915 (continued)

| | | |
|---|---|---|
| Urea Nitrogen, Blood (BUN) | 8 | Final |
| Glucose | 90 | Final |
| Calcium | 8.1 (L) | Final |
| Creatinine Serum | 1.15 | Final |
| E-GFR, African American | >60 | Final |
| E-GFR, Non-African American | >60 | Final |

**BLD GAS ARTERIAL    Status: Abnormal**

| Result | Value | Status |
|---|---|---|
| PATIENT TEMP, ART | 37.6 | Final |
| PO2, ART | 186 (H) | Final |
| O2 SAT, ART | 99 | Final |
| PCO2, ART | 37 | Final |
| pH, ART | 7.47 (H) | Final |
| HCO3, ART | 27 | Final |
| BASE EXCESS, ART | 4 (H) | Final |
| FiO2(%), ART | 30 | Final |
| PO2/FIO2 RATIO | 620 | Final |

LAST POC RESULTS
POC tests
POC Testing: No (09/06/18 0800)

I personally reviewed the following:
   * EKG: Not repeated

**ASSESSMENT AND RECOMMENDATION:**
34M with no evidence of tox ingestion. Tox alcohols neg. ASA/APAP neg. UDS neg. VPA low. Creat and acidosis improved with fluids, bicarb normalized. Patient now[MH1.1] a[MH1.2]wake and denies ingestion.[MH1.1]

-Given clinical improvement, no further workup necessary from a toxicology standpoint
-Continued airway management per primary team

Thank you for allowing us to participate in this patient's care.  If you have any further questions please page the toxicologist on call.[JC1.1]

CRITICAL CARE TIME:
Not applicable.

USE OF INTERPRETER:
Not applicable

**Recent Progress Notes (Notes from 09/04/18 through 09/07/18) (continued)**

Progress Notes by James Alan Chenoweth, MD at 09/06/18 0915 (continued)

Michael Alexander Hayoun, MD Fellow #1130[MH1.1]

The patient was seen and examined with Dr. Hayoun. I have reviewed the history, repeated the physical exam, and developed a care plan along with the fellow as outlined in the above note.

Electronically signed by:
James Chenoweth, MD MAS
Assistant Professor
Department of Emergency Medicine, Division of Medical Toxicology
Pg# 916-816-4795[JC1.1]

Electronically signed by Michael Alexander Hayoun, MD at 09/06/18 1615
Electronically signed by James Alan Chenoweth, MD at 09/06/18 1903
Electronically signed by James Alan Chenoweth, MD at 09/06/18 1903
Revision History

| User Key | Date/Time | User | Provider Type | Action |
|----------|-----------|------|---------------|--------|
| > JC1.1 | 09/06/18 1903 | James Alan Chenoweth, MD | *PHYSICIAN: FACULTY | Addend |
| MH1.2 | 09/06/18 1615 | Michael Alexander Hayoun, MD | *PHYSICIAN: FELLOW | Sign |
| MH1.1 | 09/06/18 0926 | Michael Alexander Hayoun, MD | *PHYSICIAN: FELLOW | Share |

Progress Notes by Jeremy Bolin, MD at 09/06/18 0715

| | | |
|---|---|---|
| Author: Jeremy Bolin, MD | Service: (A) Trauma Surgery | Author Type: *PHYSICIAN: RESIDENT |
| Date of Service: 09/06/18 | Filed: 09/06/18 1147 | Status: Signed |
| Editor: Jeremy Bolin, MD (*PHYSICIAN: RESIDENT) | | Cosigner: Travis Gerlach, MD at 09/06/18 1440 |

**TRAUMA BLUE SENIOR ICU PROGRESS NOTE**
9/6/2018 07:15

Length of stay: 1 Days

**ID:**[JB1.1] James Hodges[JB1.2] is[JB1.3] 34[JB1.2]-year-old man found hanging in jail cell, was obtunded, GCS 6 and intubated on arrival in the ED. BP was liable, tachycardiac and concern for possible drug overdose.[JB1.3]

**Injuries:**[JB1.1]
Internal lip laceration
Possible anoxic brain injury
No traumatic injuries[JB1.3]

**Procedures:**[JB1.1]
None[JB1.3]

**Interval Events:**[JB1.1]

COPY - Protected Health Information - 09/07/2018 16:02:02-
MHSP4037

**Recent Progress Notes (Notes from 09/04/18 through 09/07/18) (continued)**

**Progress Notes by Jeremy Bolin, MD at 09/06/18 0715 (continued)**
- Toxicology consulted- do not suspect tox OD
- Ventilator support weaned
- pressures more stable[JB1.3]

**A/P:**[JB1.1] **Hanging in jail cell with obtunded on arrival, GCS 6 and intubated**
- Ventilator management; continue to wean sedation, evaluate for anoxic brain injury and extubated when indicated .[JB1.3] Continue ICU level of care[JB1.1] with SCC as primary while in the ICU[JB1.3]

Will continue to follow while patient in ICU status in anticipation of transfer to the ward team.


Jeremy Bolin, MD, MEng, PI #20474
Vascular Surgery, PGY-3
Personal Pager: 816-1163
**Trauma Blue Surgery Service Pager: 816-5516**
**On-call Surgery Consult Pager: 816-5513**[JB1.1]


Electronically signed by Jeremy Bolin, MD at 09/06/18 1147
Electronically signed by Travis Gerlach, MD at 09/06/18 1440
Revision History

| | User Key | Date/Time | User | Provider Type | Action |
|---|---|---|---|---|---|
| > | JB1.2 | 09/06/18 1147 | Jeremy Bolin, MD | *PHYSICIAN: RESIDENT | Sign |
| | JB1.3 | 09/06/18 1141 | Jeremy Bolin, MD | *PHYSICIAN: RESIDENT | |
| | JB1.1 | 09/06/18 0715 | Jeremy Bolin, MD | *PHYSICIAN: RESIDENT | |

**Progress Notes by Garth H Utter, MD at 09/06/18 0534**

| Author: Garth H Utter, MD | Service: Surgical Critical Care | Author Type: *PHYSICIAN: FACULTY |
|---|---|---|
| Date of Service: 09/06/18 | Filed: 09/06/18 2008 | Status: Addendum |
| Editor: Garth H Utter, MD (*PHYSICIAN: FACULTY) | | |


**9/6/2018**

**My note reflects my evaluation of the patient at approximately 11:00 today.**

**I reviewed the note below of the Trauma and Emergency Surgery resident. I personally saw the patient, repeated selected aspects of the history and physical examination, and reviewed relevant laboratory and imaging findings. I discussed the assessment and plan with the resident and nurse practitioner team, with whom I agree.**

**1. Possible concussion--Patient alert and interactive while still intubated this morning. No evidence of traumatic brain injury on head CT scan. History of psychiatric disorder, so speech therapy evaluation will probably not be informative.**
**2. Rule out cervical spine injury--No evidence of an injury on preliminary reading of cervical spine CT scan. Will attempt to rule out the possibility of a ligamentous injury (and thus be able to remove the patient's cervical collar) if the final reading remains negative.**
**3. Psychiatric disorder--Will obtain records from prison and attempt to resume regular medications.**
**4. Airway protection--Suitable for extubation this morning.**

Page 38 of 59

COPY - Protected Health Information - 09/07/2018 16:02:02-
MHSP4037

Report electronically signed by:
**Garth H. Utter, MD**
**Attending Physician**
**PI #06570**
**Pager 816-3586**[GU1.1]


**SURGICAL CRITICAL CARE DAILY NOTE**
Primary Team: TRAUMA blue
ICU Team: SCC A
9/6/2018  05:34

**Reason for ICU admission**:
Ventilator management and hemodynamic monitoring

**Hospital Course:** LOS/POD 1
34yr-old man bib EMS and law enforcement after he was found hanging in his jail cell. Patient is obtunded with GCS 6 and intubated upon arrival to ED. Was found to have liable pressures and tachycardia. Toxicology consulted for possible OD.

**Pertinent Medical and Surgical Hx:**
**PMH:** borderline PD, PTSD, schizoaffective disorder, previous suicide attempts
**PSH:** unknown

**Injuries and Management:**
Internal lip laceration
Possible anoxic brain injury

**Procedures**:
None

**Major 24 hour events:**
- Toxicology consulted- do not suspect tox OD
- Ventilator support weaned
- pressures more stable

**NEURO**
24hr events: remains intubated and sedated
Exam: GCS 3T, intubated, sedated
Pain: fentanyl gtt
Sedation: propofol gtt
Neuro meds: holding home psych meds
ST: Indicated
**A/P: Wean sedation as tolerated**
**# Possible anoxic brain injury**
- ST eval once extubated

Progress Notes by Garth H Utter, MD at 09/06/18 0534 (continued)
- Will reassess once extubated

#**Possible overdose**
- Tox consulted
- Do not think it is OD
- f/u labs

#**Psych**
- holding home psych meds at this time

## SPINE
Exam: cervical collar
Spine Status: clear with collar
**A/P: needs c-spine clearance once extubated**

## CARDIOVASCULAR
24hr events: None
Exam:normocardic, regular rhythm
BP: (I) **147/96** BP: (97-147)/(45-117)
Pulse: 73 Pulse Min: 73 Max: 143
Meds:none
**A/P: Continue hemodynamic monitoring.**

## PULMONARY
24hr events: weaning ventilator support.
Exam: breathing in sync with vent
Resp: 13 Resp Min: 12 Max: 28
SpO2: 100 % mechanical ventilator SpO2 Min: 98 % Max: 100 %
*Vent:*
Mode: AC/Pressure control (09/06/18 0420)
Pressure control: 10 (09/06/18 0420) |
PEEP: 5 (09/06/18 0420)
Tidal Volume: 500 ml (09/06/18 0006)
Rate: 12 (09/06/18 0420)
Oxygen Concentration (%): 30 (09/06/18 0420)
Last ABG: pH: 7.48 (09/06 0253)
pCO2: 36 (09/06 0253)
PO2: 177 (09/06 0253)
HCO3: 27 (09/06 0253)
O2 Sat: 99 (09/06 0253)
IS: once extubated
RT: ordered
Meds: none
**A/P: SBT pending this morning. If passes, will extubate.**

COPY - Protected Health Information - 09/07/2018 16:02:02-
MHSP4037

2018 SEP 10 PM 11 59

## GI/NUTRITION
24 hours events: NPO
Exam: soft, no distention
Nutrition: NPO
Enteral:
_Last Bowel Movement: (not recorded)_
GI PPx: none
Bowel Care: colace, miralax
**A/P: once extubated, advance diet as tolerated**

## GU/RENAL/FLUIDS
24 hours events: None
Exam: Foley draining yellow urine
_Fluids:_
IVF: Electrolyte Solution A, , IV, CONTINUOUS, Last Rate: 100 mL/hr at 09/06/18 0500
Fentanyl, 5-100 mcg/hr, IV, CONTINUOUS, Last Rate: 20 mcg/hr (09/06/18 0508)
Propofol, 5-50 mcg/kg/min, IV, CONTINUOUS, Last Rate: Stopped (09/06/18 0524)

UOP: 75-300 mL/hr
_Electrolytes:_
**Recent labs for the past 48 hours**

|  | 9/5/18 2352 | 9/5/18 1941 |
| --- | --- | --- |
| • SODIUM | 138 | 144 |
| • POTASSIUM | 3.8 | 4.1 |
| • CHLORIDE | 104 | 105 |
| • CARBON DIOXIDE TOTAL | 24 | 10* |
| • UREA NITROGEN, BLOOD (BUN) | 11 | 15 |
| • CREATININE BLOOD | 1.42* | 2.10* |
| • CALCIUM | 8.5* | 8.8 |
| • MAGNESIUM (MG) | -- | -- |
| • PHOSPHORUS (PO4) | -- | -- |

**A/P: Continue Foley in setting of critical illness. Continue to monitor UOP. Replace electrolytes PRN.**

## ENDOCRINE
POC Glucose, blood: --
Insulin: None
Meds: None
**A/P: Continue to monitor for hyperglycemia, goal glucose <180.**

## HEMATOLOGY
**Recent labs for the past 48 hours**

Progress Notes by Garth H Utter, MD at 09/06/18 0534 (continued)

|  | 9/5/18 2353 | 9/5/18 2101 | 9/5/18 1941 |
|---|---|---|---|
| • HEMOGLOBIN | 10.2* | 9.8* | 10.9* |
| • HEMATOCRIT | 30.8* | 28.9* | 35.2* |
| • PLATELET COUNT | 267 | 259 | 395 |
| • APTT | -- | -- | 27.7 |
| • INR | -- | -- | 0.99 |

**Recent labs for the past 48 hours**

|  | 9/5/18 1941 |
|---|---|
| • APTT | 27.7 |
| • INR | 0.99 |

**DVT PPx:** SCD
**A/P:** start lovenox today

## ID
Temp: 37.6 °C (99.7 °F)
Temp Min: 36.7 °C (98.1 °F) Max: 37.6 °C (99.7 °F)
**Recent labs for the past 48 hours**

|  | 9/5/18 2353 | 9/5/18 2101 | 9/5/18 1941 |
|---|---|---|---|
| • WHITE BLOOD CELL COUNT | 12.4* | 18.2* | 19.3* |

Antibiotics: None
Culturelle: Ordered
**A/P: Monitor for signs and symptoms of infection, none currently.**

## MUSCULOSKELETAL
Fractures: None
Exam: sedated, no signs of trauma
Activity: Ad lib
PT/OT: not ordered
**A/P: Tertiary.**

**Lines:** right a-line, PIV    Peripheral IV 3 over-the-needle catheter L hand 22 gauge-IV Device Site Day: 0,    Arterial Line 09/05/18 1958 Right radial artery-IV Device Site Day: 1,    Peripheral IV 1 over-the-needle catheter R wrist 18 gauge-IV Device Site Day: 1,    Peripheral IV 1 over-the-needle catheter L wrist 18 gauge-IV Device Site Day: 1
**Foley:** Yes
**Consults:**
TOXICOLOGY CONSULT
**Complications:** None apparent
**Tertiary completed:** Pending
**Incidentals:** Pending tertiary
**SBI indicated:** No

COPY - Protected Health Information - 09/07/2018 16:02:02-
MHSP4037

2019 SEP 10 AM 11 59

## Disposition: Continue ICU care
Code status: Full
Discharge Planning: Pending per primary team

## Electronically signed by:
Isabelle Struve, MD
General Surgery, PGY II
Surgical Critical Care A Service Pager: 916-816-7148[IS1.1]

Electronically signed by Isabelle A Struve, MD at 09/06/18 0558
Electronically signed by Garth H Utter, MD at 09/06/18 2008
Electronically signed by Garth H Utter, MD at 09/06/18 2008
Revision History

| | User Key | Date/Time | User | Provider Type | Action |
|---|---|---|---|---|---|
| > | GU1.1 | 09/06/18 2008 | Garth H Utter, MD | *PHYSICIAN: FACULTY | Addend |
| | IS1.1 | 09/06/18 0558 | Isabelle A Struve, MD | *PHYSICIAN: INTERN | Sign |

Progress Notes by Erik S Desoucy, DO at 09/05/18 2333

| | | |
|---|---|---|
| Author: Erik S Desoucy, DO | Service: (A) Trauma Surgery | Author Type: *PHYSICIAN: RESIDENT |
| Date of Service: 09/05/18 | Filed: 09/05/18 2333 | Status: Signed |
| Editor: Erik S Desoucy, DO (*PHYSICIAN: RESIDENT) | | Cosigner: Ian Brown, MD at 09/06/18 0055 |

TRAUMA CHIEF 911 PROGRESS NOTE

I discussed the patient's care and plan with Trauma Attending Dr. Brown at 23:33 on 9/5/2018.

Erik DeSoucy, DO
R5 General Surgery
PI# 12725
Trauma Chief Pager #: 6100[ED1.1]

Electronically signed by Erik S Desoucy, DO at 09/05/18 2333
Electronically signed by Ian Brown, MD at 09/06/18 0055

## Recent Progress Notes (Notes from 09/04/18 through 09/07/18) (continued)

### Progress Notes by Erik S Desoucy, DO at 09/05/18 2333 (continued)

Revision History

| User Key | Date/Time | User | Provider Type | Action |
|---|---|---|---|---|
| > ED1.1 | 09/05/18 2333 | Erik S Desoucy, DO | *PHYSICIAN: RESIDENT | Sign |

## Consult Notes (Notes from 09/04/18 through 09/07/18)

### Consults by James Alan Chenoweth, MD at 09/05/18 2120

| | | |
|---|---|---|
| Author: James Alan Chenoweth, MD | Service: Toxicology | Author Type: *PHYSICIAN: FACULTY |
| Date of Service: 09/05/18 | Filed: 09/06/18 1904 | Status: Addendum |

Editor: James Alan Chenoweth, MD (*PHYSICIAN: FACULTY)
Consult Orders:
   1. TOXICOLOGY CONSULT [199404044] ordered by Bodhi Canfield, DO at 09/05/18 2021

## MEDICAL TOXICOLOGY INPATIENT CONSULTATION

DATE & TIME OF CONSULTATION: 9/5/2018  2100
Patient Name: James 9Bm Hodges#*
Medical Record Number: 7509175

**PRIMARY SERVICE LINKING STATEMENT:**
Attending/Service Requesting Consult: Trauma/
Reason for Consultation: Possible OD in the setting of hanging

**PATIENT HISTORY:**
**Chief Complaint**
Patient presents with
   • *911:Blunt/Critical Trauma Level I

James 9Bm Hodges#* is a 34yr male[MH1.1] with reported hx of Borderline PD, Schizoaffective[MH1.2] who presents with attempted hanging while in prison.  The history is provided by the police, medical records and ED team.  Patient was found in his cell in an attempted hanging.
Patient was taken to the medical bay in the prison and transported to the ED and made a 911 trauma.  Per officers the patient was awake, making eye contact, agitated and fighting during transport.

In the Ed he was intubated and taken for trauma scans. Trauma team was able to obtain medication list and consulted toxicology due to the multiple medications paired with his initial VS of hypotension and tachycardia as well as acidosis.

Officers report he has been recently moved to a psych cell and was in a holding area.

Medication List:

COPY - Protected Health Information - 09/07/2018 16:02:02-
MHSP4037

Consults by James Alan Chenoweth, MD at 09/05/18 2120 (continued)

Mirtazapine[MH1.1] 15[MH1.3]
Hydroxazine[MH1.1] 50[MH1.3]
Effexor XR[MH1.1] 75[MH1.3]
Latuda[MH1.1] 60 and 40[MH1.3]
VPA[MH1.1] 750 and 500
Oxybutynin 5[MH1.3]


## REVIEW OF SYSTEMS:
Not able to obtain due to AMS, intubated.

## PAST HISTORY:
## Patient Active Problem List
Diagnosis
- Borderline personality disorder
  No Known Allergies

Date Noted
09/05/2018

## Past Medical History:
Diagnosis
- Borderline personality disorder
  *Added 9/5/2018*
- PTSD (post-traumatic stress disorder)
  *Added 9/5/2018*
- Schizoaffective disorder
  *Added 9/5/2018*
- Suicidal behavior
  *Added 9/5/2018*
- Suicidal overdose
  *Added 9/5/2018*

Date

No past surgical history on file.
(Not in a hospital admission)
## Social History

Occupational History
- Not on file.

Social History Main Topics
- Smoking status:              Unknown If Ever Smoked
- Smokeless tobacco:           Not on file
- Alcohol use                  Not on file
  *Comment: u/k*
- Drug use:                    Not on file
  *Comment: prior use*
- Sexual activity:             Not on file

Social History: In prison

Family History: Unable to Review

**LAST VITAL SIGNS:**
Temp: 36.7 °C (98.1 °F) (09/05/18 2100)
Temp src: Bladder Temp (09/05/18 2100)
Pulse: 107 (09/05/18 2100)
BP: 115/65 (09/05/18 2100)
Resp: 15 (09/05/18 2100)
SpO2: 100 % (09/05/18 2100)
Weight: 83.2 kg (183 lb 6.8 oz) (09/05/18 1947)

24 Hour Summary
Temp src: Bladder Temp (09/05 2100)
Temp: [36.7 °C (98.1 °F)-37.1 °C (98.8 °F)]
Pulse: [107-143]
BP: (97-147)/(45-117)
Resp: [15-28]
SpO2: [98 %-100 %]

**PHYSICAL EXAM:**
General Appearance: Intubated, sedated.
Eyes: 5mm sluggish.
Ears: external inspection of ears show no abnormality.
Nose: Small blood in nares.
Mouth: ETT OGT in place. Dried blood.
Neck: C-collar in place, no stridor.[MH1.1] + Ligature mark[MH1.4]
Heart: normal rate and regular rhythm, no murmurs, clicks, or gallops.
Lungs: clear to auscultation.
Abdomen: BS normal. Abdomen soft, non-tender. No masses or organomegaly.
Skin: Skin color, texture, turgor normal. No rashes or lesions.
Neuro: no clonus, no rigidity.[MH1.1] Non purposeful extremity movements. + gag[MH1.4]
Mental Status: Intubated, unresponsive on no sedation.
Musculoskeletal: Normal tone and bulk.

**LAB RESULTS - 48 HOURS** (excluding micro)
**Lab Results - 48 hours (excluding micro and POC)**
**CBC NO DIFFERENTIAL    Status: Abnormal**

| Result | Value | Status |
| --- | --- | --- |
| White Blood Cell Count | 19.3 (H) | Final |
| Red Blood Cell Count | 3.84 (L) | Final |
| Hemoglobin | 10.9 (L) | Final |
| Hematocrit | 35.2 (L) | Final |
| MCV | 91.6 | Final |
| MCH | 28.4 | Final |
| MCHC | 31.0 (L) | Final |
| RDW | 15.5 (H) | Final |

## Consult Notes (Notes from 09/04/18 through 09/07/18) (continued)

Consults by James Alan Chenoweth, MD at 09/05/18 2120 (continued)

| | | |
|---|---|---|
| MPV | 9.4 | Final |
| Platelet Count | 395 | Final |

**BASIC METABOLIC PANEL   Status: Abnormal**

| Result | Value | Status |
|---|---|---|
| Sodium | 144 | Final |
| Potassium | 4.1 | Final |
| Chloride | 105 | Final |
| Carbon Dioxide Total | 10 (Crtl) | Final |
| Urea Nitrogen, Blood (BUN) | 15 | Final |
| Glucose | 183 (H) | Final |
| Calcium | 8.8 | Final |
| Creatinine Serum | 2.10 (H) | Final |
| E-GFR, African American | 46 | Final |
| E-GFR, Non-African American | 40 | Final |

**HEPATIC FUNCTION PANEL   Status: Abnormal**

| Result | Value | Status |
|---|---|---|
| Protein | 7.0 | Final |
| Alkaline Phosphatase (ALP) | 66 | Final |
| Aspartate Transaminase (AST) | 46 (H) | Final |
| Bilirubin Total | 0.7 | Final |
| Alanine Transferase (ALT) | 24 | Final |
| Bilirubin Direct | 0.1 | Final |
| Albumin | 4.0 | Final |

**LIPASE   Status: Normal**

| Result | Value | Status |
|---|---|---|
| Lipase | 30 | Final |

**INR   Status: Normal**

| Result | Value | Status |
|---|---|---|
| INR | 0.99 | Final |

**APTT STUDIES   Status: Normal**

| Result | Value | Status |
|---|---|---|
| aPTT | 27.7 | Final |

**ETHANOL, PLASMA   Status: None**

| Result | Value | Status |
|---|---|---|
| ETHANOL, PLASMA | Negative | Final |

**BLD GAS VENOUS   Status: Abnormal**

| Result | Value | Status |
|---|---|---|
| PATIENT TEMP, VEN | | Final |
| PO2, VEN | 147 (H) | Final |
| O2 SAT, VEN | 98 | Final |
| PCO2, VEN | 32 (L) | Final |
| pH, VEN | 7.10 (Crtl) | Final |
| HCO3, VEN | 10 (L) | Final |
| BASE EXCESS, VEN | -19 (L) | Final |

**SALICYLATE,BLOOD   Status: None**

| Result | Value | Status |
|---|---|---|

Consults by James Alan Chenoweth, MD at 09/05/18 2120 (continued)

| SALICYLATE,BLOOD | Negative | Final |
|---|---|---|

**TROPONIN T    Status: Abnormal**
Result

| | Value | Status |
|---|---|---|
| TROPONIN T | 27 (H) | Final |

**BLD GAS ARTERIAL    Status: Abnormal**
Result

| | Value | Status |
|---|---|---|
| PATIENT TEMP, ART | 37.1 | Final |
| PO2, ART | 261 (H) | Final |
| O2 SAT, ART | 100 | Final |
| PCO2, ART | 34 (L) | Final |
| pH, ART | 7.23 (L) | Final |
| HCO3, ART | 14 (L) | Final |
| BASE EXCESS, ART | -12 (L) | Final |
| FiO2(%), ART | 60 | Final |
| PO2/FIO2 RATIO | 435 | Final |

**CALCIUM ION WHOLE BLOOD    Status: Abnormal**
Result

| | Value | Status |
|---|---|---|
| CALCIUM ION WHOLE BLOOD | 0.95 (L) | Final |

**URINALYSIS-COMPLETE    Status: Abnormal**
Result

| | Value | Status |
|---|---|---|
| COLLECTION | CLEAN CATCH | Final |
| COLOR | Yellow | Final |
| CLARITY | Clear | Final |
| SPECIFIC GRAVITY, URINE | 1.016 | Final |
| pH URINE | 5.0 | Final |
| OCCULT BLOOD URINE | Small (Abnl) | Final |
| BILIRUBIN URINE | Negative | Final |
| KETONES | Trace (Abnl) | Final |
| GLUCOSE URINE | Negative | Final |
| PROTEIN URINE | 30  (Abnl) | Final |
| UROBILINOGEN | Negative | Final |
| NITRITE URINE | Negative | Final |
| LEUK ESTERASE | Negative | Final |
| MICROSCOPIC | Indicated | Final |
| WBC, URINE | <1 | Final |
| RBC | 1 | Final |
| BACTERIA/HPF | Moderate (Abnl) | Final |
| MUCOUS/LPF | Moderate (Abnl) | Final |
| HYALINE CASTS | 26-100 (Abnl) | Final |

**UR DRUGS OF ABUSE SCREEN    Status: Normal**
Result

| | Value | Status |
|---|---|---|
| Barbiturates Screen, Urine | NEGATIVE | Final |
| Benzodiazepines Screen, Urine | NEGATIVE | Final |
| Cocaine Metabolite Scrn, Urine | NEGATIVE | Final |
| Opiates Screen, Urine | NEGATIVE | Final |
| Amphetamine Screen, Urine | NEGATIVE | Final |

2018 SEP 10  AM 11 59

LAST POC RESULTS

I personally reviewed the following:
  * ECG:[MH1.1] Sinus tachy 107  QRS 80. Qtc 472[MH1.5]
  * Image(s):[MH1.1] CTH, CTA H/N, CT C/A/P  No acute injury[MH1.5]
  * Report(s):

## INITIAL ASSESSMENT:
In general, this is a 34yr male who presents with potential exposures to[MH1.1] VPA, effexor, hydroxazine, mirtazapine, latuda[MH1.2] [MH1.1]
Initial call was for abnormal VS and acidosis in the setting of suicide attempt by hanging. Unclear if any overdose.

VS have improved with supportive management. Currently hr in the 90's to low 100's  BP 150's on the radial A line.
His pupils are equal mydriatic and slow to respond while on no sedation.
Axilla are moist
Bowel sounds are normal.
No clonus or hyperreflexia.

No definitive toxidrome on exam.

His medicine are controlled however the patient could have been saving his medications for a possible suicide attempt later.
Corrections officer report he was agitated, making eyw contact but not speaking during the transport over prior to his intubation. Most of his medicine are sedating in overdose and many are antimuscarinic. Would expect tachycardia and dry MM, hypoacrive bowel sounds.  Tachycardia has improved.[MH1.6]

VPA: Low, ammonia nml
ASA: Neg
APAP:[MH1.7] Neg[MH1.8]
UDS: Neg[MH1.7]
ETOH: Neg[MH1.9]
Acidosis improving with supportive measures.[MH1.7]  7.10/32 -> 7.23/34
LFT: AST: 46 ALT nml

Creat **2.1**
Anion Gap: **29**[MH1.9]

The following is a general discussion of the toxicity associated with the patient's medications/exposures:[MH1.1]

## Lurasidone
Lurasidone is an antipsychotic agent. It has anticholinergic effects which can cause sedation and tachycardia. Potassium channel blockade can lead to prolonged QT and torsades de pointes. Alpha 1 blockade can lead to hypotension and pinpoint pupils mimicking opioid toxicity. Mild intoxication usually causes sedation, tachycardia, and small pupils. More severe intoxication can cause coma, seizures, and respiratory arrest. Extrapyramidal side effects such as torticollis, jaw muscle spasm, oculogyric crisis, rigidity, bradykinesia and pill-rolling tremor can occur even at therapeutic doses. Treatment is supportive. There is not a specific antidote.

## Depakote (Valproic acid)
Depakote is a carboxylic acid which is used primarily as a mood stabilizer and antiepileptic agent. It is rapidly absorbed from the GI tract, and peak levels are usually seen in 6 hours, except with sustained release formulations in which the peak can be delayed for up to 24 hours. The metabolism of VPA is complex. It is metabolized in the liver by beta oxidation in the mitochondria and omega oxidation in the cytosol. Beta oxidation involves activation and linkage to coenzyme A (CoA), followed by transfer to the carnitine shuttle for oxidation in the mitochondrial matrix.

VPA decreases carnitine stores by multiple routes. It increases excretion through formation of valproylcarnitine, which is renally excreted. It also inhibits the ATP dependent carnitine transporter on the plasma membrane. Finally, valproic acid metabolites can trap mitochondrial CoA. Due to depletion of carnitine, fatty acids arriving in the liver for metabolism cannot be metabolized in the mitochondria. This can lead to development of microvesicular steatosis.

Valproic acid can cause hyperammonemia through inhibition of carbamoylphosphate synthetase I (CPS I). This is the primary enzyme responsible for incorporation of ammonia into the urea cycle. It inhibits CPS 1 by depletion of CoA. If mitochondrial CoA is depleted, CPS I activity stops and ammonia is accumulated.

Clinically, patients can present depressed mental status. This can range from mild somnolence to severe coma. In severe cases cerebral edema and profound metabolic acidosis may occur. Additionally, pancytopenia will usually occur 3-5 days post ingestion. This pancytopenia is typically mild and self limited. Pancreatitis, hepatotoxicity and renal insufficiency are rare manifestations of acute toxicity.

Following overdose, valproic acid levels, ammonia, basic chemistry, and LFTs should be obtained. The therapeutic range of valproic acid is 50-100 mg/L.

Treatment: Supportive care is the mainstay of therapy. Carnitine should be administered if there is evidence of hyperammonemia or hepatotoxicity. The loading dose is 100mg/kg IV over 30 min (maximum 6 g) followed by 50 mg/kg (Max 3 grams) every 6 hours. Hemodialysis can be used in severe overdoses with levels >850mg/L or if there is a severe metabolic acidosis.

## Venlafaxine (Effexor)

Venlafaxine is an anti-depressent which works by blocking reuptake of dopamine, norepinephrine, and serotonin. Overdose can present with a wide variety of toxicities including serotonin syndrome, widened QRS, prolonged QT, seizures, hypo or hyperglycemia. In large overdoses rhabdomyolysis and coma may also occur.

Treatment is mainly supportive. Seizures should be treated with benzodiazepines. QRS prolongation (>100 msec) should be treated with sodium bicarbonate boluses to prevent ventricular dysrhythmias. QT prolongation should be treated with magnesium and calcium. In rare cases overdrive pacing may be required to prevent torsades.

## Hydroxazine

Toxicity is predominately antimuscarinic, classically remembered as "dry as a bone, hot as a hare, blind as a bat, mad as a hatter, tachy as a suit, full as a flask, and red as a beet". These refer to the various antimuscarinic effects on different systems. Vital signs reflect a sinus tachycardia, tachypnea, mild hypertension, and hyperthermia. Ventricular arrhythmias are unusual but have been reported. Patients may be drowsy or agitated with confusion/hallucinations, ataxia, mild tremor. The mental status changes can progress to lethargy, coma, and seizures. The skin is warm and dry. Secretions are decreased (salivation), decreased bowel sounds and ileus, and urinary retention. Pupils are dilated and cyclopleged. There is a central antimuscarinic syndrome which may not occur for 24 hours after the initial peripheral signs and symptoms. These patients have resolved their tachycardia, dry mucous membranes, urinary retention, etc. but they become or remain confused, hallucinating, and agitated.
Patients should have an ECG obtained, primarily looking for QRS widening. Treatment is supportive with maintenance of airway and blood pressure. Serum glucose should be normalized. Agitated patients may need chemical (benzodiazepines) restraint. These patients should have adequate fluid resuscitation with good urine output since muscle breakdown may result from their random motor activity.[MH1.2]

## RECOMMENDATIONS:[MH1.1]

AGMA - at this time likely related to[MH1.9] a lactic acidosis[MH1.10] and[MH1.9] acute[MH1.11] renal failure.[MH1.9]
Mgt per primary team - volume resus

VPA - low suspicion for tox given low level, almost normal LFts and normal ammonia
Latuda - possible given now depressed mental status however this is likely due to his intubation - initial report was for tachycardia with agitation - supportive care nonetheless
Effexor -  Sinus tachy on ekg. Normal intervals. QTC less than 500. No evidence of serotonin syndrome - supportive care
ASA/APAP neg with WNL lfts. Low suspicion for this as well given less access as these are not on his med list in prison
Hydroxazine is a possibility given tachycardia and reported agitation followed by sedation. - supportive care - monitor QRS and Qtc on monitor[MH1.11]

**Consult Notes (Notes from 09/04/18 through 09/07/18) (continued)**

Consults by James Alan Chenoweth, MD at 09/05/18 2120 (continued)

1. Repeat EKG, Chemistry, VPA ( prove its not going up)
2. Check CK and a Lactate[MH1.10]
3. R/o toxic alcohols - Check ethylene glycol and volatile alcohols (methanol, isopropyl) - if positive call toxicology back for recs
4[MH1.12], [MH1.10] Keep Mg around 2[MH1.11] and[MH1.10] Calcium in the normal range

If QRS widens > 100 page toxicology for further recommendations.[MH1.11]

Thank you for your consultation and letting us participate in this patient's care. If you have any further questions please call the toxicologist on call or the poison control center at 1-800-222-1222.

CRITICAL CARE TIME:[MH1.1]
Not applicable.[MH1.11]

USE OF INTERPRETER:[MH1.1]
Not applicable[MH1.11]

RESIDENT INVOLVEMENT:[MH1.1]
A resident was not involved in this case.[MH1.11]

Case discussed with[MH1.1] senior fellow[MH1.10], Dr.[MH1.1] Dorey[MH1.10] and attending Dr Chenoweth[MH1.12]

Report Electronically Signed by:  Michael Alexander Hayoun, MD[MH1.1] Fellow[MH1.11]

The patient was seen and examined with Dr. Hayoun and the entire Toxicology team during multi-disciplinary rounds. I have reviewed the history, repeated the physical exam, and developed a care plan along with the fellow as outlined in the above note.

Electronically signed by:
James Chenoweth, MD MAS
Assistant Professor
Department of Emergency Medicine, Division of Medical Toxicology
Pg# 916-816-4795[JC1.1]

Electronically signed by Michael Alexander Hayoun, MD at 09/05/18 2245
Electronically signed by Michael Alexander Hayoun, MD at 09/05/18 2315
Electronically signed by James Alan Chenoweth, MD at 09/06/18 1904
Electronically signed by James Alan Chenoweth, MD at 09/06/18 1904

## Consult Notes (Notes from 09/04/18 through 09/07/18) (continued)

### Consults by James Alan Chenoweth, MD at 09/05/18 2120 (continued)

Revision History

| User Key | Date/Time | User | Provider Type | Action |
|---|---|---|---|---|
| > JC1.1 | 09/06/18 1904 | James Alan Chenoweth, MD | *PHYSICIAN: FACULTY | Addend |
| [N/A] | 09/05/18 2315 | Michael Alexander Hayoun, MD | *PHYSICIAN: FELLOW | Addend |
| MH1.12 | 09/05/18 2245 | Michael Alexander Hayoun, MD | *PHYSICIAN: FELLOW | Sign |
| [N/A] | 09/05/18 2239 | Michael Alexander Hayoun, MD | *PHYSICIAN: FELLOW | Share |
| MH1.10 | 09/05/18 2227 | Michael Alexander Hayoun, MD | *PHYSICIAN: FELLOW | Share |
| [N/A] | 09/05/18 2210 | Michael Alexander Hayoun, MD | *PHYSICIAN: FELLOW | Share |
| MH1.4 | 09/05/18 2209 | Michael Alexander Hayoun, MD | *PHYSICIAN: FELLOW | Share |
| [N/A] | 09/05/18 2208 | Michael Alexander Hayoun, MD | *PHYSICIAN: FELLOW | Share |
| MH1.11 | 09/05/18 2159 | Michael Alexander Hayoun, MD | *PHYSICIAN: FELLOW | Share |
| MH1.3 | 09/05/18 2158 | Michael Alexander Hayoun, MD | *PHYSICIAN: FELLOW | |
| MH1.8 | 09/05/18 2157 | Michael Alexander Hayoun, MD | *PHYSICIAN: FELLOW | Share |
| MH1.5 | 09/05/18 2155 | Michael Alexander Hayoun, MD | *PHYSICIAN: FELLOW | Share |
| [N/A] | 09/05/18 2153 | Michael Alexander Hayoun, MD | *PHYSICIAN: FELLOW | Share |
| MH1.9 | 09/05/18 2147 | Michael Alexander Hayoun, MD | *PHYSICIAN: FELLOW | Share |
| MH1.7 | 09/05/18 2146 | Michael Alexander Hayoun, MD | *PHYSICIAN: FELLOW | |
| MH1.6 | 09/05/18 2145 | Michael Alexander Hayoun, MD | *PHYSICIAN: FELLOW | Share |
| MH1.2 | 09/05/18 2137 | Michael Alexander Hayoun, MD | *PHYSICIAN: FELLOW | Share |
| MH1.1 | 09/05/18 2120 | Michael Alexander Hayoun, MD | *PHYSICIAN: FELLOW | |

## Procedure Notes (Notes from 09/04/18 through 09/07/18)

### Procedures by Ian Brown, MD at 09/05/18 2009

Author: Ian Brown, MD
Date of Service: 09/05/18
Editor: Ian Brown, MD (*PHYSICIAN: FACULTY)

Service: Surgical Critical Care
Filed: 09/05/18 2046

Author Type: *PHYSICIAN: FACULTY
Status: Addendum


Pre-Procedure Time Out Checklist  (do not remove)


Attestation:
ID verified by two sources (select any two from list): MRN and Other: Emergency

**Procedure Notes (Notes from 09/04/18 through 09/07/18) (continued)**

<u>Procedures by Ian Brown, MD at 09/05/18 2009 (continued)</u>
Was this an emergency procedure?  yes

I attest that I verified the following information prior to performing the procedure: Patient ID, Site and Procedure

ADULT LINE PROCEDURE NOTE WITH CLIP NOTIFICATION

MRN: 7509175       James 9Bm Hodges#*
DOB: 7/16/1984      Date of Service: 9/5/2018   20:10
Date of Admission: 9/5/2018  7:26 PM      Patient's PCP: No Pcp Per Patient

Patient's specific hospital location during procedure: ED
Consent form completed and signed by the patient/guardian: Emergency
Was an interpreter used? no

Reason for Insertion/Pre-Procedure Diagnosis: New indication for line
Post Procedure Diagnosis: same
Surgeon/Line Inserter:[IS1.1]  Isabelle A Struve, MD[IS1.2]

TYPE OF PROCEDURE: ARTERIAL LINE PLACEMENT

Occupation of inserter: Resident
Procedural Pause Performed: yes
Skin Prep: Chlorhexidine
Was skin prep completely dry at time of first skin puncture yes
Sterility:  were maximal barrier precautions used for sterility (including handwashing, cap, full sterile drape,
gloves, gown and mask):  no:  please identify barrier and sterility precautions used: Handwashing, Gloves, and
Gown,
Type of Anesthesia/Local Anesthetic: N/A

Artery: Radial right
Estimated blood loss: minimal
Confirmation of Placement: Blood Gas and Transduced Arterial Waveform
Complications: None
Did this insertion attempt result in a successful line placement? yes

CLIP notification not required - arterial line only

Isabelle Struve, MD
General Surgery, PGY II
Surgical Critical Care A Service Pager: 916-816-7148[IS1.1]

I was present for and supervised the entire procedure.

Ian Brown, MD, PhD

## Procedure Notes (Notes from 09/04/18 through 09/07/18) (continued)

### Procedures by Ian Brown, MD at 09/05/18 2009 (continued)

Division of Acute Care Surgery, Trauma, and Surgical Critical Care
PI # 14778
Pager 816-9839[IB1.1]


Electronically signed by Isabelle A Struve, MD at 09/05/18 2011
Electronically signed by Ian Brown, MD at 09/05/18 2046
Electronically signed by Ian Brown, MD at 09/05/18 2046
Revision History

| User Key | Date/Time | User | Provider Type | Action |
|---|---|---|---|---|
| > IB1.1 | 09/05/18 2046 | Ian Brown, MD | *PHYSICIAN: FACULTY | Addend |
| IS1.2 | 09/05/18 2011 | Isabelle A Struve, MD | *PHYSICIAN: INTERN | Sign |
| IS1.1 | 09/05/18 2009 | Isabelle A Struve, MD | *PHYSICIAN: INTERN | |


## Social Work Notes (Notes from 09/04/18 through 09/07/18)

### Allied Health Progress by Christine Waligora, LCSW at 09/05/18 1937

Author: Christine Waligora, LCSW   Service: (none)          Author Type: .SOCIAL WORKER
Date of Service: 09/05/18          Filed: 09/05/18 1939     Status: Signed
Editor: Christine Waligora, LCSW (.SOCIAL WORKER)

## CLINICAL SOCIAL SERVICES
## CRISIS SERVICES PROGRESS NOTE
Note Date and Time: 9/5/2018  19:37      Date of Admission: 9/5/2018  7:26 PM
Patient Name: James 9Bm Hodges#*        Referral Source: medical staff
DOB: 9/5/1984                            Age: 34yr

Crisis SW responded to 9-1-1 code. Patient arrived with Cal Dept. Of Corrections, in custody, a
prisoner from Folsom Prison. Patient with an attempted hanging in his cell arrives with a GCS 6 and
combative. CDC# V-41134. No other social services at this time due pt being in custody.


**Signature:** Christine Waligora, LCSW          Pager # (916) 816-5585/5470
Licensed Clinical Social Worker[CW1.1]


Electronically signed by Christine Waligora, LCSW at 09/05/18 1939
Revision History

| User Key | Date/Time | User | Provider Type | Action |
|---|---|---|---|---|
| > CW1.1 | 09/05/18 1939 | Christine Waligora, LCSW | .SOCIAL WORKER | Sign |


## Speech Therapy Consults (Notes from 09/04/18 through 09/07/18)

**Speech Therapy Consults (Notes from 09/04/18 through 09/07/18) (continued)**

Allied Health Consult by Rejane Araujo Wittmann, SLP at 09/06/18 1216

| | | |
|---|---|---|
| Author: Rejane Araujo Wittmann, SLP | Service: PM&R | Author Type: .SPEECH PATHOLOGIST |
| Date of Service: 09/06/18 | Filed: 09/06/18 1426 | Status: Signed |
| Editor: Rejane Araujo Wittmann, SLP (.SPEECH PATHOLOGIST) | | |

## PM&R
## Speech Pathology Clinical Bedside Swallow Evaluation 9/6/2018

**Name: James 9Bm Hodges#***
**MR#: 7509175**
**DOB: 7/16/1984**
**Date Of Admit: 9/5/2018**
**Onset of new medical condition:9/5/2018**
**Date of initial therapy: 9/6/2018**

Treatment Time: 60 minute evaluation - includes chart review, evaluation, interpretation, and report
Patient cleared by RN for evaluation

**Impression:** A bedside swallow evaluation was completed. Patient[RW1.1] recently extubated and w/ face mask in place, which was removed for evaluation. Patient w/ c/o sore throat/tongue making it difficulty to swallow but otherwise[RW1.2] WFL swallow with no overt s/s of aspiration. Patient educated on aspiration precautions and verbalized understanding. Recommend patient start on[RW1.1] clear liquid diet until pain in throat subsides[RW1.2].

> **Diet & Fluid Recommendations:**[RW1.1] Clear liquids (advance as tolerated)[RW1.2]
> **Aspiration precautions:**  sit upright with head in neutral position
>  eat slowly and cautiously
>  small sips and bites
>  alternate consistencies
> **Medications:** no restrictions

**Recommendations:**[RW1.1]  ST to f/u for cognitive evaluation[RW1.2]
 Routine oral care

**History(from EMR):**[RW1.1]
James Hodges is 34-year-old man found hanging in jail cell, was obtunded, GCS 6 and intubated on arrival in the ED. BP was liable, tachycardiac and concern for possible drug overdose.[RW1.2]

**Reason for evaluation**: To assess tolerance for PO intake/ tolerance of current diet
**Pain:**[RW1.1] 8[RW1.2]/10

**FINDINGS:**
**Respiratory Status:**[RW1.1]  Face mask in place[RW1.2]
**Tracheostomy:** absent
**Cough:** WFL
**Secretion management:** WFL

## Speech Therapy Consults (Notes from 09/04/18 through 09/07/18) (continued)

Allied Health Consult by Rejane Araujo Wittmann, SLP at 09/06/18 1216 (continued)

**Current Diet Level**: NPO
**History of Aspiration**: CXR [RW1.1]09/05 - No focal consolidation or pulmonary edema. No pleural effusion or pneumothorax[RW1.2]; diet prior to admit- regular w/ thin liquids

### Oral Motor:
**Overall condition of oral cavity**: Pink and moist
V:      - face and mandible intact to light touch
        - rotary mandibular movement
VII:     - face symmetric to smile
IX, X:  - soft palate midline and rises symmetrically
        - [RW1.1] mild[RW1.2] dysarthria
XI:      - head control
XII:     - tongue normal bulk and range of motion, protrudes symmetrically
**Lips**: able to retrieve bolus from spoon, cup and straw without anterior spillage
**Buccal Control**: able to use straw and no pocketing noted
**Teeth**: adequate for mastication but decreased
**Tongue ROM/Strength**: WFL
**Mandible**: WFL
**Velopharyngeal**: WFL
**Nasality**: None noted
**Laryngeal/Phonation**: +phonation, +laryngeal excursion
**Vocal Quality**: clear
**Pitch**: +changes
**Loudness**: [RW1.1] reduced[RW1.2] changes
**Apraxia/Dysarthria**: [RW1.1] mild[RW1.2]
**Intelligibility**: intelligibility rated 100% at conversational level

### LEVEL OF PARTICIPATION:
**Cognitive Function**: eyes open spontaneously, cooperative, following simple directives and answering egocentric questions
**Ability to feed self**: Feeding self

**Functional Swallow:**
**Oral Phase**: WFL and bolus manipulation WFL, no pocketing noted and prompt A -> P transit suspected with liquid and puree
**Pharyngeal Phase**: laryngeal excursion appreciated, suspect prompt pharyngeal swallow, clear vocal quality and cervical neck auscultation suggestive of WFL swallow.

**Trials included**: thin liquids, soft solids and intact solids
**Compensatory Strategies Attempted**: none

**Goals**:
1. Patient and/or caregiver will participate in assessment and education 100% of the time to maximize patient's ability to tolerate the least restrictive diet safely and efficiently with decreased risk of aspiration pneumonia.
2. Evaluate and D/C.

## Speech Therapy Consults (Notes from 09/04/18 through 09/07/18) (continued)

### Allied Health Consult by Rejane Araujo Wittmann, SLP at 09/06/18 1216 (continued)

**Modalities/Procedures to be Utilized:** Skilled ST intervention to include PO trials, objective measures PRN, graded tasks, patient/family education.

**Patient Education:**
 Method of Teaching: verbal
 Learner: patient
 Response: verbalizes understanding

 Patient/Caregiver Participation:
 Has the plan of care been explained to the patient/caregiver? yes
 Is the patient/caregiver able to understand the plan of care: yes
 Does the patient/caregiver(s) agree with the plan of care: yes

 Barriers to Learning:
 Are there barriers to patient learning? no.  If Yes, what? none
 Is patient/caregiver motivated to learn? yes
 Best learning method for patient/caregiver: verbal

**Prognosis:** Good for goals

**Patient/Family participation and agreement with recommendations:** verbalized agreement

**RN/MD notified of results:** Yes

**Report by:**
Rejane Wittmann, M.S., CCC-SLP
Physical Medicine and Rehabilitation
Speech Pathologist
PI# 12500
4-0775[RW1.1]

Electronically signed by Rejane Araujo Wittmann, SLP at 09/06/18 1426
Revision History

| User Key | Date/Time | User | Provider Type | Action |
|---|---|---|---|---|
| > RW1.2 | 09/06/18 1426 | Rejane Araujo Wittmann, SLP | .SPEECH PATHOLOGIST | Sign |
| RW1.1 | 09/06/18 1216 | Rejane Araujo Wittmann, SLP | .SPEECH PATHOLOGIST | |

## Physical Therapy Notes (Notes from 09/04/18 through 09/07/18)

### Allied Health Progress by Kate J Morr, PT at 09/06/18 0940

exhibit — 🖤 🖤 ●

Declaration
OF
Facts

Defendant's Willingly, Knowing deliberately violated my 8th Amendment right. For deliberately indifference - Cruel and unusual punishment's I Ask the to Look At the Facts Defendant supervisor didn't Submit 837's incident report / suicide Attempt report. Because they were At Fault - guilty/ and in because of not Submitting report's it makes them looks more guilty/. even more so defendants had so many opportunities to stop the suicide let's look At the Fact's.

I was Arguing with defendant J. Seibert (1) statement of notice. ya'll gonna have to explain this (2). Slipping out of handcuffs (3) taking off my t-shirt, (4.) ripping it up; (5) making A noose, (6) tying it to the top of holding cage, (7) putting it Around my neck (8) Actually hanging my Self (8)" opportunities and not 1 of 8 the defendants Act, no it was After a loss consciousness did defendants Acts

defendant put me in A dangerous - life threatening situation (imminent Death) I ASK the courts to Acknowledge those Acts not only malice and Sadistic But more So Criminal Negligence - Criminal Reckless Endangerment

defendants Abandon the legal duty, civil, duty moral duty duty of care they owed me All duties were breached deliberately with no regard for consequences and it's evil to know CDCR - Supervisors are enable and Covering Up officers wrongdoings What you permit, you commit

# Cause of Action
## Fact's

I there in the care of defendants Awaiting transfer to crisis Bed.
defendants owed me A care of duty, defendants was on notice
officer J. Seibert was doing 114/A Detention/segration safety/check.
it was J. Seibert that I was Arguing with me — so his mind set/indifferent
defendants were on notice of my suicide intent
defendants didnt try to stop me from Attempting Suicide-
defendents watched me hang m/self J. seibert was Arguing with me
defendants knowingly/willingly deliberatly/put me in life-threatening
Situation exposing me to the risk of imminent Death

## As Results

Suffer Anoxic brain injury/ — which cause    All defendants
severe migraines and killed Brain Cells       was on duty/
Blurry vision Back of eye's Are s              and present
loss of Brian cell — memory loss              September 5th 2018
I have A Bad time with concention             See Delcation

## Out come                                    I Decate

I Also have nightmares and nervous    I declare under
when I am Alone with correctional officers   penalty of perjury
and Anxiety Attacks                          under the laws
                                             OF the State of
                    Defendants               California that the
the last              dont HAVe              foregoing is true
thing I                 A                    and correct
Remember              Defense,               that sergeant
Arguing with            OR                   Kevin Steele told
J. Seibert          Justifiable              me the
clearly              excuse                  circumstances And
indifferent          "period"               in Justice that
mind set"                                    Happen on 9-5-2018

Please Acknowledge that                      JAmes A. Hodges
Factfinder                                   Hodges gum ☑
                                             5-3-2020    Plaintiff

James Albert Hodges
California healthcare Facity
7107 Austin RD
OR
P.O. Box 32110
Stockton CA 95213

## DECLARATION

Superior court of California county
of Eastern District

I, plaintiff declare under penalty of perjury under the laws
of the State of California that the Foregoing is
true correct      Date 5-3-2020

my complaint 1983 I have Filed Against correctional offeers
J. seibert, A. Brewer, A monroy, P. Bevens. that the
Violations in my complaint is true that the courts take
them to be true and the event and the source of
events sergeant K. steele of investigate services unit
I Asked the courts to take what he told me in which
my complaint is Based on Are true why would he lie?

and I Ask the courts to Acknowledge this FactFinders
to 1 For K. Steele to say that defendant said I Said
ya'll gonna have to explain this and Actions Followed
that defendants Are guilty,

they sat Back and watched me hang m/self "Period"
And CDCR officials Are trying to stop the truth
From coming out

James Hodges
5-3-2020

# Exhibit - E

## Reckless endangerment
### Law and legal Definition

### Criminal Negligence

even A Lay Person could Fully understand and

Agree defendants All Acted on All Above.

 (https://uslegal.com/)

Search All of USLegal, Inc　　　Search

USLegal (https://uslegal.com/) ›
Legal Definitions (https://definitions.uslegal.com/) ›
R (https://definitions.uslegal.com/r/) › Reckless Endangerment

# Reckless Endangerment Law and Legal Definition

▷ ✕

## College Refund Class Action

### Class Suspended But No Refund?

College Refusing Refunds After Cancelling Campus Classes?
katriellaw.com

**OPEN**

Reckless endangerment is a crime consisting of acts that create a substantial risk of serious physical injury to another person. The accused person isn't required to intend the resulting or potential harm, but must have acted in a way that showed a disregard for the foreseeable consequences of the actions. The charge may occur in various contexts, such as, among others, domestic cases, car accidents, construction site accidents, testing sites, domestic/child abuse situations, and hospital abuse. State laws and penalties vary, so local laws should be consulted.

## ❯ Legal Definition list

Reckless Driving (r/reckless-driving/)
Reckless Conduct (r/reckless-conduct/)
Reckless Burning (r/reckless-burning/)

those who may be adversely affected by one's actions but is instead behavior which should be recognized as involving unreasonable danger to others." *Id.*, at 169.

*active negligence.* (1875) Negligence resulting from an affirmative or positive act, such as driving through a barrier. Cf. *passive negligence.*

*advertent negligence.* (1909) Negligence in which the actor is aware of the unreasonable risk that he or she is creating; RECKLESSNESS. — Also termed *willful negligence; supine negligence.*

*casual negligence.* A plaintiff's failure to (1) pay reasonable attention to his or her surroundings, so as to discover the danger created by the defendant's negligence, (2) exercise reasonable competence, care, diligence, and skill to avoid the danger once it is perceived, or (3) prepare as a reasonable person would to avoid future dangers.

*collateral negligence.* An independent contractor's negligence, for which the employer is generally not liable. See COLLATERAL-NEGLIGENCE DOCTRINE.

*comparative negligence.* (1862) A plaintiff's own negligence that proportionally reduces the damages recoverable from a defendant. — Also termed *comparative fault.* See COMPARATIVE-NEGLIGENCE DOCTRINE. [Cases: Negligence ⬗ 549.]

*concurrent negligence.* (1831) The negligence of two or more parties acting independently but causing the same damage. Cf. *joint negligence.*

*contributory negligence.* (1822) **1.** A plaintiff's own negligence that played a part in causing the plaintiff's injury and that is significant enough (in a few jurisdictions) to bar the plaintiff from recovering damages. • In most jurisdictions, this defense has been superseded by comparative negligence. See CONTRIBUTORY-NEGLIGENCE DOCTRINE; DISTRACTION DOCTRINE. [Cases: Negligence ⬗ 547.] **2.** *Rare.* The negligence of a third party — neither the plaintiff nor the defendant — whose act or omission played a part in causing the plaintiff's injury. [Cases: Negligence ⬗ 540.]

"The contributory negligence of a third party is no excuse for the negligence of the defendant." Thomas E. Holland, *The Elements of Jurisprudence* 154 (13th ed. 1924).

*criminal negligence.* (1838) Gross negligence so extreme that it is punishable as a crime. • For example, involuntary manslaughter or other negligent homicide can be based on criminal negligence, as when an extremely careless automobile driver kills someone. — Also termed *culpable negligence; gross negligence.* [Cases: Criminal Law ⬗ 23; Negligence ⬗ 1800–1802.]

"Though the legislatures and the courts have often made it clear that criminal liability generally requires more fault than the ordinary negligence which will do for tort liability, they have not so often made it plain just what is required in addition to tort negligence — greater risk, subjective awareness of the risk, or both. Statutes are sometimes worded in terms of 'gross negligence' or 'culpable negligence' or 'criminal negligence,' without any further definition of these terms. . . . The courts thus have had to do their best with little guidance from the legislature, with varying results." Wayne R. LaFave & Austin W. Scott Jr., *Criminal Law* § 3.7, at 235–37 (2d ed. 1986).

*culpable negligence.* (17c) **1.** Negligent conduct that, while not intentional, involves a disregard of the consequences likely to result from one's actions. **2.** See *criminal negligence.*

"'Culpable negligence,' while variously defined, has been held incapable of exact definition; it means something more than negligence . . . . In connection with negligence, the word 'culpable' is sometimes used in the sense of 'blamable,' and it has been regarded as expressing the thought of a breach of a duty or the commission of a fault; but culpable negligence has been held to amount to more than 'blameworthy' conduct . . . . It does not involve the element of intent . . . . On the other hand, it has been said to be intentional conduct which the actor may not intend to be harmful but which an ordinary and reasonably prudent man would recognize as involving a strong probability of injury to others." 65 C.J.S. *Negligence* § 1(13) (1966).

*gross negligence.* (16c) **1.** A lack of slight diligence or care. [Cases: Negligence ⬗ 273.] **2.** A conscious, voluntary act or omission in reckless disregard of a legal duty and of the consequences to another party, who may typically recover exemplary damages. — Also termed *reckless negligence; wanton negligence; willful negligence; willful and wanton negligence; hazardous negligence; magna neglegentia.* [Cases: Damages ⬗ 91.5(1); Negligence ⬗ 273.] **3.** See *criminal negligence.*

"Negligence is gross if the precautions to be taken against harm are very simple, such as persons who are but poorly endowed with physical and mental capacities can easily take." H.L.A. Hart, "Negligence, *Mens Rea* and Criminal Responsibility," in *Punishment and Responsibility* 136, 149 (1968).

"*Gross Negligence.* As it originally appeared, this was very great negligence, or the want of even slight or scant care. It has been described as a failure to exercise even that care which a careless person would use. Several courts, however, dissatisfied with a term so nebulous . . . have construed gross negligence as requiring willful, wanton, or reckless misconduct, or such utter lack of all care as will be evidence thereof . . . . But it is still true that most courts consider that 'gross negligence' falls short of a reckless disregard of the consequences, and differs from ordinary negligence only in degree, and not in kind." *Prosser and Keeton on the Law of Torts* § 34, at 211–12 (W. Page Keeton ed., 5th ed. 1984).

*hazardous negligence.* **1.** Careless or reckless conduct that exposes someone to extreme danger of injury or to imminent peril. **2.** See *gross negligence* (2).

*imputed negligence.* (18c) Negligence of one person charged to another; negligence resulting from a party's special relationship with another party who is originally negligent — so that, for example, a parent might be held responsible for some acts of a child. [Cases: Negligence ⬗ 483, 575; Parent and Child ⬗ 13.5(2), 13.5(4).]

*inadvertent negligence.* (18c) Negligence in which the actor is not aware of the unreasonable risk that he or she is creating, but should have foreseen and avoided it. — Also termed *simple negligence.*

eXhibit - F

California State Audit
Year August 2011

California Department of Corrections and
Rehabilitation.

it must increase it's Efforts to Prevent and
Respond to inmate Suicides

Note too thick
For Staple




# California Department of Corrections and Rehabilitation

It Must Increase Its Efforts to Prevent and Respond to Inmate Suicides

Report 2016-131



INTEGRITY

LEADERSHIP



**CALIFORNIA STATE AUDITOR**
621 Capitol Mall, Suite 1200 | Sacramento | CA | 95814



**916.445.0255** | TTY **916.445.0033**



For complaints of state employee misconduct,
contact us through the **Whistleblower Hotline:**
**1.800.952.5665**

*Don't want to miss any of our reports? Subscribe to our email list at* **auditor.ca.gov**

*For questions regarding the contents of this report, please contact* Margarita Fernández, Chief of Public Affairs, *at* 916.445.0255

This report is also available online at www.auditor.ca.gov | Alternate format reports available upon request | Permission is granted to reproduce reports



State Auditor

August 17, 2017

2016-131

The Governor of California
President pro Tempore of the Senate
Speaker of the Assembly
State Capitol
Sacramento, California 95814

Dear Governor and Legislative Leaders:

As requested by the Joint Legislative Audit Committee, the California State Auditor presents this audit report concerning the California Department of Corrections and Rehabilitation's (Corrections) policies, procedures, and practices for suicide prevention and reduction, with a particular emphasis on the recently elevated suicide rate at the California Institution for Women. Although female inmates account for about 4 percent of Corrections' total inmate population, they accounted for 11 percent of inmate suicides from 2014 through 2016. This report concludes that Corrections should provide increased oversight and leadership to ensure that prisons follow its policies related to suicide prevention and response.

We identified significant weaknesses in prisons' suicide prevention and response practices at the four prisons we reviewed. Specifically, we found that the prisons failed to complete some required evaluations to assess inmates' risk for suicide and those that the prisons did complete were often inadequate. The inadequacies included leaving sections of the risk evaluations blank, failing to appropriately justify the determinations of risk, failing to develop adequate plans for treatment to reduce the inmates' risk, and relying on inconsistent information about inmates to determine risk. Also, the prisons we reviewed did not properly monitor inmates who were at risk of committing suicide. For example, we found that staff were not staggering behavior checks or conducting checks in the required 15-minute intervals. Finally, we found that some staff members at the prisons we visited had not completed required trainings related to suicide prevention and response. These conditions may have contributed to elevated suicide and attempted suicide rates at California prisons.

Corrections also lacks assurance that prisons are implementing its policies to address serious issues. For many years, a court-appointed special master, working with Corrections to address inmate mental health care, identified many of the same issues we discuss in this report. In 2013 Corrections began developing an audit process to review prisons' compliance with its policies and procedures, including those it issued in response to the special master's reports; however, that process is still in development. In addition, Corrections could provide additional leadership to prisons regarding the communication of best practices related to suicide prevention efforts. Finally, Corrections' policies require it to complete a thorough review of a prison's compliance with policies and procedures following an inmate's suicide, but Corrections does not complete such reviews for suicide attempts. This hinders Corrections' ability to identify problems with a prison's compliance with crucial policies and procedures until after an inmate dies.

Respectfully submitted,

*Elaine M. Howle*

ELAINE M. HOWLE, CPA
State Auditor

## Selected Abbreviations Used in This Report

| | |
|---|---|
| CCWF | Central California Women's Facility |
| CIW | California Institution for Women |
| Corrections | California Department of Corrections and Rehabilitation |
| health care division | Corrections' Division of Health Care Services |
| RJD | Richard J. Donovan Correctional Facility |
| SAC | California State Prison, Sacramento |
| VSPW | Valley State Prison for Women |

# Contents

Summary                                                                    1

Introduction                                                               7

**Chapter 1**
Prisons Have Not Followed Corrections' Policies When
Responding to Inmates Who Have Attempted or Are at
Risk of Attempting Suicide                                                17

Recommendations                                                           37

**Chapter 2**
A Number of Factors Have Likely Contributed to High Rates
of Inmate Suicides and Suicide Attempts at CIW                           39

Recommendations                                                           49

**Chapter 3**
To Reduce Inmate Suicides and Attempts, Corrections Must
Strengthen Its Oversight and Demonstrate Greater Leadership              51

Recommendations                                                           63

**Appendix A**
Rates of Inmate Suicides and Suicide Attempts in State Prisons
From 2012 Through 2016                                                    67

**Appendix B**
Scope and Methodology                                                     71

**Response to the Audit**
California Department of Corrections and Rehabilitation                   75

Blank page inserted for reproduction purposes only.

# Summary

### Results in Brief

Despite the fact that the rates of inmate suicide in California's prisons has been higher on average than those of all U.S. state prisons for several years, the California Department of Corrections and Rehabilitation (Corrections) has failed to provide the leadership and oversight necessary to ensure that its prisons follow its policies related to inmate suicide prevention and response. Corrections is responsible for providing mental health services to its inmates who are unable to function within the usual correctional environment because of mental illness. However, from 2005 through 2013, the average suicide rate in Corrections' prisons was 22 per 100,000 inmates—substantially higher than the average rate of 15.66 per 100,000 in U.S. state prisons during the same period. Further, in recent years, the rates of female inmates who committed suicide while in Corrections' prisons have soared: from 2014 through 2016, female inmates made up only about 4 percent of Corrections' total inmate population, yet they accounted for about 11 percent of its inmate suicides. These statistics, combined with the significant deficiencies we identified when we reviewed suicide prevention and response practices at four prisons, raise questions regarding Corrections' leadership on this critical issue.

When we reviewed the California Institution for Women (CIW); California State Prison, Sacramento (SAC); Central California Women's Facility (CCWF); and Richard J. Donovan Correctional Facility (RJD), one area in which we identified significant weaknesses was the four prisons' evaluations of inmates' suicide risk. Specifically, for various reasons, including when inmates attempt suicide, express suicidal thoughts, or engage in self-harm, Corrections' policy requires that prison mental health staff (mental health staff) complete suicide risk evaluations (risk evaluations) to assess an inmate's risk for suicide. These risk evaluations are critical to successful suicide prevention because they help mental health staff identify inmates who are likely to attempt suicide and the treatments needed to prevent them from doing so. Nonetheless, over the past several years, court-appointed mental health experts have repeatedly notified Corrections of problems related to its risk evaluations. Further, when we examined risk evaluations for the 36 of 40 inmates we reviewed who required them, we found that the prisons failed to complete at least one required risk evaluation for 10 of the inmates and completed inadequate risk evaluations for 26 of the inmates. The inadequacies we noted included leaving sections of the risk evaluations blank, failing to appropriately justify the determinations of risk, failing to develop adequate plans for treatment to reduce the inmates' risk, and relying on inconsistent or incomplete information about the inmates to determine risk.

*Audit Highlights . . .*

*Our audit of Corrections' policies and practices for inmate suicide prevention and response highlight the following:*

» *The average suicide rate in Corrections' prisons was substantially higher than the average of U.S. state prisons.*

» *The rates of female inmates who committed suicide while in Corrections' prisons have soared in recent years.*

» *We found significant weaknesses in compliance with suicide prevention and response policies when we reviewed 40 files on inmates who committed or attempted suicide at four prisons.*

•  *Prisons failed to complete or completed inadequate risk evaluations for many of those inmates who required them.*

•  *Prisons did not complete or created inadequate treatment plans for some inmates—plans did not always specify medication dosage and frequency, treatment methods, provider information, or follow-up upon discharge.*

•  *Prisons did not properly monitor inmates who were at risk of committing suicide.*

» *Although Corrections has known about many of the issues related to suicide prevention and response policies and practices that we found for a number of years, it has not fully implemented processes to address the issues that have been raised.*

» *Corrections could take a more proactive leadership role in identifying programs or best practices and reviewing a prison's practices following an inmate's suicide attempt.*

In 2013 Corrections established a risk evaluation training, as well as a mentoring program to assess, every two years, whether mental health staff adequately completed risk evaluations and to provide training as needed. Corrections enhanced the mentoring program in 2016 by requiring prisons to audit mental health staff's risk evaluations twice each year and to have these staff undergo mentoring if they failed the audit; however, the results of our review demonstrate that this program has not resolved the problems. The failure may be due in part to Corrections allowing mental health staff to improperly complete significant sections of the risk evaluations and still pass Corrections' audit. According to Corrections' clinical support chief, Corrections does not expect perfection from its mental health staff. She also stated that despite their training, some mental health staff still do not know how to complete risk evaluations, and that others may rush when completing them because of their heavy workloads. Although Corrections has taken some steps to address these issues, the fact that the problems with the risk evaluations have continued shows that Corrections must increase its oversight.

Similarly, the prisons we reviewed failed to complete required treatment plans for some inmates and created inadequate treatment plans for others. Treatment plans are crucial to suicide prevention: based on the inmates' needs, they set goals for the inmates' treatment and determine the specific treatment methods mental health staff will use. State regulations and Corrections' policy require that prisons complete a plan for initial treatment (initial treatment plan) within 24 hours of an inmate's admission to a mental health crisis bed (crisis bed) and a more comprehensive plan within 72 hours of admission (72-hour treatment plan). Initial treatment plans are important because they prescribe treatment for the first few days of an inmate's crisis-bed stay. Nonetheless, when we reviewed the files of 26 inmates who required them, we found that CIW, CCWF, and RJD did not complete initial treatment plans for some inmates. Further, 25 inmates also required 72-hour treatment plans, but one prison did not complete such plans for two inmates. Finally, all 23 of the remaining 72-hour treatment plans we reviewed failed to meet the requirements outlined in state regulations. The most common problems we identified were that the plans did not specify medication dosage and frequency, treatment methods, the providers responsible for the treatments, or the follow-up treatments for the inmates who were discharged.

The four prisons also did not properly monitor inmates who were at risk of committing suicide. Corrections' policies require prisons to conduct staggered behavior checks at intervals not to exceed every 15 minutes of inmates who are at high risk of self-injury but not in immediate danger. However, when we reviewed records for 25 such inmates, we found that the prisons exceeded 15-minute

intervals for checks on 17 inmates, did not stagger checks for 19 inmates, and appeared to have prefilled or preprinted the forms documenting checks for eight inmates. Corrections said that a new electronic health record system that it is currently implementing systemwide will reduce some of these issues, as will a planned audit process that will include automated monitoring of these checks. Nevertheless, we still found problems with staff not staggering checks or conducting checks that exceeded intervals of 15 minutes at two prisons that implemented the new system, bringing into question whether it will fully resolve the problems we identified.

Taken as a whole, the types of compliance issues we identified at the four prisons we reviewed may have contributed to Corrections' continuing high suicide rates relative to those of prison systems in other states. In addition, a number of specific factors may have contributed to elevated suicide and suicide attempt rates among Corrections' female inmates. As we mention previously, the rate of suicide among female inmates has increased dramatically since 2014. This increase is especially pronounced at CIW, where six of the seven suicides by female inmates from 2014 through 2016 occurred. Officials at Corrections and CIW identified a number of reasons why the suicide rate at CIW may have increased during this period, including domestic violence in interpersonal relationships, drug involvement, and drug trafficking. Officials at CIW further cited a change in prison culture resulting from the conversion of Valley State Prison for Women to a men's institution and the subsequent transfer of high-security-level inmates to CIW.

In addition, we found that some staff members at CIW and the other prisons we visited had not completed required trainings related to suicide prevention and response. Corrections' policies require prison staff to participate in specific trainings on issues such as preventing suicide, assessing inmates' suicide risk, and developing treatment plans. However, when we reviewed records for 20 staff members at CIW, we found that the prison could not provide evidence that the staff members attended all required trainings. For example, the prison could not demonstrate that four of the 20 staff members attended annual required suicide prevention training in 2016. Further, Corrections' officials reported that not all staff members at the other three prisons received required trainings in 2016. Corrections' clinical support chief was unable to explain why these staff members had not participated in trainings as required. Instead, she stated that Corrections relies on the prisons' in-service training units to address clinical training noncompliance issues.

The ongoing nature of many of the problems we identified at the four prisons we reviewed is particularly troubling. A court-appointed special master has overseen many aspects of Corrections' provision

of mental health care since 1995. Since at least 1999, the special master has identified many of the same problems we found in our audit. In January 2015, the special master filed a report that was an audit of suicide prevention practices in each of the 35 prisons, which contained 32 recommendations. Corrections responded to the majority of these recommendations through the adoption of new policies, improvements to its facilities, changes to its trainings, and other actions. However, Corrections has not yet fully ensured prisons' compliance with changes resulting from the recommendations. According to Corrections, it began developing an audit process in 2013 to audit prisons' compliance with policies and procedures, but it has not yet completed that process nearly five years later, explaining that it continues to work on finalizing it with the special master. Absent such monitoring, Corrections lacks assurance that the prisons are addressing the serious problems the special master has identified.

Further, Corrections could take a more proactive leadership role in identifying programs and best practices that may help in preventing inmate suicide. For example, we identified best practices at one of the prisons we visited that we believe could benefit certain inmates at other prisons. Although Corrections recently conducted a suicide prevention summit with the chiefs of mental health and other prison leadership, at which it discussed best practices related to prisons' suicide prevention efforts, its documentation and dissemination of innovative programs and best practices related to suicide prevention has generally been limited. Similarly, Corrections has not conducted thorough reviews of the circumstances surrounding suicide attempts. Pursuant to its policies, the death of an inmate by suicide initiates an intensive review process in which Corrections identifies any problems with the prison's compliance with policies and procedures. It then issues a report containing recommendations to address those problems. However, Corrections requires no such review for suicide attempts. Corrections' clinical support chief explained that Corrections plans to implement a process for each prison to review a selection of its incidents of inmate self-harm; however, we question whether such reviews will be sufficiently impartial and critical. Without a thorough and unbiased review of the factors contributing to inmate suicide attempts, Corrections is hindered in its ability to identify potential problems with a prison's suicide prevention and response practices until after an inmate dies.

**Selected Recommendations**

*Legislature*

To provide additional accountability for Corrections' efforts to respond to and prevent inmate suicides and attempted suicides, the Legislature should require that Corrections report to it in April 2018 and annually thereafter on the following issues:

- Its progress toward meeting its goals related to the completion of suicide risk evaluations in a sufficient manner.

- Its progress toward meeting its goals related to the completion of 72-hour treatment plans in a sufficient manner.

- The status of its efforts to ensure that all staff receive training related to suicide prevention and response.

- Its progress in implementing the recommendations made by the special master regarding inmate suicides and attempts. Corrections should also include in its report to the Legislature the results of any audits it conducts as part of its planned audit process to measure the success of changes it implements as a result of these recommendations.

- Its progress in identifying and implementing mental health programs at the prisons that may ameliorate risk factors associated with suicide.

*Corrections*

Corrections should immediately require mental health staff to score 100 percent on risk evaluation audits in order to pass. If a staff member does not pass, Corrections should require the prison to follow its current policies by reviewing additional risk evaluations to determine whether the staff member needs to undergo additional mentoring.

To ensure that prison staff conduct required checks of inmates on suicide precaution in a timely manner, Corrections should implement its automated process to monitor these checks in its electronic health record system by October 2017.

To address the unique circumstances that may increase its female inmates' rates of suicide and suicide attempts, Corrections should continue to explore programs that could address the suicide risk factors for female inmates.

To ensure that all prison staff receive required training related to suicide prevention and response, Corrections should immediately implement a process for identifying prisons where staff are not attending required trainings and for working with the prisons to solve the issues preventing attendance.

To ensure that prisons comply with its policies related to suicide prevention and response, Corrections should continue to develop its audit process and implement it at all prisons by February 2018. The process should include, but not be limited to, audits of the quality of prisons' risk evaluations and treatment plans.

To ensure that all its prisons provide inmates with effective mental health care, Corrections should continue to take a role in coordinating and disseminating best practices related to mental health treatment by conducting a best practices summit at least annually. The summits should focus on all aspects of suicide prevention and response, including programs that seek to improve inmate mental health and treatment of and response to suicide attempts. Corrections should document and disseminate this information among the prisons, assist prisons in implementing the best practices through training and communication when needed, and monitor and report publicly on the successes and challenges of adopted practices.

In an effort to prevent future inmate suicide attempts, Corrections should implement its plan to review attempts with the same level of scrutiny that it uses during its suicide reviews. Corrections should require each prison to identify for review at least one suicide attempt per year that occurred at that prison. To ensure that the reviews include critical and unbiased feedback, Corrections should either conduct these reviews itself or require the prisons to review each other. These reviews should start in September 2017 and follow the same timelines as the suicide reviews, with the timeline beginning once the team identifies a suicide attempt for review.

### Agency Comments

Corrections stated it would address the specific recommendations in a corrective action plan within the timelines outlined in the report. We look forward to Corrections' 60-day response to our recommendations.

# Introduction

### Background

The California Department of Corrections and Rehabilitation (Corrections) is responsible for protecting the public by safely and securely supervising adult and juvenile offenders, providing effective rehabilitation and treatment, and integrating offenders successfully into the community. It operates two adult women's prisons and 33 adult men's prisons across the State.[1] According to a report Corrections issued in 2017, 123,540 male inmates and 5,876 female inmates were incarcerated within its facilities as of December 31, 2016. Figure 1 on the following page shows the locations of Corrections' prisons and highlights the four prisons we selected for review during the course of our audit work.

Corrections is responsible for the provision of mental health care to all of its inmates, including receiving, evaluating, housing, treating, and referring those inmates who are unable to appropriately function within the constraints of the usual correctional environment because of mental illnesses. Its Division of Health Care Services (health care division) provides mental health services through its Mental Health Services Delivery System (mental health system), the mission of which is "to provide inmates with an appropriate level of treatment and to promote individual functioning within the clinically least restrictive environment consistent with the safety and security needs of both [the inmates and prisons]." Corrections employs numerous individuals, such as psychiatrists, psychologists, social workers, and nurses, to provide mental health services to inmates (mental health staff). Prison staff may refer inmates to the prison's mental health program, or inmates may submit requests for services to the prison's mental health staff for their approval.

Despite the mental health services that Corrections provides, the rate at which its inmates commit suicide has generally been higher than the rates in most other states. Table 1 on page 9 shows the number of attempted suicides and suicides from 2012 through 2016 at the four prisons we reviewed, and Appendix A presents these data for all the State's prisons. According to a 2016 report by a mental health expert appointed by a U.S. district court, the average suicide rate in Corrections was 22 per 100,000 inmates from 2005 through 2013, significantly higher than the average rate of 15.66 per 100,000 inmates in U.S. state prisons during the same period. Although Corrections' 2014 inmate suicide rate of 16.97 per 100,000 inmates was lower than the 2014 rate of 20 per 100,000 inmates for all U.S. state prisons, Corrections' inmate suicide rates have been higher on average than those of U.S. state prisons since 1999.

---

[1]   Corrections houses women within other facilities, including some medical facilities and a small facility at Folsom State Prison. In addition, Valley State Prison housed women before Corrections converted it to a men's facility in 2013.

**Figure 1**

**Map of Adult Correctional Institutions and the Four Prisons We Visited**



Source: Corrections.

The suicide rate of Corrections' male inmates remained relatively static from 2012 through 2016; however, the suicide rate of its female inmates increased. In 2012 female inmates accounted for about 5 percent of Corrections' inmate population and for 4 percent of its suicides. However, although female inmates made up about 4 percent of Corrections' inmate population from 2014 through 2016, they accounted for about 11 percent of the suicides. Almost all of the suicides during this period occurred at the California Institution for Women (CIW). In fact, concern about CIW's high suicide rate was the impetus for this audit.

**Table 1**

**Suicides and Suicide Attempts at the Four Prisons We Visited, From 2012 Through 2016**

| | WOMEN'S PRISONS | | MEN'S PRISONS | |
|---|---|---|---|---|
| | CENTRAL CALIFORNIA WOMEN'S FACILITY (CCWF) | CIW | RICHARD J. DONOVAN CORRECTIONAL FACILITY (RJD) | CALIFORNIA STATE PRISON, SACRAMENTO (SAC) |
| **2012** | | | | |
| Population* | 2,931 | 1,442 | 3,539 | 2,698 |
| Suicides | 0 | 1 | 0 | 1 |
| Attempts | 5 | 13 | 28 | 22 |
| **2013** | | | | |
| Population* | 3,531 | 2,082 | 3,364 | 2,348 |
| Suicides† | 0 | 1 | 3 | 1 |
| Attempts | 8 | 15 | 33 | 52 |
| **2014** | | | | |
| Population* | 3,648 | | 3,670 | |
| Suicides | 0 | | 22 | |
| Attempts | 6 | | | |
| **2015** | | | | |
| Population* | 3,002 | 1,883 | 3,096 | 2,237 |
| Suicides† | 0 | 2 | 2 | 3 |
| Attempts | 11 | 34 | 51 | 12 |
| **2016** | | | | |
| Population* | 2,865 | 1,863 | 3,094 | 2,327 |
| Suicides† | 1 | 3 | 0 | 3 |
| Attempts | 25 | 24 | 59 | 8 |
| **Totals** | | | | |
| Population* | 3,195 | 1,895 | 3,233 | 2,345 |
| Suicides† | 1 | 8 | 6 | 10 |
| Attempts | 55 | 101 | 193 | 85 |

Sources: California State Auditor's analysis of Corrections' COMPSTAT metrics from 2012 through 2016, and the average daily population for each prison as reported by Corrections.

\* *Population* is based on Corrections' average daily population. The total represents the average of the five years' populations.

† The numbers we present here reflect our amendments to Corrections' COMPSTAT data. As we discuss in Chapter 3, our review of various records from individual prisons revealed that COMPSTAT has consistently underreported the number of suicides in California prisons. We have therefore adjusted the number of suicides in 2013, 2015, and 2016 to include three suicides that we identified at CIW, RJD, and SAC; however, we caution that these numbers may still not be accurate.

### Court-Ordered Oversight of Corrections' Mental Health Services

As Figure 2 shows, federal courts have monitored Corrections' delivery of mental health services to its inmates for over two decades, as a result of a decision on a lawsuit that began in 1990—*Coleman v. Brown (Coleman)*.[2] This federal class action lawsuit alleged that Corrections failed to provide constitutionally adequate mental health care to mentally ill inmates. The court identified that Corrections had failed to provide timely access to necessary care, which exacerbated inmates' suffering and illnesses. In addition the court found that Corrections had an inadequate screening system for mental illnesses, deficient medical recordkeeping, improper administration of medication, and insufficient staffing. In December 1995, the court in *Coleman* appointed a special master to oversee and work with Corrections to address the constitutional violations, monitor implementation of court-ordered remedial plans, and submit reports on Corrections' progress in implementing improvements. Over the next decade, the special master submitted 15 reports to the court, which noted that although Corrections had made some progress, it still had not met its constitutional obligation to provide inmates with adequate mental health care during that time. Further, the special master's fifteenth report in January 2006 indicated a reversal in Corrections' progress. Specifically, this report noted systemwide increases in staffing vacancy rates and rates of inmate suicide.

In April 2001, another class action lawsuit, *Plata v. Brown (Plata)*, alleged constitutional violations in Corrections' delivery of medical care to inmates that resulted in unnecessary pain, injury, and death.[3] These violations included delays in or failure to provide access to medical care, untimely responses to medical emergencies, and the interference of custodial staff with the provision of medical care. After the plaintiffs filed the lawsuit, they and Corrections agreed that Corrections would implement certain policies and procedures to improve its delivery of medical care, which the court entered as an order in 2002. However, in 2005 the federal court determined that Corrections had yet to ensure that its medical system met constitutional standards. As a result, the court appointed a receiver in February 2006 to provide leadership and executive management of Corrections' medical health care delivery system. This receivership is still in place.

---

[2] When this case was filed, it was called *Coleman v. Wilson*.

[3] When this case was filed, it was called *Plata v. Davis*.

**Suicide Prevention and Response**

As we mention earlier, the goal of Corrections' mental health system is to provide appropriate levels of mental health treatment to seriously mentally ill inmates in the least restrictive environment. As presented in Figure 3, Corrections provides escalating levels of mental health care to inmates, up to and including referrals to Department of State Hospitals' facilities if Corrections cannot meet inmates' mental health needs.

**Figure 3**
**Levels of Care in Corrections' Mental Health System**



**Inpatient Care**

Provides care at Department of State Hospitals' facilities for inmates whose conditions cannot be successfully treated in the outpatient setting or in short-term mental health crisis-bed (crisis bed) stays. Corrections provides this level of care for female inmates in the Psychiatric Inpatient Program at CIW.

**Crisis Beds**

Provides care to inmates with marked impairment and dysfunction requiring 24-hour nursing care, inmates who present a danger to others as a consequence of serious mental disorders, and inmates who present a danger to themselves for any reason.

**Enhanced Outpatient Program**

Provides care to inmates with mental disorders who would benefit from the structure of a therapeutic environment that is less restrictive than an inpatient setting and who do not require continuous nursing care. The program is located in a designated living unit at each prison.

**Correctional Clinical Case Management System**

Provides care to inmates whose conditions are relatively stable and whose symptoms are controlled or are in partial remission as a result of treatment.

Sources: Corrections' 2009 *Mental Health Program Guide* (program guide) and *2014 Annual Accomplishments* report.
Note: Not all institutions contain all levels of care.

---

**Terms Related to Inmate Suicide**

**Suicidal ideation:** Thoughts of suicide or death. Such thoughts may be either specific or vague and may include the desire to be dead.

**Suicidal intent:** The intention to deliberately end one's life.

**Self-harm without intent:** An act of purposeful self-harm without suicidal intent.

**Suicide attempt:** An act of purposeful self-harm with the intent to die.

**Suicide:** An act of purposeful self-harm that causes or leads to one's own death.

Sources: Corrections' 2009 program guide and suicide risk evaluation training documents.

---

A primary component of Corrections' mental health system is crisis intervention, which is treatment for rapid-onset or worsening symptoms of mental illness in inmates. Such symptoms may include thoughts of suicide. Corrections has identified factors that can lead inmates to experience mental health crises while in prison, including the loss of an existing support system outside of prison, the restrictions of incarceration, and fears of being unable to cope with the outside world upon release. Corrections' policy states that staff must refer inmates who are dangers to themselves to crisis beds, an inpatient treatment setting for inmates who have acute symptoms of serious mental disorders or are suffering from significant or life-threatening disabilities. If no crisis beds are available at a prison, staff must place an inmate in a temporary housing location in the prison—known as *alternative housing*—pending admission to a crisis bed. Under these circumstances, policy requires prisons to transfer an inmate to a crisis bed at another prison if the other prison can provide the same level of custody and security.

Corrections' policies outline specific steps prison staff must take when they become aware of inmates' suicidal ideation, suicidal intent, or self-harm, which the text box defines. If prison staff become aware of any of these conditions, Corrections' policy requires that they place inmates under observation until mental health staff can conduct a suicide risk evaluation (risk evaluation). As we discuss in Chapter 1, mental health staff use these evaluations to determine inmates' risk of suicide and to make specific recommendations regarding the level of care required.

Corrections also has a policy that prison staff must follow when staff discover inmates who are attempting suicide. When responding to a suicide attempt in progress, Corrections' policy requires prison staff to sound an alarm to summon additional personnel, respond appropriately when blood is present, neutralize any significant security threats to themselves or others, and initiate life-saving measures consistent with training. When medical personnel arrive, they take over responsibility for the medical treatment and life-saving measures.

Following the admission of inmates to crisis beds as a result of suicide attempts, ideation, or self-harm, prison staff must complete various steps in order to provide treatment. Figure 4 provides a summary of these steps. For example, while inmates are in crisis beds, prison staff must keep them under observation. Depending on whether inmates are in immediate danger, staff must either

**Figure 2**
**Timeline of Court-Ordered Oversight of Corrections**



**April 1990**
*Coleman*, a class action lawsuit, is filed, alleging constitutional
violations due to lack of adequate mental health care.

**1990**

**1995**

**December 1995**
Court ordered a special master to develop a plan to
address constitutional violations and monitor
Corrections' implementation of the plan.

**September 1995**
Court rules in favor of plaintiff, stating Corrections'
delivery of mental health care violated the Constitution.

**2001**

**April 2001**
*Plata*, a class action lawsuit, is filed, alleging constitutional
violations in Corrections' delivery of medical care to its inmates.

**January 2006**
Special master files reports, noting a reversal in
Corrections' progress of its remedial efforts.

**2006**

**February 2006**
Court appoints receiver to provide leadership and
executive management of Corrections' medical
health care delivery system.

**August 2009**
Court finds that Corrections' prison population reached
a high of more than 170,000 inmates in October 2006.
Court orders Corrections to reduce its prison
population to 137.5 percent of capacity.

**2009**

**2013**

**November 2013**
Suicide expert begins his audit on Corrections' prisons.

**January 2015**
Suicide expert files his completed audit on suicide
prevention practices at Corrections' prisons,
which results in 32 recommendations.

**2015**

**2016**

**January 2016**
Suicide expert completes a follow-up audit on prisons'
implementation of the recommendations.

**August 2016**
The Joint Legislative Audit Committee approves a
request for the State Auditor to conduct an audit
of Corrections' suicide prevention policies due to
concerns related to the number of suicides at CIW.

SPECIAL MASTER OVERSEES CORRECTIONS' MENTAL HEALTH CARE DELIVERY (*Coleman*)

FEDERAL RECEIVERSHIP OVERSEES CORRECTIONS'
MEDICAL CARE DELIVERY (*Plata*)

Sources: Reports from the special master's suicide expert in 2015 and 2016, court documents, and minutes of the California State Legislature's Joint
Legislative Audit Committee.

In 2007 the courts in *Coleman* and *Plata* recommended that both cases be assigned to a three-judge panel to address prison overcrowding. In August 2009, the three-judge panel noted that in 2006—the same year that the *Coleman* special master's report noted a reversal in Corrections' delivery of mental health services and the court in *Plata* appointed the receiver—California's prison population reached a historic high of more than 170,000 inmates. This historic high led to unprecedented overcrowding of California's prisons. The three-judge panel found overcrowding to be the primary cause of many of the issues relating to inadequate mental health and medical care in California's prisons. Therefore, the three-judge panel ordered Corrections to develop a plan to reduce its prison population, which at that time was at about 190 percent of capacity, to 137.5 percent of capacity. In 2011 the Legislature passed various laws that realigned the criminal justice system, which reduced overcrowding by allowing for inmates who were not convicted of serious or violent crimes, or felonies requiring registration as a sex offender, to serve their sentences in county jails instead of state prisons.

Although these efforts resulted in the reduction of Corrections' inmate population, a March 2013 *Coleman* special master's report identified continuing inadequacies in Corrections' delivery of mental health services. The special master had repeatedly identified many of these inadequacies in earlier reports, such as Corrections' failure to enforce its own policies regarding the delivery of mental health services and the prisons' failure to provide adequate emergency responses to suicides. In response to the report, the court in *Coleman* ordered Corrections to establish a suicide prevention and management workgroup consisting of members of Corrections' clinical, custody, and administrative staff; experts appointed by the special master; and others. The workgroup engaged a nationally recognized suicide prevention expert (suicide expert) to conduct a review of the suicide prevention practices at each of Corrections' prisons. In January 2015, the suicide expert filed his report, which contained 32 recommendations to Corrections. The suicide expert issued an update to this report in January 2016, in which he evaluated Corrections' progress in implementing the recommendations through a review of 18 prisons. We discuss the suicide expert's report and update in Chapter 3.

maintain continuous visual contact with them or perform checks at staggered intervals not exceeding once every 15 minutes. Further, while inmates are in crisis beds, prison staff must complete treatment plans. According to Corrections' policies, crisis-bed stays are supposed to last for up to 10 days, although inmates may stay longer with the approval of a prison's chief of mental health.

**Figure 4**
**Corrections' Process for Inmates' Admission to and Discharge From Crisis Beds**



Sources: Corrections' 2009 program guide and related policy memos.

Corrections has taken certain actions to ensure that the prisons comply with its policies and to identify additional ways to prevent inmate deaths due to suicide. For example, Corrections has established its own Suicide Prevention and Response Focused Improvement Team (suicide prevention team) and established suicide prevention teams at each prison. The purpose of these teams is to provide staff with training and guidance with regard to suicide prevention, response, reporting, and review. The suicide prevention teams at each prison are also responsible for monitoring and tracking all self-harm incidents, suicide attempts, and deaths, as well as reviewing the prison's policies to ensure consistency with Corrections' policies. According to Corrections' policies, these teams must be composed of certain prison staff representing multiple disciplines, such as the chief psychologist and chief psychiatrist, and must meet once per month.

In addition, following each suicide, Corrections completes a review of the prison's compliance with policies and procedures, including examining the history of the inmate's mental health care while incarcerated and the prison's emergency response to the suicide. It describes the results of its review in a report (suicide report) that it provides to the prison. When warranted, Corrections makes recommendations to the prison to improve the quality of care and ensure compliance with its policies and procedures.

# Chapter 1

## PRISONS HAVE NOT FOLLOWED CORRECTIONS' POLICIES WHEN RESPONDING TO INMATES WHO HAVE ATTEMPTED OR ARE AT RISK OF ATTEMPTING SUICIDE

The four prisons we reviewed failed to consistently follow Corrections' policies for responding to, treating, and observing inmates who had attempted or were at risk of attempting suicide. For example, we found many instances in which prisons either did not perform or did not adequately complete required risk evaluations, even though mental health staff use these critical documents to determine the treatment inmates should receive. In addition, we identified numerous instances in which prisons did not include necessary information in inmates' treatment plans, potentially affecting the nature and timeliness of the care the inmates received. In fact, Corrections' reviews of inmate suicides and its own audits of the quality of both risk evaluations and treatment plans have found that prisons did not complete these documents to its required standards. Further, the four prisons may have placed inmates at risk of death by insufficiently monitoring them following suicide attempts, and some prisons failed to respond to suicide attempts in accordance with Corrections' policies.

### The Prisons We Reviewed Did Not Properly Evaluate Some Inmates' Suicide Risk

Risk evaluations are critical to successful suicide prevention because they help prisons identify inmates who are likely to attempt suicide and determine the treatments needed to prevent them from doing so. The proper completion of a risk evaluation can therefore be the difference between life or death for an inmate. Corrections' policies require that mental health staff complete risk evaluations under a number of circumstances, including when inmates have initial face-to-face evaluations for suicidal thoughts, threats, attempts, or self-harm, as well as before their discharge from crisis beds. When completing risk evaluations, mental health staff are to examine inmates' mental status and determine the presence or absence of chronic and acute risk factors for suicide. The text box includes examples of such risk factors. They must also review any protective factors that may mitigate inmates' risk of suicide, such as religious beliefs, family support, and participation

---

**Examples of Inmate Suicide Risk Factors**

**Chronic risk factors**

- History of suicide attempts
- History of emotional, physical, or sexual abuse
- Chronic pain problem
- Long or life sentence
- History of depressive or psychotic disorders
- History of certain mental illnesses
- History of substance abuse

**Acute risk factors**

- Suicidal thoughts
- Recent trauma
- Recent bad news
- Agitation or anger
- Hopelessness or helplessness
- Increasing interpersonal isolation
- Single cell placement

Sources: Corrections' 2009 program guide and suicide risk evaluation form.

in group activities. Finally, mental health staff must document whether inmates are at high, moderate, or low risk for suicide and make specific recommendations regarding the appropriate level of care. Mental health staff must also address how the treatment plan will be implemented and any required follow-up procedures.

*Despite the critical role risk evaluations serve, all four prisons we reviewed failed to complete at least one required risk evaluation.*

Despite the critical role risk evaluations serve, all four prisons we reviewed failed to complete at least one required risk evaluation. Specifically, for a selection of 40 inmates who attempted or committed suicide from 2014 through 2016, we reviewed the risk evaluations the prisons conducted just before or immediately following the suicide attempt or suicide, and the suicide reports Corrections completed following the suicides. We identified that the prisons should have completed risk evaluations for 36 of these 40 inmates. However, as Table 2 shows, 10 of the 36 inmates were missing at least one required risk evaluation. Although the four prisons offered a number of reasons for the missing risk evaluations, they generally agreed that they had failed to comply with Corrections' policies. For example, the chief of mental health of CCWF stated that risk evaluations are not always necessary for inmates discharged to a higher level of care because the receiving institutions will complete them on admission. However, she acknowledged that Corrections' policies require prisons to complete risk evaluations under these circumstances, and Corrections' clinical support chief affirmed that conducting risk evaluations on discharge to a higher level of care is helpful for continuity of care.

In addition to failing to complete certain risk evaluations, the four prisons completed inadequate risk evaluations for 26 of the 36 inmates we reviewed. Each of these 26 inmates received at least one inadequate risk evaluation, and 13 received more than one. The types of problems we identified varied. For example, mental health staff left blank sections of the risk evaluations for 10 inmates, including sections detailing their consideration of some risk factors and identifying whether the inmates had a desire or plan to die. These blank spaces suggest that the mental health staff may not have considered all relevant information when determining the likelihood of the inmates attempting suicide, which could have caused them to underestimate the inmates' suicide risk level.

Further, for 18 of the 36 inmates, mental health staff did not adequately justify their determinations of the inmates' suicide risk levels. Specifically, either they did not incorporate risk factors when justifying their determinations or they simply listed inmates' risk factors without considering their behaviors or symptoms. In some cases, mental health staff noted the presence of several risk factors and warning signs of imminent suicide risk, yet they still concluded that inmates were at low acute risk, which refers to short-term

fluctuations in inmates' risk of attempting suicide, without adequately documenting the rationale for their determinations. For example, one mental health staff member at SAC indicated that an inmate was at low acute risk for suicide, despite noting that he demonstrated five of the 10 warning signs of imminent suicide risk. The mental health staff member did not include any of these warning signs in the justification of risk, but rather noted that the inmate denied a desire to commit suicide. However, the mental health staff member also indicated that the inmate stated that talking about his suicidal ideation was difficult because he had no intention of ever going to a crisis bed. The inadequate justification for this inmate's risk determination suggests that the mental health staff member may not have considered all risk factors and therefore may have incorrectly estimated the inmate's risk of suicide—a problem that we found repeatedly in the risk evaluations we reviewed.

**Table 2**

**The Four Prisons We Reviewed Completed Inadequate Risk Evaluations**

| PRISON | NUMBER OF INMATES REVIEWED WHO REQUIRED ONE OR MORE RISK EVALUATIONS | NUMBER OF INMATES MISSING AT LEAST ONE REQUIRED RISK EVALUATION | NUMBER OF INMATES WITH ONE OR MORE INADEQUATE RISK EVALUATIONS |
|---|---|---|---|
| CCWF | 9 | 7 | 7 |
| CIW | 8 | 1 | 4 |
| RJD | 9 | 1 | 6 |
| SAC | 10 | 1 | 9 |
| **Totals** | **36** | **10** | **26** |

| PRISON | SPECIFIC PROBLEMS WITH THE RISK EVALUATIONS* (BY NUMBER OF INMATES) | | | |
|---|---|---|---|---|
| | SECTIONS IN RISK EVALUATION WERE BLANK | JUSTIFICATION OF RISK DETERMINATION WAS INCOMPLETE[†] | TREATMENT PLAN TO REDUCE RISK WAS MISSING OR INCOMPLETE[†] | STAFF USED INCONSISTENT OR INCOMPLETE INFORMATION ABOUT THE INMATE TO DETERMINE SUICIDE RISK |
| CCWF | 5 | 5 | 5 | 2 |
| CIW | 2 | 2 | 2 | 1 |
| RJD | 0 | 4 | 5 | 3 |
| SAC | 3 | 7 | 6 | 4 |
| **Totals** | **10** | **18** | **18** | **10** |

Sources: California State Auditor's review and analysis of health records for 10 inmates at each of the four prisons, Corrections' 2009 program guide, and other Corrections' policies.

\* We present the number of inmates who had risk evaluations with the problem listed. Some inmates had multiple inadequate risk evaluations, and some had risk evaluations that had more than one of the problems listed.

[†] We determined whether the justifications and risk reduction plans in the risk evaluations were complete based on whether they contained all required elements named in Corrections' suicide risk evaluation audits and mentoring documents.

The four prisons also failed to develop adequate plans for treatment within the risk evaluations for half of the inmates we reviewed. When completing risk evaluations, mental health staff must document treatments targeting modifiable risk factors, such as feelings of agitation, anger, or hopelessness. These treatments should be as specific as possible, leaving little room for misinterpretation or confusion. However, mental health staff failed to document such specific treatments in the risk evaluations for 18 of the 36 inmates we reviewed. For example, CIW's risk evaluation for an inmate that had just attempted suicide indicated that she demonstrated seven acute risk factors, including depression and agitation or anger. However, the mental health staff member did not prescribe treatment, noting only that the inmate should be observed and should continue her current medication. Prisons are not likely to be able to prevent inmates from attempting suicide without addressing the factors that increase their risk of doing so.

*Prisons are not likely to be able to prevent inmates from attempting suicide without addressing the factors that increase their risk of doing so.*

Further, for 10 of the inmates we reviewed, mental health staff completed risk evaluations based on inconsistent or incomplete information. For example, according to the suicide report Corrections completed following one inmate's suicide at SAC, mental health staff had completed for the inmate three different risk evaluations, which stated that he had certain protective factors in place to reduce his risk of suicide, including family support and good coping skills. However, a review of other documents in the inmate's file showed that he did not have these protective factors. Corrections stated in the suicide report that similarities among the three risk evaluations suggest that mental health staff copied the risk and protective factors from previous evaluations, resulting in an inaccurate picture of the inmate's mental health. Similarly, another one of Corrections' suicide reports stated that the final risk evaluation CIW completed before an inmate's suicide failed to note that she had a history of suicide attempts—a critical determinant of future suicide risk. According to the suicide report, the mental health staff member appeared to accept the inmate's denial of any prior suicide attempts and did not review the suicide attempt history documented in a previous risk evaluation.

Corrections offered some reasons for the prisons' failure to complete adequate risk evaluations. Specifically, its clinical support chief explained that mental health staff have heavy caseloads, which the four prisons we reviewed generally also indicated is a contributing factor. The clinical support chief stated that if prison management has not set clear expectations that suicide risk evaluations should be prioritized, mental health staff may rush to complete risk evaluations. She said prison management should help mental health staff by redirecting their workloads to allow

them to devote the necessary attention to complete adequate risk evaluations. She also stated that, despite existing training, mental health staff are still unsure of how to complete risk evaluations.

Despite its ability to point to reasons for deficiencies in risk evaluations, our review demonstrates that Corrections has not adequately addressed those factors, jeopardizing its ability to prevent inmate suicide attempts. In fact, for years mental health experts on suicide have called on Corrections to address many of the same problems we identified in our review. For example, a 2013 special master's report stated that for half of the suicide cases in 2011, prisons either did not complete risk evaluations or concluded that inmates had a low or "no appreciable" risk of suicide without adequate consideration of risk factors, past history, or medical records. Clinical experts that the special master engaged noted similar problems with risk evaluations each year through 2014, when they concluded that the prisons had either failed to conduct or had inadequately completed risk evaluations in almost 70 percent of the suicide cases that occurred that year. Further, beginning in November 2013 and continuing through July 2014, the suicide expert reviewed each prison's suicide prevention practices and found that mental health staff often did not complete required risk evaluations and that the quality of risk evaluations was frequently problematic. Specifically, the suicide expert's review of hundreds of risk evaluations found that many contained risk factors and protective factors that did not align with the mental health staff's assessments of the inmates' risk levels.

*For years mental health experts on suicide have called on Corrections to address many of the same problems we identified in our review.*

Although Corrections has taken actions in response to these findings, those actions have not resulted in significant change. For example, in 2013 Corrections issued policies requiring mental health staff to attend a seven-hour training and, every two years, undergo a mentoring program that focuses on administering risk evaluations. The mentoring program involves trained mentors observing mental health staff conducting one or more risk evaluations, assessing their skills, and when needed, providing training on the proper techniques for completing risk evaluations. However, as the reports cited demonstrate, neither the training nor the mentoring program ensured that mental health staff adequately completed risk evaluations. The suicide expert noted that mental health staff were required to complete only two risk evaluations under the supervision of a mentor and that they received no additional critiques until they had to undergo the mentoring program two years later. Based on his recommendations, Corrections modified its policy in early 2016 to, among other things, require that prisons audit risk evaluations for each mental health staff member twice each year, and to require that those who failed the audit repeat the mentoring program.

Although we agree that this change was necessary to improve oversight of risk evaluations, room for further improvement in both the policy and its implementation remains. Specifically, Corrections' risk evaluation audits permit a degree of failure. Figure 5 shows the process prisons use when completing the audits to determine whether mental health staff members need additional mentoring. During the audit, program supervisors review seven items—which Table 3 lists—that must be in a risk evaluation. Corrections' policy requires that mental health staff correctly complete six of the seven items to pass the audit.

**Figure 5**
**Corrections' Process for Determining Whether Mental Health Staff Require Additional Mentoring on Completing Risk Evaluations**



Twice each year the prison audits one randomly selected suicide risk evaluation for every staff member who completes risk evaluations. The audit reviews seven items, and the staff member must adequately complete at least six to pass.

✓ PASS — FAIL ✗

The prison audits a second suicide risk evaluation.

✓ PASS — FAIL ✗

The prison audits a third suicide risk evaluation.

✓ PASS — FAIL ✗

No further action is taken until the next audit cycle. — The prison refers the staff member to repeat the mentoring program.

Sources: Corrections' health care division's March 15, 2016, memorandum revising its risk evaluation mentoring program and Corrections' instructions for completing the risk evaluation audit.

However, as a result, a mental health staff member could fail to complete an important section in a risk evaluation, such as detailing the inmate's history of suicide attempts or describing the risk reduction plan, and still pass. Corrections' clinical support chief said that Corrections does not require that mental health staff obtain 100 percent because it does not expect perfection and because if too many failed the audit, it would not have enough mentors to complete the necessary mentoring. She also identified all but one item in the audit—the identification of sources of information— as critical. Nevertheless, listing the sources of information is important to ensure that mental health staff are considering all critical sources of information when evaluating an inmate's risk factors. In response to our concerns, Corrections' clinical support chief explained that Corrections could make passing certain items within the audit mandatory. However, because of the importance of each section of the risk evaluation, we believe requiring mental health staff to adequately complete all sections is essential for reducing the risk of inmate suicide.

**Table 3**

**Items of a Risk Evaluation and Corrections' Corresponding Audit Criteria**



Sources: Corrections' risk evaluation form and its risk evaluation audit criteria.

Corrections has similarly set the bar too low for the percentage of prisons' risk evaluations that must pass the risk evaluation audit—90 percent—yet it has still struggled to meet its own standards. According to Corrections' mental health administrator for quality management and inpatient facilities (quality administrator), the prisons report to Corrections the percentage of mental health staff members who passed the risk evaluation audit each month. A June 2017 Corrections report shows that from December 1, 2016, through May 31, 2017, prisons reported that 71 percent of risk evaluations systemwide met the audit criteria. Although this is a marked improvement from the prisons' performance in 2014 and 2015—Corrections' reports show that only 38 percent of the risk evaluations audited passed during that two-year period—it is still far below Corrections' established goal of 90 percent. However, even if Corrections achieved its goal, mental health staff would still have adequately completed only nine out of 10 risk evaluations. We believe that this is an unacceptable level of failure, given the potential consequences of deficient risk evaluations.

*Although prisons reported that 71 percent of risk evaluations systemwide met the audit criteria from December 1, 2016, through May 31, 2017, it is still far below Corrections' established goal of 90 percent.*

Corrections also sets its completion standards too low for the percentage of risk evaluations that each prison should complete on time. According to the quality administrator, Corrections uses an automated process to track the percentage of risk evaluations that each prison completes on time and requires prisons that score lower than 85 percent to develop an action plan for improvement. According to Corrections' reports, from December 1, 2016, through May 31, 2017, the prisons collectively achieved a score of 92 percent for being on time. The quality administrator said that it set the goal at 85 percent because that is a standard goal for health care processes. However, given that the timely completion of risk evaluations is critical to ensuring that inmates receive prompt and necessary treatment to reduce their risk of suicide, we believe Corrections should find it unacceptable for more than one in 10 inmates to not receive a risk evaluation on time.

Corrections could improve the quality of its risk evaluations by updating its electronic risk evaluation form. In our review of risk evaluations at RJD, we found that the prison had included prompts to aid the mental health staff member in completing the form. For example, in the section for documenting the treatment to reduce the inmate's risk, the prison included text instructing mental health staff to document treatment interventions for those risk factors that can be treated, which are referred to as *modifiable risk factors*. We found that this risk evaluation met all of the requirements of the risk evaluation audit. Although this was the only risk evaluation that we reviewed at RJD that contained these prompts, according to RJD's chief psychologist, the prison began including these prompts in early 2016 and she believed that they had contributed to an improvement in risk evaluations. Consistent with the chief's

statement, Corrections' risk evaluation audit reports showed that the percentage of RJD's risk evaluations that passed the audit increased from 77 percent in January 2016 to 100 percent in March 2017. Corrections' clinical support chief agreed that such prompts would be beneficial, and that Corrections could incorporate them into the risk evaluation forms in its electronic health record system.

## Prison Staff Failed to Establish Treatment Plans for Some Inmates, and the Plans They Established for Others Were Inadequate

According to the suicide expert, treatment planning is a critical element of any correctional system's suicide prevention program. A treatment plan is based on a comprehensive assessment of an inmate's physical, mental, emotional, and social needs and must include the goals of treatment and identify the treatment methods prison staff will use. State regulations and Corrections' policies require that the admitting staff develop a provisional diagnosis and a plan for initial treatment (initial treatment plan) within 24 hours of an inmate's admission to a crisis bed. In addition, state regulations and Corrections' policies require that an inmate's treatment team—which must include, at a minimum, a crisis-bed psychiatrist, a crisis-bed clinician, nursing staff, a correctional counselor, and the inmate if appropriate—complete a treatment plan within 72 hours of the inmate's admission to a crisis bed (72-hour treatment plan). The text box describes selected information state regulations require in a 72-hour treatment plan.

> **Selected Requirements for a 72-Hour Treatment Plan**
>
> · All mental health diagnoses.
>
> · Prescribed medication, dosage, and frequency of administration.
>
> · Treatment goals with interventions, actions toward improvement, and measurable objectives.
>
> · Treatment methods to be used, including the frequency of the methods and the persons or disciplines responsible for each method.
>
> · Goals for aftercare and a plan for post-discharge follow-up.
>
> Source: California Code of Regulations, Title 22, Section 79747.

Despite the importance of treatment plans, three of the four prisons we reviewed did not always comply with state regulations and Corrections' policy that require prison staff admitting inmates to crisis beds to develop an initial treatment plan within 24 hours. Corrections' policies state that this initial treatment plan should contain a provisional diagnosis and an initial plan for treatment. Although this is Corrections' only written requirement regarding initial treatment plans, its clinical support chief explained that she would expect an initial treatment plan to contain an admitting diagnosis, reason for admission, a description of symptoms, and immediate interventions to address those symptoms and target the reason for admission. However, mental health staff did not complete such plans for four of the 26 inmates who should have had them at the four prisons we reviewed. Because Corrections' policies state that inmates must be discharged from crisis beds within 10 days, unless otherwise approved for a longer stay, inmates

without initial treatment plans may not have a treatment plan for up to 30 percent of their stays in crisis beds—until the 72-hour treatment plan is complete.

In addition, one of the prisons we reviewed failed to comply with state regulations and Corrections' policies for completing 72-hour treatment plans. As Table 4 shows, we reviewed 25 files for inmates who attempted or committed suicide from 2014 through 2016 who should have had 72-hour treatment plans following their admission to crisis beds at the four prisons. We found that mental health staff completed 23 of these 72-hour treatment plans. However, CCWF's mental health staff did not complete a 72-hour treatment plan for two inmates, but rather completed a separate supplemental section, which does not serve as the 72-hour treatment plan. CCWF's chief of mental health acknowledged that when she assumed her position in mid-2015, mental health staff were not completing all sections of the 72-hour treatment plans. She could not provide an explanation for this deficiency because she was not familiar with the guidance mental health staff had received at that time; however, she stated that after she noticed the practice, she reminded mental health staff that they needed to complete all sections of the 72-hour treatment plans.

**Table 4**
**Problems With 72-Hour Treatment Plans at the Four Prisons We Reviewed**

| | PRISON | | | | |
|---|---|---|---|---|---|
| | CCWF | CIW* | RJD | SAC | TOTAL |
| **Number of inmates who...** | | | | | |
| ...should have had a 72-hour treatment plan | 9 | 7 | 5 | 4 | 25 |
| ...did not receive a 72-hour treatment plan | 2 | | 0 | 0 | 2 |
| ...received a 72-hour treatment plan | 7 | | 5 | 4 | 23 |
| **Missing or incomplete items on the treatment plans reviewed** | | | | | |
| Mental health diagnoses | 0 | | | | 0 |
| Medication dosage and frequency | 1 | | | | 12 |
| Treatment goals with interventions and measurable objectives | 1 | | | | 3 |
| Treatment methods, including frequency and persons responsible for each method | 7 | | | | 20 |
| Post-discharge follow-up plan | 5 | | | | 17 |

Sources: California State Auditor's analysis of mental health records for selected inmates at each of the four prisons reviewed, Corrections' 2009 program guide, and California Code of Regulations Title 22, Section 79747.

\* Staff at CIW completed one treatment plan more than 72 hours after the inmate was admitted to a crisis bed.

Moreover, none of the 23 completed 72-hour treatment plans we reviewed were adequate based on the elements state regulations require. For example, many of the 72-hour treatment plans were missing either the treatment methods, the frequency at which the treatment methods should be completed, or who was responsible for administering the methods. Without this information, inmates may not receive necessary treatment from the correct providers at appropriate intervals. In addition, many of the 72-hour treatment plans we reviewed had missing or incomplete discharge follow-up plans. It is vital that the treatment teams begin planning for inmates' care following discharge from crisis beds as soon as possible because Corrections' policies state that crisis-bed stays should be 10 days or fewer, although crisis-bed stays may surpass 10 days with the approval of the prison's chief of mental health or a designee.

Further, some 72-hour treatment plans we reviewed had multiple deficiencies. For example, one 72-hour treatment plan at SAC—for an inmate admitted to a crisis bed after a suicide attempt in 2016— lacked specific treatment interventions, the frequency of treatment, and a discharge plan. Additionally, the prison's mental health staff left several other sections of this plan blank, such as a statement of the inmate's mental condition and descriptions of the long-term goals of the inmate and of the inmate's participation in the treatment planning process. When we inquired, prison officials at SAC stated that this treatment plan was not acceptable and that management would address the deficiencies with the mental health staff member.

Corrections has been aware for years that its 72-hour treatment plans were inadequate, because multiple experts have reached this conclusion. For instance, a 1999 special master's monitoring report found that several treatment team meetings failed to develop realistic and meaningful 72-hour treatment plans at one prison. The same report noted that another prison did not hold any treatment team meetings in the crisis-bed unit. Further, a special master's review of inmate suicides that occurred in the second half of 2012 determined that the prisons had provided inadequate 72-hour treatment plans for about 33 percent of the inmates who committed suicide, while a similar special master's review of inmate suicides that occurred in 2014 found that this number had risen to over 65 percent. Finally, the suicide expert found continued problems with the adequacy of treatment planning for patients identified as suicidal at all 18 prisons that he reviewed in his 2016 report on suicide prevention practices.

*Corrections has been aware for years that its 72-hour treatment plans were inadequate, because multiple experts have reached this conclusion.*

To address concerns related to treatment planning, Corrections stated that it implemented an internal audit of the quality of the 72-hour treatment plans beginning in September 2013. Every quarter, each prison must audit a random sample of 15 of its 72-hour treatment plans per institutional program, which includes

crisis beds. In these audits, the reviewers are instructed to examine 15 crucial aspects of the 72-hour treatment plans, including whether the interventions are measurable and specify frequency and duration, as well as whether the goals for the inmates are correlated to problems and interventions. According to Corrections' quality administrator, a plan must meet 13 of the 15 criteria in order for a treatment plan to pass the internal audit. She also stated that if the audits identify a systemic problem in a program or prison, the prison must work with Corrections' staff to create a corrective action plan that the prison must then submit to Corrections.

These audits found varying levels of treatment plan quality from 2014 through 2016 at the four prisons we reviewed. According to Corrections' reports, its overall monthly rate of 72-hour treatment plans that met the audit criteria from 2014 through 2015 fluctuated between 0 percent and 67 percent, with no treatment plans meeting the audit criteria for 14 of these 24 months. According to the quality administrator, none of the audited plans met the criteria during these months because the audits were new and the standards were fairly high. In the second half of 2016, the overall monthly rate of treatment plans that met audit criteria fluctuated from 55 percent to 68 percent. However, in at least one month, all four prisons we reviewed had lower percentages of treatment plans that met the audit criteria than Corrections' overall rate. In fact, in July 2016, only 33 percent of SAC's audited treatment plans met the audit criteria. The quality administrator stated that the prisons have continued to struggle to pass the audits because Corrections had examined only the timeliness of 72-hour treatment plans before 2014. She explained that mental health staff should now be more aware of the standards as the result of several trainings. However, Corrections has had regulations in effect since 1996 that specify what a 72-hour treatment plan should include. Therefore, Corrections' mental health staff should have already been aware of these requirements.

*It had always been CIW's policy to allow inmates in crisis beds access to yard time; however, prior to this audit, privileges for inmates would only be documented in treatment plans if access to these privileges was restricted in any way.*

As part of this audit, we were also requested to determine whether CIW allows inmates identified as suicidal to have access to inmate program activities or movements, such as yard time. The chief of mental health at CIW explained that it had always been CIW's policy to allow inmates in crisis beds access to yard time; however, prior to this audit, privileges for inmates would only be documented in treatment plans if access to these privileges was restricted in any way. He further described that any records of yard privileges for inmates in crisis beds would have been maintained by a recreation therapist separate from the treatment plan; however, CIW was unable to provide these records for the six inmates we reviewed. Thus, we were unable to determine whether these inmates had access to privileges like yard time. As a result of our audit, CIW stated that it has verbally instructed staff to improve their

documentation regarding inmate privileges such as yard time by indicating in treatment plans whether inmates have access to such privileges or by justifying why the inmates do not. Furthermore, in response to the suicide expert's recommendation, Corrections updated its policies in June 2016 to allow inmates in crisis beds to have access to phone and visitation privileges equal to the privileges the inmates would have when not in a crisis bed—privileges which inmates in crisis beds at CIW were previously not allowed to have.

In conducting our audit work, we observed that some inmates faced delays in being placed in a crisis bed. Specifically, in certain cases, inmates must await assignment to crisis beds because only a limited number of these beds are available. Corrections' policies require that inmates awaiting crisis beds be assigned to alternative housing, which is meant to be short-term and can include large holding cells or other housing where complete and constant visibility can be maintained. Inmates must be transferred out of alternative housing within 24 hours and, according to CCWF's chief of mental health, alternative housing should provide a crisis-bed level of care. Thus, we expected that inmates who remain in alternative housing for more than 24 hours would receive the same documentation of care as inmates in crisis beds, including initial and—if necessary—72-hour treatment plans. However, Corrections' clinical support chief for mental health stated that mental health staff complete treatment plans when inmates enter a new level of care and that alternative housing is a temporary placement rather than a level of care. She explained that completing treatment plans for inmates in alternative housing is not practical for various reasons, including that most alternative housing settings lack space to conduct confidential treatment plan meetings and not all members of the treatment team are required to see inmates in alternative housing. She also stated that inmates receive their standard medications while in alternative housing and that psychiatrists can order additional medication as necessary. Although these explanations appear to be reasonable, we remain concerned that Corrections has not always transferred inmates out of alternative housing within 24 hours.

For example, in a 2016 monitoring report, the special master found that 47 percent of CIW's alternative housing stays and 36 percent of RJD's alternative housing stays during the review period exceeded 24 hours. Our findings are similar to those of the special master. Specifically, 10 of 40 inmates we reviewed remained in alternative housing for more than 24 hours. For instance, one inmate was in alternative housing for approximately six days following a suicide attempt before being admitted to a crisis bed. Because she was discharged from the crisis bed about seven days after her admission, nearly half of her time at a crisis-bed level of care was spent in alternative housing. Of even greater concern,

*In conducting our audit work, we observed that some inmates faced delays in being placed in a crisis bed.*

*Two inmates assigned to alternative housing ultimately committed suicide after not being admitted to crisis beds based on the mental health staff's assessments of their mental health.*

two inmates assigned to alternative housing ultimately committed suicide after not being admitted to crisis beds based on the mental health staff's assessments of their mental health. Both of these inmates committed suicide within two weeks of discharge from alternative housing.

In order to address the fact that some inmates spend more than 24 hours in alternative housing while waiting to transfer to a crisis bed, Corrections submitted a budget change proposal for the 2017–18 fiscal year, requesting the construction of 100 new crisis beds. It is Corrections' belief that adding additional crisis beds will help alleviate the issue of inmates spending more than 24 hours in alternative housing, because many of the inmates that spend more than 24 hours in alternative housing do so because no crisis beds are available. The Legislature approved Corrections' request for 100 new crisis beds in its 2017–18 budget. According to the deputy director of the statewide mental health program, the 100 crisis beds should be sufficient; however, sufficiency assumes that the needs of Corrections' inmate population will not change in ways that will require additional crisis beds. Also, Corrections has the ability to monitor alternative housing stays that exceed 24 hours as a part of its audit process, which we discuss in Chapter 3.

### Prison Staff Did Not Sufficiently Monitor At-Risk Inmates or Respond to Suicide Attempts as Corrections' Policies Require

At all four prisons we reviewed, we observed deficiencies in the prisons' efforts to monitor inmates who were at risk of committing suicide. Staff at each of the four prisons failed to appropriately observe inmates within the required time interval, giving inmates greater opportunities to injure themselves with potentially lethal results. Further, we found instances where prison staff prefilled observation logs and did not stagger the timing of checks. In addition, Corrections has determined that prison staff did not always respond appropriately upon discovering that inmates had attempted to commit suicide. Specifically, Corrections' reviews of inmate suicides found that prison staff sometimes failed to bring required life-saving equipment to the scene, did not appropriately relieve pressure on three hanged inmates' airways, and did not always promptly summon medical responders. Although Corrections agreed that these issues are problematic, it has only recently taken steps to address them.

checks. We also identified logs that listed observation times after inmates had been discharged, suggesting the logs were prefilled. This strongly suggests that staff may not have actually conducted visual observation at the times the logs indicate, and may not have conducted the observations at all.

**Table 5**

**Problems With Monitoring of Inmates on Suicide Precaution at the Four Prisons We Reviewed**

| PRISON | NUMBER OF INMATES OUT OF 10 ON SUICIDE PRECAUTION | INMATES ON SUICIDE PRECAUTION WHO DID NOT RECEIVE STAGGERED CHECKS | | INMATES ON SUICIDE PRECAUTION WHO RECEIVED CHECKS WITH INTERVALS GREATER THAN 15 MINUTES | | NUMBER OF INMATES WITH LOGS NOT COMPLETED APPROPRIATELY (I.E. PREFILLED OR PREPRINTED) | TOTAL NUMBER OF SUICIDE PRECAUTION RECORDS REVIEWED THAT HAD AT LEAST ONE OF THE ISSUES IDENTIFIED IN THIS TABLE |
|---|---|---|---|---|---|---|---|
| | | NUMBER | PERCENTAGE | NUMBER | PERCENTAGE | | |
| CCWF* | 7 | | 86% | | 86% | | 7 |
| CIW* | 7 | | 86 | | 29 | | 6 |
| RJD | 5 | | 80 | | 80 | | 5 |
| SAC | 6 | | 50 | | 83 | | 6 |
| **Totals** | **25** | **19** | **76%** | **17** | **68%** | **8** | **24** |

Sources: California State Auditor's review and analysis of health records for 10 inmates at each of the four prisons, Corrections' 2009 program guide, and Corrections' other policies.

\* CCWF and CIW transitioned to an electronic health record system in October 2015, and suicide precaution checks are now recorded electronically in this system. Therefore, we could only test for prefilling/preprinting for four of the seven inmates on suicide precaution at CCWF and six of the seven inmates on suicide precaution at CIW.

Officials at the four prisons agreed that suicide precaution observations have been problematic. The chief of mental health at CCWF stated that checks might have been late or not appropriately staggered in the past because staff did not understand how to implement staggered checks. She also explained that staff shift changes can cause intervals between checks that exceed 15 minutes and that staff are sometimes unable to conduct checks at the required times because they are engaged with other inmates. Prison staff at SAC indicated that the prison used preprinted forms in the past to help nurses stagger their checks but stopped this practice after the suicide expert's 2015 report stated that they were inappropriate. Further, they explained that SAC now conducts spot checks of its suicide precaution logs.

Although prison officials indicated the implementation of Corrections' new electronic health record system should reduce some of the issues we found, we still identified problems in the prisons that have implemented the system. According to Corrections' January 2016 report titled *An Update to the Future of California Corrections*, the electronic health record system allows providers to more efficiently prescribe treatment, maintain or

*Prison Staff Did Not Always Monitor Inmates at High Risk of Suicide as Corrections' Policies Require*

Our review found that the four prisons have not always performed timely and appropriate checks of inmates placed on suicide precaution. As the text box shows, Corrections has established specific policies for monitoring inmates at risk of suicide, depending on whether they are in immediate danger of self-harm. Because suicide watch entails continuous, direct visual observation of inmates, we could not confirm through a review of watch logs whether this type of observation occurred. Instead, we focused our review on suicide precaution logs, which indicate when prison staff conducted their staggered behavior checks of inmates. Corrections' policy requires prison staff to stagger their behavior checks of inmates on suicide precaution in intervals not to exceed 15 minutes. According to the chief nursing executive at CCWF, the purpose of staggering behavior checks is to ensure that inmates are not able to anticipate when checks will occur and hurt themselves between checks. Nonetheless, the records for 19 out of 25 inmates we reviewed who were placed on suicide precaution indicated they did not always receive staggered behavior checks. Table 5 on the following page presents the problems we identified with suicide precaution checks at the four prisons we reviewed. When prison staff do not stagger the timing of their behavior checks of inmates on suicide precaution, they increase the risk that inmates will be able to injure themselves, perhaps fatally.

---

**Suicide Watch and Suicide Precaution**

When inmates are in crisis beds because of suicide risk and are in immediate danger of self-harm, they are placed on suicide watch, which entails the following:

- They are allowed only a no-tear smock or gown, a safety mattress, and a no-tear blanket. All furniture is removed.

- Staff must provide continuous, direct visual observation as well as nursing checks every 15 minutes.

When inmates are in crisis beds because of a high risk of attempting self-harm but are not in immediate danger, they are placed on suicide precaution, which entails the following:

- If they are at higher risk, they are allowed only a no-tear smock or gown, a safety mattress, and a no-tear blanket. If they are at lower risk, they are allowed certain clothing, reading and writing materials, and toiletries. Mental health staff must use their clinical judgment when allowing inmates access to these items.

- Staff must conduct staggered behavior checks of the inmate in intervals not to exceed 15 minutes.

Source: Corrections' 2009 program guide.

---

Table 5 on the following page shows that the prisons we reviewed did not always conduct suicide precaution behavior checks in a timely manner and that, for several inmates, prison staff prefilled or preprinted the observation logs. All four prisons exceeded the maximum requirement of 15-minute intervals between checks for some inmates, with several intervals at SAC and CCWF exceeding 20 minutes. In one particularly egregious example, prison staff at CCWF checked on an inmate on suicide precaution 90 times, but exceeded 15 minutes between checks more than 35 times, with one gap lasting longer than one hour. Further, we found that staff appeared to prefill times for checks on observation logs for eight of the 19 inmates on suicide precaution that we reviewed in prisons that used paper logs, rather than electronic logs. For example, we found several instances of logs with preprinted observation times for three inmates on suicide precaution who required staggered

strengthen continuity of care, work cohesively with other treatment team members, and monitor inmate progress. Both CCWF and CIW implemented the system in October 2015, whereas Corrections' remaining prisons are in various stages of transitioning to the new system, with Corrections estimating that all prisons will have implemented it by October 2017. Prison officials at CCWF and CIW indicated that the shift to the new system has improved compliance with their monitoring of suicidal inmates because providers can order the behavior checks and set when they are due. However, we still found instances in which staff did not stagger behavior checks after CIW and CCWF implemented the system, and the checks continued to occur at predictable intervals. Corrections' chief psychologist of quality management and informatics asserted that he believed it is difficult in practice for mental health staff to mentally track every patient they are monitoring and plan to stagger the behavior checks. The continued problems we observed with staggering behavior checks suggest that Corrections needs to increase training for mental health staff on how to properly stagger such checks.

Additionally, out of the four prisons we reviewed, SAC and RJD did not regularly check on the welfare of inmates in certain housing units as required by Corrections' policies. The policies require that prison staff regularly observe all inmates placed in certain housing units.[4] These checks, known as security welfare checks, should occur at staggered intervals twice an hour, with the intervals not exceeding 35 minutes. However, the security welfare check data show that SAC and RJD did not conduct these checks as required. For example, four of the 10 inmates we reviewed at SAC were in segregated housing units, yet none appeared to have received timely security welfare checks on the days they either committed or attempted to commit suicide. For one of these inmates, SAC could not provide any evidence demonstrating the welfare checks occurred at all. For another inmate, the security welfare check log shows some intervals between checks were longer than an hour on the day the inmate committed suicide. According to a Corrections' suicide report, when staff discovered the inmate's body, more than 50 minutes had elapsed since the last check. As these examples clearly show, when they do not check on inmates as required, prison staff may miss opportunities to prevent inmates from injuring themselves or attempting to commit suicide.

Although Corrections has recently taken steps to ensure that prisons comply with the suicide precaution and security welfare check policies, it is too soon to determine the effectiveness of

*Out of the four prisons we reviewed, SAC and RJD did not regularly check on the welfare of inmates in certain housing units as required by Corrections' policies.*

---

[4] Inmates may be removed from a prison's general population and placed in segregated housing for various reasons, including that they pose an immediate threat to the safety of others.

these actions. In particular, the suicide expert recommended in his January 2015 report that Corrections enforce its policies regarding behavior checks at staggered intervals not to exceed 15 minutes between checks for inmates on suicide precaution. In response to this recommendation, Corrections issued a memorandum in March 2016 reiterating policies for inmates placed in crisis beds, including the requirements for observing inmates on suicide precaution. Additionally, Corrections' quality administrator explained that it is developing an audit process that it plans to implement statewide for reviewing prisons' compliance with its policies and procedures. Corrections' regional teams will conduct this process, and it will include a review of suicide precaution logs and security welfare check logs. We describe this audit process in more detail in Chapter 3. Further, she indicated that as part of this audit process, Corrections is developing automated monitoring of suicide precaution checks in its electronic health record system to ensure compliance with Corrections' policies. However, since Corrections has not yet finalized its development of the audit process, including the automated monitoring, it is too early to determine its effectiveness.

*We found that mental health staff at CCWF, RJD, and CIW did not always make required daily progress notes for inmates in crisis beds.*

Finally, we found that mental health staff at CCWF, RJD, and CIW did not always make required daily progress notes for inmates in crisis beds. Corrections' policies require mental health staff to assess and monitor on a daily basis the condition of inmates who are in crisis beds. According to the policies, mental health staff must document these daily contacts within 24 hours. However, four inmates we reviewed at CCWF, two inmates at RJD, and two inmates at CIW did not receive daily progress notes for at least one day while in crisis beds. Without these notes, prison staff are hindered in their ability to assess inmates' progress and determine whether they should be either discharged or referred to a higher level of care. For example, an inmate at CCWF spent over 20 days in a crisis bed before she was discharged—more than twice as long as Corrections' policies specify—yet she did not receive progress notes for several of the additional days. Had staff completed the daily progress notes, this inmate might have received the treatment she needed in a timelier manner. The chief of mental health at CCWF could not explain why staff did not make these progress notes. The quality administrator stated that Corrections does not currently monitor prisons' compliance with requirements for daily progress notes for inmates in crisis beds but is open to incorporating such monitoring into its audit process once all prisons have transitioned to the electronic health record system in October 2017.

**Corrections' Suicide Reports Are Not Always Timely and Have Identified Various Concerns Regarding Prisons' Compliance With Emergency Response Requirements**

One of the experts engaged by the special master noted that the suicide review process and the issuance of suicide reports on each inmate suicide is one of the strengths of Corrections' suicide prevention program. However, of the 16 suicide reports that we reviewed, Corrections completed nine later than the 60 days following a suicide that its policy requires. In two instances, Corrections took 137 days to complete a report—more than double the timeline established in its policies. Corrections' clinical support chief attributed two of the late reports to a shortage of resources caused by a large number of suicides that occurred over a short time frame, while she explained that several others were late due to the complexities of the necessary reviews. However, she stated that delays in completing a suicide report would not delay Corrections from informing a prison of an urgent problem that needed immediate attention; in such cases, while reviewers are still on-site, they would inform the prison of the issue. Nevertheless, we believe that it is critical that Corrections complete these reports as expeditiously as possible because they are a crucial tool for identifying problems with the prisons' clinical care and compliance with policies and procedures, including their emergency responses to suicides.

In fact, several suicide reports we reviewed identified that prison staff have not always complied with Corrections' requirements and state regulations for how to respond to suicide attempts. For instance, state regulations and Corrections' policy require that a cut-down kit be immediately accessible in each housing unit of a prison and that staff use the kit in cases of attempted hangings. The text box lists the cut-down kit's required contents—several of which can be used to provide life-support care or clear an obstruction to an airway—which Corrections has identified as being critical to saving the life of inmates who attempt suicide by hanging. However, of the 15 suicides by hanging that we reviewed, Corrections' suicide reports noted three instances in which responders did not indicate having or using all or part of a cut-down kit. For example, one suicide report found that prison staff immediately responding to the hanging did not use a resuscitator at the scene of the emergency. Rather, the report found that prison staff indicated the resuscitator was used after the inmate had been transported away from the scene of the emergency.

---

**Contents of a Cut-Down Kit**

A cut-down kit must be kept in a lockable metal box maintained within each housing unit and must contain the following:

- An inventory list affixed to the inside of the box door.

- One emergency cut-down tool.

- One single patient use resuscitator.

- One CPR mask.

- A minimum of 10 latex gloves.

- A disposable oral airway.

Source: Corrections' 2009 program guide.

Corrections offered several possible explanations for why prison staff may not have carried or used the entire kit when responding to suicide attempts. According to an associate warden for the Division of Adult Institutions' mental health compliance team (compliance team associate warden), staff who did not bring an entire cut-down kit may have had any missing items elsewhere on their persons or used their required training to perform the necessary life-saving measures. She also noted that the kits' storage locations in some units may have restricted staff's access to them. For example, she explained that some housing units store kits in secured control booths, even though the booth windows may not be large enough for the required metal boxes to pass through. According to the compliance team associate warden, this limitation has resulted in prisons using various bags, buckets, or other storage devices to store cut-down kits—all of which deviate from Corrections' policy that prisons store kits in lockable metal boxes.

Corrections is aware of the problems related to the storage of the cut-down kits and is in the process of taking steps to address them. Specifically, the clinical support chief for mental health indicated that Corrections had formed a workgroup to address keeping the kits in bags rather than boxes so that they could be more easily stored in secured areas. The compliance team associate warden also explained that her team is in the process of developing a memo to update Corrections' policies on when to use cut-down kits and how prison staff should maintain them. According to the compliance team associate warden, the memo will make some significant changes to Corrections' current policies, including requiring that prisons keep all cut-down kit items together in a durable bag and that prison staff bring the kits to suicide attempts by asphyxiation in addition to hangings. It will also emphasize that staff must transport the entire kit to the scene of an emergency. The compliance team associate warden expects that Corrections will finish and implement the memo by August or September 2017. Without such changes to its policies, Corrections risks additional instances of prison staff not having the entire kit at a moment when it could potentially save an inmate's life.

*Without changes to its policies, Corrections risks additional instances of prison staff not having the entire kit at a moment when it could potentially save an inmate's life.*

Corrections' suicide reports also note other issues with prisons' emergency response, and the suicide review process can result in changes to emergency response preparedness. For example, two suicide reports identified issues with the timing of summoning medical responders. Corrections addresses these types of issues by including recommendations in its suicide reports, which the prisons are responsible for implementing. Furthermore, Corrections' policy requires specific staff to follow up with prisons to ensure that they implement the recommendations. To address several issues related to their emergency responses, the prisons involved submitted to Corrections evidence that they had provided additional training

To ensure that it identifies inmates who are at risk of attempting suicide and determines the treatments needed to prevent them from doing so, Corrections should immediately reevaluate and revise its goals for the percentage of risk evaluations that mental health staff must complete on time and for the percentage of risk evaluations that must pass its risk evaluation audits. It should set revised goals that better take into consideration the importance of mental health staff completing adequate risk evaluations in a timely matter. Corrections should require prisons that perform below its revised goals to develop improvement plans.

To improve the quality of its risk evaluations, by December 2017 Corrections should develop and incorporate into its electronic risk evaluation form prompts to aid mental health staff in completing adequate risk evaluations that meet all audit criteria.

To minimize the number of inmates who spend more than 24 hours in alternative housing, Corrections should use the audit process it is developing to monitor the amount of time inmates spend in alternative housing and annually reassess its need for additional crisis beds.

To ensure that prisons document the privileges, such as yard time, that inmates receive while in a crisis bed, Corrections should immediately require prisons to develop and formalize policies to record on their treatment plans the privileges inmates are allowed and receive while in a crisis bed.

To ensure that prison staff conduct required checks of inmates placed on suicide precaution in a timely manner, Corrections should implement its automated process to monitor suicide precaution checks in its electronic health record system by the time it is implemented systemwide in October 2017. Further, Corrections should train staff on how to plan for and conduct staggered suicide precaution checks.

To monitor prisons' compliance with its requirement that inmates in crisis beds receive daily progress notes, Corrections should implement monitoring of these notes electronically into its audit process by the time the electronic health record system is in use systemwide in October 2017. Corrections should require prisons that are out of compliance to develop and implement quality improvement plans, and it should follow up on the prisons' implementation of those plans.

To ensure that prison staff appropriately respond to attempted suicides, Corrections should implement its proposed changes to its emergency response policies regarding cut-down kits by December 2017 and should include in its policies a method for monitoring prisons' compliance.

to their staff, which we believe is appropriate. In another example, three suicide reports identified concerns with staff not relieving pressure on an inmate's airway when the inmate was discovered hanging. However, CIW identified that prison staff involved in one of these incidents had most recently received suicide prevention training roughly six months before the suicide, but that the training did not provide specific instruction on relieving tension on the inmate's body by using a stable object for support. We find it concerning that Corrections omitted this critical information from this training, as its mental health policies have specified since 2009 that responding prison staff must relieve pressure on the inmate's airway. In 2016 Corrections updated its suicide prevention training to include instruction to support the inmate's airway. Corrections' clinical support chief stated that the information should have been included in previous versions of the training and that its omission was an oversight. She explained that the information was likely missing from previous versions of the training because when her team revised the training they focused on adding new issues rather than reviewing the training to ensure that all of the necessary information was included. She further explained that she was surprised to find that the information was missing, because the same team that assembled the 2009 program guide with Corrections' policies put together the training.

## Recommendations

### Legislature

To provide additional accountability for Corrections' efforts to respond to and prevent inmate suicides and attempted suicides, the Legislature should require that Corrections report to it in April 2018 and annually thereafter on the following issues:

- Its progress toward meeting its goals related to the completion of risk evaluations in a sufficient manner.

- Its progress toward meeting its goals related to the completion of 72-hour treatment plans in a sufficient manner.

### Corrections

Corrections should immediately require mental health staff to score 100 percent on risk evaluation audits in order to pass. If a staff member does not pass, Corrections should require the prison to follow its current policies by reviewing additional risk evaluations to determine whether the staff member needs to undergo additional mentoring.

# Chapter 2

## A NUMBER OF FACTORS HAVE LIKELY CONTRIBUTED TO HIGH RATES OF INMATE SUICIDES AND SUICIDE ATTEMPTS AT CIW

From 2014 through 2016, the rates of inmate suicides and suicide attempts at CIW were significantly higher than the rates at either CCWF or Corrections' men's prisons. Staff at Corrections and CIW provided several reasons for CIW's elevated rates, including inmate drug involvement, domestic violence in interpersonal relationships between female inmates, and the transfer of additional inmates to CIW and CCWF following the conversion of a women's prison to a men's prison. Because suicide is the result of multiple factors, we believe many of these causes could have contributed to CIW's high rates of suicides and suicide attempts. In addition, we identified several factors that many of Corrections' prisons share in common that may influence rates of inmate suicides and suicide attempts. Specifically, Corrections has not established a means of ensuring that all staff receive required trainings related to suicide prevention and response, and as a result, some staff may not have the knowledge necessary to address inmates' mental health needs. Further, Corrections has struggled to fill certain mental health staff vacancies, particularly for psychiatrist positions. Finally, Corrections has not recently updated its staffing model to ensure that the prisons have adequate staff to meet their inmates' mental health needs.

### Corrections Has Identified Possible Causes for the High Suicide Rate at CIW

As the Introduction discusses, the rates of suicides and suicide attempts at women's prisons in California have increased over the last several years. After declining from 2012 through 2013, the rates of both suicides and attempted suicides at women's prisons rose dramatically, from 3.7 attempts and 0.35 suicides per 1,000 inmates in 2014 to 10.3 attempts and 0.63 suicides in 2016.

Further, as Table 6 on the following page shows, the rates of suicides and attempted suicides at women's prisons were significantly higher and less stable than the rates at other prisons in California during this same time period. Although the increase in female inmate suicides is dramatic, Corrections' clinical support chief noted that even one suicide can significantly affect the rate because of the small population of female inmates. However, she acknowledged that there have been more suicides among female inmates than she would have expected and she believes that California's rates are high in comparison to large prison systems in other states.

**Table 6**

**Suicides and Attempted Suicides in Adult Prisons From 2012 Through 2016**

| | | INMATE POPULATION* TOTALS | ATTEMPTED SUICIDES | | SUICIDES | |
|---|---|---|---|---|---|---|
| | | | TOTALS | PER 1,000 INMATES | TOTALS[†] | PER 1,000 INMATES |
| | Women's prisons | 6,643 | | 4.5 | | 0.15 |
| | All other prisons[‡] | 119,633 | | 2.7 | | 0.20 |
| | All prisons | 126,276 | | 2.8 | | 0.20 |
| 2013 | Women's prisons | 5,627 | | 4.1 | | 0.18 |
| | All other prisons[‡] | 117,611 | | 3.0 | | 0.21 |
| | All prisons | 123,238 | | 3.0 | | 0.21 |
| 2014 | Women's prisons | 5,646 | | 3.7 | | 0.35 |
| | All other prisons[‡] | 117,006 | | 2.9 | | 0.15 |
| | All prisons | 122,652 | | 3.0 | | 0.16 |
| 2015 | Women's prisons | 4,887 | | 9.2 | | 0.41 |
| | All other prisons[‡] | 109,243 | | 3.2 | | 0.16 |
| | All prisons | 114,130 | | 3.4 | | 0.17 |
| 2016 | Women's prisons | 4,743 | | 10.3 | | 0.63 |
| | All other prisons[‡] | 114,938 | | 3.2 | | 0.20 |
| | All prisons | 119,681 | | 3.5 | | 0.22 |
| 5-YEAR TOTALS | Women's prisons | | 168 | | 9 | |
| | All other prisons[‡] | | 1,733 | | 107 | |
| | All prisons | | 1,901 | | 116 | |

Sources: California State Auditor's analysis of Corrections' COMPSTAT metrics and additional information on suicides provided by various prisons.

* *Inmate population* is the average of the 12 months in each year.

† The numbers we present here reflect our amendments to Corrections' COMPSTAT data. As we discuss in Chapter 3, our review of various records from individual prisons revealed that COMPSTAT has consistently underreported the number of suicides in California prisons. We have therefore adjusted the number of suicides in 2013, 2015, and 2016 to include three suicides that we identified at CIW, RJD, and SAC that were not included in the COMPSTAT data; however, we caution that these numbers may still not be accurate.

‡ According to a COMPSTAT research program specialist, Corrections expresses its numbers in COMPSTAT by institution and not by gender. Thus, *Women's prisons* includes CCWF and CIW, as well as the former Valley State Prison for Women (VSPW) in 2012, and CCWF and CIW from 2013 through 2016. *All other prisons* comprises nearly all male inmates; however, it does include inmates in other facilities, including some that house both men and women, such as certain medical facilities, and Folsom State Prison, which has a small women's facility.

The clinical support chief offered three primary reasons for why the suicide rate at women's prisons has been high in recent years. First, she explained that unlike male inmates, female inmates tend to build family units within prisons, and Corrections has found that domestic violence can occur within these units. She believes that this domestic violence has contributed to the higher suicide rates at women's prisons. She stated that in order to address this issue, Corrections is planning to develop a curriculum regarding same-sex domestic violence for female inmates who receive mental health services.

The second reason the clinical support chief pointed to was drug involvement. Specifically, she explained that substance abuse affects female inmates differently than male inmates because incarcerated women have high levels of past trauma. That trauma, combined with substance abuse, likely increases the risk of suicide. According to the clinical support chief, drugs or drug trafficking were involved in four of the six most recent suicides in women's prisons. She stated that in order to address this issue, Corrections is hoping to finalize a contract in the near future to establish a co-occurring disorders program at CIW and at other prisons. She explained that this program would be modeled on best practices that combine mental health issues with treatment for substance abuse.

*Substance abuse affects female inmates differently than male inmates because incarcerated women have high levels of past trauma that, when combined with substance abuse, likely increases the risk of suicide.*

Finally, the third reason she cited was that the realignment of prisons changed the composition of the inmate population in state prisons. In 2011 the Legislature passed various laws that realigned the criminal justice system by allowing inmates who were not convicted of serious or violent felonies, or felonies requiring registration as a sex offender, to serve their sentences in county jails rather than state prisons. She explained that as a consequence of realignment and lower-level offenders being sentenced to county jails, inmates who remain in state prisons generally have more severe behavioral issues and are more likely to have committed violent crimes. She also said that inmates who have committed violent crimes are potentially more likely to commit suicide because they have a history of using violence as a response to various situations, including self-directed violence. As a result, female inmates in the State's prisons may be more likely to make lethal suicide attempts.

These reasons, however, apply to all female inmates and do not necessarily explain the difference in the rates of suicides and attempts between CIW and CCWF, which are both women's prisons. As Table 1 in the Introduction shows, all but one of the suicides occurring from 2014 through 2016 at the two women's prisons we reviewed occurred at CIW. During this same period, there were also more suicide attempts at CIW than at CCWF, despite CIW's smaller inmate population. For example, there were 11 attempted suicides at CCWF in 2015, but 34 attempted suicides at CIW. We asked the clinical support chief why she thought the suicide and suicide attempt rates at CIW were higher than those at CCWF from 2014 through 2016 and she stated that she did not have any easy hypotheses for why the rates were higher at CIW. She additionally described that based on her understanding, the characteristics of the inmates at CIW and CCWF do not seem to differ significantly. Moreover, the Centers for Disease Control and Prevention has identified that suicidal behavior results from a combination of many factors—including genetic, developmental, environmental, psychological, social, and cultural factors—operating through diverse and complex pathways. It is therefore likely that there are many components to the cause for the difference in suicide and suicide attempt rates between CIW and CCWF.

Prison officials at CIW, however, did identify one other explanation for why the suicide rate at CIW was elevated from 2014 through 2016: they attributed the increased suicide rate at CIW to the conversion of VSPW to a men's prison and the subsequent transfer of higher-security-level inmates to CIW than the prison was designed to house. Corrections converted VSPW to a men's prison due to the decline in the number of female inmates in state prisons following realignment. According to Corrections' acting associate warden of female offender programs and services, Corrections transferred about 970 inmates to CCWF and 400 inmates to CIW from VSPW from September 2012 through January 2013. Two chief psychologists and a senior psychologist at CIW stated that the transfer of inmates resulted in a number of negative effects, including increases in gang influences, more drugs, higher-security-level inmates, and increased conflict in the housing units. The chief executive officer at CIW explained that CIW was not designed to house high-security-level offenders, and he agreed that the change in prison culture following the conversion of VSPW may have contributed to the increase in suicides and attempted suicides. We attempted to verify whether high-security-level inmates were transferred to CIW; however, Corrections' acting associate warden of female offender programs and services explained that Corrections does not have a historical breakdown of that information.

*Two chief psychologists and a senior psychologist at CIW stated that the transfer of inmates resulted in a number of negative effects, including increases in gang influences, more drugs, higher-security-level inmates, and increased conflict in the housing units.*

Although Corrections acknowledged at the time that the conversion of VSPW to a men's prison might significantly affect CIW and CCWF, it did little to prepare those prisons. According to documentation Corrections provided, beginning in 2011, Corrections developed action plans for the conversion of VSPW and held meetings with certain stakeholders to discuss these plans. However, Corrections was unable to provide evidence of such a meeting occurring at CIW. Further, CIW officials were unable to recall the occurrence of such a meeting. Corrections distributed a memorandum in late August 2012 announcing the conversion of VSPW and the resulting transfer of its female inmates to CIW, CCWF, and certain other special programs beginning the next month. However, the memorandum lacked any details regarding the steps the prisons should take to prepare for the new inmates; instead, it simply stated that the support of the wardens in ensuring their prisons' assistance was appreciated. According to Corrections' acting associate warden of female offender programs and services, the wardens at each prison were responsible for preparing their staff for the conversion and the subsequent increases in their inmate populations. Both an associate warden at CIW and its chief executive officer confirmed that, beyond the standard preparations made for inmate transfers, they could not remember any special preparations or training that CIW provided for its staff.

The inmates who transferred from VSPW were not the majority of those attempting suicide at either CIW or CCWF. This supports CIW officials' perspective that there was a cultural change at the prison subsequent to the transfers. According to CIW, inmates who transferred from VSPW committed 8 percent of the suicides and suicide attempts at CIW from 2014 through 2016. Similarly, CCWF's data show inmates who transferred from VSPW committed 12 percent of the suicide attempts at CCWF during this period. CIW's chief executive officer stated that before the transfer of inmates from VSPW, he would have described CIW as a prison that had relatively few issues with inmates. He explained that he could no longer describe the prison in this way after the transfer because the inmates from VSPW brought with them a culture of substance abuse, illegal drug trading, and violence related to drug trafficking.

### CIW and Other Prisons Have Not Ensured That Their Staff Have Received Required Training on Suicide Prevention and Response

As we describe in the previous section, Corrections and CIW were able to identify certain factors that are unique to CIW and CCWF and that may have contributed to CIW's high rates of suicides and suicide attempts. However, we identified additional factors that may increase the risk of inmate suicides and attempts at both men's and women's prisons throughout the State. One of these factors is Corrections' failure to ensure that prison staff receive required training related to suicide prevention and response. We believe this lack of training may have contributed to some of the problems we identify in Chapter 1.

Because effective suicide prevention and response at prisons requires a collective effort, staff that routinely interact with inmates should receive training on how to identify and help inmates at risk of suicide as well as on how to respond to suicide attempts. When staff fail to fulfill their duties as Corrections' policies require, it may result in the serious injury or death of inmates whose lives depend on both the quality and promptness of the interventions that staff provide. The Joint Legislative Audit Committee (Audit Committee) asked us to evaluate the adequacy of the mental health and suicide prevention training specifically for CIW staff, and we found that the prison did not ensure that its staff received the required trainings. We also identified similar attendance concerns at the three other prisons we reviewed, and we found that some trainings need improvement in terms of their content and delivery.

Officials at CIW could not demonstrate that some staff had attended required training courses related to inmate suicide. State regulations and Corrections' policies require each prison to ensure that all staff

*Officials at CIW could not demonstrate that some staff had attended required training courses related to inmate suicide.*

**Selected Training That Corrections Requires Related to Suicide Prevention and Response**

**Annual Suicide Prevention:** Provides staff with a basic understanding of suicide prevention and their roles when working in a prison. This training includes elements related to responding to suicide attempts.

**Risk Evaluation Mentoring Program:** Provides one-on-one training and mentoring on the administration of risk evaluations. Mentoring includes feedback on suicide assessment, risk formulation, and crisis intervention skills.

**Risk Evaluation for Mental Health Staff:** Focuses on practical methods to improve the accuracy and reliability of risk assessments across staff and settings. This training is designed to complement the risk evaluation mentoring program.

**Safety/Treatment Planning Within Suicide Risk Assessment and Management:** Helps mental health staff know when and how to create adequate treatment/safety plans that contain specific actions mental health staff and inmates will undertake to reduce risk of suicide.

Sources: State regulations, Corrections' policies, 2016 lesson plans, and presentation slides for the listed trainings.

whose assignments routinely involve inmate contact complete various trainings related to suicide prevention and response. The text box lists some of these trainings. In addition, we reviewed a training on working with female offenders, which provides information and skills that support managing female inmates safely and effectively. However, when we reviewed training records for a selection of staff at CIW, we found that prison officials could not demonstrate whether some staff had attended certain trainings. Specifically, the in-service training manager at CIW could not demonstrate that four of the 20 staff members attended a required annual suicide prevention training during 2016. Further, of the 15 mental health staff we reviewed who were required to take the same course at CIW in 2015, the prison's documentation shows that only nine attended.

Moreover, some mental health staff at CIW did not attend a required training on conducting risk evaluations or receive mentoring. Corrections requires staff who will be evaluating whether inmates are at risk of suicide to attend a training on how to complete risk evaluations. We reviewed 10 psychologists, psychiatrists, or social workers who were required to attend this training within 180 days of hire; however, the documents the prison provided demonstrate that only six did so. Further, we found that CIW did not adequately audit risk evaluations for five of the 10 mental health staff we reviewed, and did not provide mentoring for two mental health staff that failed the audit. As Chapter 1 explains, the correct completion of risk evaluations is critical because they help mental health staff identify inmates who are likely to attempt suicide as well as the treatments needed to prevent them from doing so.

CIW provided several reasons for why it was unable to demonstrate that certain staff attended the required trainings. In particular, the in-service training manager explained that some of the staff simply did not attend the training. However, he also stated that before May 2015, CIW did not effectively track its training. Further, he explained that staff in the training units at CIW and other prisons do not always record attendance—which is demonstrated by a sign-in sheet—in Corrections' tracking system. He indicated that as a result, when staff transfer to CIW, CIW must directly contact the prisons at which they previously worked to determine if those prisons can provide the sign-in sheets for trainings. This situation could lead to staff missing required trainings. For example, CIW's in-service training manager stated that one staff member we

reviewed had received the required suicide prevention training at a different prison in 2016, but he could not provide documentation that the staff member had actually received this training.

Some of the problems we found are not unique to CIW: Corrections reported that not all staff at the prisons we reviewed received required trainings in 2016. For example, at SAC, about half of the required staff received training on the principles of safety planning for suicidal inmates. Attendance compliance at RJD, CIW, and CCWF was 72 percent, 83 percent, and 89 percent, respectively, with this training requirement, according to Corrections' reports. Staff attendance rates for the annual suicide prevention training ranged from 68 percent at CIW to 95 percent at CCWF. Staff attendance was similar for the suicide risk evaluation mentoring, with reported attendance rates ranging from 71 percent at SAC to 95 percent at CCWF. Corrections' clinical support chief stated that Corrections has not followed up with the prisons regarding the reasons for the low attendance rates. She explained that although the prisons provide Corrections with some staff attendance rates at trainings, Corrections does not request that they explain or justify those rates. Rather, she stated that Corrections relies on the prisons' in-service training units and chiefs of mental health to address training noncompliance issues. Lastly, although not a training on suicide prevention, a program regarding working with female offenders was offered in 2015 and 2016. CIW and CCWF reported average staff attendance rates of 74 percent and 91 percent, respectively, for this training.

This is not a new problem, nor is it isolated. In his 2016 report regarding selected prisons' suicide prevention practices, the suicide expert also identified concerns with staff attendance at required trainings in 2014. Specifically, he found that attendance for the annual suicide prevention training across 18 prisons varied from 0 percent to 100 percent during the period he reviewed. He reported that 94 percent of custody staff, 69 percent of medical staff, and 63 percent of mental health staff received the annual suicide prevention training in the 18 prisons during 2014. He concluded that the compliance rates for training both medical and mental health staff remained problematic.

*The suicide expert found that attendance for the annual suicide prevention training across 18 prisons varied from 0 percent to 100 percent during 2014.*

In addition, our review found that CIW's trainers themselves have missed required classes. Corrections requires that instructors teaching suicide prevention and risk evaluation trainings participate in specific train-the-trainer courses. Although both of CIW's instructors for the suicide prevention training and the instructor for the risk evaluation training attended the required courses, only one of five of its mentors had received the necessary training. Further, the two suicide prevention trainers taught several trainings before they were qualified to do so per Corrections' requirements. CIW's suicide prevention

team coordinator stated that she received training from Corrections and that she subsequently provided training to all mentors. She explained that she believed the training she provided was sufficient to fulfill the training requirements for mentors. However, the clinical support chief stated that all mental health staff are required to receive Corrections' training before mentoring other staff. She further explained that, at one point, Corrections allowed prisons to train their own mentors, but it discontinued this practice around 2013 after realizing the content was not always adequately communicated.

Unless Corrections ensures that its trainers have the knowledge and tools necessary to provide instruction in an engaging and effective manner, it reduces the effectiveness of its training about suicide prevention practices. In the suicide expert's January 2015 report, he stated that he attended the required one-hour suicide prevention trainings at seven prisons and that many were problematic. For example, the suicide expert noted that at one of the trainings, the instructor simply read the nearly 40 PowerPoint slides at a fairly quick pace, ending the presentation after about 25 minutes. The suicide expert pointed out that another training lasted roughly 40 minutes and that the only interaction between the instructor and the participants occurred when one participant asked about the length of the class. He also observed that one prison had only offered the suicide prevention training via DVD. If Corrections does not ensure that all trainers receive instruction on delivery, it risks its trainers poorly presenting information and failing to create meaningful discussions regarding the training topic, which significantly diminishes the value to those attending the training.

*We found that some of Corrections' suicide prevention trainings were missing required content.*

Additionally, we found that some of Corrections' suicide prevention trainings were missing required content. For example, Corrections' policies require that the annual suicide prevention and response training explain how to handle situations in which inmates with mental health concerns commit violations of prison rules. However, we did not find such content in the suicide prevention training from 2014 through 2016. Corrections offers a training that focuses on situations involving violations of prison rules, but that training is not offered to everyone whom Corrections requires to take the annual suicide prevention training. Corrections must also follow a 2015 court order requiring it to incorporate into its trainings certain topics that the suicide expert's January 2015 report outlines. The suicide expert recommended that Corrections expand the length and content of certain suicide prevention trainings by including various topics, such as dealing effectively with inmates perceived to be manipulative. Although the annual suicide prevention training, risk evaluation training, and a training aimed at helping staff improve the accuracy of diagnoses contained discussion of such perceptions, a webinar on treatment planning in risk evaluations did not. Without required content, Corrections' trainings will lack effectiveness in

preventing suicides and improving responses to attempted suicides. For example, if Corrections' staff assume inmates are expressing suicidal thoughts in order to obtain some benefit—in other words, are being manipulative—the staff may miss important warning signs of impending suicide attempts.

### Staff Vacancies Continue to Challenge Corrections' Ability to Provide Sufficient Mental Health Services to Inmates

For more than 20 years, Corrections has continued to struggle to fill key mental health position vacancies, creating the risk that it may not be able to adequately serve inmates in need of mental health services. In a May 2016 report, the special master recounts that the court in *Coleman* ruled in 1995 that Corrections was significantly and chronically understaffed in the area of mental health care services and did not have sufficient staff to treat the large numbers of mentally ill inmates in its custody. The special master reported that during the intervening 20 years, the proportion of Corrections' inmates requiring mental health care soared from less than 15 percent to 29 percent of the total inmate population, for a total of nearly 37,000 inmates requiring mental health care. In 2002 the court ordered Corrections to maintain a vacancy rate among psychiatrists, psychologists, and social workers of not more than 10 percent.

When we reviewed Corrections' data on three key positions the court identified—psychiatrists, psychologists, and social workers—we found that vacancy rates were highest among psychiatrists. According to our analysis of Corrections' data, its prisons overall had a 31 percent vacancy rate for psychiatrists, 9 percent for psychologists, and 2 percent for social workers as of December 2016. Each of the four prisons we reviewed had vacancy rates below 10 percent for social workers and at or below 10 percent for psychologists. However, CCWF, RJD, and SAC have continued to struggle to fill psychiatrist positions, with vacancy rates of about 32 percent, 31 percent, and 44 percent, respectively. According to a March 2017 report from the National Council for Behavioral Health, there is a national shortage of psychiatrists. Only CIW had vacancy rates below 10 percent for all three classifications. When prisons do not maintain adequate mental health staff, their ability to provide quality mental health care to inmates can suffer. For example, according to the coordinator of SAC's suicide prevention team, a shortage of psychiatrists has a trickle-down effect because if inmates do not receive the proper medication, they may act out more and require additional attention or therapy, exacerbating mental health staff's already heavy workloads.

*When we reviewed Corrections' data on three key positions the court identified—psychiatrists, psychologists, and social workers—we found that vacancy rates were highest among psychiatrists at 31 percent as of December 2016.*

Furthermore, the prisons' total authorized mental health positions may not be enough to fulfill inmates' needs. For example, CIW's chief of mental health stated that even when CIW's mental health positions are almost fully staffed, mental health staff still feel overwhelmed and do not have time to meet with inmates as often as they believe is needed. Similarly, the chief of mental health at CCWF stated that although workloads seem manageable based on Corrections' minimum requirements for mental health care, inmates sometimes require significantly more visits than the minimum required, effectively increasing staff workload. She explained that given the increased workload for suicide prevention, mental health staff may neglect routine but important tasks, such as completing follow-up suicide risk evaluations, to focus on urgent matters, such as responding to imminent suicide threats.

The staffing problems that these prisons noted are likely in part due to the fact that Corrections has not updated its staffing model since 2009. Specifically, the chiefs of mental health at both CIW and CCWF expressed the need for Corrections to revisit the staffing model it uses to determine the number of mental health staff needed per prison. For example, CCWF's chief of mental health indicated that the staffing ratios for women's prisons is 20 percent higher than staffing ratios for men's prisons in the model; however, this adjustment is not enough to compensate for the increased number of mental health crises and referrals that arise with the female inmate population. Corrections' associate director of policy and clinical support (associate director) acknowledged that Corrections has not revised the model since 2009, eight years ago. She explained that when calculating the number of staff needed per prison, the model does not take into account the following factors: gender; facility layout; security level; and number of inmates in each security level, excluding restricted housing. The associate director explained that she believes Corrections needs to revisit the 2009 staffing model to take into account some of these factors as well as Corrections' revised policies, recent court orders, the prisons' implementation of the new electronic health record system, and the prisons' adherence to requirements based on its current filled positions.

**Recommendations**

*Legislature*

To provide additional accountability for Corrections' efforts to respond to and prevent inmate suicides and attempted suicides, the Legislature should require that Corrections report to it in April 2018 and annually thereafter on the following issues:

- The status of its efforts to ensure that all mental health staff receive required training and mentoring related to suicide prevention and response.

- The status of its efforts to fill vacancies in its mental health treatment programs, especially its efforts to hire and retain psychiatrists.

*Corrections*

To address the unique circumstances that may increase its female inmates' rates of suicide and suicide attempts, Corrections should take the following actions:

- Implement its planned same-sex domestic violence curriculum by December 2017.

- Continue to explore additional programs that could address the suicide risk factors for female inmates.

To ensure that all prison staff receive required training related to suicide prevention and response, Corrections should immediately implement a process for identifying prisons where staff are not attending required trainings and for working with the prisons to solve the issues preventing attendance.

To ensure that trainers and risk evaluation mentors at all prisons are able to train staff effectively, Corrections should immediately begin requiring prisons to report the percentage of their trainers and mentors who have received training on how to conduct training and mentoring. It should work with prisons to ensure that all trainers and mentors receive adequate training.

To maximize the value of its trainings related to suicide prevention and response, Corrections should ensure that starting in January 2018, its trainings include all content that the special master and its own policies require.

To ensure that it has enough staff to provide mental health services to all inmates who require care, Corrections should review and revise its mental health staffing model by August 2018.

# Chapter 3

## TO REDUCE INMATE SUICIDES AND ATTEMPTS, CORRECTIONS MUST STRENGTHEN ITS OVERSIGHT AND DEMONSTRATE GREATER LEADERSHIP

Corrections has struggled for decades to adequately provide mental health services to inmates. As a result, most of its efforts to reduce its inmate suicide rates in recent years have been in response to court-ordered oversight. For example, in response to the suicide expert's 2015 recommendations, it adopted a number of policies, implemented facility improvements, and improved its training. However, its policies are unlikely to have significant impact if it does not ensure that the prisons fully implement and adhere to them—which it has yet to do. Although Corrections stated it is developing an audit process to ensure that prisons comply with policies and procedures, it has known about their noncompliance for years, and it is uncertain as to when it will fully implement this process across all prisons. Similarly, Corrections created teams at each of the prisons to specifically focus on suicide prevention and response; however, it has not ensured that these teams consistently provide leadership on critical issues. In addition, Corrections has not always proactively sought opportunities to demonstrate leadership in regards to documenting and disseminating programs or best practices for preventing inmate suicide.

### Although Corrections Has Developed Policies and Training to Address Past Recommendations, It Has Not Ensured That Prisons Fully Implement These Changes

From November 2013 through July 2014, the suicide expert conducted a comprehensive audit of suicide prevention practices in each of Corrections' prisons. This audit resulted in a January 2015 report containing 32 recommendations. The court in *Coleman* subsequently ordered Corrections to work with the special master to develop strategies to implement these recommendations, and it also ordered the suicide expert to provide an updated report on Corrections' progress. The suicide expert completed this updated report in January 2016, in which he stated that Corrections had begun to implement corrective actions in response to his recommendations. Through the adoption of new policies, improvements to its facilities, changes to its trainings, and other actions, Corrections has now addressed the majority of the recommendations from the suicide expert's January 2015 report. Table 7 on the following page lists selected recommendations from the suicide expert's 2015 report to Corrections and Corrections' responses to those recommendations.

**Table 7**

**Selected Recommendations From the Suicide Expert's 2015 Report**

| RECOMMENDATION | CORRECTIONS' ACTION IN RESPONSE TO RECOMMENDATION | DATE ACTION TAKEN | IS CORRECTIONS ENFORCING/MONITORING COMPLIANCE WITH THIS POLICY? |
|---|---|---|---|
| Corrections should revise its risk evaluation mentoring program to require ongoing mentoring throughout the year and audit mental health staff's risk evaluations on a regularly scheduled basis. | Issued memorandum to all prisons implementing a revised mentoring program and describing regular audits of risk evaluations. | March 2016 | No. Corrections tracks aggregate information the prisons report to monitor compliance, but does not follow up with the prisons. |
| Corrections should enforce its policy authorizing only two levels of observation for suicidal inmates: *suicide precaution* and *suicide watch*. | Issued memorandum to all prisons reiterating existing policy that the only two levels of observation are suicide precaution and suicide watch. | March 2016 | No. Will begin monitoring systemwide once it finalizes its audit process, which does not have an implementation date. |
| Corrections should take action to correct inaccurate documentation on inmate suicide precaution observation forms. | Issued memorandum to all prisons reiterating existing policy regarding documentation on suicide precaution observation forms. | March 2016 | No. Will begin monitoring systemwide once it finalizes its audit process, which does not have an implementation date. |
| Corrections should enforce its policy of housing only newly admitted inmates in administrative segregation units in retrofitted suicide-resistant cells for their first 72 hours of admission to the prison. | Included reiteration of this policy in its annual suicide prevention training. | July 2015 | No. Will begin monitoring systemwide once it finalizes its audit process, which does not have an implementation date. |
| Corrections should ensure all crisis beds are suicide resistant. | Developed a schedule to begin retrofitting cells at identified prisons. | November 2015 | Corrections indicated one prison required extensive retrofitting and is still in progress. |
| Corrections should revise its policy so that all inmates discharged from a crisis bed or alternative housing, where they had been housed due to suicidal behavior, are observed at 30-minute intervals by custody staff, regardless of the housing units to which they are transferred. | Issued revised policy regarding checks of inmates discharged from crisis beds, and is working to finalize a policy regarding alternative housing. | January 2016 | No. Will begin monitoring systemwide once it finalizes its audit process, which does not have an implementation date. |
| Corrections should take corrective action to address inconsistencies between privileges allowed for patients in crisis beds. | Issued memo reiterating and clarifying policy regarding privileges for inmates in crisis beds. | June 2016 (Updated February 2017) | No. Will begin monitoring systemwide once it finalizes its audit process, which does not have an implementation date. |

Sources: The suicide expert's 2015 report, Corrections' memoranda, and interviews with Corrections' officials.

Several of the recommendations from the suicide expert's 2015 report directed Corrections to revise, examine, or enforce existing policies. Corrections addressed several of these recommendations by issuing memos to the prisons that either reiterate or revise policies. For example, Corrections' 2009 program guide states that custody staff must conduct hourly checks for the first 24 hours after discharge of inmates at risk of suicide who had been admitted to a crisis bed or alternative housing. However, the suicide expert recommended in his 2015 report that these checks occur at 30-minute intervals. In response to this recommendation, Corrections issued a memorandum in January 2016 requiring checks every 30 minutes for the first 24 hours that inmates are discharged from crisis beds.

Corrections is working to finalize a similar policy for inmates released from alternative housing. Further, Corrections made changes to its suicide prevention training and risk evaluation mentoring program.

However, Corrections has yet to fully ensure prisons' compliance with the new and revised policies resulting from the suicide expert's recommendations. For example, despite these policies, many of the problems we identify in Chapter 1 relate to the completion and quality of both risk evaluations and treatment plans. Further, these same issues have persisted for years: court-ordered reports by the special master dating back to 2002 identified similar concerns. In addition, Corrections has yet to ensure attendance at suicide prevention team meetings, as we describe later in this chapter. Further, as we show in Chapter 1, the monitoring it currently provides does not result in significant positive change at the prisons. Although revising policies and holding trainings are important parts of improving prisons' ability to prevent and respond to suicides, Corrections cannot ensure that prisons actually comply with its policies unless it provides adequate monitoring.

*Corrections has yet to fully ensure prisons' compliance with the new and revised policies resulting from the suicide expert's recommendations.*

Corrections is still developing an audit process to, among other things, track implementation of several of the suicide expert's recommendations. According to Corrections' quality administrator, Corrections is integrating certain recommendations from the suicide expert's report into an audit process for conducting audits of prisons' compliance with policies and procedures. The portion of the audit process conducted on site at the prisons rates 12 broad areas—including treatment planning processes, suicide prevention and response to suicide, leadership, staffing, and quality management—on a scale ranging from *proficient* to *urgent concerns*. The resulting reports include specific recommendations.

We reviewed the report of a pilot audit that Corrections conducted of a certain prison and found that the audit was thorough and critical in its analysis of identified deficiencies. According to the report, the audit combined performance data, document reviews, patient and staff interviews, health care record reviews, and the regional teams' on-site observations of the prison's day-to-day operations. Our review suggests that the audit process may prove helpful as Corrections begins improving areas in which it has consistently struggled, particularly because it requires monitoring of several of the suicide expert's recommendations. For example, in response to one of the suicide prevention expert's recommendations, Corrections issued a memo to prisons in March 2016 that explicitly states that they can use only suicide watch or precaution levels of observation for suicidal inmates in crisis beds. According to the health care administrator in charge

of quality control, Corrections added instructions on reviewing prisons' use of suicide watch and precaution to the audit process in response to the suicide expert's recommendations.

Nevertheless, the audit process has been in development for some time. According to Corrections' chief psychologist of the health care division, the court in *Coleman* indicated several times that Corrections needs to demonstrate that it has a full quality improvement system in place that includes processes for continually monitoring, enforcing, and improving its policies and procedures. She explained that, to comply with this requirement with the eventual goal of replacing the court's monitoring, Corrections began developing the audit process and expanded the role of its regional teams, who will be following it. Corrections' quality administrator stated that Corrections first began development of the audit process in 2013, that the regional teams have conducted several initial audits of selected prisons, and that they plan to continue developing the process for use systemwide in the future. However, the quality administrator indicated that Corrections has not established a concrete date for implementation of the audit process systemwide. Corrections' quality administrator stated that it is continuing to work collaboratively with the special master to finalize the audit process. Until Corrections fully implements the audit process systemwide, it lacks assurance as to whether its prisons are adhering to the policies it put in place to address several of the suicide expert's recommendations.

*Despite issuing and revising numerous policies, Corrections has not updated its program guide to reflect these changes since 2009.*

Additionally, despite issuing and revising numerous policies, Corrections has not updated its program guide to reflect these changes since 2009, creating the potential for confusion for the prisons that must implement those policies. Corrections' clinical support chief stated that it would have to coordinate any formal revision to the entire program guide with the special master. However, she explained that prisons can access all of Corrections' policy changes at a central location on its intranet. Further, in March 2017 the court in *Coleman* encouraged Corrections to update its program guide through the publication of addenda called "pocket parts." However, the fact that prison and mental health staff must refer both to the program guide and to any relevant update memos and addenda when determining how to implement policies, is inefficient and adds needless confusion to an already complex process.

Updating the program guide would also help Corrections to identify and correct inconsistencies within it. For example, the program guide states that inmates must not stay in crisis beds for more than 10 days without the approval of a high-ranking official. However, one part of the program guide states that approval must come from the chief of mental health or the appropriate designee,

whereas another part states that approval must come from the chief psychiatrist or the appropriate designee. These are different positions at the four prisons we reviewed. Although we did not identify specific concerns related to this discrepancy, it is further indicative of the need for Corrections to review and revise its program guide. When Corrections does not ensure that prisons are implementing policy changes appropriately or does not document its policies in a clear, organized, consistent, and consolidated fashion, it risks creating confusion and inconsistency in the treatment that prisons provide to inmates. According to Corrections' deputy director of the statewide mental health program, Corrections intends to incorporate appropriate portions of the program guide into state regulations, which will help strengthen Corrections' mental health system. She explained that Corrections has been working on memorializing the policies in regulations, but has yet to begin the formal process for promulgating the regulations and does not have a time frame for when it intends to begin this process.

## Corrections Has Not Ensured That Prisons' Suicide Prevention Teams Adequately Fulfill the Purposes for Which They Were Created

Although Corrections established a statewide suicide prevention team as well as suicide prevention teams at each of the prisons, it has not ensured that these teams exercise sufficient leadership to help prevent suicides. To reduce the risk of inmate suicides, Corrections' policies require the suicide prevention teams to provide staff with training and guidance with regard to suicide prevention, response, reporting, and review. Corrections' policies state that the statewide suicide prevention team and teams at each prison must meet at least monthly, and require that individuals in certain positions, as the text box shows, attend each meeting. However, only one of the four prisons we reviewed met Corrections' attendance requirements. Further, the suicide prevention teams often failed to discuss key issues that might enable the prisons to better prevent suicides.

Suicide prevention and response in California's prisons requires attention from multiple clinical disciplines. If required members are absent, they and the staff they supervise risk missing important information, and the suicide prevention team lacks the insight of the missing members. Nonetheless, only CCWF met attendance

---

**Required Membership of Suicide Prevention Teams**

Prisons:

- Suicide prevention team coordinator (chairperson)
- Chief psychiatrist*
- Chief psychologist*
- Supervising registered nurse
- Senior licensed psychiatric technician or licensed psychiatric technician
- Correctional health services administrator
- Department of State Hospitals' coordinator

Statewide:

- Suicide prevention team coordinator (chairperson)
- Chief psychiatrist
- Chief psychologist
- Nurse consultant
- Designated facility captain

Source: Corrections' 2009 program guide.

\* A senior psychiatrist or senior psychologist attendance meets the quorum requirement in prisons without a chief psychiatrist or chief psychologist position.

requirements for its team in 2016. Although each of the four prisons we visited held monthly suicide prevention team meetings during 2016, the minutes of these team meetings at CIW, SAC, and RJD indicate that they did not meet attendance requirements for 11, 10, and eight monthly meetings, respectively, in 2016. We also found instances in which required suicide prevention team members missed several meetings. For example, at CIW the chief psychiatrist or a designee failed to attend eight of 12 meetings, and at SAC the supervising registered nurse missed six of 12 meetings.

These attendance issues have been brought to Corrections' attention before, and it has pointed to obstacles that make achieving a quorum challenging. For instance, the suicide expert stated in his 2016 report that he found that attendance by some required suicide prevention team members, particularly chief psychiatrists or their designees, was inconsistent at many prisons. Specifically, he explained that eight of the 18 suicide prevention teams he reviewed still fell short of attaining a quorum at their monthly meetings. Corrections' clinical support chief stated that prison staff have many competing demands, making it difficult for teams to coordinate schedules and added that Corrections overlooked the difficulties in assembling key participants in these meetings at the time leadership drafted the program guide. She further explained that some elements regarding suicide prevention team attendance are not clear, such as whether one individual may fill multiple roles and who may send designees. Nevertheless, we found that CCWF was able to meet the attendance requirements every month during 2016. CCWF's chief of mental health explained that its team plans several weeks in advance of a meeting to ensure that all required members can attend, reminds team members about the meeting during the week it is scheduled, and waits until all members are present before starting the meeting.

Further, the suicide expert raised concerns regarding whether the prisons' suicide prevention teams had fully met their responsibilities, some of which are listed in the text box. For instance, one of these responsibilities is ensuring each prison's implementation of and compliance with all of Corrections' policies and procedures relating to suicide prevention and response. However, in his 2016 report, the suicide expert found that the suicide prevention teams had not adequately monitored and evaluated the risk evaluations completed at their respective prisons. Specifically, the suicide expert stated that the prisons' suicide prevention teams were collecting only

---

**Selected Responsibilities of Prisons' Suicide Prevention Teams**

- Ensure implementation of and compliance with all Corrections' policies and procedures relating to suicide prevention and response.

- Implement training related to suicide prevention and response.

- Update local operating procedures to ensure consistency with Corrections' policies regarding suicide prevention and response.

- Review all suicides and suicide attempts in response to which staff performed CPR or other medical procedures, as well as prison staff cell entry and cut-down procedures.

- Monitor and track all suicide gestures, suicide attempts, self-mutilations, and deaths.

Source: Corrections' 2009 program guide.

quantitative but not qualitative monthly data on the completion of risk evaluations. Moreover, in his 2015 report, the suicide expert explained that he found that the prisons engaged in little discussion of overall suicide prevention strategies during their meetings. He commented that most meeting minutes reflected recitations of certain monthly statistics, but included few meaningful discussions about challenging cases or struggles with risk evaluations and treatment planning. In his January 2016 report, he stated that he found few positive changes in suicide prevention team practices at the 18 prisons he reviewed.

We identified similar concerns when we reviewed the minutes for the past three years of suicide prevention teams' meetings at the four prisons we visited. Specifically, the teams often did not discuss key issues, including self-harm incidents and the completion of risk evaluations. CCWF's minutes indicate that the suicide prevention team's reviews of attempted suicides were mostly narrations of events or recitation of statistics rather than analytical discussions focused on lessons learned and prevention. For example, its May 2016 minutes describe that two inmates attempted suicide by swallowing foreign objects, but the minutes do not indicate any actions required or lessons learned as a result of these incidents. In the same minutes, the team reported that the prison's mental health staff had a 29 percent passing rate for risk evaluation audits, but the minutes do not indicate that the team discussed what caused the low passing rate and how they planned to improve staff performance. Similarly, at RJD, discussions about mentoring and training prison staff regarding the completion of risk evaluations largely focused on quantitative data, such as attendance and completion rates. Further, RJD's suicide prevention team minutes do not indicate that discussions extended to the quality of the training or mentoring. Without such discussions, the work of the suicide prevention teams becomes more focused on reporting data rather than ensuring compliance with Corrections' policies and procedures related to suicide prevention and response.

### Corrections Has Not Ensured That It Reports Reliable Data on Inmate Suicide and Suicide Attempts

Corrections collects and reports data related to its operations using an organizational management tool called COMPSTAT. Each month Corrections publishes a statistical report detailing more than 500 data points on its prisons' operations. According to the COMPSTAT operations manager, Corrections' staff conduct a quality control process that entails reviewing the data they receive from prisons each month. She explained that staff look for outliers, unexpected patterns, and system issues. In addition, she stated that Corrections' staff meet with each prison's staff annually to discuss

the data in detail, which includes a joint annual review with the prison's leadership to discuss each line item in the annual report to ensure that the COMPSTAT numbers match the prison's numbers.

*We found discrepancies in the data related to COMPSTAT—Corrections' organizational management tool—that bring into question the data's accuracy.*

Nevertheless, we found discrepancies related to COMPSTAT's data that bring into question the data's accuracy. For example, for each of the four prisons we reviewed, we selected four months of COMPSTAT data from 2014 through 2016 and compared those months to the prisons' incident logs. We found that COMPSTAT reported a greater number of attempted suicides at CIW and suicides at CCWF than were recorded in their incident logs, and that it reported fewer attempts at SAC and RJD than were recorded in their respective logs. Further, when we reviewed suicide prevention team meeting minutes, incident reports, and other records, we found that COMPSTAT did not include suicides that occurred from 2013 through 2016 at three of the prisons we reviewed. Moreover, we were surprised to find that the special master's reports identify significantly more suicides from 2012 through 2015 than are recorded in COMPSTAT. For instance, COMPSTAT shows 18 suicides in 2015, while the suicide expert reported 24—a 33 percent difference.

Corrections' clinical support chief offered a number of explanations for the discrepancies we identified. She stated that the special master's reports used data from Corrections' mental health program on suicides in prisons, which she believes are accurate because it is this program that determines whether a death is a suicide. She explained that the numbers in COMPSTAT may be understated because they are based on prison staff's initial incident reports. She told us that the classification of incidents may not be accurate because an inmate may die from an attempted suicide days or weeks after the attempt occurs. Further, she noted that mental health staff have the opportunity to more thoroughly review the circumstances of incidents, which may cause them to reach different conclusions than the prison staff's initial incident reports reflect. In these instances, the clinical support chief indicated that the mental health program's data will reflect its staff assessment of the incident, but COMPSTAT may not. Specifically, she explained that prison staff are supposed to update this information in COMPSTAT by providing updated incident reports; however, she believes this step may not have always occurred given the understated suicide numbers in COMPSTAT.

The clinical support chief stated that she has previously raised these concerns with the COMPSTAT team, and the team was not resistant to adjusting its processes in order to present more accurate data. Because COMPSTAT represents Corrections' comprehensive source of data it makes readily available to the public on suicides and attempted suicides for each of its prisons, it must take steps

to ensure that the data are accurate. Otherwise, the public may draw incorrect conclusions about the rate of suicides and suicide attempts at a given prison or in the system as a whole.

## Corrections Can Increase Its Documentation and Dissemination to Prisons of Best Practices Related to Suicide Prevention

Although innovative programs and best practices related to inmate suicide prevention exist, Corrections could increase its efforts to document and disseminate this information to the prisons, and to monitor the success of programs or practices that could prove beneficial. For example, during our visit to RJD, we noted that it had implemented a program known as Striving to Achieve Rewards (STAR) that might benefit certain inmates at other prisons as well. RJD implemented STAR in August 2016 for inmates in its enhanced outpatient program, which provides care for mentally disordered inmates in a structured therapeutic environment that is less restrictive than inpatient care. According to a STAR pamphlet, the program's purpose is to improve inmate quality of life by creating a therapeutic community where inmates have many opportunities for positive experiences. STAR provides rewards to inmates for engaging in positive behavior, such as attending mental health groups and treating mental health staff and peers in a respectful manner. Over time, the inmates accumulate points that they can use for different levels of rewards, including participating in drama and book clubs and purchasing items, such as hygiene products, from the STAR store. RJD's chief psychologist stated that preliminary data, while not conclusive, have indicated that incidents of self-harm and rules violations have decreased since STAR began, even though RJD's inmate population has increased.

*RJD implemented a program that rewards positive behavior, such as attending mental health groups and treating staff and peers in a respectful manner. RJD stated that incidents of self-harm and rules violations have decreased since the program began.*

We also noted another program that RJD is in the process of developing that could prove useful for staff working in other prisons. Specifically, according to the program-related materials, workplace stress and job burnout are high among staff working in correctional settings. To better support its staff in managing its high-risk inmate population, RJD began developing a program named Helping Everyone Reach Objectives. The program's documentation indicates that RJD is designing a framework to provide additional resources and support to its multidisciplinary treatment teams who directly deal with inmate-patients. The program aims to ensure that RJD continues to provide high-quality care to its inmate population by providing staff with consultation and coaching, as well as fostering closer collaboration between all prison staff. According to RJD's chief psychologist, the prison had implemented aspects of the program with certain staff as of May 2017. It anticipates an increased rollout by the summer of 2017.

Corrections' clinical support chief agreed that RJD's programs are innovative and explained that implementing them on a systemwide basis might be useful at some prisons, depending on those prisons' missions, infrastructures, and security levels. Nevertheless, Corrections' documentation related to discussion and dissemination of innovative programs and best practices related to suicide prevention is limited. For example, the deputy director of Corrections' statewide mental health program stated that in February 2016, Corrections' mental health program held a summit regarding suicide prevention at its headquarters in Northern California. She explained that prison leadership, including prisons' suicide prevention team coordinators, chiefs of mental health, and selected wardens, attended the summit to discuss challenges with suicide prevention, share best practices, and identify additional initiatives that might help improve the suicide prevention efforts already in place. She noted that Corrections has a number of plans for implementing ideas such as increasing outreach to inmates both inside and outside of mental health care. However, she could not provide documentation of the best practices discussed or of the outcomes of the summit's discussions—she could only provide the agenda and a spreadsheet listing Corrections' suicide prevention team's July 2017 tasks and priorities, which indicated the suicide summit occurred and another one would be scheduled in the near future. She stated that Corrections is tentatively planning to hold another summit in October 2017, and acknowledged that holding these summits at least annually is a good idea. We believe such meetings should occur on an ongoing basis, not only to discuss and document best practices, but also to monitor their effectiveness. This approach would provide Corrections an opportunity to formally disseminate information regarding programs like those at RJD.

Additionally, Corrections' clinical support chief stated that it holds quarterly meetings at headquarters between the prisons' chiefs of mental health where informal discussion on best practices may occur. She further explained that the regional teams hold monthly calls for all prisons within their respective regions, which also allows for the sharing of ideas and best practices. However, because these discussions are not documented, the clinical support chief could not provide evidence of any best practices discussed. Because it has not documented the discussion of best practices during these meetings and calls, Corrections has likely missed opportunities to formally identify and disseminate innovative program ideas systemwide, as well as to evaluate the effectiveness of these practices.

### Corrections Could Do More to Assess Ways to Reduce Suicide Attempts

Corrections' policies require that it review each suicide to determine whether staff complied with its policies and procedures, such as the prison's emergency response to the suicide, completion of suicide risk evaluations, and follow-up treatment after the inmate's discharge from a crisis bed prior to the suicide. The text box lists the specific information Corrections reviews. Corrections' policies require it to submit a report to the prison within 60 days of the inmate's death that includes recommended actions to address any problems it identified during its review and due dates for the prison to complete those actions. Prisons then have 90 days to submit documentation proving they have implemented the recommendations. According to Corrections' clinical support chief, Corrections established these timelines to ensure that it promptly identifies problems and that prisons take quick action to correct them.

> **Information Included in Corrections' Investigation of an Inmate Suicide**
>
> - Emergency response to the incident.
> - Medical autopsy and toxicology findings.
> - Inmate's background.
> - Inmate's ability to function in an institutional setting.
> - Inmate's mental health history.
> - Inmate's suicide attempt history.
> - Mental health care the inmate received while incarcerated.
> - Inmate's medical history.
> - Significant events preceding the suicide.
>
> Source: California State Auditor's analysis of Corrections' suicide report template.

The resulting reports are comprehensive enough to provide Corrections and its prisons with information critical to improving suicide prevention and response. Nonetheless, Corrections does not conduct similarly detailed reviews of the circumstances surrounding suicide attempts. As a result, it may not identify problems with clinical care or prisons' compliance with policies until those problems have contributed to an inmate's death. Although Corrections' policies require prisons to monitor and track suicide attempts, we do not believe Corrections requires sufficient detail in these reviews. Specifically, as of March 2017, its policies require that prisons' suicide prevention teams review the appropriateness of treatment plans for these inmates and the daily follow-up checks that mental health staff must complete for five days following the inmates' discharges from crisis beds. However, Corrections does not require prisons to review other important circumstances surrounding suicide attempts, such as the actions of staff responding to the incidents and the adequacy of the risk evaluations that mental health staff completed before the attempts.

One of the four prisons we reviewed has implemented policies requiring in-depth documented reviews of selected self-harm incidents, including suicide attempts, at its facility. Specifically, SAC implemented a policy requiring its suicide prevention coordinator and supervisors involved with crisis triage and inpatient care to identify self-harm incidents that might require detailed review, such as incidents where the inmates suffered serious bodily injury.

SAC prison officials explained that the suicide prevention team assigns mental health staff to conduct a review of the identified incident. According to a prison official at SAC, since 2008 the prison has completed roughly 450 of these self-harm reviews, but has performed a decreasing number because of increasing workloads and time constraints. We reviewed three of these reviews that the prison completed in 2016 and found that they generally included a thorough review of the inmates' mental health history, mental health status, and suicide risk. However, the reviews did not contain an examination of the adequacy of the inmates' previous risk evaluations or treatment plans, and were not as detailed or pointed in their criticism as Corrections' suicide review process.

Corrections plans to require prisons to complete more detailed reviews of suicide attempts. According to Corrections' clinical support chief, Corrections will require prisons to conduct detailed reviews of a selection of self-harm incidents where the inmate intended to die and there was serious bodily injury beginning in July 2017. She said that the prisons will need to review all of the same items that are included in the suicide reviews, except those that are not applicable, such as autopsy and toxicology reports, or those that would be inappropriate due to the need to protect inmate privacy, such as cellmate or peer interviews. However, even if Corrections requires prisons to be more detailed in their examination of self-harm incidents, prison staff are less likely to be as critical of their own processes as an external reviewer from Corrections might be. Corrections' clinical support chief stated that requiring Corrections to conduct such reviews at each prison could be resource intensive, but that pairing each prison with another, similar prison and having them review each other could help to ensure that the reviews are impartial. Absent an unbiased, thorough review of the factors contributing to inmate suicide attempts, Corrections may not identify potential problems with prisons' suicide prevention and response practices until after inmates have already died.

**Recommendations**

*Legislature*

To provide additional accountability for Corrections' efforts to respond to and prevent inmate suicides and attempted suicides, the Legislature should require that Corrections report to it in April 2018 and annually thereafter on the following issues:

- Its progress in implementing the recommendations made by the special master's experts, the court-appointed suicide expert, and its own reviewers regarding inmate suicides and attempts. Corrections should include in its report to the Legislature the results of any audits it conducts as part of its planned audit process to measure the success of changes it implements as a result of these recommendations.

- Its progress in identifying and implementing mental health programs that may ameliorate risk factors associated with suicides at the prisons.

*Corrections*

To ensure that prisons comply with its policies related to suicide prevention and response, Corrections should continue to develop its audit process and implement it at all prisons by February 2018. The process should include, but not be limited to, audits of the quality of prisons' risk evaluations and treatment plans.

To ensure that prisons can easily access Corrections' current policies related to mental health, Corrections should ensure that its program guide is current and complete as it works to incorporate the program guide into regulations. Corrections should immediately begin working with federal court monitors to draft regulations.

To ensure that suicide prevention teams meet quorum requirements, Corrections should, starting January 2018, work with prisons that consistently fail to achieve a quorum to resolve issues that may be preventing the teams from having all required members present at meetings.

To eliminate confusion regarding suicide prevention team meeting attendance, Corrections should immediately update its program guide to clarify who is required to attend suicide prevention team meetings, which attendees may send designees, and the extent to which staff may fill multiple roles when meeting quorum requirements.

To ensure that suicide prevention teams exercise leadership at prisons, Corrections should immediately require them to use available information about critical factors—such as the number and nature of inmate self-harm incidents and the quality and compliance with the policy of risk evaluations and treatment plans—to identify systemic issues related to suicide prevention. Corrections should require the suicide prevention teams to assess lessons they can learn, create plans to resolve current issues, and prevent foreseeable problems in the future.

To provide the public and relevant stakeholders with accurate information on suicides and suicide attempts in its prisons, Corrections should immediately require prison staff to work with mental health staff to reconcile any discrepancies on suicides and suicide attempts before submitting numbers to the COMPSTAT unit.

To ensure that all its prisons provide inmates with effective mental health care, Corrections should continue to take a role in coordinating and disseminating best practices related to mental health treatment by conducting a best practices summit at least annually. The summits should focus on all aspects of suicide prevention and response, including programs that seek to improve inmate mental health and treatment of and response to suicide attempts. Corrections should document and disseminate this information among the prisons, assist prisons in implementing the best practices through training and communication when needed, and monitor and report publicly on the successes and challenges of adopted practices.

In an effort to prevent future inmate suicide attempts, Corrections should implement its plan to review attempts with the same level of scrutiny that it uses during its suicide reviews. Corrections should require each prison's suicide prevention team to identify for review at least one suicide attempt per year that occurred at its prison. To ensure that the reviews include critical and unbiased feedback, Corrections should either conduct these reviews itself or require the prisons to review each other. These reviews should start in September 2017 and follow the same timelines as the suicide reviews, with the timeline beginning once the team identifies a suicide attempt for review.

We conducted this audit under the authority vested in the California State Auditor by Section 8543 et seq. of the California Government Code and according to generally accepted government auditing standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives specified in the Scope and Methodology section of the report. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

Respectfully submitted,

*Elaine M. Howle*

ELAINE M. HOWLE, CPA
State Auditor

Date:           August 17, 2017

Staff:          Laura G. Kearney, Audit Principal
                John Lewis, MPA
                Fahad Ali, CFE
                Amanda Millen, MBA
                Alejandro Raygoza, MPA
                Kelly Reed, MSCJ

Legal Counsel:  Heather Kendrick, Sr. Staff Counsel

For questions regarding the contents of this report, please contact
Margarita Fernández, Chief of Public Affairs, at 916.445.0255.

Blank page inserted for reproduction purposes only.

# Appendix A

## RATES OF INMATE SUICIDES AND SUICIDE ATTEMPTS IN STATE PRISONS FROM 2012 THROUGH 2016

The Joint Legislative Audit Committee (Audit Committee) requested that we compare the rates of suicides and attempted suicides for male and female inmates in all state prisons from 2014 through 2016. In order to calculate these rates, we used data from Corrections' COMPSTAT system because it is the most comprehensive source of publicly reported data for the entire correctional system. Based on our analysis of COMPSTAT data, Table A beginning on the following page presents the rates and number of inmate suicides and suicide attempts at each state prison from 2012 through 2016. As we discuss in Chapter 3, the data from COMPSTAT on inmate suicides and attempted suicides are unreliable; however, they are also the most comprehensive, as well as being the data Corrections makes available to the public. Therefore, we present the data here but recommend in Chapter 3 that Corrections take steps to ensure its accuracy in the future.

**Table A**

**Suicides and Suicide Attempts in Each California Prison From 2012 Through 2016**

| | 2012 | | | | | 2013 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | ATTEMPTED SUICIDES | | SUICIDES | | | ATTEMPTED SUICIDES | | SUICIDES | |
| PRISON | POPULATION | TOTAL | PER 1,000 | TOTAL | PER 1,000 | POPULATION | TOTAL | PER 1,000 | TOTAL | PER 1,000 |
| Avenal State Prison | 5,020 | | 1.00 | | 0.20 | | 3 | | 0 | |
| California City Correctional Facility | — | | — | | — | | — | | — | |
| California Correctional Center | 4,657 | | 0.43 | | 0.00 | | 2 | | 0 | |
| California Correctional Institution | 4,643 | | 1.08 | | 0.22 | | 5 | | 1 | |
| California Health Care Facility | — | | — | | — | | — | | — | |
| California Institution for Men | 5,002 | | 2.00 | | 0.00 | | 7 | | 0 | |
| *California Institution for Women* | *1,636* | | *7.95* | | *0.61* | | *15* | | *0* | |
| California Medical Facility | 2,363 | | 7.19 | | 0.42 | | 28 | | 2 | |
| California Men's Colony | 5,368 | | 3.91 | | 0.00 | | 29 | | 0 | |
| California Rehabilitation Center | 3,694 | | 0.27 | | 0.00 | | 1 | | 0 | |
| California State Prison, Corcoran | 4,626 | | 4.32 | | 0.22 | | 16 | | 1 | |
| California State Prison, Los Angeles County | 3,848 | | 3.38 | | 0.00 | | 7 | | 1 | |
| *California State Prison, Sacramento* | *2,693* | | *8.17* | | *0.37* | | *32* | | *1* | |
| California State Prison, Solano | 4,313 | | 0.93 | | 0.23 | | 2 | | 0 | |
| California Substance Abuse Treatment Facility and State Prison | 5,683 | | 2.64 | | 0.00 | | 11 | | 0 | |
| California Training Facility, Soledad | 5,759 | | 0.69 | | 0.00 | | 3 | | 2 | |
| Calipatria State Prison | 3,814 | | 0.00 | | 0.00 | | 12 | | 0 | |
| Centinela State Prison | 3,659 | | 0.55 | | 0.27 | | 1 | | 1 | |
| *Central California Women's Facility* | *2,934* | | *1.70* | | *0.00* | | *8* | | *0* | |
| Chuckawalla Valley State Prison | 2,712 | | 0.00 | | 0.00 | | 0 | | 0 | |
| Deuel Vocational Institution | 2,504 | | 4.79 | | 0.80 | | 6 | | 0 | |
| Folsom State Prison | 2,840 | | 0.70 | | 1.06 | | 4 | | 3 | |
| High Desert State Prison | 3,695 | | 2.17 | | 0.00 | | 2 | | 1 | |
| Ironwood State Prison | 3,503 | | 0.86 | | 0.00 | | 3 | | 0 | |
| Kern Valley State Prison | 4,108 | | 2.43 | | 0.00 | | 20 | | 1 | |
| Mule Creek State Prison | 3,027 | | 4.96 | | 0.33 | | 13 | | 1 | |
| North Kern State Prison | 4,680 | | 1.71 | | 0.00 | | 14 | | 1 | |
| Pelican Bay State Prison | 3,091 | | 3.56 | | 0.00 | | 17 | | 0 | |
| Pleasant Valley State Prison | 3,737 | | 2.14 | | 0.54 | | 5 | | 1 | |
| *Richard J. Donovan Correctional Facility* | *3,537* | | *7.92* | | *0.00* | | *33* | | *3* | |
| Sierra Conservation Center | 4,555 | | 0.22 | | 0.22 | | 4 | | 0 | |
| San Quentin State Prison | 3,853 | | 3.37 | | 0.78 | | 14 | | 3 | |
| Salinas Valley State Prison | 3,607 | | 10.26 | | 1.11 | | 27 | | 2 | |
| Valley State Prison | 2,074 | | 5.79 | | 0.00 | | 3 | | 0 | |
| Wasco State Prison | 5,043 | | 4.96 | | 0.20 | | 27 | | 1 | |
| **Totals\*** | **126,276** | **352** | **2.79** | **25** | **0.20** | **123,238** | **374** | **3.03** | **25** | **0.20** |

Source: California State Auditor's analysis of Corrections' COMPSTAT metrics.

Notes: As we note in Chapter 3 on page 58, our review of various records from individual prisons revealed that COMPSTAT has consistently underreported the number of suicides in California prisons. The numbers in this table are not adjusted; we present them as they appear in COMPSTAT.

Italicized rows represent the four prisons reviewed in this audit.

\* Because we calculated populations based on a 12-month average, annual population amounts may differ from the total prison populations due to rounding.

| | 2014 | | | | | 2015 | | | | | 2016 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | ATTEMPTED SUICIDES | | SUICIDES | | | ATTEMPTED SUICIDES | | SUICIDES | | | ATTEMPTED SUICIDES | | SUICIDES |
| POPULATION | TOTAL | PER 1,000 | TOTAL | PER 1,000 | POPULATION | TOTAL | PER 1,000 | TOTAL | PER 1,000 | POPULATION | TOTAL | PER 1,000 | TOTAL | PER 1,000 |
| 4,028 | 4 | 0.99 | | 0.00 | | 3 | | 0 | | 3,274 | | 0.61 | 0 | 0.00 |
| 1,825 | | 0.00 | | 0.00 | | | | | | 1,933 | 0 | 0.00 | | 0.00 |
| 4,909 | | 0.00 | | 0.20 | | 1 | | 0 | | 3,991 | 0 | 0.00 | | 0.25 |
| 4,404 | | 0.68 | | 0.45 | | 11 | | 1 | | 3,435 | 17 | 4.95 | | 0.58 |
| 1,626 | 17 | 10.45 | | 0.00 | | | | | | 2,342 | 26 | 11.10 | | 0.43 |
| 4,636 | 13 | 2.80 | | 0.22 | | | | 1 | | 3,669 | | 1.64 | 0 | 0.00 |
| 1,994 | 15 | 7.52 | | 1.00 | | 34 | | 2 | | 1,882 | 24 | 12.75 | 2 | 1.06 |
| 2,082 | 16 | 7.69 | | 0.48 | | 15 | | 1 | | 2,563 | 8 | 3.12 | | 0.00 |
| 4,368 | 18 | 4.12 | 0 | 0.00 | | 15 | | 2 | | 4,101 | 12 | 2.93 | | 0.73 |
| 2,826 | 0 | 0.00 | | 0.00 | | 7 | | 0 | | 3,006 | | 0.67 | | 0.00 |
| 4,335 | | 3.92 | | 0.00 | | 20 | | 1 | | 3,640 | 33 | 9.07 | | 0.00 |
| 3,587 | 22 | 6.13 | | 0.00 | | 11 | | 0 | | 3,479 | 19 | 5.46 | | 0.57 |
| 2,212 | 11 | 4.97 | | 0.90 | | 12 | | 3 | | 2,339 | 8 | 3.42 | | 0.86 |
| 4,005 | 8 | 2.00 | | 0.25 | | 5 | | 0 | | 3,983 | | 0.50 | | 0.00 |
| 5,435 | 16 | 2.94 | 1 | 0.18 | | 19 | | 0 | | 5,296 | 32 | 6.04 | | 0.00 |
| 4,963 | 5 | 1.01 | | 0.00 | | 1 | | 0 | | 5,184 | | 0.96 | | 0.00 |
| 3,863 | 5 | 1.29 | | 0.00 | | 2 | | 0 | | 3,819 | 0 | 0.00 | | 0.00 |
| 2,862 | | 0.00 | | 0.00 | | 4 | | 0 | | 3,614 | | 1.11 | | 0.00 |
| 3,652 | | 1.64 | | 0.00 | | 11 | | 0 | | 2,861 | 25 | 8.74 | | 0.35 |
| 2,315 | | 0.43 | | 0.00 | | 0 | | 0 | | 2,425 | | 0.00 | | 0.00 |
| 2,561 | 14 | 5.47 | | 0.00 | | 10 | | 3 | | 2,340 | 14 | 5.98 | | 0.00 |
| 3,100 | 2 | 0.65 | | 0.00 | | 1 | | 1 | | 2,979 | | 0.34 | | 0.34 |
| 3,421 | | 2.63 | | 0.29 | | 1 | | 0 | | 3,702 | | 0.54 | | 0.00 |
| 3,018 | 5 | 1.66 | | 0.00 | | 1 | | 0 | | 3,265 | | 0.31 | | 0.00 |
| 3,804 | 30 | 7.89 | | 0.26 | | 26 | | 0 | | 3,910 | 16 | 4.09 | 3 | 0.77 |
| 2,908 | 17 | 5.85 | 2 | 0.69 | | 22 | | 0 | | 3,266 | 18 | 5.51 | | 0.00 |
| 4,591 | 18 | 3.92 | | 0.00 | | 11 | | 0 | | 4,381 | | 1.14 | | 0.23 |
| 2,777 | 4 | 1.44 | | 0.36 | | 11 | | 0 | | 2,247 | 15 | 6.67 | 1 | 0.44 |
| 3,113 | 7 | 2.25 | | 0.00 | | 2 | | 0 | | 3,206 | | 0.31 | 1 | 0.31 |
| 3,076 | 22 | 7.15 | 1 | 0.33 | | 37 | | 1 | | 3,112 | 59 | 18.96 | | 0.00 |
| 4,628 | | 0.43 | | 0.00 | | 3 | | 0 | | 4,329 | | 0.69 | | 0.00 |
| 3,920 | | 3.06 | | 0.51 | | 14 | | 2 | | 3,953 | | 2.53 | | 0.00 |
| 3,415 | | 5.56 | | 0.29 | | 23 | | 0 | | 3,718 | 17 | 4.57 | | 1.08 |
| 3,243 | | 2.16 | | 0.00 | | 11 | | 0 | | 3,455 | | 1.74 | | 0.00 |
| 5,154 | 20 | 3.88 | | 0.00 | | 27 | | 0 | | 4,983 | 26 | 5.22 | | 0.00 |
| 122,652 | 365 | 2.98 | 20 | 0.16 | 114,130 | 391 | 3.43 | 18 | 0.16 | 119,681 | 419 | 3.50 | 25 | 0.21 |

Blank page inserted for reproduction purposes only.

# Appendix B

## SCOPE AND METHODOLOGY

The Audit Committee directed the California State Auditor to perform an audit of Corrections' policies, procedures, and practices related to suicide prevention and reduction. We were directed to review the suicide and attempted suicide rates for male and female inmates in all state prisons; Corrections' policies and procedures for inmate suicide prevention and response, as well as their implementation; and CIW's implementation of Corrections' policies. We were also asked to determine areas in which Corrections could improve its mental health services, causes for CIW's high suicide rates, and the adequacy of mental health and suicide prevention training for CIW staff. Table B lists the objectives that the Audit Committee approved and summarizes the methods we used to address those objectives.

**Table B**
**Audit Objectives and the Methods Used to Address Them**

| | AUDIT OBJECTIVE | METHOD |
|---|---|---|
| 1 | Review and evaluate the laws, rules, and regulations significant to the audit objectives. | We reviewed relevant state laws and regulations. |
| 2 | Evaluate Corrections' policies and procedures for inmate suicide prevention and response, including those related to instances when an inmate exhibits suicidal behavior. Determine whether such policies and procedures are implemented consistently throughout California's state prisons. | • We judgmentally selected three prisons to review in addition to CIW based on an analysis of the number of suicides and suicide attempts from 2014 through 2016 and of the prisons' missions: CCWF, RJD, and SAC.<br>• We obtained Corrections' policies and procedures for inmate suicide prevention and response. Further, we reviewed local operating procedures at each of the four prisons.<br>• We reviewed the *Coleman* special master monitoring reports, Corrections' suicide reports, and the suicide expert's audits to identify recommendations made to CIW, Corrections, and the other three prisons. We determined if the appropriate policies and procedures reflected those recommendations. We also interviewed relevant Corrections' staff for perspective on the implementation of these recommendations.<br>• We judgmentally selected 10 inmate suicides and suicide attempts from 2014 through 2016 from each of the four prisons. We reviewed the records for the 40 inmates' suicides and suicide attempts to determine if the prisons adhered to their local operating procedures and Corrections' policies and procedures on suicide prevention and response. We interviewed relevant staff at Corrections and at the prisons to obtain perspective on issues we found pertaining to these records. |
| 3 | For the most recent three-year period, compare the suicide and attempted suicide rates for male and female inmates in all state prisons. | • To better identify trends, we reviewed the five-year period from 2012 through 2016.<br>• We gathered Corrections' statistics on inmate suicides and suicide attempts from 2012 through 2016 for all California state prisons from Corrections' organizational management tool called COMPSTAT.<br>• We analyzed the COMPSTAT data to present the inmate suicide and suicide attempt rates by prison in Appendix A.<br>• We obtained perspective from Corrections' officials on any trends or inaccuracies that we observed and the methods Corrections used to gather and track these data.<br>• For Table 1 on page 9 and Table 6 on page 40, we adjusted the COMPSTAT data we present on suicides for the four prisons we reviewed based on documentation of suicides not recorded in COMPSTAT. In Table 1, we also adjusted the prison populations for the four prisons we reviewed based on average daily populations Corrections provided. In Appendix A, we did not adjust the COMPSTAT data as they are the data Corrections makes available to the public. |

*continued on next page ...*

| AUDIT OBJECTIVE | METHOD |
|---|---|
| 4 Identify areas where Corrections can improve its mental health services, particularly with respect to the safety and care for inmates needing mental health treatment. | • Using the results of the testing of policies and recommendations in Objective 2, we determined areas in which Corrections could improve its practices. We gathered perspective on these areas of improvement from relevant Corrections' staff. |
| | • We reviewed the monthly meeting minutes for the statewide suicide prevention team and the suicide prevention teams at each of the four prisons for 2016 to determine the meeting attendees and the topics staff addressed. |
| | • We interviewed Corrections' officials and reviewed available documentation to identify the methods used to discuss, document, and disseminate best practices to the prisons related to suicide prevention and response. |
| | • We obtained Corrections' reports on position vacancy rates as of December 2016 for social workers, psychiatrists, and psychologists at the four prisons we reviewed and for Corrections as a whole. |
| | • We interviewed key staff at the four prisons and Corrections' headquarters to gather perspective on staff vacancies. |
| 5 In reviewing the CIW do the following: | The procedures we performed in Objective 2 also addressed this objective. |
| a. Evaluate whether CIW appropriately implemented Corrections' suicide prevention policies. | |
| b. Identify and analyze CIW's policies and procedures in the event of a suicide, including any ensuing investigation and communication with the deceased inmate's family during and after such investigation. | • The procedures we performed in Objective 2 also addressed this objective. |
| | • We reviewed Corrections' procedures for communicating with a deceased inmate's family following a death. |
| | • We reviewed records for six inmates who committed suicide from 2014 through 2016 and determined that CIW complied with Corrections' policies for communicating with a deceased inmate's family following a suicide. |
| c. To the extent possible, identify the causes or factors contributing to the higher rates of suicide and suicide attempts at CIW, including any systemic problems or failures. | • We interviewed key Corrections' headquarters staff and CIW staff to gather their perspectives on the causes for the higher rates of suicide and suicide attempts at CIW from 2014 through 2016. |
| | • We evaluated data from CIW and CCWF regarding the suicide attempts by inmates who transferred from VSPW. |
| | • We reviewed Corrections' available documentation of the plan to convert VSPW to a men's prison. |
| | • We interviewed officials at CIW and Corrections to determine if the conversion process accounted for the effect the transfer of inmates from VSPW would have on CIW. |
| d. Identify and analyze CIW's policies and practices in the event that an inmate displays suicidal behavior. Evaluate CIW's ability to appropriately house and treat inmates identified as suicidal and determine whether CIW allows access to inmate program activities or movements such as yard time. | • The procedures we performed in Objective 2 for the 40 inmates' suicides and suicide attempts also addressed this objective. |
| | • We reviewed CIW's policies and documentation for six inmates regarding access to yard time. |
| e. Evaluate the adequacy of the mental health and suicide prevention training for CIW staff. | • From a list containing all employees at CIW, we randomly selected 20 CIW staff members and determined the percentage who received annual suicide prevention training in 2014, 2015, and 2016. |
| | • From a list containing all mental health staff at CIW, we randomly selected 10 psychiatrists, psychologists, and social workers and determined how many received training on how to complete suicide risk evaluations and other trainings required for mental health staff. |
| | • We reviewed several suicide prevention trainings that Corrections' staff received to determine if the trainings contained the content Corrections' policies require and any additional content the suicide expert had recommended. |
| | • We obtained self-reported data on selected required trainings from CCWF, CIW, RJD, and SAC and identified instances of low compliance. |
| 6 Review and assess any other issues that are significant to the audit. | • We interviewed selected advocacy groups to identify their key concerns related to our audit scope. |
| | • We addressed concerns related to delays in emergency response and monitoring inmates in Objective 2. |
| | • We also addressed concerns related to identifying and disseminating best practices in Objective 4. |

Sources: California State Auditor's analysis of the Audit Committee's audit request number 2016-131, planning documents, and analysis of information and documentation identified in the table column titled *Method*.

**Assessment of Data Reliability**

In performing this audit, we obtained data from Corrections'
COMPSTAT organizational management tool. The
U.S. Government Accountability Office, whose standards we are
statutorily required to follow, requires us to assess the sufficiency
and appropriateness of computer-processed information that
we use to support findings, conclusions, or recommendations.
Corrections' COMPSTAT tool provides monthly data to
stakeholders and the public on a variety of measures at each of
Corrections' prisons and other institutions. We used COMPSTAT
data to report on the number of suicides and attempted suicides
throughout California's adult prisons. We performed data-set
verification procedures and found no errors. Further, as reported
in Chapter 3, we assessed the accuracy and completeness of
COMPSTAT data by comparing the data on suicides and attempted
suicides for selected months to incident logs from the four prisons
we visited and identified several errors. We also compared the
number of suicides reported in COMPSTAT to those in reports
from the special master's suicide experts and found they did not
agree. Finally, during the course of our audit work, we identified
one suicide each at three of the four prisons we visited that was
not included in COMPSTAT. As a result, we determined that
COMPSTAT data are not sufficiently reliable for the purposes of
this audit. Nevertheless, we present these data in the report because
COMPSTAT is Corrections' comprehensive source of data available
on suicides and attempted suicides for each of its prisons, and it
contains data Corrections makes publicly available. We discuss our
findings in more detail in Chapter 3 and make a recommendation
for improving the data on page 64.

We also obtained summary data from Corrections on the rates at
which its employees attend various trainings. We tested selected
employees at CIW and determined they did not all attend required
trainings. We requested self-reported summary data from
Corrections for each of the four prisons we visited to determine
whether there was evidence at each prison to corroborate our
findings at CIW. Because the data corroborated our findings, we
determined it would be too resource-intensive to further test the
accuracy and completeness of the prisons' self-reported data.
Instead, we clearly attribute the data in the report to Corrections.

Blank page inserted for reproduction purposes only.

STATE OF CALIFORNIA—DEPARTMENT OF CORRECTIONS AND REHABILITATION                    EDMUND G. BROWN JR., GOVERNOR

**OFFICE OF THE SECRETARY**
P.O. Box 942883
Sacramento, CA 94283-0001

July 31, 2017

Ms. Elaine M. Howle, State Auditor
California State Auditor
621 Capitol Mall, Suite 1200
Sacramento, CA 95814

Dear Ms. Howle:

The California Department of Corrections and Rehabilitation (CDCR) submits this letter in response to the California State Auditor's (CSA) audit titled "California Department of Corrections and Rehabilitation: It Must Increase Its Efforts to Prevent and Respond to Inmate Suicides."

CDCR takes its responsibility to prevent inmate deaths by suicide very seriously and reviews each case carefully to allow it to continue to refine the suicide prevention program. Delivery of mental health services to CDCR inmates has improved overall, and CDCR continues to create a culture of focused improvement, oversight, and accountability in the area of suicide prevention both with staff and inmates. CDCR is committed to continuously evaluating and improving the performance and quality of the entire Mental Health Services Delivery System, including suicide prevention and response practices.

CDCR has made a great deal of progress implementing policies, training, and support for suicide prevention practices statewide, and acknowledges there is further progress to make. CDCR has completed or has in progress 58 initiatives, only 29 of which were recommendations from external suicide experts. For example, CDCR is nearing completion of a contract to provide substance abuse treatment specifically designed for individuals with mental health issues at the California Institution for Women (CIW) and other institutions; is developing a contract to address domestic violence for inmates in the mental health system in CDCR's women's institutions; has implemented the use of new suicide assessment tools and treatment protocols that reflect best practices in the field of suicidology; and provides increased mental health outreach to all inmates at CIW (including those who are not in the mental health system) by offering access to brief, solution-focused counseling.

CSA's report on CDCR's suicide prevention policies highlights areas where CDCR has already improved its practices, and where improvements continue to be made. CDCR will consider the recommendations made by the auditors to continue to improve upon its ongoing suicide prevention mission.

CDCR would like to thank CSA for their work on this report and will address the specific recommendations in a corrective action plan within the timelines outlined in the report. If you have further questions, please contact me at (916) 323-6001.

Sincerely,

SCOTT KERNAN
Secretary

exhibit - 6

Suicide prevention and Response

# CHAPTER 10
## Suicide Prevention and Response

### A. INTRODUCTION

It is the goal of the California Department of Corrections and Rehabilitation (CDCR) Suicide Prevention and Response Focused Improvement Team (SPR FIT) to prevent inmate deaths due to suicide. Suicide is defined as an intentional self-injurious behavior that causes or leads to one's own death. CDCR recognizes that prevention of suicide involves a team effort by every employee regardless of professional discipline or job title.

To accomplish this goal, each institution shall implement CDCR Division of Correctional Health Care Services (DCHCS) policies, described herein, regarding suicide prevention and response, via written operating procedures. The purpose of the policies is to:

- Establish standards of intervention and care

- Establish ongoing education and training for clinical, custodial, and administrative staff.

- Provide instructions and guidance for establishment and maintenance of the SPR FIT.

- Review suicide deaths regarding systems issues, clinical care issues, and custody response.

- Ensure that quality improvement (also known as corrective action) plans are drafted and implemented, when indicated, to reduce the incidence of preventable suicides, improve the delivery of quality care, improve the involvement of non-healthcare staff, and contribute to the ongoing education and training.

This chapter of the Mental Health Services Delivery System (MHSDS) Program Guide is divided into the following subsections:

### B. Suicide Prevention and Response Project

### C. Training for Staff

### D. Clinical Care Services

    1. Suicide Risk Assessment

2. Interventions for Suicidal Ideation and Threats, Self-Injurious Behaviors and Suicide Attempts

   a. Procedures for Suicide Precautions

   b. Procedures for Suicide Watch

   c. Response to Self-Injurious Behaviors and Suicide Attempts

**E. Suicide Reporting**

**F. Suicide Death Review**

**G. Mental Health Evaluation Component for a Rules Violation Report**

**B. <u>SUICIDE PREVENTION AND RESPONSE PROJECT</u>**

*Policy*

<u>CDCR DCHCS</u>

The CDCR DCHCS Quality Management Committee (QMC) shall maintain a DCHCS Mental Health Program (MHP) Subcommittee that provides oversight to and coordination of the statewide mental health program to achieve statewide strategic objectives. The DCHCS MHP Subcommittee shall plan, develop, manage and improve timely access to and effectiveness of clinical services related to the mental health program. The DCHCS MHP Subcommittee shall also cooperate with, and respond in a timely manner to, any requests from the DCHCS Emergency Response & Death Review (ERDR) Subcommittee following a suicide.

The DCHCS MHP Subcommittee shall establish and maintain a statewide SPR FIT. The DCHCS MHP Subcommittee shall appoint a DCHCS SPR FIT Coordinator. The Coordinator shall be a licensed physician, psychologist, social worker, nurse practitioner, or registered nurse (RN).

<u>Local Institutions</u>

Each Local QMC shall maintain a Local MHP Subcommittee that provides oversight to and coordination of the local mental health program to achieve statewide strategic objectives. Each Local MHP Subcommittee shall plan, develop, manage and improve timely access to and effectiveness of clinical services related to the mental health program. Each Local MHP Subcommittee shall also cooperate with, and respond in a timely manner to, any requests from the Local ERDR Subcommittee following a suicide.

Each Local MHP Subcommittee shall establish and maintain a Local SPR FIT. Each Local MHP Subcommittee shall appoint a Local SPR FIT Coordinator. The Coordinator shall be a licensed physician, psychologist, social worker, nurse practitioner, or RN.

### *Purpose*

The DCHCS SPR FIT and each Local SPR FIT shall provide employees with training and guidance with regard to suicide prevention, response, reporting, and review for the purpose of reducing the risk of inmate suicides.

### *Procedure*

### 1. Reporting Relationships

The DCHCS SPR FIT shall:

- Send a management report, at least once a month, to the DCHCS MHP Subcommittee.
- Receive formal communication, at least once a month, from the DCHCS MHP Subcommittee.
- Each local SPR FIT shall:
- Send a management report, at least once a month, to the local MHP Subcommittee.
- Receive formal communication, at least once a month, from the local MHP Subcommittee.

### 2. Responsibilities

#### a. The DCHCS SPR FIT shall:

1). Provide oversight and guidance for each Local SPR FIT regarding time sensitive due dates.

2). Monitor implementation and compliance with all CDCR policies and procedures relating to suicide prevention and response.

3). Provide for the planning, development, and implementation of statewide training, in collaboration with the DCHCS Training Department, regarding the issue of suicide prevention and response.

4). Monitor and track all suicides statewide.

5). Provide for the selection and dispatch of a mental health suicide reviewer (MHSR) after a suicide occurs.

6).   Provide oversight, assistance, coordination, and supervision of MHSR activities and reports.

7).   Track and analyze demographic and clinical information received from the DCHCS ERDR Subcommittee for improving suicide prevention and response processes.

b.  **Each Local SPR FIT shall:**

1).   Ensure implementation and compliance with all CDCR policies and procedures, relating to suicide prevention and response, at their institution.

2).   Be responsible for updating local operating procedures (LOP) to ensure consistency with DCHCS policies regarding suicide prevention and response. The institution's Suicide Prevention and Response LOP shall be updated at least annually and sent to the DCHCS through the standard Quality Management process for review and approval.

3).   Implement training, in collaboration with the local In-Service Training (IST) unit, regarding the issue of suicide prevention and response.

4).   Review Suicide Watch and precaution procedures, including use of video cameras (used as a supplement to direct visual observation), to ensure they are being carried out consistent with operating procedures.

5).   Work with the Local ERDR Subcommittee to review all suicides and those suicide attempts, in which Cardiopulmonary Resuscitation (CPR) and/or other medical procedures were performed, as well as custody cell entry and cut-down procedures.

6).   Monitor and track all suicide gestures, suicide attempts, self-mutilations, and deaths. Monitoring and tracking of suicide attempts should include a review of the appropriateness of treatment plans and five-day follow-ups.

7).   Review and track all 5-day clinical follow-up treatment plans and custody wellness check procedures. The Mental Health Tracking System (MHTS) shall be used to track all clinical five-day follow-ups.

8).   Ensure all required documentation for suicide death reporting is forwarded to DCHCS in adherence with time-sensitive due dates.

9).   Provide assistance for the activities of the visiting MHSR.

10). Provide oversight for the implementation of DCHCS-issued quality improvement plans (QIP) with input and assistance from the Local MHP and Local ERDR Subcommittees.

### 3. SPR FIT Membership

DCHCS shall include:
- SPR FIT Coordinator (Chairperson)
- Chief Psychiatrist
- Chief Psychologist
- Nurse Consultant
- Designated Facility Captain

Local shall include:
- SPR FIT Coordinator (Chairperson)
- Chief Psychiatrist*
- Chief Psychologist*
- Supervising RN
- Sr. Licensed Psychiatric Technician (LPT) or LPT (preferably from Administrative Segregated Unit (ASU)
- Health Program Coordinator
- Correctional Health Services Administrator
- DMH Coordinator

DCHCS may also include, but is not limited to:
- Senior Psychiatrist
- Senior Psychologist
- Administrative/Clerical Support

- Analyst Support

Local may also include, but is not limited to:
- Senior Psychiatrist
- Senior Psychologists
- Staff Psychiatrist: Mental Health Crisis Bed (MHCB)/Outpatient Housing Unit (OHU)
- Staff Psychologist: MHCB/OHU
- Standards and Compliance Coordinator
- Litigation Coordinator
- Facility Captain
- ASU Lieutenant/Sergeant
- Reception Center Lieutenant/Sergeant
- Classification and Parole Representative
- In Service Training Lieutenant
- Administrative/Clerical Support
- Keyhea Coordinator

*Senior Psychiatrist/Senior Psychologist attendance shall meet quorum requirement in institutions without Chief Psychiatrist/Chief Psychologist positions.

### 4. Frequency of Meetings

The DCHCS SPR FIT shall meet at least, but is not limited to, once a month.

Each Local SPR FIT shall meet at least, but is not limited to, once a month.

### 5. Attendance Requirements

A quorum consists of the above listed mandatory members.

### 6. Management Reports

The DCHCS SPR FIT shall submit a complete, standardized management report to the DCHCS MHP Subcommittee by the 5th day of each month.

Each Local SPR FIT shall submit a complete, standardized management report to the Local MHP Subcommittee by the 5th day of each month.

## C. TRAINING FOR STAFF

### *Definitions*

| | |
|---|---|
| Suicidal ideation: | Thoughts of suicide or death, which can be specific or vague, and can include active thoughts of committing suicide or the passive desire to be dead. |
| Suicidal intent: | The intention to deliberately end one's own life. |
| Self-injurious behavior: | A behavior that causes, or is likely to cause, physical self-injury. |
| Self-mutilation: | An intentional self-injurious behavior without suicidal intent. The purpose of the behavior may be to gain attention, relieve stress, or experience pain. Self-mutilation can result in serious injury or accidental death. |
| Suicide gesture: | An intentional self-injurious behavior, accompanied by suicidal ideation and/or intent, which is unlikely to cause death. The purpose of the behavior may be to gain attention and/or experiment with the possibility of suicide. Suicide gestures may indicate increased suicide risk. |
| Suicide attempt: | An intentional self-injurious behavior, which is apparently designed to deliberately end one's life, and may require medical and/or custody intervention to reduce the likelihood of death or serious injury. |
| Suicide: | An intentional self-injurious behavior that causes or leads to one's own death. |

All CDCR health care and custodial employees at the local institutions shall attend updated training on suicide prevention and response at least once annually. Suicide Prevention and

Response training shall be part of the new employee orientation provided by mental health staff in collaboration with the IST unit at each local institution. New correctional officers shall receive this training at the Basic Correctional Officer Academy.

The suicide prevention and response training shall include the following elements:

- Suicide risk assessment
- Suicide methods awareness
- Interventions for suicidal ideation, threats, gestures, and attempts
- Suicide reporting and reviews
- Mental health evaluations for rules violation reports

Clinical and custody staff shall receive specialized training with respect to their particular roles in responding to self-injurious behaviors, suicide attempts, and suicides.

## D. CLINICAL CARE SERVICES

This subsection addresses the various clinical care services for inmates regarding suicide prevention and response. Included are the assessment of risk for suicide, the utilization of a form for documenting the risk factors, and clinical interventions such as procedures for Suicide Precaution and Suicide Watch, and responses to suicide attempts and to suicide.

Education regarding the methods utilized by inmates when attempting suicide shall be taught as part of the suicide prevention and response training.

Employee strategies for maintaining a safe environment, and for ensuring that other policies and procedures relative to suicide prevention and response, such as regarding medication distribution and inmate-patient compliance, are detailed in the relevant chapters and sections of the complete Inmate Medical Services Program Policies & Procedures.

**Any CDCR employee who becomes aware of an inmate's current suicidal ideation, threats, gestures, self-injurious behaviors or suicide attempts shall immediately notify a member of the health care staff. The inmate shall be placed under direct observation, per local custody operating procedure, until a clinician trained to perform a suicide risk assessment (psychiatrist, psychologist, clinical social worker, primary care physician, nurse practitioner, or RN) conducts a face-to-face evaluation.**

### 1. Suicide Risk Assessment

All inmates are observed for suicide risk. Suicide risk assessment is critical to successful suicide prevention. Inmate-patients enrolled in the MHSDS shall be regularly monitored

for risk of suicide as clinically appropriate. When an inmate expresses current suicidal ideation, or makes threats or attempts, a suicide risk assessment shall be made by collecting, analyzing, and documenting data. Documentation is achieved by utilizing the CDCR standardized Suicide Risk Assessment Checklist (SRAC) and by clinician notation in the Unit Health Record (UHR). When an inmate expresses chronic suicidal ideation without intent or plan, the clinician may document that no change in suicide risk has occurred since completion of the prior SRAC, instead of completing a new SRAC.

**These clinicians shall be trained to perform a suicide risk assessment and complete the SRAC:**

- psychiatrists
- psychologists
- clinical social workers
- primary care physicians
- nurse practitioners
- RNs

This shall occur during the specialized training provided for clinical staff who are receiving either the new employee orientation or completing the required annual training module, or when determined necessary by supervisory and/or management staff.

When a primary clinician is scheduled to be available on-site, he or she shall be responsible for completing a SRAC. When a mental health clinician is not available, any other staff member who has been trained by CDCR in suicide risk assessment may complete the SRAC.

A RN completing the SRAC shall collect data related to suicide risk and protective factors and refer the patient and data collected to a mental health clinician for further evaluation to determine level of risk.

**At a minimum, a written suicide risk assessment using a SRAC shall be completed:**

- Every time an inmate has an initial face-to-face evaluation for suicidal ideation, gestures, threats, or attempts, by a clinician trained to complete the SRAC.

- By the referring clinician prior to placement of an inmate-patient into an OHU for continued suicide risk assessment or into a MHCB for suicidal ideation, threats, or attempt.

- After hours, on weekends and holidays, on call clinicians shall conduct a face-to-face assessment of suicide risk prior to releasing an inmate to any housing without suicide watch or precaution.

- After hours, on weekends and holidays, when the referring clinician has not completed an SRAC, by the clinician providing coverage, by the next day, for those inmate-patients placed into an OHU or MHCB.

- By the associated Interdisciplinary Treatment Team (IDTT) and/or clinician for all inmate-patients placed into an OHU, for mental health reasons, or MHCB, for any reason, upon decision to release or discharge.

- Subsequent to release from an OHU placement that was for the purpose of continued suicide risk assessment, or a MHCB placement for the reason of suicidal ideation, threats, or attempts, at a minimum of every 90 days for a twelve month period, by a mental health clinician.

- Within 72 hours of return from a Department of Mental Health (DMH) facility, or within 24 hours if clinically indicated based on new arrival screening.

- Any time the medical and mental health screening of a new arrival to an institution indicates a current or significant history, over the past year, of suicide risk factors, ideation, threats, or attempts.

- Pursuant to Department Operating Manual (DOM), Article 41, Prison Rape Elimination Act Policy, for victims of sexual assault, within four hours after the required sexual assault forensic examination.

**The clinician shall use the SRAC when documenting a suicide risk assessment, in addition to making a notation in the UHR. At a minimum, the following categories shall be used to assess potential risk:**

a. Static Risk Factors (unchanging, historical):

- Ethnicity
- History of lewd and lascivious acts with a child and/or killed a child
- History of violence
- History of substance abuse
- Suicide ideation and/or threats in past (when and method)
- Previous suicide attempts (when and method)
- Family history of suicide
- History of mental illness with Axis I diagnosis
- High profile case

b. Slowly Changing Risk Factors (long-term risk factors):

- First prison term
- Long or life sentence; three strikes
- History of poor impulse control and/or poor coping skills
- Early in prison term
- Known new court proceedings and/or disciplinary actions
- Current term in ASU, Security Housing Unit, or Psychiatric Services Unit
- Level IV custody score
- Chronic, serious or terminal illness

c. Dynamic Risk Factors (short-term risk factors that require ongoing assessment):

- Recent suicidal ideation - acute or chronic
- Recent release from psychiatric hospital
- Sudden calm following ideation or attempt
- Anxious and/or agitated and/or fearful
- Disturbance of mood (depression or mania)
- Unstable or labile affect
- Current insomnia and/or poor appetite
- Lack of perceived support system
- Hopelessness and/or helplessness
- Feelings of guilt and/or worthlessness
- Fearful for safety
- Anniversary of important loss
- Recent rejection and/or loss
- Single-cell placement
- Significant current impulsivity
- Recent suicide attempt or self-injury
- Well-planned, highly lethal, attempt or ideation
- Hoarding and/or cheeking medication
- Poor compliance with treatment and/or medication
- Recent trauma and/or threat to self-esteem
- Recently assaultive or violent
- Pre-death behavior: note, gives things away
- Disclosure of adverse court hearings

d. Protective Factors:

- Family support
- Children at home
- Religious support
- Spousal support
- Supportive friends
- Helping others

- Adequate insight
- Realistic life plan
- Exercises regularly
- Group activities
- Job assignment
- Other noted protective factors

Clinicians shall utilize their best clinical judgment and make a summary of the relative risk for suicide via an appropriate descriptor, such as "No apparent significant risk, Low Risk, Moderate Risk, High Risk, or Conditional Risk" based on a combination of the above factors, an interview of the inmate, and all other relevant information available to them. Peer consultation is encouraged when information collected for making a suicide risk assessment is ambiguous. The clinician shall then make a recommendation regarding the appropriate level of care required. They shall document their summary, recommendations, and plan on the SRAC and with appropriate notation in UHR. Treatment recommendations should be as specific as possible, leaving as little room as possible for misinterpretation or confusion. A brief rationale for each recommendation shall be provided. They shall also address how the treatment plan will be implemented and any required follow-up procedures.

Peer Consultation

Peer consultation can be one of the most important clinical and legal safeguards a practitioner has at his or her disposal, especially when dealing with ambiguous cases.

Sources of peer consultation include, but are not limited to:

- Other clinical members of an IDTT
- Other colleagues working at the institution
- Clinical supervisors

When evaluating for suicide risk, peer consultation is not always necessary. However, in those cases where there is clinical uncertainty about ambiguous issues, it can be of benefit for validating or challenging ideas and assumptions. Another clinician's opinion may also uncover important additional information. Peer consultation does not absolve a clinician of responsibility for any decision that he or she ultimately makes, nor does it require the

clinician to change his or her initial opinion. It is to the clinician's advantage to consult with peers. It demonstrates that the clinician cared enough about the case to seek another opinion and that he or she utilized prudent and reasonable judgment.

### Suicide History Tracking

In order to ensure quality and continuity of care for high-risk mental health inmate-patients, all institutions shall track the suicidal history of inmate-patients using MHTS.

### 2. Interventions for Suicidal Ideation, Threats, and Attempts

Any CDCR employee who becomes aware of inmate suicidal ideation, threats, or attempt shall immediately notify a member of the health care staff. The inmate shall be placed under direct observation, per local custody operating procedure, until a clinician trained to perform a suicide risk assessment (psychiatrist, psychologist, clinical social worker, primary care physician, nurse practitioner, or RN) conducts a face-to-face evaluation.

### Recommendation for placement or admission

Health care staff who assess a patient as a significant suicide risk shall initiate procedures to admit the patient into a MHCB.

A physician, licensed psychologist, or nurse practitioner may place an inmate-patient into an OHU for continued suicide risk assessment. Custody staff shall inspect the cell to ensure that there are no known or obvious safety hazards present. When an inmate-patient in the OHU is determined to require MHCB level of care, including Suicide Precaution and/or Watch, he or she shall be recommended for admission to that higher level of care. The established timeframe for MHCB transfers is 24 hours from the time a physician or licensed psychologist determines the need for a MHCB.

When an inmate-patient verbalizes suicidal ideation without other signs and symptoms of increased risk of suicide, the mental health clinician is responsible for evaluating any contributing environmental stressors and communicating with custody staff and supervisors regarding any potentially solvable custody issues.

Pending transfer out of the OHU direct observation by clinical and/or custody staff shall be provided, consistent with requirements for Suicide Precaution or Watch, until the inmate-patient is transferred.

If there is a difference of opinion, between the clinician who makes the recommendation and the receiving/admitting clinician, regarding admission into a MHCB or placement into an OHU, then

a. A third opinion and final decision shall be obtained by consultation with a Chief or Senior Psychiatrist, or a Chief or Senior Psychologist.

b. When a Chief or Senior Psychiatrist, or a Chief or Senior Psychologist is not available, the third opinion and final decision shall be obtained from Chief Medical Officer or Chief Physician and Surgeon.

c. The default shall be to place the inmate into the MHCB or OHU in the event that there is not a Chief, Senior, or Chief Medical Officer (CMO) available to supply the third opinion and final decision.

Required Documentation

The clinician who recommends an inmate for placement into an OHU for continued suicide risk assessment or into a MHCB for active suicidal ideation, or suicide threats or attempts, shall provide to the accepting clinician both a completed SRAC, the patient's medication administration record, and a written transfer summary that contains:

- Date and time of referral
- Identifying information: inmate name, CDCR number, date of birth, age, and race
- Current level of care and housing location
- Current diagnosis: all five Diagnostic and Statistical Manual (DSM) axes
- Reason for referral: suicidal ideation and/or threat and/or attempt
- History of present illness
- Mental status examination
- Brief psychiatric history including previous OHU, MHCB, or DMH placements
- History of previous suicidal ideation, threats, and/or attempts
- Treatment recommendations
- Contact information for the referring clinician

After hours and on weekends and holidays, the clinician providing coverage shall complete the required documentation by the next day.

Health Care Cost and Utilization Program

As an integral part of the DCHCS, the Health Care Cost and Utilization Program provides timely and accurate information, and analysis of health care service delivery data to assist in the provision of cost effective, quality health care. To facilitate this effort, the clinician

who admits an inmate-patient to a MHCB shall record two codes for the diagnosis on the CDCR 7388, *Mental Health Treatment Plan*. One code shall be from the most current edition of the Diagnostic and Statistical Manual of Mental Disorders and the other shall to be from the most current edition of the World Health Organization's International Classification of Diseases Code.

### Additional Treatment Options

In addition to inpatient care, the clinician may recommend another type of treatment such as daily or weekly contact by a mental health clinician, intensive individual psychotherapy, resolution of a stressful environmental issue or interpersonal conflict, or other clinically appropriate intervention. Other interventions may be considered such as notifying a correctional counselor of the inmate-patient's desire or need to contact a family member. Alternative interventions, such as a housing change, may be considered in consultation with custody staff. Clinical and custody staff shall work together to develop an intervention to address the inmate's concerns and reduce the risk of suicide.

### Physical Restraints and Seclusion

Physical restraints or placement in seclusion may be utilized to protect an inmate-patient from imminent self-harm, if clinically indicated, and other treatment measures are ineffective. A staff member shall be assigned to provide one-on-one direct visual observation of all inmate-patients in physical restraints. Refer to MHSDS Program Guide, Chapter 5, *Mental Health Crisis Bed*, for complete descriptions of procedures. In accordance with Health and Safety Code 1180, a clinical and quality review shall be conducted for each episode of the use of seclusion or restraints.

### Inmate and Cell Search

Before placing an inmate-patient in a room for Suicide Precaution or watch, a custody officer shall conduct a complete body search.

Call-light cords, nightstands, bed frames, and sheets shall be removed, by order of a clinician, from the room unless the inmate is in physical restraints. Only a safety (no-tear) mattress, a safety (no-tear) blanket, and a safety (no-tear) smock/gown shall be provided and placed directly on the floor.

Additional inmate-patient clothing and furnishing items, while on Suicide Watch or Precaution, shall be allowable by a clinician's order.

Custody staff shall conduct a complete cell search before placing an inmate in a cell.

Suicide Precaution and Suicide Watch

When clinically indicated, an inmate with active suicidal ideation, threats, or attempt shall be placed in an MHCB on Suicide Precaution or Suicide Watch. These are methods used to provide a safe environment and prevent the inmate from harming him or herself or others. Suicide Watch and Suicide Precaution procedures shall be a joint responsibility of custody and health care staff. A close working relationship shall be maintained between custody and health care staff to ensure the safety and security of the inmate.

The preferred location to place an inmate on Suicide Precaution or Watch status is in the MHCB, or in the OHU pending transfer to MHCB. The use of Suicide Precaution or Suicide Watch in any non-medical location shall be a temporary, short-term approach until an inmate can be moved to an OHU or MHCB, and shall require constant direct visual observation.

A psychiatrist, licensed psychologist, physician, or nurse practitioner shall review, modify, and/or renew the order for Suicide Precaution and/or Watch at a minimum of every 24 hours with input from at least one other member of the IDTT, such as the RN on duty.

Inmate-patients that are placed in an OHU for continued assessment of suicide risk, or in an MHCB for active suicidal ideation, threats, or attempt, shall have a note regarding progress toward the treatment plan goals and objectives recorded *daily* by a treating clinician in the Interdisciplinary Progress Notes section of the UHR.

a.  **Suicide Precaution**

    When an inmate is in an MHCB because of high risk of attempting self-injurious behavior, but is not in immediate danger, he or she shall be placed on Suicide Precaution.

    These inmate-patient management procedures require an order from a psychiatrist, licensed psychologist, physician or nurse practitioner.    Additional details of requirements and procedures are located in Chapter 5, *Mental Health Crisis Bed*.

**Guidelines for clinician-ordered Suicide Precaution:**

| STATUS | CLOTHING | FURNITURE AND OTHER MATERIALS | BEHAVIORAL CHECKS |
|---|---|---|---|
| SAFE CELL STATUS | Safety (no-tear) smock/gown, no ID band on wrist | Remove all furniture. Safety (no-tear) mattress, safety (no-tear) blanket | Staggered intervals not to exceed 15-minute staff checks |
| PARTIAL ISSUE | Shorts, t-shirt, socks | Remove all furniture. Safety (no-tear) mattress, safety (no-tear) blanket, one book | Staggered intervals not to exceed 15-minute staff checks |
| FULL ISSUE | Shorts, t-shirt, socks | Safety (no-tear) mattress or furniture. Reading and writing materials. Toiletries. | Staggered intervals not to exceed 15-minute staff checks |

A clinician, when writing orders, can utilize these guidelines for furniture and clothing and/or make modifications based on clinical judgment, with documentation of justification. The IDTT shall review all decisions regarding furniture, clothing, and other materials. No modification is allowed for the interval of staff checks for Suicide Precaution.

b.  **Suicide Watch**

When an inmate is in an MHCB because of suicide risk *and* is in immediate danger of self-injurious behavior, he or she shall be placed on Suicide Watch.

These inmate-patient management procedures require an order from a psychiatrist, licensed psychologist, physician or nurse practitioner. Additional details of requirements and procedures are located in Chapter 5, *Mental Health Crisis Bed.*

### Guidelines for clinician-ordered Suicide Watch:

| STATUS | CLOTHING | FURNITURE AND OTHER MATERIALS | BEHAVIORAL CHECKS |
|--------|----------|-------------------------------|-------------------|
| SUICIDE WATCH | Safety (no-tear) smock/gown, no ID band on wrist | Remove all furniture. Safety (no-tear) mattress, safety (no-tear) blanket | Continuous observation<br>15 minute nursing checks |

All institutions shall conduct Suicide Watch observation by direct visual observation. The staff member shall be stationed at the cell door with direct line-of-sight from the observer to the patient. One observer may be responsible for observation of two inmate-patients on Suicide Watch when the staff member can maintain direct line-of-sight observation of both inmate-patients. The staff-observer to inmate-patient ratio shall not exceed one-to-two. Video-monitoring shall never be used as the sole method for observation of any inmate-patient housed on Suicide Watch status, but may be used to supplement direct visual observation.

Some institutions have been approved via memoranda signed by the Directors of the Division of Adult Institutions (DAI) and the DCHCS, to provide one-on-two direct cell-front observation of inmate-patients on Suicide Watch, when the staff member can maintain direct line-of-sight observation of both inmate-patients, unless one-on-one monitoring is ordered by the psychiatrist or psychologist. All other institutions shall provide one-on-one direct cell-front observation.

The assigned observer shall assume a position where continuous direct visual contact with the inmate-patient can be maintained, including when the inmate uses the shower, sink, or toilet.

Suicide Watch posts will be filled using the following order of job classifications:

1. Hospital Aide
2. Certified Nursing Assistant
3. Licensed Psychiatric Technician
4. Licensed Vocational Nurse
5. RN
6. Correctional Officer

It is the responsibility of the Health Care Manager and Warden to ensure that all hiring efforts be exhausted, including offering voluntary overtime and assigning

involuntary overtime of the medical classifications on the list above, prior to filling these positions with a Correctional Officer.

The employee assigned to provide direct observation shall be appropriately trained regarding this post and the performance of duties related to Suicide Watch.

Observation Documentation

The custody and/or health care staff employee assigned to provide continuous observation during Suicide Watch shall document such observation every 15 minutes on a log sheet.

Custody and health care staff shall document behaviors and activities on a CDCR 114A, *Detention/Segregation Record.*

Nursing staff shall document behavioral checks and the inmate-patients' affect at least every 15 minutes during both Suicide Precaution and Suicide Watch. Nursing checks shall always include visual observation and, when the inmate-patient is awake, shall also include verbal interaction. Nursing staff shall document using CDCR 7212, *Nursing Care Record* (for non-acute care settings), or CDCR 7212A, *Nursing Care Record-Acute Hospital,* (for acute care settings) in the UHR.

Leaving a Post Assignment

- The observer assigned to Suicide Watch shall only vacate the post if immediate attention or assistance is needed in a life-threatening situation, and no other alternative exists.

- A life-threatening situation is defined as a situation in which staff's failure to immediately respond will likely result in serious morbidity or mortality.

- In the event of a life-threatening situation, the staff shall activate a personal alarm in order to summon additional staff to the MHCB area.

- If it becomes necessary for staff assigned to Suicide Watch to leave their post due to a life-threatening situation, they shall request other staff in the vicinity, whenever possible, to provide direct observation coverage of the inmate-patients while away. If no other staff is available, and there is sufficient time, the officer shall contact the Watch Office before responding to the life-threatening situation.

- Any vacating of the post under these circumstances shall be for the minimal time necessary. Once the life-threatening situation has been contained, or there is sufficient staff at the scene to handle the situation, the officer shall immediately return to the Suicide Watch post.

- Upon return to post, the staff shall document his or her departure and return on the CDCR 114A, *Detention/Segregation Record*. The officer shall also ensure that the staff that covered the post in his or her absence also documents that on the CDCR 114A, *Detention/Segregation Record*.

- For the purpose of this procedure, a minimum of one custody officer and one health care professional shall respond to a life-threatening situation involving a general population or reception center inmate.

- For the purpose of this procedure, a minimum of one peace officer and one nursing staff member shall respond to a life-threatening situation involving an ASU inmate. Responding staff shall obtain and wear a protective vest while responding in the ASU areas. The ASU Sergeant shall also be notified as soon as possible.

- Staff will use universal precautions when responding to medical emergencies and utilize Personal Protective Equipment kits, available in the MHCB unit.

### Discharge or Return

Inmates sent to a MHCB because of active suicidal ideation, threats, or attempt shall be returned to their housing unit only after the IDTT and/or a clinician has completed a SRAC and has determined that the inmate-patient is no longer at imminent risk. The inmate-patient shall be placed on the 5-day clinical follow-up treatment plan and custody wellness check procedure as detailed below.

Inmates sent to an OHU for continued suicide risk assessment shall be returned to their housing unit only after the IDTT and/or a clinician has completed a SRAC and has determined that the inmate-patient is not at significant risk. The inmate-patient may, depending on clinical determination, be placed on the 5-day clinical follow-up treatment plan and custody wellness check procedure as detailed below.

### MHCB Discharge

- A psychiatrist or licensed psychologist, in consultation with the IDTT, shall write the order to discontinue an inmate-patient from Suicide Precaution or Suicide Watch when the inmate is no longer in imminent danger of self-harm. After hours, on weekends and holidays, the Medical Officer of the Day (MOD) or psychiatrist, licensed psychologist, or primary care physician on call may write an order to discontinue Suicide Precaution or Suicide Watch.

- A psychiatrist or licensed psychologist shall complete the MHCB discharge summary.

- Before discharge, the IDTT shall develop a detailed and complete follow-up treatment plan, which shall be documented in the inmate's UHR on CDCR 7221, *Physician's Orders*. The plan shall include prescribed housing, medication, type and frequency of outpatient therapy, and an explicit recommendation on 5-day clinical follow-up treatment plan and custody wellness check procedure.

- The primary clinician (PC) (or in their absence, the senior mental health clinician) shall be notified person-to-person of the pending discharge of the inmate-patient and the discharge plan.

- Inmates with multiple MHCB admissions (three or more within a six-month period) shall be evaluated by the IDTT for referral to the DMH. The results of this evaluation, decision of the IDTT, and outcome of the referral shall be documented on a CDCR 7230-MH, *Mental Health Progress Note*, in the UHR.

- Careful consideration should be given by the IDTT when discharging from an MHCB an inmate-patient who was admitted for reasons of suicidal ideation, threats, or attempt, on a Friday, over the weekend, or the day before a holiday. Inmate-patients will only be released over a weekend if the IDTT has determined such and only after an updated face-to-face evaluation by a mental health clinician. That clinician will establish the 5-day clinical follow-up treatment plan and custody wellness check procedure. The mental status, stability, and risk factors of the inmate-patient should be documented in detail on a CDCR 7230-MH, *Mental Health Progress Note*. A mental health clinician must be available on weekends and holidays, either on duty or on call. **In the event that there is no mental health clinician on call in an institution, no discharges shall be accepted by that institution on, or the day before, a weekend or holiday.**

- A mental health clinician, usually the inmate-patient's PC, shall provide follow up treatment on an outpatient basis. This shall include daily contact with the inmate in their housing unit for five consecutive days following discharge. A psychiatric technician or other mental health clinician may conduct the contacts on weekends and holidays. The PC is responsible for ensuring that the contacts occur. The frequency of visits may then be reassessed. Housing unit custody officers and mental health staff shall communicate regarding the inmate-patient's status.

- Custody shall conduct an hourly check of inmate-patients discharged from the MHCB (admitted for suicidal ideations, threats, or attempt) for the first 24 hours after discharge. A mental health clinician shall then discuss the inmate-patient's behavior with the custody staff and evaluate the inmate-patient to determine if the custody checks should be continued or discontinued. If the custody checks are continued, the mental health clinician shall determine whether the checks are to be every hour, every two hours, or every four hours for the next 24-48 hours. If

after a second evaluation, mental health clinical staff feel additional hourly checks are required, the inmate shall be readmitted to the MHCB for further stabilization. Custody staff shall maintain a log on CDCR 114A, *Detention/Segregation Record,* of rounds on inmate-patients.

- The local SPR FIT shall regularly audit compliance with the 5-day clinical follow-up and custody wellness check procedure. Audit findings shall be forwarded monthly to the Local MHP Subcommittee.

c. **Response to Self-Injurious Behaviors and Suicide Attempts**

Self-injurious behaviors cause, or are likely to cause, physical self-injury. A suicide attempt is an intentional act that is deliberately designed to end one's own life. Both are medical emergencies that require immediate and appropriate responses.

Custody Protocol

**In medical emergencies, the primary objective is to preserve life.** All peace officers who respond to a medical emergency are mandated, pursuant to court order, to provide immediate life support, if trained to do so, until medical staff arrives to continue life support measures. All peace officers must carry a personal CPR mouth shield at all times.

The officer must assess and ensure it is reasonably safe to perform life support by effecting the following actions:

- Sound an alarm (a personal alarm or, if one is not issued, an alarm based on local procedures must be used) to summon necessary personnel and/or additional custody personnel.
- Determine and respond appropriately to any exposed bloodborne pathogens.
- Determine and neutralize any significant security threats to self or others including any circumstances causing harm to the involved inmate.
- Initiate life saving measures consistent with training.

The responding peace officer will be required to articulate the decision made regarding immediate life support and actions taken or not taken, including cases where life support is not initiated consistent with training and/or situations which pose a significant threat to the officer or others.

Clinical and Custody Combined Efforts

**Upon arrival, responding medical personnel shall relieve the correctional peace officer and assume primary responsibility for the provision of medical attention and life saving efforts. Custody and medical personnel together are responsible for the continuance of life saving efforts for as long as necessary.**

---

**Preservation of life shall take priority over preservation of a crime scene.**

---

Emergency Response

The following first aid procedures shall be implemented when an inmate attempts suicide by hanging, laceration, or other methods:

Hanging

Medical and custodial staff shall be informed of the nature of the emergency by the most expedient method available. The cut-down kit shall be transported to the location immediately by custody staff. Clearing the obstruction to the airway as quickly as possible is critical to saving the life of the inmate who has attempted suicide by hanging. When it appears safe, a minimum of two staff shall enter the area where the inmate is located, relieve pressure on the airway by using a stable object for support of the inmate's body or by physically lifting the inmate's weight off the noose. The inmate shall be cut down by cutting above the knot and then loosening the noose. Custody staff shall preserve any item of evidentiary value.

Once the inmate is cut down, custody staff shall provide immediate life support, if trained to do so, until medical staff arrives to continue life support measures.

Medical staff, upon arrival, shall assume responsibility for medical care, as outlined in the institution's local operating procedures for emergencies, including any decisions regarding initiating or continuing CPR.

If possible, the inmate shall also be transported to a triage and treatment area.

Laceration

General guidelines:

- Use impervious latex gloves and/or appropriate, personal protective equipment

---

- Utilize whatever clean material is available to apply pressure to the wound site
- Elevate extremities if they are bleeding
- Transport to a triage and treatment area or an emergency room

Other Methods (overdosing, trauma, swallowing dangerous objects):

- Provide assistance to medical staff and obtain as much information as possible.
- Staff shall perform the Heimlich maneuver if choking is evident.

Cut-down Kit Availability

Each warden shall ensure that cut-down kits:

- Are maintained within each housing unit
- Are inventoried and inspected on a daily basis with problems immediately reported to a supervisor
- Consist of a lockable metal box containing:
  a. One inventory list affixed to the inside of the box door
  b. One emergency cut-down tool
  c. One single-patient-use resuscitator (e.g., AMBU Single-Patient-Use Resuscitator)
  d. One CPR mask (e.g., Lardell CPR Mask, for use by CPR-certified staff only)
  e. Minimum of ten latex gloves
  f. Disposable oral airway

## E. SUICIDE REPORTING

All reports of death shall be in accordance with DOM, Section 51070, Deaths.

If at any point during the review of the case, questions arise regarding any circumstances surrounding or leading up to the suicide that may be attributed to employee misconduct, the MHSR, the Health Care Manager (HCM), or other responsible individuals may request a misconduct investigation. In this event, the MHSR shall immediately consult with the DCHCS SPR FIT Coordinator to determine further action. Requests for further misconduct inquiry and/or investigation shall be referred in accordance with DOM, Chapter 3, Article 14, Employee Misconduct Investigations/Inquiries. Even if the matter is referred, all other aspects of the suicide review shall continue.

Local Institution Responsibilities

- In the case of an inmate suicide death, the watch commander or senior custody officer shall be notified immediately, and shall subsequently notify the Warden, or evenings, weekends and holidays, the Administrative Officer of the Day. Upon notification of a possible death, the senior custody officer or the watch commander shall determine the need to secure the death scene and initiate investigation or other custody measures as indicated in accordance with DOM, Section 51070.7.

- The institution's CMO or physician designee shall have primary responsibility for reporting the death within eight hours to the DCHCS Death Notification Coordinator (DNC).

- The initial reporting procedures and submission of the CDCR 7229 A, *Initial Inmate Death Report*, shall be completed and submitted in accordance with the procedures set forth in DOM, 51070.9, Deaths. The CDCR 7229 B, *Initial Inmate Suicide Report*, shall be completed by the Local SPR FIT Coordinator or designee, and shall be reviewed, signed and dated by the HCM/CMO. It shall be submitted to the DNC at Central Office by the close of the second business day following the date of death. This form shall contain relevant information including the method of suicide, mental health level of care, psychiatric diagnoses (if applicable), behavioral problems observed, recent history of suicidal ideations or attempts, medication, and recent stressors.

## F. SUICIDE DEATH REVIEW

- Within one business day of receipt of the initial data including CDCR 7229 A, *Initial Inmate Death Report*, and 7229 B, *Initial Inmate Suicide Report*, the DCHCS Death Notification Coordinator (DNC) shall forward the death review folder to the DCHCS SPR FIT Coordinator.

- Within two business days of receipt of the death review folder, the DCHCS SPR FIT Coordinator shall appoint a MHSR from a pool of qualified mental health staff at DCHCS, or regionally from an institution other than where the suicide occurred.

- Within one week, seven calendar days, of being appointed, the MHSR shall begin reviewing the suicide case for compliance with the CDCR SPR FIT policies and procedures. The MHSR shall also review all related documentation including the UHR; Central File; Inmate Death Reports, CDCR 7229 A, *Initial Inmate Death Report*, 7229 B, *Initial Inmate Suicide Report*; CDCR 837 A and B, *Crime/Incident Report*; and any other appropriate documentation. The MHSR shall have access to the inmate's cell, visiting log, recorded telephone conversations, and other information as required. The institution's SPR FIT Coordinator may assist the MHSR in his or her efforts. The assistance may include making available the UHR, the Central File, and any other appropriate information as well as arranging interviews if required. The MHSR may conduct interviews with clinical staff, custody staff, and inmates. However, should there

be any indication an employee misconduct investigation may be warranted, the MHSR shall immediately consult with the DCHCS SPR FIT Coordinator, who shall provide guidance in proceeding with the review. Generally, the MHSR shall discontinue interviews with any employees who may be associated with or implicated in the employee misconduct investigation, but shall continue with all other aspects of the suicide review process.

- In cases where there are concerns with clinical care, the case shall be referred to the local Clinical Performance Enhancement and Review Subcommittee.

- Within 30 calendar days of the inmate suicide, the MHSR shall complete a preliminary Suicide Report containing the following information: Inmate name, CDCR number, age, date and time of discovery, time of death, institution, housing, mental health level of care (if applicable), method, cause of death, findings of coroner (if available), brief summary and preliminary findings including recommendations for quality improvement. The report shall also indicate whether further investigation/inquiry is recommended (if one has not already been initiated). This report shall be immediately forwarded to the DCHCS SPR FIT Coordinator who will then schedule discussion of the report at the DCHCS Suicide Case Review (SCR) Subcommittee. The MHSR will present the case to the SCR Subcommittee.

- The DCHCS SCR Subcommittee is the body that reviews the documentation and reports submitted by the institution and MHSR, determines compliance with the statewide SPR FIT policies and procedures, reviews the QIP (also known as corrective action), and continues its review, in collaboration with the DCHCS MHP Subcommittee, until the QIPs are completed and the cases are closed.

- Within 45 days from the date of death, the DCHCS ERDR Subcommittee shall complete its review of the preliminary suicide report, review the QIP on the preliminary suicide report, and forward the report to the MHSR for completion of the Suicide Report and the accompanying Executive Summary.

Quality Improvement Plan

When warranted, the MHSR shall recommend a QIP (also known as corrective action), based on the findings from the review of the case, which shall address and make recommendations to improve identified problems with clinical care and compliance with policy and procedure. The QIP shall address problems identified, recommended actions, due dates for recommended actions, and supporting documents required from the institution.

The DCHCS SCR Subcommittee shall review the QIP and may take the following actions:

- Ensure consistency with policy and procedure
- Recommend remedial action, documentation, and monitoring

- Refer for further action in accordance with DOM, Chapter 3, Article 14, Employee Misconduct Investigations/Inquiries, when appropriate. When individual conduct of custody staff requires further investigation, a memorandum shall be forwarded to the Director, Adult Institutions Division, who shall initiate a CDCR 989, *Request for Investigation*, to the Office of Internal Affairs.

- Prepare a memorandum to refer the case to the DCHCS Professional Practice Executive Committee (PPEC) for review of individual practice of licensed psychologists, psychiatrist, and/or physicians when appropriate. The DCHCS PPEC shall report to the appropriate professional licensing board for investigation, when appropriate

When approved by the DCHCS SCR Subcommittee, the Suicide Report shall be signed by the Director, DCHCS, or designee.

The Suicide Report by the MHSR shall incorporate the QIP approved by the DCHCS SCR Subcommittee. The DCHCS SPR FIT Coordinator shall include with this report the Inmate Death Reports, CDCR 7229 A, *Initial Inmate Death Report*, and CDCR 7229 B, *Initial Inmate Suicide Report*, CDCR 837 A and B, *Crime/Incident Report* , Movement History and Offense History, and the Executive Summary serving as the cover page to complete the Final Suicide Report. The report shall then be forwarded to the Director of the CDCR DCHCS and the Director, DAI. The report shall be signed by both Directors, and copied to Regional Administrators of DCHCS and DAI; Legal Affairs Division; and to the reporting institutions' Warden; Health Care Manager/Chief Medical Officer; Mental Health Program Manager, Chief/Senior Psychiatrist and Chief/Senior Psychologist; and, other appropriate interested and legally designated persons within 60 days of date of death.

When an investigation is required, the Office of Internal Affairs (OIA) shall track progress until the investigation is complete. The OIA shall forward a memorandum with a summary description of the methods and outcome of the investigation to the DCHCS SPR FIT Coordinator, who shall forward the results to the *Coleman* Special Master through DCHCS routing procedures.

For QIP items focused on institutional compliance, the Warden and HCM/CMO are responsible for ensuring the implementation of the QIP within the specified time frame, which is not greater than 60 days of receipt of the finalized Executive Summary of the Suicide Report with signature approval from the Director, DCHCS (120 days following the date of death). QIP items focused on system-wide policy or training shall be referred to the SPR FIT at DCHCS. The SPR FIT Coordinator shall maintain a master list of QIP problems, corrective action, supporting documentation required, and completion dates. A proof-of-practice binder shall be maintained by the SPR FIT coordinator in order to track and record the progress of policy revisions and system-wide training.

The QIP shall be monitored by the Warden, HCM/CMO, Mental Health Program Manager, Chief Psychiatrist, Chief Psychologist, and SPR FIT Coordinator at the institution of occurrence. DCHCS may require ongoing documentation of compliance.

The Local SPR FIT Coordinator shall prepare a follow up report of implementation addressing action taken on the recommendations of the QIP. All appropriate supporting documentation confirming that these actions have been taken shall be attached to this report. See table below for list of suggested supporting documentation. The Warden and HCM/CMO, or institution Mental Health Program Manager shall sign this report. The institution shall retain a copy of the report and forward the original to the DCHCS ERDR for review. The report is due within 30 days following the implementation of the QIP (90 days following receipt of the Executive Suicide Report). Additional follow up monitoring shall occur as necessary as dictated in the QIP.

**Action, Documentation, & Monitoring for Suicide Quality Improvement Plans**

| ACTION | DOCUMENTATION/MONITORING |
|---|---|
| Training | Copy of training agenda and sign-in sheet |
| Required appointments with clinicians are held | List of appointments from MHTS |
| Changes in operating procedure | Copy of procedure or memos |
| Develop Quality Improvement Team | Copy of recommendations or change in procedures |
| Missing medication due to transfer to a different housing unit | Ongoing monitoring of Medication Administration Records in the UHR Provide sample audit |
| Proper Documentation | Provide plan to audit UHR and a sample audit |
| Five Day Follow-up of suicidal inmates released from MHCB | Audit of documentation in UHR; provide a sample audit |
| Rounds and evaluations done in ASU by psychiatric technicians | Audit UHR, CDCR 114 Isolation log and CDCR 114-A, *Daily Log*; provide sample audit |
| Inmates on Keyhea are identified | Review UHR |
| Conduct suicide risk assessment | Review UHR |
| Statewide policy issues | Review new policy |
| Investigation of individual practitioners | Provide status or completion date of investigation |
| Audit of records per specified length of time to be sure that quality improvement is being consistently followed | Periodic reports of audit findings to DCHCS SPR FIT and DCHCS MHP |

The DCHCS SCR Subcommittee shall continue to review all open suicide cases until the QIP is approved and each case is closed. The QIP shall be incorporated into the final Suicide Report. All decisions made by the DCHCS SPR FIT regarding compliance and quality improvement shall be documented in the final Suicide Report.

The follow-up report on implementation of the QIP shall be reviewed by the DCHCS SPR FIT Coordinator. In cases where the QIP is not sufficiently completed by the institution within the required time frame, the SPR FIT coordinator shall send a memorandum indicating non-compliance to the institution and to the Regional Administrator at DCHCS and DAI. Appropriate follow-up shall be conducted by the Regional Administrator in order to ensure the completion of the QIP item. In cases where a system-wide QIP is not sufficiently completed by the SPR FIT within the required time frame, a report of progress and any barriers to completion shall be forwarded from the SPR FIT to the Director of the appropriate CDCR division. The CDCR Division Director shall take appropriate action to ensure completion of the QIP. When complete, the QIP shall be distributed by the SPR FIT Coordinator according to legal mandates.

If, during the suicide review process, other death related information arrives, such as CDCR 837 C, CDCR 7229 C, or Coroner's report, the DNC will locate the death review folder and place these documents inside. The DNC shall update the routing sheet and notify the SPR FIT Coordinator of the new information. Upon completion of the suicide review, the death review folder containing the Suicide Report and other related information shall be returned to the DNC for final data entry. The DNC shall ensure that all documentation is complete and then return the folder for final storage in a designated locked cabinet at DCHCS.

The DCHCS SPR FIT Coordinator appointed to oversee suicide-related activities shall coordinate analysis and review of each suicide, and compile and forward annual suicide statistics to: Secretary, Youth and Adult Correctional Agency; Director, DAI; Director, DCHCS; Deputy Director, DCHCS; Chief of Clinical Policies and Programs, DCHCS; Institution Wardens; Institution HCM/CMOs; and, other appropriate senior DCHCS staff.

## G. MENTAL HEALTH EVALUATION COMPONENT FOR A RULES VIOLATION REPORT

Per California Code of Regulations, Title 15, Section 3317 "An inmate shall be referred for a mental health evaluation prior to documenting misbehavior on a CDCR 115, in any case where the inmate is suspected of self-mutilation or attempted suicide."

Staff are to utilize the Request for CDCR 128B, when requesting this mental health evaluation.

exhibit H

optometry Exam

* Auth (Verified) *

| Date/Time | | OPTOMETRY EXAM | |
|---|---|---|---|
| UNIT | | | |

**MAR 0 5 2019**

| OCCUPATION | 15+ | SPECIAL HOBBIES | |
|---|---|---|---|
| LAST EXAM | "a few years" LAST Rx | Rx USE: Full-time OR Part-time | |
| CHIEF COMPLAINT | Annual exam | PD: 63 | |

1450

| | Blurry FAR Ⓨ N | | | |
|---|---|---|---|---|
| | Vision? NEAR Ⓨ N | | | |
| | Double vision? Y Ⓝ | Ocular History attempted suicide 9/5/18, lost o²to brain, & | | |
| | Headaches? Y Ⓝ | vision was affected | | |
| | Family Maternal- DM HTN GLAUCOMA CATARACTS | | | |
| | History Paternal- DM HTN GLAUCOMA CATARACTS | | | |

| VA (NO Rx) | DIST R 20/ 50 | L 40 | NEAR R 20/ | L 20/ | VA (With Rx) | DIST R 20/ | L 20/ | NEAR R 20/ | L 20/ |
|---|---|---|---|---|---|---|---|---|---|
| R.D. | | | MONO N ISH | | NOSE | | | VERSIONS A | |
| S.F. # Axis | | | C.V. 320 B? / | NPA | | CM | | | |
| C.T. C/S Rx SM | 10 LXT | ESO | 40 cm | 10 LXT | ESO | | |
| STATIC DRY R | -0.25 DS | | L | +0.75-0.75 x 085 | | |
| S.R. DRY | pl DS | 20/ 50 GR/RED | +0.50-0.75 x 085 | 20/ 50 | |
| STATIC WET R | | L | | |
| S.R. WET R | | 20/ | L | 20/ | |

| PHORIA SM LATERAL | EXO/ESO | VERTICAL | R/L HYPER | CONF/ FIELDS | R | |
|---|---|---|---|---|---|---|
| | V 20/ | | | | L | |
| ADD (+) | 20/ 50 PRA (+) | NRA(+) | PHORIA 40 CM V | | ESO/EXO MT PD | |
| | | | OTHER TESTS/HISTORY | | MONO PD OD OS | |
| MEDICAL HX HTN DM HYPERLIPIDEMIA | | | ALLERGIES: | | |

RECOMMENDATIONS FOR SPECIALTY SERVICES:

| DIAGNOSIS | | MEDICARE | |
|---|---|---|---|
| Refraction | | 1. | |
| Binocular Vision | | 2. | |
| Ocular Health H A | | 3. | |

PLAN:

PHARMACEUTICAL RECOMMENDATIONS:

① CHA - No reported improvement w/ glasses

② Oxygen deprivation - OCT taken, RNFL losses, Macular edema

* Recheck in 6mths, or earlier if needed

- check for better vision w/ time, and decrease in macular edema

| Institution: CHCF Housing Unit: | B7B-124 |
|---|---|

RECOMMENDED FOLLOW-UP DATES AND DIAGNOSIS:

| Provider (Print Name/Title): Dr. Tyler Kirk | SPH | CYL | AXIS | PRISM | ADB | BC |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |

| 1. Disability Code: | 2. Accommodation: | 3. Effective Communication: | CDC# V41134 |
|---|---|---|---|
| ☐ TABE score ≤ 4.0 | ☐ Additional time | ☐ P/I asked questions | |
| ☐ OPH ☐ OPV ☐ LD | ☐ Equipment ☐ SLI | ☐ P/I summed information | LAST NAME: Hodges |
| ☐ DPS ☐ DNH | ☐ Louder ☐ Slower | Please check one: | |
| ☐ DNS ☐ DOP | ☐ Basic ☐ Transcribe | ☐ Not reached ☐ Reached | FIRST NAME: James |
| ☐ Not Applicable | ☐ Other* | *See chrono/notes | DOB: 07/16/1984 |
| 4. Comments: 5.1 | | | |

* Auth (Verified) *

## OPTOMETRY EXAM
### BIOMICROSCOPY

| DATE | MAR 0 5 2019 | Right | | Left |
|---|---|---|---|---|

| | N | A | | | N | A |
|---|---|---|---|---|---|---|
| ADNEXA | N | A | | ADNEXA | N | A |
| UOS | N | A | | LASHES | N | A |
| LASHES | N | A | | CONJUNCTIVA | N | A |
| CONJUNCTIVA | N | A | | CORNEA | N | A |
| CORNEA | N | A | | IRIS | N | A |
| IRIS | N | A | | VITEOUS | N | A |
| VITEOUS | N | A | | LENS | | |
| LENS | | | | | | |

UNIT

x4    CORNEA

x4    CORNEA

MYOP    NEO    CYC    @ AM/PM    FUNDUSCOPY

OD                    OS

OCT shows RNFL
losses Inferior OU
+ macular edema OU

C/D O.2    D    ←  EI  →    C/D O.2    D
DISK COLOR N A    Trace pallor    DISK COLOR N A  Trace pallor
MACULA  N A    MACULA  N A
BV    BV
PER:    N A    PER    N A
4 DIR./C    4 DIR./C

TONOMETRY    @ TONO

GONIOPH    18
L AM/PM    17

3:10

Institution: CHCF    OPTOMETRY SPECIALTY CLINIC

Provider (Print Name/Title): Dr. Tyler Kirk

Provider (Signature):

| 1. Disability Code: | 2. Accommodation: | 3. Effective Communication: |
|---|---|---|
| □ TABE score ≥ 4.0 | □ Additional time | □ P/I asked questions |
| □ DPH □ DPV □ LD | □ Equipment □ SLI | □ P/I summed information |
| □ DPS □ DNH | □ Louder □ Slower | Please check one: |
| □ DNS □ DDP | □ Basic □ Transcribe | □ Not reached* □ Reached |
| □ Not Applicable | □ Other* | *See chrono/notes |

4. Comments:

CDC# V41134
LAST NAME: Hodges
FIRST NAME: James
DOB: 7/16/84

### INTERDISCIPLINARY PROGRESS NOTES

CDC 7230 (Rev. 04/03)
STATE OF CALIFORNIA    DEPARTMENT OF CORRECTIONS

STATE OF CALIFORNIA
INTERDISCIPLINARY PROGRESS NOTES
CDCR 7230 (REV. 02/13)

DEPARTMENT OF CORRECTIONS AND REHABILITATION

Page 1 of 1

| DATE mm/dd/yy | TIME hh:mm AM/PM | Onsite Optometry: |
|---|---|---|
| JUN 27 2019 | 10:45 | 3 mth F/U - Oxygen Deprivation from suicide attempt in 9/2018. Vision needs improvement. BCVA at last visit 20/50 OU |
| | | Subj.   - 0.50 DS          20/30+ |
| | | Refr    + 0.50 - 1.00 x 088   20/30 |
| | |           Add: none        PD: 63 |
| | | OCT taken |
| | | OU: Macular edema mild, improvement in last 3 mths. |
| | | [signature] |
| | | Glasses ordered: (Y) N |
| | | Frame Choice: NTc-1  Black 49-17-135 |

| Institution CHCF | Housing Unit B10A |
|---|---|

| 1. Disability Code: | 2. Accommodation: | 3. Effective Communication: | |
|---|---|---|---|
| ☐ TABE score ≤ 4.0 | · ☐ Additional time | ☐ P/I asked questions | CDCR#: V41134 |
| ☐ DPH ☐ DPV ☐ LD | ☐ Equipment ☐ SLI | ☐ P/I summed information | Last Name: Hodges |
| ☐ DPS ☐ DNH | · ☐ Louder ☐ Slower | Please check one: | First Name: James   MI: |
| ☐ DNS ☐ DDP | · ☐ Basic ☐ Transcribe | ☐ Not reached* ☐ Reached | DOB: 7/16/1984 |
| ☒ N/A Applicable | ☐ Other | *See chrono/notes | |
| 4. Comments: | S-1 | | |

* Auth (Verified) *

| (PATIENT'S NAME) LAST | FIRST | MI |
|---|---|---|
| | Hodges, James | |

PLEASE TYPE OR WRITE LEGIBLY
THIS Rx IS FABRICATED TO MEET THE REQUIREMENTS OF
AMERICAN NATIONAL STANDARD Z.80.1-1972
AMERICAN STANDARD Z.87. Z-2003
PLEASE FILL IN ALL SHADED AREAS IF APPLICABLE

Dept. Contact Phone

Contact Person

| Control# | Tray # | Account # | Arrival Date |
|---|---|---|---|
| 0975659 | | A454 | |

## CHECK APPROPRIATE LENS STYLE AND CIRCLE SEGMENT WIDTH

| SINGLE VISION | BIFOCALS | | | TRIFOCALS | |
|---|---|---|---|---|---|
| ☒ | ☐ Flat Top 28 35 CR-39 ONLY | ☐ Progressive | | ☐ Flat Top 7 X 28 | |

|  | SPHERE | CYLINDER | AXIS | DIST | PD NEAR | PRISM | BASE |
|---|---|---|---|---|---|---|---|
| DIST R | - 0.50 | DS | | 63 | | In___ Out___ | Up___ Down___ |
| DIST L | + 0.50 | - 1.00 | 058 | | | In___ Out___ | Up___ Down___ |
| NEAR R | ADD | SEG HEIGHT | | | | | |
| NEAR L | | | | | | | |

*"Contact PIA Customer Service for information on any special order requests"*
*Phone (707) 454-3445, or Fax (707) 454-3214*

| CR-39 (PLASTIC) | POLYCARBONATE | HIGH INDEX | LENS COLOR | LENS COATING |
|---|---|---|---|---|
| CLEAR ☒ | CLEAR | CLEAR ☐ | PINK ①②③ | UV 400 ☐ |
| TRANSITIONS ☐ | TRANSITIONS | OTHER ☐ | GREY ①②③ GREEN ①②③ | SCRATCH COAT ☐ ANTI-REFLECT ☐ COAT |
| | OTHER ☐ | | OTHER ☐ | |

| EYE SIZE | BRIDGE SIZE | TEMPLES | FRAME STYLE | FRAME COLOR | FRAME ENCLOSED |
|---|---|---|---|---|---|
| 49 | 17 | 135 | Black | NH-1 | ☐ YES ☒ NO |

SPECIAL INSTRUCTIONS:

| PURCHASE ORDER NUMBER | PATIENT IDENTIFICATION NUMBER / CDC # |
|---|---|
| 4300007454 | V41134 |

*PLEASE NOTE: State Law requires that this prescription be signed by a professionally trained and registered person.
(Ophthalmologist, Optometrist or Registered Dispenser.)

| PROFESSIONAL SIGNATURE* | DATE | PHONE |
|---|---|---|
| Tat: K.F | 6/22/19 | |

SHIP TO (No PO Box):

A454

B6A

CALPIA
Quality Products • Changed Lives • A Safer California
(707) 454-3445
FAX (707) 454-3214

REVISED 7/04          AGENCY COPY

exhibit — I

Doctor exam

Progress Note
Report *

# * Final Report *



### Chief Complaint ~ss
Headache ........ for headache. Patient reported to been having headaches
............ ust year after he committed suicide by hanging. He was
### History o ....
Patient .... migraine headache. It started in the center of the head. It started
.... uild up . Sometime it is associated with blurred vision. It is worse
sind movement . He described the headache as throbbing. He has been
...... ,enol without help. He would like to try something else for the headache .
.... ies any fever chills or any neck pain any lateral weakness. CT of the head
.... neck done on September 7/2018 was unremarkable. He has no neck pain at
.... is point he denies any recent trauma

## Review of Systems
Reviewed and are negative except for the above

## Physical Exam

### Vitals & Measurements
**RR:** 18
IN GENERAL: Patient is pleasant appeared to be healthy, in no distress
SKIN: No rash, capillary refill less than 2 seconds
HEENT: Pupils are equal, round reactive to light and accommodation,
normocephalic atraumatic,polyps, no thrush, tympanic membranes intact, no
drainage
NECK: No JVD, no thyroid mass palpable, no bruit
HEART: Regular rate and rhythm, S1 82 normal, no rubs, no murmur, no gallops
CHEST WALL: Nontender to palpation, no rash
LUNGS: Good air exchange, no wheezes no rales, no sensory muscle use, breath
sounds equal
ABDOMEN: Bowel sound present for quadrant, soft nontender to palpation, no
organomegaly,
EXTREMITY:No calf tenderness, peripheral pulses are within normal limits, moving
all extremities
BACK: No focal point tenderness to palpation
NEUROLOGIC EXAM: The patient is alert awake oriented ×3, cranial nerves II
through XII grossly intact, deep tendon reflexes are within normal limits, sensory
are intact, motor strength are within normal limits

## Assessment/Plan
Headache

## Problem List/Past Medical History
Ongoing
   Borderline personality disorder
   Exhibitionist behavior
   Homicidal ideation
   Noncompliance
   Post traumatic stress disorder
   Schizoaffective disorder without good
   prognostic features
Historical
   No qualifying data

## Procedure/Surgical History
CT Neck/Thoracic/Abdomen/Head
(09/06/2018), MRI C spine (09/05/2018),
ORIF R ankle (01/01/2009).

## Medications
### Active Medications:
SUMAtriptan 50 mg Oral q2hr NA PRN:
migraine headache
acetaminophen 650 mg Oral TID NA
PRN: pain
benztropine 0.5 mg Oral q8hr DOT PRN:
extrapyramidal symptoms
chlorproMAZINE 50 mg Oral q6hr NA
PRN: agitation
chlorproMAZINE 75 mg Oral Daily DOT
chlorproMAZINE 75 mg Oral qPM DOT
chlorproMAZINE 50 mg Intramuscular
BIDAM+PM DOT PRN: refusal of oral
meds
diphenhydrAMINE 75 mg Oral q8hr [
PRN: agitation
mirtazapine 45 mg Oral qPM DOT
valproic acid 1,000 mg Oral BIDAM
DOT

## Allergies
No Known Medication Allergies

## Social History
Alcohol



Result type:        Inpatient Progress Note
Result date:        January 24, 2019 12:41 PST
Result status:      Auth (Verified)
Result title:       Office Visit Note
Performed by:       Nguyen, Huu P&S on January 24, 2019 12:50 PST
Verified by:        Nguyen, Huu P&S on January 24, 2019 13:17 PST

Printed by: LaBerge, Vicky HRT l
Printed on: 4/12/2019 9:29 PDT



* Final Report *

Likely due migraine headache. Will try the Imitrex and assess his response. Naprosyn will be also added to his medication. He is is encouraged to take the Naprosyn once the headache comes. Follow-up if the headache is worse or not improving
Diagnosis, treatment plan, benefits and risks of treatment plan and medications discussed with patient in detail, who voiced good understanding of his medical conditions .All his questions were answered to his satisfaction and agreed to proceed with care plan.
Effective communication : N/A

Ordered: SUMAtriptan, 50 mg, Oral, Tab, q2hr, PRN migraine headache, Administration Type NA, Order Duration: 30 day, First Dose: 01/24/19 9:56:00 PST, Stop Date: 02/23/19 9:55:00 PST

Former, Liquor, Daily, Withdrawal Symptoms Present No. Started age 16 Years. Stopped age 32 Years. Previous treatment: None. Alcohol use interferes with work or home: Yes. Drinks more than intended: Yes. Others hurt by drinking: Yes. Ready to change: Yes.

Employment/School

Previous employment/school: Remains valid: 11th grade. Hx of special education and juvenile hall for vandalism and attempted carjacking.. Highest education level: Some High School. Behavioal Problems in School Yes. Work History Reported. Income Source Work. Workplace hazards: In Home Support Services. Part time, Employment/School description: Remains valid: Work hx indicated as a fork life operator.

Home/Environment

Raised by grandparents and aunts Lives with:. Alcohol abuse in household: Yes. Substance abuse in household: Yes. Injuries/Abuse/Neglect in household: Yes. Type of injury/abuse: Physical and Sexual. Have you ever been emotionally abused: Yes. Have you ever been physically abused: Yes.

Substance Abuse

Former, Cocaine, Ecstasy, Marijuana, Methamphetamines, Daily, Withdrawal Symptoms Present No. Previous treatment: None. Started age 9 Years. IV drug use: No. Drug use interferes with work/home: Yes. Ready to change: Yes.

Tobacco

Former, .5 per day. Started age 15 Years. Stopped age 22 Years. Previous treatment: None.

**Family History**

Diabetes mellitus: Mother.

Result type: Inpatient Progress Note
Result date: January 24, 2019 12:41 PST
Result status: Auth (Verified)
Result title: Office Visit Note
Performed by: Nguyen, Huu P&S on January 24, 2019 12:50 PST
Verified by: Nguyen, Huu P&S on January 24, 2019 13:17 PST

**Signature Line**
Electronically Signed on 01/24/2019 01:17 PM PST

_____

Nguyen, Huu P&S, P&S

Modified by: Nguyen, Huu P&S, P&S on 01/24/2019 01:17 PM PST

**Completed Action List:**
* Perform by Nguyen, Huu P&S on January 24, 2019 12:50 PST
* Modify by Nguyen, Huu P&S on January 24, 2019 13:17 PST
* Sign by Nguyen, Huu P&S on January 24, 2019 13:17 PST Requested by Nguyen, Huu P&S on January 24, 2019 12:50 PST
* VERIFY by Nguyen, Huu P&S on January 24, 2019 13:17 PST

Result type:     Inpatient Progress Note
Result date:     January 24, 2019 12:41 PST
Result status:   Auth (Verified)
Result title:    Office Visit Note
Performed by:    Nguyen, Huu P&S on January 24, 2019 12:50 PST
Verified by:     Nguyen, Huu P&S on January 24, 2019 13:17 PST

XEhibit - J

Suicide Risk and Self-harn Evaluation
the PSYchologist I told I was Suicidal

Suicide Risk and Self-Harm Evaluation Entered On: 9/5/2018 14:18 PDT
Performed On: 9/5/2018 13:46 PDT by Costa, Joseph Psychologist

Reason for Assessment
*Reason for Assessment: :* The IP was found making a noose in his cell to hang himself with. The IP was alert, oriented X4, agitated, emotionally unstable, depressed, feelings of worthlessness, anxious, and labile affect. He describe SI (of hanging himself) and HI (with no intended victim), frustration (feeling he is not getting treatment that is working). He also reported ISAPATHWARM immediate indications of dangerous SI: Suicidal Ideation, purposelessness, anxiety, feeling trapped, feeling hopeless, feeling abandoned by his family, agitation, and recklessness (making a noose to end his suffering when he has a parole date in a few years).

The IP had a hard time focusing on SATSEH questions, thus the assessment was partially based on documentation form recent SRASHE's.

*Sources of information :* I/P Interview, Other: File review

Costa, Joseph Psychologist - 9/5/2018 13:46 PDT

C-SSRS Suicidal Ideation
*1a. Have you wished you were dead or wished you could go to sleep and not wake up in the past month? (ref) :*  Yes
*If yes, describe: :*  Pt. denies current, but refers interviewer to pre-admission statements.

04/17/18: Pt. refused to answer direct questions. Stated he was "going to end it this time, I'll just cut my neck and bleed out instead of the wrists."
*CSSRS Wish to be Dead 2 :*  Yes
*2a. Have you actually had any thoughts of killing yourself in the past month? (ref) :*  Yes
*If yes, describe: :*  4/17/18:Pt. stated he would cut his neck and "bleed out this time"
Pt had acute onset of SI and cut on his left forearm on 3/7/18 with ongoing SI
Previous report: pt cut his left forearm with a piece of metal from a legal folder on 12/21/17.
*CSSRS NonSpecific Active Suicide Thought 2 :*  Yes
*3a. Have you been thinking about how you might do this in the last month? (ref) :*  Yes
*CSSRS Suicidal Ideation w- Method Cmnt :*  IP wants to hang self and was making a noose.
*CSSRS Suicide Idea w- Method No Intent 2 :*  Yes
*4a. Have you had these thoughts and had some intention of acting on them in the past month? (ref) :*  Yes

| | |
|---|---|
| Result type: | Suicide Risk and Self-Harm Eval - Text |
| Result date: | September 05, 2018 13:46 PDT |
| Result status: | Auth (Verified) |
| Result title: | Suicide Risk and Self-Harm Evaluation |
| Performed by: | Costa, Joseph Psychologist on September 05, 2018 13:46 PDT |
| Verified by: | Costa, Joseph Psychologist on September 05, 2018 13:46 PDT |

*If yes, describe::* IP wants to hang self and was making a noose.
*CSSRS Active Suicide Idea Intent no Plan 2:* Yes
*5a. Have you started to work out or worked out the details of how to kill yourself in the past month? Do you intend to carry out this plan? (ref):* Yes
*If yes, describe::* IP wants to hang self and was making a noose.
*CSSRS Suicidal Ideation Intent w-Plan 2:* Yes
*SRASHE Calculation:* 15

Costa, Joseph Psychologist - 9/5/2018 13:46 PDT

C-SSRS Intensity of Ideation
*Intensity of Most Severe Lifetime Ideation:* 5
*Description of Most Severe Lifetime Ideation:* IP wants to hang self and was making a noose.
*Intensity of Most Severe Recent Ideation:* 5
*Description of Most Severe Recent Ideation:* IP wants to hang self and was making a noose.
*How many times have you had these thoughts?:* Many times each day
*When you have the thoughts how long do they last?:* More than eight hours, persistent or continuous
*CSSRS Controllability of Suicidal Thoughts:* Does not attempt to control thoughts
*Are there things, anyone or anything (e.g., family, religion, pain of death) that stopped you from wanting to die or acting on thoughts of committing suicide?:* Deterrents definitely did not stop you
*What sort of reasons did you have for thinking about wanting to die or killing yourself? Was it to end the pain or stop the way you were feeling (in other words you couldn't:* Completely end pain, can't go on living w-pain or feelings

Costa, Joseph Psychologist - 9/5/2018 13:46 PDT

C-SSRS Intensity of Ideation Score
*CSSRS Intensity of Ideation Total Score:* 25

Costa, Joseph Psychologist - 9/5/2018 13:46 PDT

C-SSRS Suicidal Behavior
*1a. Actual Attempt in past 3 months (ref):* Yes
*Past Three Months Total Number Attempts:* 1
*If yes, describe::* Claims to have cut arm requirng sutures.
*CSSRS Actual Suicide Attempt 2:* Yes
*Lifetime Total Number of Attempts:* 6
*CSSRS Actual Suicide Attempt Comment 2:* IP would not discuss. Cut left forearm.
*2a. Has subject engaged in Self-harm without intent in past 3 months?:* Yes
*CSSRS Engaged Non Suicidal Injury 2:* Yes

Costa, Joseph Psychologist - 9/5/2018 13:46 PDT

Lethality and Medical Damage
*Actual Lethality, Most Recent Attempt Date:* 8?25/2018 cut left forearm
*Actual Lethality, Most Recent Attempt:* Moderate injury
*Preparation for most recent attempt:* Some preparation
*Actual Lethality, Most Lethal Attempt Date:* IP would not discuss
*Actual Lethality, Initial 1st Attempt Date:* IP would not discuss.

| | |
|---|---|
| Result type: | Suicide Risk and Self-Harm Eval - Text |
| Result date: | September 05, 2018 13:46 PDT |
| Result status: | Auth (Verified) |
| Result title: | Suicide Risk and Self-Harm Evaluation |
| Performed by: | Costa, Joseph Psychologist on September 05, 2018 13:46 PDT |
| Verified by: | Costa, Joseph Psychologist on September 05, 2018 13:46 PDT |

Costa, Joseph Psychologist - 9/5/2018 13:46 PDT

## Suicide and Self-Harm Summary
*Suicide and Self-Harm History :* Yes

*Suicide and Self-Harm History Narrative :* 06.18.2018, T. Taylor, Psy.D: During the present interview, he reported first attempting suicide in 1999 via an overdose on pills. He stated he was admitted to the emergency room, had his stomach pumped, and was given charcole. Mr. Hodges reported having been admitted to a psychiatric hospital for a 72 hour hold. He stated his second attempt was due to using ecstasy during a party, "tripping out," and attempting to hang himself in the bathroom. Mr. Hodges reported his third suicide attempt occured in 2008 following his mothers death and was via a hanging attempt. He stated attempting suicide for the fourth time in 2011, via an overdose, cutting himself in 2014, and his most recent suicide attempt was reported to be in March, 2018 (via cutting).

Review of the information below indicates several inconsistencies within the provide dates and reported means of suicide attempts. As such, Mr. Hodges does not appear to be a reliable historian.

03/18/18: Patient cut on himself on 3/7/18 with a razor with intention to die with two cuts to his left forearm requiring five and six stitches, respectively. While in MHCB patient has not engaged in SIB other than trying to remove stitches (would was starting to heal). Patient has recently gassed his 1:1 and has remained on 1:1 due to threats of hurting himself and staff members. There is significant trauma, psychosis and grief that this patient has been unable to deal with, as well as abandonment, anger issues, and PTST. He does meet the criteria for exhibitionism based on his history, and does not know how to regulate himself properly, therefore he acts out through frustration, anger and impulsivity. He wants help, but can only tolerate small intervals if intervention. He has been able to work with me somewhat, but when overstimulated he doesn't know how to regulate himself and needs long term structured interventions to address these needs. Patient was able to calm down after taking PRN and agreed to start new medications.

Suicide/Self-Harm History:

In 1999, specifics of attempt are unknown, but reported he tried to kill himself after he witnessed his friend being shot in the face twice and killed. Pt's mother died in Recently, IP cut on himself with the intention of dying, per self-report. Although, it should be noted that IP stated he wanted to get out of the housing unit (HCITC 64-bed). He cut on himself on 12/21/17 and again cut on hismelf 3/7/18 requiring stitches.

Hospitalizations:

IP stated that he was hospitalized at least three times. He noted that he was hospitalized in a San Bernardino Psychiatric Ward for SI/HI and 5150 at age 15. When he was 19, he was again hospitalized at Azusa Hospital for attempting suicide by OD, per self-report. He also stated that he was hospitalized in LA at one point in his life, but he could not recall the reason and location of his stay. It is clear that, based on the data below, IP is inconsistent with his self-reported self-harm behaviors and SA's.

---Previous Data---
Mr. Hodges has multiple attempts. In 1999 he attempted suicide the first time (unknown method) and participated in mental health treatment in the community. After his initial attempt, records indicate he attempted suicide again in 2009 by OD after

| | |
|---|---|
| Result type: | Suicide Risk and Self-Harm Eval - Text |
| Result date: | September 05, 2018 13:46 PDT |
| Result status: | Auth (Verified) |
| Result title: | Suicide Risk and Self-Harm Evaluation |
| Performed by: | Costa, Joseph Psychologist on September 05, 2018 13:46 PDT |
| Verified by: | Costa, Joseph Psychologist on September 05, 2018 13:46 PDT |

his mother's death. His third attempt occurred in 2010 via OD. On 9/28/2014 he had a potentially highly lethal attempt after losing family contact from being in the PSU and segregation. He cut himself with a blade removed from a pencil sharpener, and required two blood transfusions following the attempt. Most recently, on 12/21/17, pt cut his left forearm with a metal piece from a legal envelope requiring stitches.

Costa, Joseph Psychologist - 9/5/2018 13:46 PDT

Suicide History Grid

| | Suicide Attempt #1 | Suicide Attempt #2 | Suicide Attempt #3 | Suicide Attempt #4 |
|---|---|---|---|---|
| Suicide Attempt Date : | 1/1/1999 PST | 1/1/2009 PST | 1/1/2010 PST | 9/28/2014 PDT |
| Intent to Die : | Yes | Yes | Yes | Yes |
| Suicide Method : | | Pills/Overdose | Pills/Overdose | Cut wrist |
| Lethal Method? : | | | | Yes - if the inmate had not been discovered he/she would have died |
| Medical Severity (1-4) : | | | | 4 - Severe, requiring intensive medical/surgical management; Hospitalization required |
| Mental Health Follow-Up : | | | | Yes |
| Source : | | | | |
| | Costa, Joseph Psychologist - 9/5/2018 13:46 PDT | Costa, Joseph Psychologist - 9/5/2018 13:46 PDT | Costa, Joseph Psychologist - 9/5/2018 13:46 PDT | Costa, Joseph Psychologist - 9/5/2018 13:46 PDT |

| | Suicide Attempt #5 | Suicide Attempt #6 |
|---|---|---|
| Suicide Attempt Date : | 12/21/2017 PST | 3/7/2018 PST |
| Intent to Die : | Yes | |
| Suicide Method : | Cut wrist | Other: cut left forearm and wrist |

Result type:      Suicide Risk and Self-Harm Eval - Text
Result date:      September 05, 2018 13:46 PDT
Result status:    Auth (Verified)
Result title:     Suicide Risk and Self-Harm Evaluation
Performed by:     Costa, Joseph Psychologist on September 05, 2018 13:46 PDT
Verified by:      Costa, Joseph Psychologist on September 05, 2018 13:46 PDT

| Lethal Method? : | No | No |
|---|---|---|
| Medical Severity (1-4) : | 3 - Moderate, may be sutures or other skilled treatment | 3 - Moderate, may be sutures or other skilled treatment |
| Mental Health Follow-Up : | Yes | Yes |
| Source : | I/P, Medical Chart | |
| | Costa, Joseph Psychologist - 9/5/2018 13:46 PDT | Costa, Joseph Psychologist - 9/5/2018 13:46 PDT |

*inmate's self-harm behavior non-suicidal :*  Mr. Hodges reported that his most recent cutting (April 2018) was not the result of a suicide attempt, but that he was "tired."

*Significant anniversary dates :*  Mr. Hodges reported the following anniversary dates: July (birthdays: patient and sister) and Decemember (Sister completed suicide in December).  This report is consistent with previous information

Per previous SRASHE: Sister completed suicide on 12/30/2008 and he has reported December as a cue for increase in suicidality.

*Identified self-harm/suicidal triggers :*  Current stressors include his current legal case and concern about an increased prison sentence.

Per previous SRASHE: Segregration and isolation from family, thinking about parole and registering as a sex offender, poor coping skills when he does not feel his needs are immediately met.

*History of successful coping strategies :*  Mr. Hodges described the following coping skills: reading books, using DBT skills, and writing stories.

Per previous SRASHE: IP stated that he enjoys engaging in mindlessness activities to include deep breathing, positive self-talk, and that he is a good self-advocate for himself.

---Previous Data---
Religious beliefs (reads Bible); family support (brother); ambivalent about parole.

Costa, Joseph Psychologist - 9/5/2018 13:46 PDT

Chronic Risk Factors


Result type:          Suicide Risk and Self-Harm Eval - Text
Result date:          September 05, 2018 13:46 PDT
Result status:        Auth (Verified)
Result title:         Suicide Risk and Self-Harm Evaluation
Performed by:         Costa, Joseph Psychologist on September 05, 2018 13:46 PDT
Verified by:          Costa, Joseph Psychologist on September 05, 2018 13:46 PDT

*Family history of suicide(s) :* Yes
*History of psychiatric disorder :* Yes
*History of abuse :* Yes
*History of substance abuse :* Yes
*History of violence (including index crime) :* Yes
*Chronic medical illness :* No
*Chronic pain problem :* No
*First prison term :* No
*Sex offender :* Yes
*Long or life sentence :* No
*Caucasian/White ethnicity :* No
*Older than 35 years of age :* No
*Male :* Yes

Costa, Joseph Psychologist - 9/5/2018 13:46 PDT

Acute Risk Factors
*Suicidal Ideation MH :* Yes
*Recent suicide attempt :* Yes
*Current/recent depressive symptoms :* Yes
*Current/recent psychotic symptoms :* Yes
*Current/recent anxiety or panic symptoms :* Yes
*Current/recent subst abuse/intoxication :* No
*Agitated or angry :* Yes
*Disturbance of mood/lability :* Yes
*Current/recent violent behavior :* Yes
*Perception of loss of social support :* Yes
*Increasing interpersonal isolation :* Yes
*Hopelessness/helplessness :* Yes
*Recent serious medical diagnosis :* No
*pain problems :* No
*Medication hoarding/cheeking :* No
*Recent trauma (including sexual trauma) :* No
*Recent bad news :* Yes
*Anniversary date :* Yes
*Recent negative staff interactions :* Yes
*Recent disciplinary ("115") :* Yes
*Single cell placement :* Yes
*Negative housing change in housing :* Yes
*Safety concerns (e.g., gang dropout) :* Yes
*Early in prison term :* No

Costa, Joseph Psychologist - 9/5/2018 13:46 PDT

| Result type: | Suicide Risk and Self-Harm Eval - Text |
|---|---|
| Result date: | September 05, 2018 13:46 PDT |
| Result status: | Auth (Verified) |
| Result title: | Suicide Risk and Self-Harm Evaluation |
| Performed by: | Costa, Joseph Psychologist on September 05, 2018 13:46 PDT |
| Verified by: | Costa, Joseph Psychologist on September 05, 2018 13:46 PDT |

Protective Factors / Buffers
*Family support:* Yes
*Religious/spiritual/cultural beliefs :* Yes
*Interpersonal social support:* No
*Future orientation/plans for future :* Yes
*Exercises regularly :* No
*Positive coping/conflict resolution :* Yes
*Children at home :* No
*Spousal support:* No
*Insight into problems :* Yes
*Job or school assignment:* No
*Active and motivated in psych treatment:* Yes
*Sense of optimism; self-efficacy :* Yes

Costa, Joseph Psychologist - 9/5/2018 13:46 PDT

Additional Information and Warning Signs

*Additional Information :* IP HODGES V41134 is a 34 year-old African-American male with a history of Schizoaffective Disorder; Borderline Personality Disorder; and Posttraumatic Stress Disorder. His charges include Possession of a Firearm by an Ex-Felon X 2; Vandalism; Brandishing Weapon in the presence of a Peace Officer; Burglary 1st; and Indecent Exposure X 2. He has a current out date of 11/01/2021. He is designated NCF with a 5.1 TABE score. He has 285 points and is a Level IV IP.

IP was admitted to the crisis bed at CSP-SAC on 08/26/2018 due to danger to self after he lacerated his left forearm that required 19 stitches. A Psychiatric Initial Assessment dated 8/27/2018 reported in part that IP was" was fed up with being in prison, and not getting the right kind of help etc. Apparently he was written up recently for IEX." This was his third crisis bed admission in the past six months, all due to DTS (3/8/2018, 4/17/2018, and 08/26/2018). IP was at CMF ICF from 6/1/2018 to 6/28/2018. A Master Treatment Plan dated 7/12/2018 states in part, "Mr. Hodges has just returned from ICF LOC, and appeared to have worsened. He was discharged from the ICF LOC because of his Max Custody designation, and not due to clinical improvement. The ICF treatment team noted he would receive better treatment access back in Ad-Seg at the EOP LOC than was currently available in ICF LOC. This IDTT has no reason to believe a referral to the ICF LOC at this time would be beneficial to Mr. Hodges. IDTT is of the opinion a referral to the ICF LOC at this time would result in greater isolation, less treatment programing, and less out of cell activities for Mr. Hodges. IDTT still believes Mr. Hodges could benefit from the ICF LOC programming available to those not deemed Max Custody. Once greater treatment programming is available for those with Max custody status, or Mr. Hodges is no longer designated Max Custody, this IDTT will reconsider a referral to the ICF LOC based on Mr. Hodges level of functioning at that time." On 8/27/2018 Use of Force was employed after IP engaged in a Battery on an Officer.

While in CTC IP has not engaged in any self-injurious behaviors, has not incurred any more RVRs after 8/27/2018, and has denied SI and HI since 8/29/2018, but he continues to report AH ("do bad things"), VH ("small green people"), and depression 10/10. Although he has reported significant depression his presentation and behaviors have not been congruent with his self-assessment. He has been actively engaged in treatment, often coming out to talk to mental health staff, and has utilized letter writing and reading as effective coping strategies. Adjustments have been made to his medications and IP is much calmer with no apparent agitation or distress. Last week he was pessimistic about

| Result type: | Suicide Risk and Self-Harm Eval - Text |
| --- | --- |
| Result date: | September 05, 2018 13:46 PDT |
| Result status: | Auth (Verified) |
| Result title: | Suicide Risk and Self-Harm Evaluation |
| Performed by: | Costa, Joseph Psychologist on September 05, 2018 13:46 PDT |
| Verified by: | Costa, Joseph Psychologist on September 05, 2018 13:46 PDT |

programming on the block; today, he was much more optimistic and looked forward to being discharged. He expressed no concerns about being discharged to SAC-PSU. When asked about possible thoughts of hurting himself or others he stated that he did not have any current urges and will try to use historically successful coping strategies such as writing, reading, positive self-talk, deep breathing, and listening to music. He was encouraged to request core groups (Anger Management, DBT Skills, Conflict Resolution) when he gets to PSU. IP alert, cooperative, calm, and Ox4. Mood stable with restricted affect. Speech regular rate and rhythm. Good eye contact. Thought content focused on returning to the block and utilizing his coping skills to manage distress. Thought process linear and goal-directed. Denied SI/HI, but reported manageable AH, VH, and depression. No overt hallucinations or other psychotic symptoms. No significant distress or agitation is noted, and there are no signs of acute anxiety disorder/major depression. Appropriate hygiene and grooming. Cell neat and clean. ADLs ok, eating and sleeping ok per nursing reports, yet IP stated he is only sleeping four hours each night. Insight/Judgment fair. IP is future oriented and goal directed. 2nd watch nurse J. Elias and 2nd watch officer A. Marshall report no issues with IP. Higher level of care not indicated at this time. Treatment team in agreement to discharge IP today.

A full evaluation is not possible due to IP's refusal to engage in a confidential 1:1 session today. Much of the information for this SRASHE is gathered from previous SRASHEs.
There are no IS PATH WARM imminent warning signs of suicide.

Mr. Hodges appeared at this meeting cleanly dressed, well groomed, and hygienic. He was alert and oriented and participated openly and cooperatively with this assessment. He admitted some frustration pertaining to his recent PIP placement ("it's a bunch of bullshit, they said they discharged me because of my max custody") and continues to feel untreated for his self-perceived exhibitionistic impulses. But, he was not at all irate or acutely angry. His speech was clear and his thought process rational and linear. His thought content revolved around prosocial aspirations and often reiterated his commitment to "stop fucking up." This appeared somewhat shallow but also meaningful, as it demonstrated his capacity to express dissatisfaction with the system around him while also committing to engaging appropriately in processes wherein he can contest and protest his concerns.

Costa, Joseph Psychologist - 9/5/2018 13:46 PDT

Risk Levels and Justification
*CHRONIC RISK:* High
*ACUTE RISK:* High
*Justification of Risk Level :*  CHRONIC RISK: The IP is estimated to be a high chronic risk due to having 6 past suicide attempts and many SI and SIB incidents. The IP has chronic issues with psychosis, depression, anxiety, family history of suicide, history of emotional, physical, or sexual abuse, history of polysubstance use, history of violence, poor impulse control, and being a sex offender.


--Previous Data from Recent SRASHE dated 9-4-18 by E. Koch, Psychologist---

IP has had two documented self-harm incidents while incarcerated:


| Result type: | Suicide Risk and Self-Harm Eval - Text |
| --- | --- |
| Result date: | September 05, 2018 13:46 PDT |
| Result status: | Auth (Verified) |
| Result title: | Suicide Risk and Self-Harm Evaluation |
| Performed by: | Costa, Joseph Psychologist on September 05, 2018 13:46 PDT |
| Verified by: | Costa, Joseph Psychologist on September 05, 2018 13:46 PDT |

3/7/2018
Injury Severity: Moderate
Intent to die: Yes
Method: Laceration
Lethal Method: No

08/25/2018
Injury Severity: Moderate
Intent to die: Unknown
Method: Laceration
Lethal Method: Yes

IP has had four out to hospital green lines in documents reviewed:

9/29/2014---IP cut his left antecubital fossa.
10/16/2018---Thyroid imaging
3/7/2018---IP lacerated his right wrist
8/25/2018---IP lacerated his left forearm

A SRASHE dated 6/29/2018 states in part IP "reported first attempting suicide in 1999 via an overdose of pills. He stated he was admitted to the emergency room, had his stomach pumped, and was given charcoal. Mr. Hodges reported having been admitted to a psychiatric hospital for a 72 hour hold. He stated his second attempt was due to using ecstasy during a party, "tripping out," and attempting to hang himself in the bathroom. Mr. Hodges reported his third suicide attempt occurred in 2008 following his mother's death and was via a hanging attempt. He stated attempting suicide for the fourth time in 2011, via an overdose, cutting himself in 2014, and his most recent suicide attempt was reported to be in March, 2018 (via cutting).

Review of the information below indicates several inconsistencies within the provide dates and reported means of suicide attempts. As such, Mr. Hodges does not appear to be a reliable historian.

03/18/18: Patient cut on himself on 3/7/18 with a razor with intention to die with two cuts to his left forearm requiring five and six stitches, respectively. While in MHCB patient has not engaged in SIB other than trying to remove stitches (would was starting to heal). Patient has recently gassed his 1:1 and has remained on 1:1 due to threats of hurting himself and staff members. There is significant trauma, psychosis and grief that this patient has been unable to deal with, as well as abandonment, anger issues, and PTST. He does meet the criteria for exhibitionism based on his history, and does not know how to regulate himself properly, therefore he acts out through frustration, anger and impulsivity. He wants help, but can only tolerate small intervals if intervention. He has been able to work with me somewhat, but when overstimulated he doesn't know how to regulate himself and needs long term structured interventions to address these needs. Patient was able to calm down after taking PRN and agreed to start new medications.

Suicide/Self-Harm History:

In 1999, specifics of attempt are unknown, but reported he tried to kill himself after he witnessed his friend being shot in the

| Result type: | Suicide Risk and Self-Harm Eval - Text |
| Result date: | September 05, 2018 13:46 PDT |
| Result status: | Auth (Verified) |
| Result title: | Suicide Risk and Self-Harm Evaluation |
| Performed by: | Costa, Joseph Psychologist on September 05, 2018 13:46 PDT |
| Verified by: | Costa, Joseph Psychologist on September 05, 2018 13:46 PDT |

face twice and killed. Pt's mother died in Recently, IP cut on himself with the intention of dying, per self-report. Although, it should be noted that IP stated he wanted to get out of the housing unit (HCITC 64-bed). He cut on himself on 12/21/17 and again cut on himself 3/7/18 requiring stitches.

Hospitalizations:

IP stated that he was hospitalized at least three times. He noted that he was hospitalized in a San Bernardino Psychiatric Ward for SI/HI and 5150 at age 15. When he was 19, he was again hospitalized at Azusa Hospital for attempting suicide by OD, per self-report. He also stated that he was hospitalized in LA at one point in his life, but he could not recall the reason and location of his stay. It is clear that, based on the data below, IP is inconsistent with his self-reported self-harm behaviors and SA's.

Mr. Hodges has multiple attempts. In 1999 he attempted suicide the first time (unknown method) and participated in mental health treatment in the community. After his initial attempt, records indicate he attempted suicide again in 2009 by OD after his mother's death. His third attempt occurred in 2010 via OD. On 9/28/2014 he had a potentially highly lethal attempt after losing family contact from being in the PSU and segregation. He cut himself with a blade removed from a pencil sharpener, and required two blood transfusions following the attempt. Most recently, on 12/21/17, pt cut his left forearm with a metal piece from a legal envelope requiring stitches."

ACUTE RISK:

Acute risk is estimated to be high at this time due to current SI & HI. His SI is with intention, plan, and preparation (to make a noose). He reports aversive AHs and VHs that he feels are difficult to cope with. The IP was found making a noose in his cell to hang himself with. The IP was alert, oriented X4, agitated, emotionally unstable, depressed, feelings of worthlessness, anxious, and labile affect. He describe SI (of hanging himself) and HI (with no intended victim), frustration (feeling he is not getting treatment that is working). He also reported ISAPATHWARM immediate indications of dangerous SI: Suicidal Ideation, purposelessness, anxiety, feeling trapped, feeling hopeless, feeling abandoned by his family, agitation, and recklessness (making a noose to end his suffering when he has a parole date in a few years).

Protective factors: family support, religious/spiritual/cultural beliefs, future orientation/plans for future, positive coping skills/conflict resolution skills, insight into problems, active and motivated in treatment, and a sense of optimism/self-efficacy. Protective factors appear not to be mitigating risk at this time.

Costa, Joseph Psychologist - 9/5/2018 13:46 PDT

Safety/ Treatment Plan
*Is this for a MHCB Discharge?:* No
*Safety/Treatment Plan:* The IP should be transferred to MHCB on sucide precautions.

Costa, Joseph Psychologist - 9/5/2018 13:46 PDT

| Result type: | Suicide Risk and Self-Harm Eval - Text |
|---|---|
| Result date: | September 05, 2018 13:46 PDT |
| Result status: | Auth (Verified) |
| Result title: | Suicide Risk and Self-Harm Evaluation |
| Performed by: | Costa, Joseph Psychologist on September 05, 2018 13:46 PDT |
| Verified by: | Costa, Joseph Psychologist on September 05, 2018 13:46 PDT |

**Completed Action List:**
* Perform by Costa, Joseph Psychologist on September 05, 2018 13:46 PDT
* Sign by Costa, Joseph Psychologist on September 05, 2018 13:46 PDT
* VERIFY by Costa, Joseph Psychologist on September 05, 2018 13:46 PDT

Result type:        Suicide Risk and Self-Harm Eval - Text
Result date:        September 05, 2018 13:46 PDT
Result status:      Auth (Verified)
Result title:       Suicide Risk and Self-Harm Evaluation
Performed by:       Costa, Joseph Psychologist on September 05, 2018 13:46 PDT
Verified by:        Costa, Joseph Psychologist on September 05, 2018 13:46 PDT

# Attention Clerk

I am Asking you to Accept exhibits because the seriousness of Complaint over the last 14 months correctional officers came in my Cell and took legal documents in the Attempt to Stop me from filing lawsuit. I had to hide documents in matress. I am not trying overwhelm the courts its Just I am scared for my safety and I know officers are going to retaliate Against me filing lawsuit.

# PROOF OF SERVICE BY MAIL
## [CCP §§ 1013(a), 2015.5]

STATE OF CALIFORNIA, COUNTY OF Sacramento

    I am a citizen of the County of Sacramento , State of California. I am a citizen of the United States of America. I am over the age of eighteen (18) and not a party to this action. I am a resident of the County of San Joaquin, CDCR# V4113.4

    My address is:

        California Health Care Facility

        P.O. Box 32110

        Stockton, Ca 95213

    On 5-3-2020, 20 I served via United States Mail a copy of the following document(s): 1983 civil complaint - and Exhibits

    The above-noted legal document(s) was placed in a sealed envelope, with postage thereon fully prepaid, addressed to the person at the address indicated below pursuant to California Code of Civil Procedure Section 1013. I placed the envelope or package in a mailbox or other like facility addressed to:

    I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. This document was executed on 5-3-20 , 20 in San Joaquin County, California.

James Hodges
Type or Print Name

Jmg Hodge
Signature